# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF NEW YORK, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Rhode Island

## EMERGENCY MOTION FOR STAY PENDING APPEAL

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

SARA MIRON BLOOM
  *Acting United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 616-5446*
  *brian.j.springer@usdoj.gov*

## INTRODUCTION

Although this case was originally about a single Office of Management and Budget (OMB) Memorandum that has been rescinded, plaintiffs have converted it into a broad programmatic attack on funding decisions made by twenty-three federal agencies. Currently at issue is a preliminary injunction that limits the degree to which federal agencies can follow Executive Orders and that casts a shadow over broad swaths of agency action the legality of which the district court did not even purport to consider. Given these serious implications, we respectfully request a stay pending appeal no later than Monday, March 24. The district court has denied a stay request, and plaintiffs oppose this motion.

Although the government disagrees with the district court's analysis of the now-rescinded OMB Memorandum, that is not the basis for this motion. It is instead the broad preliminary injunction, unmoored from any specific agency action, that poses the problem. In the guise of litigation under the Administrative Procedure Act (APA), the district court has enjoined almost two dozen federal agencies applying countless statutory schemes. The only unifying theme is that agencies are prohibited from carrying out policy directives issued by the President to pause funding, where consistent with law, if continued funding might conflict with the President's priorities. Such directives are plainly lawful, and the district court's interference with them poses grave separation-of-powers problems. A stay is warranted.

# STATEMENT

1. In the days after his inauguration, the President issued several Executive Orders setting forth his Administration's priorities and instructing agencies to pause funding to the extent permitted by law to allow time to review whether the funding aligns with those priorities. For example, Executive Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025), titled *Unleashing American Energy*, declares the policy of the United States to encourage certain "energy exploration and production," guarantee the accessibility of "an abundant supply of reliable energy," and ensure no federal funding is "employed in a manner contrary to the principles outlined in this section, unless required by law," *id.* § 2(a), (c), (g). The Executive Order further instructs agencies to "immediately pause the disbursement of funds" under two federal statutes to assess "consistency with the law and the policy outlined in" the Executive Order, *id.* § 7(a), but further provides that all implementation must be "in a manner consistent with applicable law," *id.* § 10(b).

On January 27, OMB issued a memorandum that called for agencies to review federal financial assistance programs "consistent with the President's policies and requirements." Dkt. No. 27-1, at 2. While that review was ongoing, agencies were to "temporarily pause all activities related to obligation or disbursement" of such financial assistance "and other relevant agency activities that may be implicated by [the President's] executive orders," including the American Energy Executive Order, "to the extent permissible under applicable law." *Id.* at 3 (emphasis omitted). OMB also

released guidance reiterating that the memorandum's pause applied only to funding implicated by the President's recent Executive Orders and that agencies should pause their funding activities only when doing so would be consistent with underlying law. *See* Dkt. No. 49-1, at 1-2.

Following a partial administrative stay of the OMB Memorandum in a different lawsuit, OMB rescinded the memorandum. Dkt. No. 43-1, at 1. That rescission did not affect the President's Executive Orders, which continue to direct agencies to carry out the President's policy directives, consistent with applicable law.

2. Plaintiffs—twenty-two states and the District of Columbia—initially challenged the OMB Memorandum on various grounds. Plaintiffs asserted claims not only against OMB but also against the President, eleven other agencies, and senior officials at those agencies. *See* Dkt. No. 1, at 8-12.

The district court granted a temporary restraining order against the OMB Memorandum, despite acknowledging that "some aspects of the pause" contemplated by the OMB Memorandum "might be legal and appropriate constitutionally for the Executive to take." Dkt. No. 50, at 4. The court directed that the government defendants "shall not pause, freeze, impede, block, cancel, or terminate [their] compliance with awards and obligations to provide federal financial assistance to the States" and "shall not impede the States' access to such awards and obligations, except on the basis of the applicable authorizing statutes, regulations, and terms." *Id.* at 11. The court also prohibited the government defendants "from reissuing, adopting,

implementing, or otherwise giving effect to the [OMB Memorandum] under any other name or title." *Id.* at 12.

The scope of the court's order was unclear and generated multiple disputes, chiefly relating to the degree to which agencies could continue to exercise their independent authority in a manner consistent with the President's policy directives. The district court eventually declared that its order "prohibit[ed] all categorical pauses or freezes in obligations or disbursements based on the OMB Directive or based on the President's 2025 Executive Orders." Dkt. No. 96, at 3. The court ordered the government to "immediately restore frozen funding" and indicated that the government could "request targeted relief" in specific instances of demonstrated compliance. *Id.* at 4-5.

The government appealed, and in their response to the government's stay motion, plaintiffs disclaimed that the government needed to seek preclearance with the district court to terminate funding in individual cases (despite the language in the court's order authorizing the government to seek targeted relief). Response to Motion for Administrative Stay 8-9, *New York v. Trump*, No. 25-1138 (1st Cir. Feb. 11, 2025). This Court denied an administrative stay without prejudice, stating that it expected that the district court would promptly "provide any clarification needed" regarding whether it was ordering the government to seek "prior approval of the district court" before defendant agencies could "exercis[e] their own lawful authorities to withhold funding." Dkt. No. 106, at 2. The district court then disclaimed that its order required

the government to obtain any such "preclearance" when acting pursuant to authority in "applicable statutory, regulatory, or grant terms," Dkt. No. 107, at 3 (emphasis omitted), and the government accordingly dismissed its appeal, *see* Dkt. No. 121.

Nonetheless, over the course of this litigation, plaintiffs have further expanded their lawsuit to more than double the number of agency defendants and to recast their case as a challenge to what they describe as an "indefinite pause on federal funds" that allegedly applies "across myriad federal funding programs" and "extend[s] to nearly all federal funding streams nationwide." Dkt. No. 114, at 3-4, 9-16. And plaintiffs more recently moved to enforce, questioning whether one agency defendant, the Federal Emergency Management Agency (FEMA), is noncompliant. *See* Dkt. No. 160.

3. The district court granted a preliminary injunction. After rejecting the government's threshold arguments, *see* Dkt. No. 161, at 15-24, the court concluded that "the challenged federal funding freeze," *id.* at 25, was both contrary to law and arbitrary and capricious. First, the court held that the funding freeze violated the Impoundment Control Act, 2 U.S.C. § 684. That statute allows the Executive Branch to "defer any budget authority provided for a specific purpose or project" only for certain reasons and only upon sending a "special message" to Congress detailing the deferral. *Id.* The court believed that the OMB Memorandum "constituted a budget authority deferral because it commanded—and prompted—an indefinite withholding

or delay of obligated funds" and that the deferral violated the statute because no "special message" was "ever communicated to Congress." Dkt. No. 161, at 27.

Second, the district court held that in some circumstances pausing federal funding could violate federal statutes because there are some "examples in which Congress has appropriated funds to federal programs and has strictly prescribed how those funds must be expended." Dkt. No. 161, at 28. The court cataloged five examples of such purportedly mandatory funding: a clean water program, a program for subsidizing heat pump systems purchases, a climate pollution reduction grant, federal highway funds, and grants for mental health and substance abuse treatment. *See id.* at 28-29. Because the court determined that, "in implementing the funding freeze" shortly after the OMB Memorandum was first issued in January, the government "withheld funding" under some such programs, *see id.* at 29, the court concluded that the pause itself was contrary to law.

Third, the district court held that "challenged federal funding freeze" was arbitrary and capricious because the government had "not provided a rational reason that the need to 'safeguard valuable taxpayer resources' is justified by such a sweeping pause of nearly all federal financial assistance with such short notice" and the government had not engaged in "thoughtful consideration of practical consequences." Dkt. No. 161, at 31-32. The court also emphasized that the OMB Memorandum provided agencies a "mere twenty-four hours" to "discern which of thousands of funding" streams "must or must not be paused." *Id.* at 32. And the

court further concluded that the freeze of any "funding streams that mandated expenditures based on fixed formulas" was "substantively unreasonable." *Id.* at 33.

On the equities, the district court concluded that the suspension of certain funding streams would irreparably harm the States, although the court emphasized that "while the States are the plaintiffs in this Court, it is their citizens" who "are enduring much of the harm." Dkt. No. 161, at 36; *see id.* at 34-42. On the other side of the balance, the court believed that the Executive Branch would not be "harmed" by an order "requir[ing] them to disburse funds that Congress has appropriated to the States and that they have obligated" because an "agency is not harmed by an order prohibiting it from violating the law." *Id.* at 42-43. The court also emphasized its belief that its preliminary injunction would "not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms" but would only "enjoin[] agency action that violates statutory appropriations and obligations." *Id.* (quotation omitted).

Thus, the district court entered a preliminary injunction. In relevant part, the injunction prohibits the defendants—which include twenty-three federal agencies— from "reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in" the OMB Memorandum "with respect to the disbursement and transmission of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations." Dkt. No. 161, at 44. And the injunction prohibits the defendants from "pausing, freezing,

blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations"—not only "based on" the OMB Memorandum but also based on any "funding freezes dictated, described, or implied by Executive Orders issued by the President," including but "by no means limited to" the American Energy Executive Order described above. *Id.* In addition, given plaintiffs' assertions that FEMA had continued to withhold funds in violation of the court's earlier order, the court ordered FEMA to "file a status report" regarding "the status of their compliance." *Id.* at 45. The district court denied the government's motion to stay its order pending appeal. *Id.*

## ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

### A.     The Government Is Likely to Prevail on the Merits

1. This case began as a challenge to an OMB Memorandum that instructed federal agencies to temporarily pause funding programs—"to the extent permissible under applicable law"—implicated by certain Executive Orders, pending review of those programs for consistency with the President's priorities. *See* Dkt. No. 161, at 9-10; *see also* Dkt. No. 27-1, at 3. That OMB Memorandum has since been rescinded. *See*

Dkt. No. 161, at 11. Thus, although we disagree with the district court's analysis of that Memorandum, the need for an immediate stay arises only because plaintiffs have successfully leveraged their challenge to that Memorandum into broad-based relief against innumerable funding decisions at twenty-three federal agencies.

Such relief is improper. In addition to the impermissibility of such broad-based APA challenges, discussed below, the preliminary injunction primarily operates to interfere with the President's authority to supervise federal agencies by providing policy direction in the exercise of each agency's authorities. In particular, the President issued a series of Executive Orders in which he articulated his policy views on several subjects and generally directed his subordinates in the Executive Branch to pause or terminate federal funding programs—to the extent consistent with applicable law—to ensure that those programs are consistent with the President's policy priorities. *See* Dkt. No. 161, at 9 (describing some of the relevant Executive Orders).

The relevant provisions of the President's Executive Orders are plainly lawful. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. CONST. art. II, § 1, cl. 1; *id.*, § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. To that end, the President has authority to exercise "'general administrative control of those executing the laws,' throughout the Executive Branch of government, of which he is

the head." *Building & Const. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)) (citation omitted).

There should therefore be no dispute that the President may issue policy guidance to federal agencies, including in the form of Executive Orders that direct agency officials in the performance of their duties. Nor can there be any dispute that the President may properly exercise this constitutional authority by directing subordinates generally to pause or terminate federal funding programs that do not accord with the President's policy priorities, to the extent they have authority to do so under governing law. And federal agencies often have broad discretion to determine how to implement funding programs, including to terminate grants or contracts based on policy preferences. *See, e.g.*, 2 C.F.R. § 200.340(a)(4) (authority to terminate award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"); *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad.").

Thus, because agencies may often terminate funding awards for policy-based reasons, so too may the President "control and supervise" agencies' decisions in this area. *Sierra Club v. Costle*, 657 F.2d 298, 406 (D.C. Cir. 1981). Nor are the President's directions to subordinates in this regard themselves reviewable under the APA. The President is not an "agency" within the meaning of the statute, and thus the President's actions "are not reviewable for abuse of discretion under the APA." *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

In short, the President has issued a series of Executive Orders—not directly subject to APA review—that simply direct federal agencies to pause or terminate federal funding programs that may not accord with the President's priorities where such action is consistent with applicable law. Those orders are plainly lawful, and the district court did not identify any meaningful defect in the President's directions to his subordinates.

2. Nonetheless, the district court has now entered a preliminary injunction that, among other things, broadly prohibits twenty-three federal agencies from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement" of certain funds to the plaintiff States "based on" any "funding freezes dictated, described, or implied by Executive Orders issued by the President." Dkt. No. 161, at 44.

In concluding that such an injunction was warranted, the district court did not meaningfully explain how the Executive Orders themselves violate any applicable law. Nor did the court dispute that some—or even many—federal funding programs may be suspended or terminated at the discretion of the relevant agency (and thus, in turn, subject to the directions of the President as head of the Executive Branch).

Instead, the district court primarily concluded that there were defects in the (now-rescinded) OMB Memorandum, which partially implemented the Executive Orders; in some possible applications of the Memorandum's directions; and in guidance that implemented the American Energy Executive Order. According to the

court, the Memorandum was not properly explained, Dkt. No. 161, at 31-33, and could be implemented in ways that would violate statutes governing specific programs, *id.* at 28-29. And the court faulted OMB's guidance regarding the American Energy Executive Order for not "even attempt[ing] to allow for agency discretion." *Id.* at 23. *But see* Dkt. No. 68-13 (guidance making clear that "[a]gency heads may disburse funds as they deem necessary after consulting with the Office of Management and Budget."). The court then leveraged these purported defects as a basis for not only enjoining implementation of the Memorandum or guidance but also as a basis for broadly enjoining implementation of the underlying Executive Orders across the whole range of federal funding programs.

Of course, the government disputes the district court's assessment of the Memorandum's legality. But an erroneous assessment of a now-rescinded Memorandum would not give rise to the need for an immediate stay, if the district court's order had been tailored to preventing the government from implementing that Memorandum. *Cf.* Order, *National Council of Nonprofits v. OMB*, No. 25-239, Dkt. No. 52 (D.D.C. Feb. 25, 2025) (erroneously enjoining OMB Memorandum but not issuing further order targeting federal funding more generally). The problem that cries out for immediate relief is that the district court entered a sweeping injunction that was not tethered to the supposed flaws in the OMB Memorandum, but instead broadly and unjustifiably prohibited actions based on other Executive Orders or directives.

The district court's determination that the Memorandum was insufficiently explained cannot support an injunction against any action beyond the Memorandum itself. The Executive Orders are not subject to the APA's requirements. And the question whether any specific funding action is (or, in the future, will be) properly explained is not presented by this case. It is black-letter law that cases under the APA must challenge discrete agency actions and may not level a "broad programmatic attack." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). Only in a case presenting a specific and concrete dispute could a district court properly determine whether a specific funding decision comported with any applicable APA requirements. *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192-93 (1993) (concluding that "allocation of funds from a lump-sum appropriation" is "committed to agency discretion").

The impropriety of proceeding in broad-brush fashion is highlighted by the district court's reliance on its conclusion that the Memorandum was, in a handful of cases, implemented in violation of applicable statutes that require funding to be disbursed. *See* Dkt. No. 161, at 28-29. Even accepting the premise, there is no dispute that many federal funding programs and instruments provide the Executive with discretion to suspend or terminate funding that the Executive determines is inconsistent with the national interest. *See supra* p. 10; *see also* Dkt. No. 113, at 39-43. The district court's failure to limit its injunction to the few statutory schemes that it concluded were nondiscretionary (none of which was in any event properly raised by

plaintiffs) caused it to enjoin broad swaths of lawful conduct. The court's original temporary restraining order essentially acknowledged as much. Dkt. No. 50, at 4 (noting that some actions under the OMB Memorandum "might be legal and appropriate constitutionally for the Executive to take"). But the court's preliminary injunction then blew past the issue, enjoining the admittedly lawful with the ostensibly unlawful alike. That was improper.

Nor can the district court's overbroad injunction be saved by the statements in its opinion suggesting that its injunction "does not prevent the Defendants from making funding decisions in situations under the Executive's actual authority in the applicable statutory, regulatory, or grant terms." Dkt. No. 161, at 42-43 (quotation omitted). That qualification appears nowhere in the injunction's text, and although in this manner and others the injunction is therefore unclear, the Executive Branch faces the prospect of contempt unless it parses out the intended meaning from the court's seemingly inconsistent directives. And the purported limitation is particularly unclear because the directives that the district court deemed unlawful themselves instructed agencies to make funding decisions only consistent with applicable law. The injunction thus appears to demand that, in exercising their discretionary authority, agencies should not take policy direction from the President. That cannot be squared with Article II.

3. The district court also suggested (at 27) that the funding pauses contemplated by the Executive Orders would violate the Impoundment Control Act

by "defer[ring] any budget authority" without sending a "special message" to Congress detailing the deferral. 2 U.S.C. § 684. This suggestion too cannot support the district court's injunction.

As an initial matter, even assuming that any short-term pause in funding constitutes a deferral of budget authority subject to the statute, *but see infra* pp. 16-17, the district court's injunction still suffers from two threshold flaws. First, the only violation found by the district court is that the Executive has not sent the "special message" to Congress contemplated by the statute. Yet "injunctions must be tailored to the specific harm to be prevented." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 487 (1st Cir. 2009) (quotation and alteration omitted). At most, then, an appropriate injunction would require defendants to send the requisite message to Congress—it would not broadly prohibit any funding pauses.

Second, the State plaintiffs cannot enforce the terms of the Impoundment Control Act through an APA suit. That statute is designed to regulate the relationship between Congress and the Executive Branch. Congress did not contemplate private enforcement lawsuits, which would raise significant separation-of-powers concerns and inject courts into disputes that coordinate branches must work out among themselves. Congress specified particular forms of legislative action to address efforts to impound funds. 2 U.S.C. § 688. And to the extent that Congress contemplated litigation, it provided for suits brought by the Comptroller General, an official within the Legislative Branch. *See id.* § 687. Regardless whether such suits are cognizable

under Article III and the separation of powers, the statute does not contemplate enforcement through suits by other parties under the APA.

The district court nevertheless held that plaintiffs could advance a claim based on the Impoundment Control Act because the APA provides for review of agency action "not in accordance with law," which in the district court's view "refers to *any* law." Dkt. No. 161, at 25 n.13 (quotation omitted). That is incorrect. A plaintiff may not seek review under the APA if "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The Supreme Court has accordingly recognized that Congress can displace the APA's default cause of action, including by constructing a detailed scheme that provides for review by only some parties. *See, e.g.*, *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345-47 (1984). That is exactly the structure of the Impoundment Control Act, which governs the relationship between two coordinate branches of government and does not contemplate judicial review at the behest of nonfederal entities.

Finally, even setting all of that aside, the district court's conclusion that any short-term pause in funding constitutes a deferral of budget authority subject to the statute's strictures is unsupported. Congress expressly directed the Executive to apportion, or reapportion, appropriated funds to determine when to make them available to agencies to carry out federal law. 31 U.S.C. § 1512. The statute contemplates that OMB will report to Congress under the Impoundment Control Act when it considers declining to obligate funds and instead creating a reserve "to

provide for contingencies" or "to achieve savings made possible by or through changes in requirements or greater efficiency of operations." *Id.* § 1512(c). But the government has not reached that point here, instead temporarily pausing certain obligations to determine how to allocate funds most efficiently consistent with applicable law.

Such temporary pauses in funding are commonplace and accepted by the Legislative Branch. *See City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (explaining how Congress has previously "acknowledged that 'the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year' and such delays may result from the 'normal and orderly operation of the government'" (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)). The Government Accountability Office has approved of agencies "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981). It would be extraordinary if a new Administration could not, consistent with applicable law, assess ongoing government spending to ensure that it was aligned with the new President's priorities. And as noted above, if the Legislative Branch disagrees with the Executive Branch's understanding of its obligations, the proper resolution is not a suit by a nonfederal party under the APA.

### B.     The Equitable Factors Favor a Stay Pending Appeal

The balance of harms and public interest overwhelmingly favor a stay pending appeal. *See Nken*, 556 U.S. at 435 (noting that these factors merge in cases involving the government). The district court's preliminary injunction interferes with agencies' ability to exercise their lawful authorities to implement the President's policy directives. The injunction thus undermines the President's unquestioned Article II authority to direct subordinate agencies how to exercise their own authorities, giving rise to an intolerable intrusion on the prerogatives of the Executive Branch.

The preliminary injunction in this case presents especially stark separation-of-powers problems. The injunction purports to govern the manner in which a range of federal agencies make funding decisions across a spectrum of federal spending programs, and it extends even to lawful implementations of the President's Executive Orders. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (holding that courts lack jurisdiction "to enjoin the President in the performance of his official duties").

The injunction also includes multiple vague instructions. It enjoins the government defendants from "implementing" or "giving effect to" the OMB Memorandum "under a different name." Dkt. No. 161, at 44. And it enjoins the government defendants from pausing funds as "described" or "implied by" the President's Executive Orders. *Id.* In addition to lacking the requisite detail and precision about the specific "act or acts restrained," Fed. R. Civ. P. 65(d)(1)(C), that language invites the district court to engage in precisely the sort of "preclearance"

regime that led the government to appeal the court's earlier order, and which the district court purported to disclaim, Dkt. No. 107, at 1.

Despite the court's assurances that it was not "micromanaging the administration of federal funds," Dkt. No. 161, at 4, the injunction it entered plainly contemplates such oversight. Before the court issued its preliminary injunction, plaintiffs filed a motion to enforce claiming that FEMA violated the temporary restraining order by failing to adequately justify its decision to manually review payment requests for certain funds. *See* Dkt. No. 160. Rather than deny that motion outright after dissolving the temporary restraining order, the court directed FEMA to file a report "informing the Court of the status of their compliance with this order." Dkt. No. 161, at 45. Thus, the court is already poised to entertain an individual funding dispute and pass judgment on whether the agency's funding decision is consistent with the court's unmanageably broad preliminary injunction. It is improper for the court to demand that the nearly two dozen agency defendants and their senior officials either seek judicial approval before exercising their lawful authority and discretion or face the risk of contempt proceedings. *See* Dkt. No. 160, at 1 n.1 (stating that plaintiffs "are not moving for contempt at this time"); *see also* Plaintiffs' Motion for Contempt at 9-10, *Washington v. Trump*, No. 25-cv-244 (W.D. Wash. Mar. 6, 2025), Dkt. No. 243 (effort by one plaintiff State to seek contempt in a different case partly on the basis that the government has violated the orders in this case by relying on an Executive Order to withhold funding pursuant to lawful authorities).

Absent a stay, the preliminary injunction will inflict harms on the government and the public that could not be unwound. If the government's position is later vindicated at the conclusion of the litigation, there would be no guarantee that funds that the government obligated or disbursed pursuant to the district court's order would be retrievable from the States or their subgrantees after the fact. There is no sound basis to compel the government to continue to take actions that the President considers "a waste of taxpayer dollars that do[] not improve the day-to-day lives of those we serve." Dkt. No. 27-1, at 2. And the separation-of-powers harm that the district court's injunction inflicts on the President and his ability to control his subordinates itself reflects irreparable injury. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (Roberts, C.J., in chambers).

These irreversible harms far outweigh any asserted harms to plaintiffs. Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled. The district court could find irreparable harm only by presuming that federal funds would be cut off unlawfully, *see* Dkt. No. 161, at 39, even though as noted above the government frequently enjoys broad authority to terminate funding instruments for policy reasons. *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) (explaining that reviewing courts owe agency actions a "presumption of regularity"). A stay would simply allow the government—in accord with the plain terms of the Executive Orders—to make

funding decisions consistent with federal law. Allowing such actions is clearly in the public interest.

The district court focused on the alleged "pecuniary harm to the States and their residents." Dkt. No. 161, at 36. Even putting aside that States cannot invoke harms on behalf of their citizens in actions against the federal government, *Haaland v. Brackeen*, 599 U.S. 255, 294-95 (2023), the district court overlooked that plaintiffs will receive any funds that agencies are legally obligated to disburse and failed to examine the relevant statutes and instruments individually to determine which funds may be subject to such an obligation. To the extent that plaintiffs have a justiciable legal dispute over a particular agency's decision with respect to a particular grant, plaintiffs can bring an action in an appropriate forum where a court can consider the arguments in the context of the specific grant program and grant instrument. The possibility of individualized disagreements related to discrete actions on specific funding streams does not justify a preliminary injunction imposing continuous judicial monitoring over the entire suite of funding decisions made by a huge swath of the Executive Branch.

# CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

SARA MIRON BLOOM
*Acting United States Attorney*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

DANIEL TENNY
SEAN R. JANDA

 /s/ Brian J. Springer
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, D.C. 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

MARCH 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,174 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Garamond typeface.

*/s/ Brian J. Springer*
BRIAN J. SPRINGER

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2025, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

First Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Brian J. Springer*
BRIAN J. SPRINGER