No. 25-1236

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

STATE OF NEW YORK, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS
PRESIDENT OF THE UNITED STATES, et al.,

Defendants-Appellants.

—————————————

On Appeal from the United States District Court
for the District of Rhode Island (No. 1:25-cv-00039)
The Honorable John J. McConnell, Jr.

—————————————

**PLAINTIFF STATES' OPPOSITION TO DEFENDANTS'
MOTION FOR STAY PENDING APPEAL**

Defendants are not entitled to the "extraordinary remedy," *Nken v. Holder*, 556 U.S. 418, 428 (2009), of a stay pending appeal. Defendants abruptly implemented blanket "freezes" on billions of dollars in federal funds that imposed severe and substantial harms on Plaintiff States. As the district court correctly held, defendants' actions were likely arbitrary and capricious and contrary to law, in violation of the Administrative Procedure Act ("APA"). Defendants failed to justify

1

their sweeping and reckless conduct, and no federal statute authorized their actions.  Nor did the district court abuse its discretion in entering a preliminary injunction.  Defendants' motion should be denied.

## BACKGROUND

### A.    Legal Background

The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  Pursuant to that power, Congress has enacted a complex set of statutes governing federal funding.  Congress has instructed federal agencies that appropriated funds "shall be applied only to the objects for which the appropriations were made," 31 U.S.C. § 1301(a)—*i.e.*, only the purposes Congress has indicated.  Congress has also provided—in the Congressional Budget and Impoundment Control Act of 1974 ("Act"), 2 U.S.C. §§ 681 *et seq.*—that federal agencies can "impound" appropriated funds only under a narrow range of circumstances.  Specifically, the Act expressly withholds from the Executive Branch the power to decline to spend appropriated funds, instead instructing the President to "propose[]" such an action (called a "rescission") to Congress if he thinks appropriate.  *Id.* § 683.  And it

allows the Executive to "defer" expenditure of appropriated funds only under narrow circumstances, not for policy reasons, and only after notice to Congress. *Id*. § 684.

Congress appropriates funds with these rules in mind. In many statutes, Congress specifically provides funds that it requires federal agencies to distribute to the States and other entities, who will then spend the funds to provide critical services across the Nation. For instance, Congress has required the Secretary of Health and Human Services to "pay" "each State" a fixed portion of their annual Medicaid expenditures for the purpose of providing certain health insurance, 42 U.S.C. § 1396b(a), and mandated that the Secretary of Transportation "shall" distribute federal funds to States for the purpose of building highways, 23 U.S.C. § 104(a)(1), (b), (c). These federal appropriations, and others, are called "formula" funds, in that they afford the relevant federal agency no discretion either in the fact of funding or the amount of funds provided. *City of Los Angeles v. Barr*, 941 F.3d 931, 934-35 (9th Cir. 2019).

But many non-formula federal programs are also mandatory, in that Congress has instructed federal agencies to spend appropriated

funds for specific purposes and left those agencies no discretion to decline to do so. To take one recent example, Congress appropriated over $2 trillion in 2021 and 2022 in two federal statutes that made investments in energy and infrastructure projects across the Nation. *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA"); Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021) ("IIJA"). These funds supported programs that require federal agencies to provide money to States for purposes ranging from wastewater treatment to the rehabilitation of water systems to air quality monitoring. *See, e.g.*, 33 U.S.C. §§ 1381(a), (b) (Environmental Protection Agency ("EPA") "shall make capitalization grants to each State" to implement federal Clean Water Act), 1384(a) (unallotted clean-water funds must be provided to states); 42 U.S.C. §§ 7403(a)(2), (c) (similar for clean-air funding); *see* Doc. 67 at 6-11. Many Plaintiff States received grants pursuant to these programs, and the resulting funds are subject to final, binding agreements with EPA and other agencies. *Id.*

### B.    The Funding Freezes

On January 20, 2025, shortly after his inauguration, President Trump issued a series of executive orders.  Many directed the federal agencies implementing them to pause or suspend distribution of funds pending a review of those funds for consistency with the President's priorities.  Most directly, Executive Order 14,154, "Unleashing American Energy," directed federal agencies to "immediately pause the disbursement of funds appropriated through the [IRA] or the [IIJA]" to permit those agencies to review those funds' alignment with the new administration's policies.  Doc. 68-1 at 6.  Other orders likewise directed agencies to implement "pauses" to align funding with the President's priorities.  *See* Doc. 68-3 at 6 (agencies shall "[p]ause distribution" of funds under "all contracts, grants, or other agreements" providing services to noncitizens); Doc. 68-3 at 3 (gender ideology).

Within days, defendants complied.  On January 27, the Office of Management and Budget ("OMB") issued a memorandum to all federal agencies directing them to conduct a "comprehensive analysis of all . . . Federal financial assistance programs to identify" programs "implicated by any of the President's executive orders."  Doc. 1-1 ("Directive") at 2.

While doing so, OMB explained, "to the extent permissible under applicable law, Federal agencies **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance." *Id.* (emphasis in original)  Other agencies issued contemporaneous guidance also instructing funding officials to pause disbursements pending a review of federal programs for compliance with presidential priorities. *E.g.*, Doc. 68-14 (EPA: "all disbursements of unliquidated obligations funded by any line of accounting . . . are paused"); Doc. 68-123 (similar at Department of Energy).  A document OMB provided to defendants identified over 2,600 affected federal programs.  Doc. 1-2.

Consistent with those instructions, defendants initiated funding freezes that—without any regard to the governing statutes, regulations, or grant terms—suspended payments on a wide range of government programs to funding recipients, including the States.  Plaintiff States were instantly locked out of access to billions of dollars of funds supporting Medicaid expenditures, emergency operations, road construction, education, veteran's care, and more.  Doc. 67 at 17-21, 24-34.  EPA and other agencies suspended and deleted grants supporting

critical air, water, and infrastructure projects from federal payment systems, leaving Plaintiff States unable to even seek (much less obtain) reimbursement for expenses already approved by agencies. *Id.* at 21-24. These funding freezes, the district court later found, caused an extraordinary "disruption in health, education, and other public services" within Plaintiff States. Doc. 161 ("Op.") at 43.

Less than 24 hours after the Directive was issued, a district court elsewhere issued an "administrative stay" suspending it, *Nat'l Council of Nonprofits v. OMB* ("*Council I*"), 2025 WL 314433, at *2 (D.D.C. Jan. 28, 2025), and OMB promptly rescinded it, Doc. 68-12. But the White House Press Secretary subsequently clarified that OMB's action was "NOT a rescission of the federal funding freeze" itself, but "simply a rescission of the OMB memo" prompted by the court's stay. Doc. 68-126.

### C.     Proceedings Below

Plaintiffs are 24 States and state executives that receive hundreds of billions of dollars of federal funds annually—funds used to provide services to state residents ranging from healthcare to education to infrastructure. Doc. 114 at 6-9.

7

Plaintiff States filed this action within 24 hours after the issuance of the Directive and sought a temporary restraining order ("TRO") to preserve their ability to provide these services.  Docs. 1, 3.  The district court issued a TRO directing defendants not to "pause, freeze, impede, block, cancel, or terminate" federal funding "except on the basis of the applicable authorizing statutes, regulations, and terms."  Doc. 50 at 11.  Defendants appealed and sought an administrative stay from this Court, which was denied.  *New York v. Trump*, No. 25-1138, 2025 WL 455494 (1st Cir. Feb. 11, 2025).  Defendants dismissed their appeal.

Plaintiff States amended their complaint, Doc. 114, and sought a preliminary injunction, which the district court granted, Op. 1.  The court held that defendants had likely acted arbitrarily and capriciously by initiating a "sweeping pause of nearly all federal financial assistance," threatening "the States' ability to provide vital services," without providing a rational reason for doing so.  *Id.* at 32.  And it held that defendants had likely acted contrary to law in attempting to "carry out a categorical federal funding freeze" without authority to do so.  *Id.* at 30.  The court also made factual findings—supported by over 100 unrebutted evidentiary submissions—of the irreparable harm the

funding freezes had caused the States, *id.* at 36, and held that, as a result, "the public interest lies in maintaining the status quo and enjoining any federal funding freeze," *id.* at 43.

## ARGUMENT

Defendants are not entitled to a stay. In evaluating a stay request, this Court considers "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos.*, 996 F.3d 37, 44 (1st Cir. 2021) (cleaned up); *accord New Jersey v. Trump*, No. 25-1170, 2025 WL 759612, at *3 (1st Cir. Mar. 11, 2025). Defendants are not entitled to such relief because they are unlikely to succeed on the merits and because the district court acted well within its discretion in issuing the preliminary injunction.

9

I.    **Defendants Have Not Made A Strong Showing That They Will Succeed On The Merits.**

The district court correctly held that defendants likely violated the APA, Op. 20-34, and defendants have not shown that it erred in doing so.

A.    **The freezes were arbitrary and capricious.**

Defendants failed to reasonably explain the categorical funding freezes, rendering their actions arbitrary and capricious in violation of the APA. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). While a court may not "substitute its own policy judgment for that of the agency," *id.*, it must ensure that the agency has "examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

Here, defendants failed to provide any reasoned explanation for suddenly freezing billions of dollars in financial assistance that funds critical services for millions of Americans—including food, healthcare, public safety, law enforcement, a healthy environment, education, and infrastructure. Op. 19 & n.8, 36-42. Particularly given the scope and

speed at which defendants froze funds, the district court properly found that "[i]t is difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences." Op. 32. As another court observed, this was a "breathtakingly large sum of money to suspend practically overnight." *Nat'l Council of Nonprofits v. OMB* ("*Council II*"), 2025 WL 597959, at *14 (D.D.C. Feb. 25, 2025).

There is no merit to defendants' conclusory contention that safeguarding taxpayer resources justified "a sweeping pause of nearly all federal financial assistance with such short notice" while defendants began indefinite reviews of grant programs. Op. 32. Defendants failed to provide any explanation, let alone a rational one, for why they did not conduct their reviews to identify supposed waste *before* freezing spending. Indeed, defendants plainly did not consider this obvious alternative, instead cutting off funding for a vast array of government services without any meaningful consideration of the consequences of that decision. Op. 31-33; *see Council II*, 2025 WL 597959, at *14.

Moreover, defendants' actions were also arbitrary and capricious because they failed to consider the enormous reliance interests of Plaintiff States, as well as their agencies and residents, in billions of

dollars of obligated funds that keep critical government services running. Defendants' characterization of the funding freezes as "temporary" ignored the overwhelming and unrebutted evidence demonstrating that "consistent disbursements of funds" is critical to the operation of state governments. *Council II*, 2025 WL 597959, at *15. Defendants' overnight change to longstanding funding practices relied on by States to maintain these services failed to consider "serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). As the district court correctly held, defendants "failed to offer rational reasons for finding that" their policy objectives justified a broad, indefinite freeze of federal funding. Op. 33-34.

## B. The freezes were contrary to law.

The district court also correctly held that the categorical funding freezes likely violated multiple federal funding statutes and thus were contrary to law. Federal agencies have only those powers conferred on them by Congress, and agency action that exceeds statutory limits is ultra vires, violating the APA. *See City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020). Defendants have never cited any statute that

allows them "to unilaterally pull the plug on nearly all federal monetary flows," *Council II*, 2025 WL 597959, at \*15, and none exists.

First, defendants' actions violated numerous statutes mandating that funding be used in a specific manner, for specific purposes, according to specific terms, limiting agencies' authority to decline to spend funds appropriated by Congress.  In the appropriations context, federal agencies "must follow statutory mandates so long as there is appropriated money available."  *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *accord, e.g.*, *San Francisco*, 897 F.3d at 1232; *see Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes").

As the district court correctly concluded, Op. 8-9, many funding streams that defendants froze are "formula" grants, which Congress has required that States receive based on enumerated statutory factors, like population or the expenditure of qualifying state funds, *see, e.g.*, *City of Los Angeles*, 941 F.3d at 934-35.  Such grants provide funding for many critical government services, including Medicaid, highway construction,

special education services, and mental health and substance abuse treatment.  Op. 8.  The funding freezes were contrary to those laws.

The freezes of IIJA and IRA funding—which goes to projects such as broadband access, improving the electric grid, providing clean water, and pollution reduction—are also contrary to Congress's specific dictates and designs.  *See, e.g.*, IIJA § 50102; IIJA § 50210; Op. 8-9.  As the district court correctly explained, Op. 28-29, those statutes *require* their implementing agencies to expend the funds that Congress allotted, and defendants have entered into binding agreements to do so, leaving them "no discretion to deviate" from statutory command, *id.* at 29; *supra* pp. 3-4.  Yet defendants categorically and indefinitely froze these funds.

Finally, as the district court explained, Op. 25-27, the Impoundment Control Act strictly limits the circumstances under which the Executive may decline to spend appropriated funds.  *Supra* p. 2; *Aiken Cnty.*, 725 F.3d at 261 n.1.  None of those circumstances is present here:  The President has not received approval to initiate a budget rescission, nor has he identified a permissible reason to defer expenditures or told Congress of his intent to so.  2 U.S.C. §§ 683(a),

684(b).  Absent compliance with the Act, defendants "may not decline to follow" an appropriations law just because they disagree with it.  *Aiken Cnty.*, 725 F.3d at 259.

### C.    Defendants' counterarguments fail.

Defendants do not defend their freezes on the merits.  Mot. 8-17. Instead, they advance a range of technical and procedural arguments. All are wrong.

1.    Defendants argue primarily that the case has "improper[ly]" shifted from a discrete challenge to the Directive to a "broad-based" attack on the President's authority.  Mot. 9-14.  That is incorrect on multiple levels.

First, Plaintiff States' APA claims challenge discrete and final agency actions, not the President's executive orders.  Plaintiff States challenge agency defendants' actions—following the executive orders and Directive—to implement categorical funding freezes without regard and contrary to legal authority.  Doc. 114 at 3.  As the district court correctly held, Op. 20-25, and defendants do not contest, those agency actions are "final" under the APA.  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  The agency actions challenged here represented defendants'

15

final positions on whether to categorically freeze funds pending their review. *See Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017) (stay pending review can be "final"). And defendants' funding freezes determined "obligations" from which "legal consequences" flowed, *Bennett*, 520 U.S. at 178, disrupting funding obligated to Plaintiff States under binding statutory requirements and grants. Op. 24.

Contrary to defendants' arguments, Mot. 13-14, Plaintiff States challenge discrete agency actions, not general statements of priority or policy goals. *See Norton v. SUWA*, 542 U.S. 55 (2004); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006). Defendants misplace their reliance on *Norton*, which involved a challenge to agency *in*action under 5 U.S.C. § 706(1), where a litigant "faces a different burden from that borne by a challenger of agency *action*" under § 706(2). *Nat'l Assn. of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1280-81 (D.C. Cir. 2005). Here, unlike in *Norton*, the agency actions challenged fit comfortably within the APA's definition of "agency action." 5 U.S.C. § 551(13).

The Directive, for instance, is reviewable under the APA as either a "rule" or an "order." *See id.* § 551(4); *N.Y. Stock Exch. LLC v. Sec. &*

16

*Exch. Comm'n*, 2 F.4th 989, 992 (D.C. Cir. 2021) (an "order" is "virtually any authoritative agency action other than a rule").  The plain text of the Directive—which stated that all federal agencies "must temporarily pause all activities related to [the] obligation or disbursement of all Federal financial assistance," Doc. 68-9 at 2—gave a "command, not a suggestion" to federal agencies to implement "a categorical, indefinite funding freeze."  Op. 23; *see Council II*, 2025 WL 597959, at *6.  And the agency defendants plainly understood it that way; on January 28, they suspended funding across the board at the same time.  *Id.* at *7.  These discrete actions are far removed from the general statements of priority that are unreviewable under the APA.

Likewise, agency defendants' categorical funding freezes are reviewable as orders or the "denial" of "relief"—defined to include the denial of "the whole or part of an agency . . . grant of money."  5 U.S.C. § 551(11), (13).  Put simply, the "determinations of agency heads" to implement funding freezes "have immediate effect and constitute" agency action under the APA.  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 485324, at *5 (D.D.C. Feb. 13, 2025).  These actions had concrete consequences, and therefore are unlike the (in)actions

17

challenged in *Norton*, which turned on general statements about what an agency "plans to do, at some point, provided it has the funds and there are not more pressing priorities." 542 U.S. at 71.

2.    Defendants are also wrong to portray the injunction as a broad-based attempt to interfere with the President's executive orders. Mot. 8-11.

First, and most fundamentally, defendants misdescribe Plaintiff States' challenge and the injunction. Plaintiff States did not challenge the President's power to "issue policy guidance to federal agencies through Executive Orders," *id.* at 10, and the injunction does not circumscribe that power. Rather, it simply prohibits federal agencies from unlawfully freezing federal funds while they conduct the review the President has directed. Op. 43-44. The district court entered that injunction because agency defendants did just that—freezing broad swaths of appropriated, obligated funding on *no* reasoning, much less individualized assessments grounded in the statutes, regulations, or grant terms governing particular funds. Enjoining that conduct does not interfere with the President's authority to "control and supervise"

18

federal agencies, Mot. 10; it simply ensures that those agencies do not exceed their authority in following his commands.

Defendants' contrary view rests mainly on the executive orders' instruction that agencies pause federal funding "consistent with applicable law." Doc. 68-1 at 8; Mot. 10. But savings clauses like this must be "read in their context," and "cannot be given effect when [doing so] would override clear and specific language" in the directive at issue. *San Francisco*, 897 F.3d at 1239. Here, the undisputed evidence showed that the savings clauses were neither meant nor taken seriously. Op. 22 n.11. Executive Order 14,154, for instance, told agencies to "immediately pause the disbursement of funds"—*all* funds— appropriated under the IRA and IIJA, Doc. 68-1 at 6, and defendants did so, *supra* p. 6. At bottom, the sweeping and indiscriminate nature of the freezes belies any suggestion that agency defendants either thought they were required to consider their legal obligations before freezing funds or actually did so. Indeed, "it is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them," to assess a freeze's legality. *Council I*, 2025 WL 368852, at *8.

Defendants also repeatedly attack the district court for enjoining them from implementing funding freezes even after the Directive's rescission. Mot. 8-9, 12-13. But they appear to accept the court's conclusion that the rescission did not moot the case. Op. 15-17. For good reason: A defendant's voluntary change in conduct moots a case only if it shows that the cessation was unrelated to the litigation and the conduct is unlikely be repeated. *Lowe v. Gagné-Holmes*, 126 F.4th 747, 756 (1st Cir. 2025). Here, the unrebutted evidence amply supports the district court's findings that defendants likely "rescinded" the Directive to evade judicial review, and that they will reinstitute their funding freezes if this Court stays the injunction pending appeal. Op. 15-17. Indeed, Plaintiff States submitted extensive evidence establishing that defendants did not actually cease the challenged conduct even with the TRO in place, instead continuing to impose categorical freezes. Op. 12-13, 36, 39, 41-42; *see Council I*, 2025 WL 368852, at *7-8. This case is thus a textbook application of the voluntary-cessation exception, which ensures a defendant is not "free to return to [its] old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

20

3.      Finally, defendants criticize the district court's conclusion that they likely violated the Impoundment Control Act by withholding funds without attempting to comply with that statute's limitations. Mot. 14-17.  These arguments do not provide an adequate basis for granting a stay, given that the district court found that defendants also acted arbitrarily and violated other federal funding statutes in freezing funds, Op. 27-30, but they are also wrong.

First, Plaintiff States can seek relief under the APA for a violation of the Act.  Mot. 15-16.  APA review is presumed available unless a statute "preclude[s] judicial review," 5 U.S.C. § 701(a)(1), and only a statute with "sufficient clarity" can overcome that presumption, *Thryv, Inc v. Click-To-Call Techs., LP*, 590 U.S. 45, 53 (2020).  The Act is not such a law.  Although it confers enforcement authority on the Comptroller General when an agency has refused to make appropriated funds "available for obligation," 2 U.S.C. § 687, that is immaterial here, given that this case concerns only already *obligated* funds, Opp. 44. And nothing in the Act states that APA review is precluded.  *Accord AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *17 n.17 (D.D.C. Mar. 10, 2025).

Defendants' remaining arguments regarding the Act also fail.

Defendants assert that this case involves only "short-term pause[s] in funding," which are not "deferrals" under the Act, Mot. 16, but the record shows otherwise.  The funding freezes initiated by the Directive had no end date, Doc. 1-1 at 2, and indeed, some defendants are *still* freezing funds to Plaintiff States, *see* Doc. 160.  Nor did the district court abuse its discretion in prohibiting defendants from categorically freezing funds (rather than requiring them to inform Congress of their intent to defer spending, as defendants suggest), Mot. 15, given ample evidence that the freezes were based on policy priorities, rather than any of the reasons enumerated under the Act, 2 U.S.C. § 684.

## II.    The District Court Did Not Abuse Its Discretion Issuing Injunctive Relief.

The district court also held that the equitable considerations overwhelmingly favored entry of a preliminary injunction.  Op. 34-43. This Court reviews the district court's analysis for abuse of discretion, keeping in mind "the preliminary nature of the proceeding."  *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 170 (1st Cir. 2015).  "[T]he purpose of a preliminary injunction is to preserve the status quo *before* the merits have been resolved."  *Francisco Sanchez v.*

22

*Esso Standard Oil Co.*, 572 F.3d 1, 19 (1st Cir. 2009).  The injunction
here does so by preventing defendants from reinstating the Directive or
similar categorical funding freezes, while allowing them to continue to
make funding decisions in accordance with applicable legal authorities
and grant terms.

### A.    Defendants have not shown irreparable injury.

Defendants' arguments that they will be "irreparably injured
absent a stay," *New Jersey*, 2025 WL 759612, at *3, largely rest on a
misreading of the injunction, and the district court did not abuse its
discretion in rejecting them.

Defendants' primary argument is that, if their position is "later
vindicated" on appeal, funds "obligated or disbursed pursuant to the
district court's order" might not ultimately be "retrievable from the
States or their subgrantees."  Mot. 20.  That is wrong in multiple
respects.  First, the injunction does not compel defendants to execute
*new obligations* of appropriated funds, only to honor the obligations
they have already finalized under the binding terms of existing awards.
Op. 44.  Following the terms of the contracts it negotiated and signed
hardly constitutes a "harm" to defendants.  But even that alleged injury

is ameliorated by the limited nature of the injunction, which applies only to the Directive and similar "categorical pause[s] or freeze[s] of funding appropriated by Congress." *Id.* at 44. As the district court emphasized, the injunction "does not prevent the Defendants from making funding decisions in situations under the Executive's 'actual authority in the applicable statutory, regulatory, or grant terms.'" *Id.* at 42-43. There is thus no real risk that defendants will be forced to disburse funds they are legally entitled to withhold.

Defendants are likewise incorrect that the injunction "presents especially stark separation-of-powers problems" because it "purports to govern the manner in which a range of federal agencies make funding decisions across a spectrum of federal spending programs, and it extends even to lawful implementations of the President's Executive Orders." Mot. 18. The injunction does no such thing. As explained, agencies may continue to make funding decisions, informed by the President's executive orders, in accordance with the agencies' statutory, regulatory, and contractual authority. They simply may not impose across-the-board funding freezes of the kind reflected in the Directive, untethered from legal justification. Continuation of that status quo

while this case proceeds to judgment will not irreparably injure defendants.

Defendants are also wrong that the preliminary injunction is "vague." Mot. 18. The injunction prohibits them from implementing the Directive "under a different name or through other means," and extends to orders that are "materially similar" to the Directive in "impos[ing] or appl[ying] a categorical pause or freeze of funding appropriated by Congress." Op. 44. That description satisfies Rule 65, which requires only that an injunction "describe in *reasonable* detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C) (emphasis added). It does not require that an injunction more precisely define terms "whose boundaries are understood by common parlance." *United States v. Prof'l Air Traffic Controllers Org.*, 678 F.2d 1, 3 (1st Cir. 1982). And that language is especially sensible here, as it prevents defendants from again invoking the Directive's "rescission" as an excuse to continue the unlawful categorical funding freezes. *See United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019) ("degree of particularity required" by Rule 65(d) "depends on the nature of the subject matter").

Defendants further contend that the injunction's "language invites the district court to engage in precisely the sort of 'preclearance' regime" that the court has disclaimed.  Mot. 18-19.  That is not correct either. Agencies need not seek or receive affirmative authorization from the district court before making funding decisions regarding particular grants in a manner consistent with their statutory and regulatory authority and applicable grant terms and conditions.  Nor is the district court improperly "micromanaging the administration of federal funds." *Id.* at 19.[1]  Plaintiff States have brought *two* disputes to the court since the case was filed regarding whether certain attempts to curtail funding violate court orders.  That is ordinary litigation, not a separation-of-powers problem.  At bottom, it is the court's injunction, not a stay, that will allow funding decisions to be made "consistent with federal law." Mot. 20.

---

[1] Defendants invoke the specter of contempt, and cite a motion filed in an unrelated case as evidence of that risk, *id.*, but Plaintiff States have never sought contempt in *this* case, as defendants concede.

**B.     The balance of the equities tilts sharply against a stay.**

Defendants have also failed to show that the balance of equities and the public interest favor a stay.  Indeed, a stay would "substantially injure the other parties interested in the proceeding," *Nken*, 556 U.S. at 426, and accordingly should be denied.

The Directive was sweeping in scope, implicating over 2,600 funding sources and billions of dollars to Plaintiff States.  Docs. 68-9, -11.  The resulting harm was severe and widespread.  As the district court explained, Plaintiff States submitted "unrebutted evidence that the States and their citizens are currently facing and will continue to face a significant disruption in health, education, and other public services that are integral to their daily lives due to [defendants'] overly broad pause in federal funding."  Op. 43.  Childhood education providers were unable to access federal funds, threatening layoffs and a reduction in services.  *Id.* at 36-37.  Medicaid providers faced a similar situation.  *Id.* at 37.  Law enforcement and public safety agencies were unable to access grants for combating violent crime, emergency response, and other critical functions.  *Id.* at 37-38.  And the district court considered ample evidence of other important state functions impaired by the

freezes, including K-12 education funding, services for the elderly and people with disabilities, and environmental protection. *See id.* at 19 n.8 (citing evidence).

Defendants do not dispute that these harms have occurred. Mot. 20-21. Rather, defendants contend that Plaintiff States would suffer irreparable injury only if "federal funds [are] cut off unlawfully," rather than in a manner "consistent with federal law." *Id.* But that is simply a repackaging of defendants' merits arguments, not an argument about equities supporting a stay. Defendants also argue that Plaintiff States would not be harmed in the absence of injunctive relief because at some unspecified future time, they will "receive any funds that agencies are legally obligated to disburse." *Id.* at 21. The district court correctly was "not reassured by this vague promise." Op. 35. Even if Plaintiff States were to someday receive the funds owed to them, in the interim, they would have to cut services, cancel projects, departments, and programs, and lay off staff. *Id.* at 35-42. And the resulting uncertainty regarding whether funds would be restored would make it impossible for Plaintiff States to budget or plan their operations. *Id.* at 35-36, 41. The district

court properly weighed these harms in issuing the preliminary injunction.

## CONCLUSION

The Court should deny a stay pending appeal.

Respectfully submitted,

**PETER F. NERONHA**
Attorney General
State of Rhode Island

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini
*Civil Division Chief*
*Special Assistant*
    *Attorney General*
Sarah W. Rice
*Deputy Chief, Public Protection*
    *Bureau*
*Assistant Attorney General*
Leonard Giarrano IV
*Special Assistant Attorney*
    *General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
ksabatini@riag.ri.gov
srice@riag.ri.gov
lgiarrano@riag.ri.gov

**LETITIA JAMES**
Attorney General
State of New York

Barbara D. Underwood
*Solicitor General*
Judith N. Vale
*Deputy Solicitor General*

/s/ Mark S. Grube
Mark S. Grube
*Senior Assistant Solicitor General*
Rabia Muqaddam
*Special Counsel for Federal*
    *Initiatives*
Michael J. Myers
*Senior Counsel*
Molly Thomas-Jensen
*Special Counsel*
Colleen Faherty
*Special Trial Counsel*
Zoe Levine
*Special Counsel for Immigrant*
    *Justice*
28 Liberty St.

New York, NY 10005
(929) 638-0447
mark.grube@ag.ny.gov
rabia.muqaddam@ag.ny.gov
michael.myers@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
colleen.faherty@ag.ny.gov
zoe.levine@ag.ny.gov

**ROB BONTA**
Attorney General
State of California

/s/ Laura L. Faer
Laura L. Faer
Christine Chuang
*Supervising Deputy Attorneys
   General*
Joshua Patashnik
*Deputy Solicitor General*
Nicholas Green
Carly Munson
Kenneth Sugarman
Marie Logan
Theodore McCombs
*Deputy Attorneys General*
1515 Clay St.
Oakland, CA 94612
(510) 879-3304
laura.faer@doj.ca.gov
christine.chuang@doj.ca.gov
josh.patashnik@doj.ca.gov
nicholas.hreen@doj.ca.gov
carly.munson@doj.ca.gov
kenneth.sugarman@doj.ca.gov
marie.long@doj.ca.gov
theodore.mccombs@doj.ca.gov

**KWAME RAOUL**
Attorney General
State of Illinois

Jane Elinor Notz
*Solicitor General*

/s/ Alex Hemmer
Alex Hemmer
*Deputy Solicitor General*
115 S. La Salle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

/s/ Katherine B. Dirks
Katherine B. Dirks
*Deputy Chief, Government Bureau*
Turner Smith
*Deputy Chief, Energy and
    Environment Bureau*
David C. Kravitz
*State Solicitor*
Anna Lumelsky
*Deputy State Solicitor*
1 Ashburton Pl.
Boston, MA  02108
(617) 963-2277
katherine.dirks@mass.gov
turner.smith@mass.gov
david.kravitz@mass.gov
anna.lumelsky@mass.gov

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

/s/ Jeremy M. Feigenbaum
Jeremy M. Feigenbaum
*Solicitor General*
25 Market St.
Trenton, NJ 08625
(609) 376-3377
jeremy.feigenbaum@njoag.gov

**KRISTEN K. MAYES**
Attorney General
State of Arizona

/s/ Joshua D. Bendor
Joshua D. Bendor
*Solicitor General*
Nathan Arrowsmith
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
joshua.bendor@azag.gov
nathan.arroswmith@azag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

/s/ Michael K. Skold
Michael K. Skold
*Solicitor General*
Jill Lacedonia
165 Capitol Ave.
Hartford, CT 06106
(860) 808-5020
michael.skold@ct.gov
jill.lacedonia@ct.gov

**PHILIP J. WEISER**
Attorney General
State of Colorado

/s/ Shannon Stevenson
Shannon Stevenson
*Solicitor General*
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
shannon.stevenson@coag.gov

**BRIAN L. SCHWALB**
Attorney General
District of Columbia

/s/ Andrew Mendrala
Andrew Mendrala
*Assistant Attorney General*
*Public Advocacy Division*
Office of the Attorney General for
    the District of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 724-9726
andrew.mendrala@dc.gov

**AARON M. FREY**
Attorney General
State of Maine

/s/ Jason Anton
Jason Anton
*Assistant Attorney General*
Maine Office of the Attorney
    General

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

/s/ Vanessa L. Kassab
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov

**ANNE E. LOPEZ**
Attorney General
State of Hawai'i

/s/ Kaliko'onālani D. Fernandes
David D. Day
*Special Assistant to the Attorney*
    *General*
Kaliko'onālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**ANTHONY G. BROWN**
Attorney General
State of Maryland

/s/ Adam D. Kirschner
Adam D. Kirschner
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor

6 State House Station
Augusta, ME 04333
207-626-8800
jason.anton@maine.gov

Baltimore, Maryland 21202
410-576-6424
akirschner@oag.state.md.us

**DANA NESSEL**
Attorney General
State of Michigan

/s/ Linus Banghart-Linn
Linus Banghart-Linn
*Chief Legal Counsel*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney
    General
525 W. Ottawa St.
Lansing, MI 48933
(517) 281-6677
banghart-linnl@michigan.gov
giovanattin@michigan.gov

**KEITH ELLISON**
Attorney General
State of Minnesota

/s/ Liz Kramer
Liz Kramer
*Solicitor General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 757-1010
liz.kramer@ag.state.mn.us

**AARON D. FORD**
Attorney General
State of Nevada

/s/ Heidi Parry Stern
Heidi Parry Stern
*Solicitor General*
Office of the Nevada Attorney
    General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
hstern@ag.nv.gov

**RAÚL TORREZ**
Attorney General
State of New Mexico

/s/ Anjana Samant
Anjana Samant
*Deputy Counsel*
N.M. Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
505-270-4332
asamant@nmdoj.gov

**JEFF JACKSON**
Attorney General

**DAN RAYFIELD**
Attorney General

State of North Carolina

/s/ Daniel P. Mosteller
Daniel P. Mosteller
*Associate Deputy Attorney General*
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

**CHARITY R. CLARK**
Attorney General
State of Vermont

/s/ Jonathan T. Rose
Jonathan T. Rose
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 793-1646
jonathan.rose@vermont.gov

**OFFICE OF THE GOVERNOR**
*ex rel.* **ANDY BESHEAR**
in his official capacity as
Governor of the Commonwealth of
Kentucky

/s/ S. Travis Mayo
S. Travis Mayo
*General Counsel*
Taylor Payne
*Chief Deputy General Counsel*

State of Oregon

/s/ Christina Beatty-Walters
Christina Beatty-Walters
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
tina.beattywalters@doj.oregon.gov

**NICHOLAS W. BROWN**
Attorney General
State of Washington

/s/ Andrew Hughes
Andrew Hughes
*Assistant Attorney General*
Leah Brown
*Assistant Attorney General*
Office of the Washington State
    Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
andrew.hughes@atg.wa.gov
leah.brown@atg.wa.gov

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

/s/ Aaron J. Bibb
Aaron J. Bibb
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street

Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0810
bibbaj@doj.state.wi.us

March 17, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the response contains 5,200 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 365 in proportionally spaced 14-point Century Schoolbook typeface.

/s/ Alex Hemmer
ALEX HEMMER

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2025, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER