No. 25-1236

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

STATE OF NEW YORK, et al.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE
UNITED STATES, et al.,

*Defendants-Appellants*.

---

*On Appeal from the United States District Court
for the District of Rhode Island*

---

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
AS *AMICUS CURIAE* IN OPPOSITION TO APPELLANTS' EMERGENCY
MOTION FOR A STAY PENDING APPEAL**

---

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina G. Henry
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE* ....................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ..................................................................................... 4

I.    To Guard Against the Risk of a Tyrannical President, the Framers
      Gave Congress Control of the Purse Strings ..................................... 4

II.   The President and His Subordinates Have No Authority to Defy the
      Will of Congress by Refusing to Execute Laws Requiring
      Disbursement of Federal Funding ..................................................... 8

CONCLUSION .................................................................................. 11

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024)................................................................ 2, 6

*Clinton v. City of New York*,
  524 U.S. 417 (1998)................................................................ 3, 10

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
  365 F. Supp. 1355 (D.N.J. 1973)............................................ 11

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013)................................................ 9

*INS v. Chadha*,
  462 U.S. 919 (1983)................................................................ 8

*Kendall v. United States ex rel. Stokes*,
  37 U.S. 524 (1838).................................................................. 3, 9

*Louisiana ex rel. Guste v. Brinegar*,
  388 F. Supp. 1319 (D.D.C. 1975)........................................... 3, 11

*Maine v. Fri*,
  486 F.2d 713 (1st Cir. 1973)................................................... 11

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974)................................................ 10

*OPM v. Richmond*,
  496 U.S. 414 (1990)................................................................ 7

*Reeside v. Walker*,
  52 U.S. 272 (1850).................................................................. 7

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Sioux Valley Empire Elec. Ass'n v. Butz*,
　504 F.2d 168 (8th Cir. 1974) ................................................ 11

*State Highway Comm'n of Mo. v. Volpe*,
　479 F.2d 1099 (8th Cir. 1973) .............................................. 3, 10

*Train v. City of New York*,
　420 U.S. 35 (1975) ................................................................ 4, 10

*United States v. Midwest Oil Co.*,
　236 U.S. 459 (1915) .............................................................. 8

*Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952) .............................................................. 8

## CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6 .................................... 6

Del. Const. of 1776, art. VII ........................................................ 5

U.S. Const. art. I, § 8 ................................................................ 2, 6

U.S. Const. art. I, § 9 ................................................................ 3, 7

## STATUTES AND LEGISLATIVE MATERIALS

An Act Declaring the Rights and Liberties of the Subject and Settling the
　Succession of the Crown (Bill of Rights), 1689,
　1 W. & M., c.2 (Eng.) ............................................................ 5

2 U.S.C. § 683 ........................................................................ 8

2 U.S.C. § 684 ........................................................................ 8

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

<u>BOOKS, ARTICLES, AND OTHER AUTHORITIES</u>

Gerhard Casper, *Appropriations of Power*,
13 U. Ark. Little Rock L.J. 1 (1990) ....................................................... 4

*The Debates in the Several State Conventions on the Adoption of the Federal
Constitution* (Jonathan Elliot ed., 1836) ................................................. 7

*The Federalist No. 30* (Clinton Rossiter ed., 1961)..................................... 3

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and
Sovereign Immunity*,
107 Mich. L. Rev. 1207 (2009) ............................................................. 5

Louis Fisher, Cong. Rsch. Serv., Court Cases on Impoundment of Funds:
A Public Policy Analysis (1974) ............................................................ 11

Letter to Joseph Jones (May 31, 1780), *in The Writings of George Washington
from the Original Manuscript Sources 1745-1799*
(John C. Fitzpatrick ed., 1931) ............................................................. 6

F.W. Maitland, *The Constitutional History of England* (1908).................. 5

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*,
121 Colum. L. Rev. 277 (2021) ............................................................. 8

*The Records of the Federal Convention of 1787*
(Max Farrand ed., 1911) ...................................................................... 2, 6

Robert J. Reinstein, *The Limits of Executive Power*,
59 Am. U. L. Rev. 259 (2009)............................................................... 4, 5

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

There is perhaps no tenet more central to our tripartite form of government than the separation of the powers of the sword and the purse. President Trump's effort to freeze disbursement of all federal funding for programs he dislikes makes a mockery of this principle, flying in the face of our Constitution's Spending and Appropriations Clauses, which give Congress—not the executive branch—control over the public fisc.

While the choice to vest Congress with control over appropriations and spending was "uncontroversial" by the time of the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), that consensus marked the

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties consent to its filing.

1

culmination of centuries of struggle in England for parliamentary supremacy. Historically, British kings had used their royal prerogatives both to legislate and to tax and spend without the approval of Parliament.  The result was a blurring of the lines between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased.  Only after the Glorious Revolution were royal attempts to seize the purse strings finally squelched.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch."  1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson).  Indeed, almost every post-Revolution state constitution vested the spending and appropriations authorities in a multimember legislative body.  Even the Articles of Confederation, despite leaving the federal government without the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

Against that backdrop, when the Framers gathered to draft the new Constitution, there was no question that Congress would be granted the powers to tax, spend, and appropriate funds.  The authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, at 188 (Clinton Rossiter ed., 1961) (Alexander

Hamilton).  At the same time, the Appropriations Clause evinced a clear limitation on executive authority: "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

These provisions dictate that the President has no power to unilaterally withhold funding appropriated by Congress.  The Supreme Court first made this clear in 1838, unanimously rejecting the authority of the Postmaster General to withhold appropriated funding for a contract he claimed was tainted by political favoritism.  *Kendall v. United States ex rel. Stokes*, 37 U.S. 525 (1838).  The issue came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted . . . that his constitutional right to impound appropriated funds was absolutely clear."  *Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).  A slew of decisions "proved him wrong," *id.*—sometimes explicitly, *e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975) ("the President's express or implied constitutional powers [do not] justify holding back authorized funds"), and other times implicitly, by scrutinizing the relevant statutory language to ascertain whether it granted discretion to spend less than the full amount of funds appropriated, *e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973).  One of these cases made it all the way to the Supreme Court, which

3

unanimously rejected Nixon's claim of discretion to withhold appropriated funds. *See Train v. City of New York*, 420 U.S. 35, 42-47 (1975).

This unbroken line of authority underscores that Defendants' effort to unilaterally withhold appropriated funds is unlawful. Defendants' efforts may be brazen, but they are not novel—they have been rejected as contrary to foundational constitutional principles for centuries.

## ARGUMENT

**I. To Guard Against the Risk of a Tyrannical President, the Framers Gave Congress Control of the Purse Strings.**

**A.** When the Framers wrote the Constitution, they took pains to deny the President the kind of sweeping powers the King of England had enjoyed. In the sixteenth and seventeenth centuries, British Kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament. *See, e.g.*, Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 272-77 (2009). "[U]nconstrained by the need to consult the representatives of the people," Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (quotation marks omitted), English kings generally spent their money on whatever they pleased.

After centuries of struggle, Parliament finally succeeded in curtailing the king's abuses of power attendant to his sweeping authority over the purse. Following the Glorious Revolution, "in granting money to the crown," Parliament

always "appropriated the supply to particular purposes more or less narrowly defined." F.W. Maitland, *The Constitutional History of England* 433 (1908). At the same time, the Bill of Rights of 1689 prohibited the various devices the King had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.). Finally, in 1782, Parliament eliminated the King's prerogative to determine how the "civil list"—the domestic budget—would be spent. Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

**B.** In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers." Reinstein, *supra*, at 307. After the Revolution, the majority of state governments required legislative authorization for the withdrawal of funds from a state treasury. *See, e.g.*, Del. Const. of 1776, art. VII (requiring funds be "appropriated by the general assembly"). The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of Money to be raised for the service of the united states, and to appropriate and apply the same for defraying the public expenses,"

although they failed to give the central government the critical power to levy taxes. Articles of Confederation of 1781, art. IX, para. 6.

Still, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement." *CFPB*, 601 U.S. at 431.  It was "uncontroversial" that the authority to raise and disburse public funds should "reside in the Legislative Branch" rather than with the chief executive. *Id.*; *see* 2 *Farrand's Records* 131, 274 (debate limited to whether authority over the purse strings should be further confined to the direct representatives of the people in the House of Representatives).  The Framers thus gave Congress, not the President, the lawmaking power, including exclusive power over the federal purse.

In the Taxing and Spending Clause, the Framers granted Congress the affirmative power to raise revenue and to spend funds.  The Clause contains the first power conferred upon the legislature, providing authority "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  The provision of this power was a response to the failure of the Articles of Confederation to grant the federal government authority to tax and spend for the general interests of the union, creating such an ineffectual central government that, according to George Washington, it nearly cost Americans victory in the Revolutionary War.  *See*

6

Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799*, at 453 (John C. Fitzpatrick ed., 1931).

While the Framers crafted the Taxing and Spending Clause as a sweeping grant of authority to Congress, they framed the Appropriations Clause as a *limitation* on the executive: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  Because the clause is phrased in the negative, it means that "[h]owever much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned."  *Reeside v. Walker*, 52 U.S. 272, 291 (1850).  This command was repeatedly invoked during the ratification debates to assuage fears of a tyrannical president.  *See, e.g.*, 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 349 (Jonathan Elliot ed., 1836) (Alexander Hamilton); 3 *id.* at 17 (George Nicholas); 3 *id.* at 201 (James Madison & Edmund Randolph); 4 *id.* at 330 (Charles Pinckney).

The text and history of the Appropriations Clause thus make clear that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."  *OPM v. Richmond*, 496 U.S. 414, 425 (1990).  Because appropriations must be "made by Law," U.S. Const. art. I, § 9, cl. 7, the Clause

demands that spending be authorized by the "single, finely wrought and exhaustively considered, procedure" for enacting legislation set forth in the Constitution. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Under that procedure, "except for recommendation and veto, [the President] has no legislative power," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 655 (1952) (Jackson, J., concurring), for the Constitution simply "does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts," *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915).

## II. The President and His Subordinates Have No Authority to Defy the Will of Congress by Refusing to Execute Laws Requiring Disbursement of Federal Funding.

Because the Framers gave the purse strings to Congress while strictly limiting the President's lawmaking powers, the executive branch has no power to unilaterally suspend programs for which Congress has appropriated funding based on disapproval of the policies underlying those programs. The President may *ask* Congress to rescind funds pursuant to the Impoundment Control Act's procedures. 2 U.S.C. § 683. He may also defer funding for *non-policy reasons* after submitting a special message to Congress. *Id.* § 684. And *Congress itself* may choose to delegate to the President and executive branch agencies discretion regarding how to implement the programs for which it appropriates money—indeed it has done so since the Founding. *See generally* Julian Davis Mortenson & Nicholas Bagley,

*Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021). But that discretion is always limited by statute, and typically restricted to the terms of implementation, not *whether* to implement at all. Simply put, the President and federal agencies "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.).

In recognition of these separation of powers principles, courts have consistently recognized that the President enjoys no constitutional power to suspend or cancel funds appropriated by Congress. In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Supreme Court unanimously rejected Postmaster General Kendall's claim that he could withhold money that Congress had required him to spend. The Justices balked at the Attorney General's assertion that Kendall possessed some inherent constitutional authority to rescind appropriated funds: "To contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 525. Sanctioning such a theory would be, according to the Court, "vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution." *Id.* The Court refused to "assert[] a principle, which if carried out in its results to all cases

9

falling within it, would be clothing the President with a power to control the legislation of congress." *Id.*

In *Train v. City of New York*, 420 U.S. 35 (1975), the Supreme Court again unanimously rejected the principle that the President holds an inherent power to rescind funds.  The Court rejected President Nixon's attempt to withhold certain funding based on the absence of discretion in the governing statute.  *Id.* at 42-49. Implicit in that conclusion was the premise that any presidential discretion to withhold appropriated funds must be granted by Congress.  As Justice Scalia later succinctly summarized it, "our decision . . . in *Train v. City of New York* . . . proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds."  *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).

Courts of appeals have similarly held that the President's discretion to spend less than the total amount of appropriated funds is limited by Congress's direction as expressed in statutory text.  In *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), the D.C. Circuit held that mandatory statutory language required the President to put into effect a pay raise for members of the plaintiff union, reasoning that the President's duty to "take Care the Laws be faithfully executed" "does not permit the President to refrain from executing laws duly enacted by the Congress." *Id.* at 604.  In *State Highway Commission of Missouri v. Volpe*, 479 F.2d

1099 (8th Cir. 1973), the Eighth Circuit held that the Transportation Secretary could not impound funds for reasons beyond those Congress had supplied by statute. *Id.* at 1114. Other appellate courts, including this Court, have reached similar conclusions compelling the executive to disburse funds consistent with statutory commands, *e.g.*, *Sioux Valley Empire Elec. Ass'n v. Butz*, 504 F.2d 168, 178 (8th Cir. 1974), or upholding preliminary injunctions to that effect, *e.g.*, *Maine v. Fri*, 486 F.2d 713, 716 (1st Cir. 1973); *see also, e.g.*, *Brinegar*, 388 F. Supp. at 1324-25 (rejecting "argument . . . that the President's express or implied constitutional powers justify holding back authorized funds"); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973) ("The Executive Branch has no authority, even for motives such as the control of inflation, to decide for itself whether to obey a law after the President has signed a bill into law."); *see also* Louis Fisher, *Court Cases on Impoundment of Funds: a Public Policy Analysis*, Congressional Research Service (March 15, 1974) (cataloguing cases rejecting presidential impoundment). Because the law so clearly prohibits Appellants' actions here, this Court should not stay the injunction.

## CONCLUSION

This Court should deny a stay.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
Nina G. Henry
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: March 17, 2025

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 2,589 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 17th day of March, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court

for the United States Court of Appeals for the First Circuit by using the appellate

CM/ECF system on March 17, 2025.

I certify that all participants in the case are registered CM/ECF users and that

service will be accomplished by the appellate CM/ECF system.

Executed this 17th day of March, 2025.


/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*