No. 25-1236, 25-1413

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

STATE OF NEW YORK, *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his Official Capacity as President of the United States, *et al.*,

Defendants-Appellants.

---

*On Appeal from the United States District Court
for the District of Rhode Island*

---

## AMICI CURIAE BRIEF OF THE CLAREMONT INSTITUTE'S CENTER FOR CONSTITUTIONAL JURISPRUDENCE AND JOHN C. EASTMAN IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Alexander Haberbush
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Boulevard, Suite 1403
Long Beach, CA 90802
Telephone: (562) 435-9062
FAX: (562) 600-7570
ahaberbush@ccg1776.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## **Table of Contents**

INTEREST OF AMICI CURIAE................................................................1

SUMMARY OF ARGUMENT...............................................................2

ARGUMENT........................................................................................4

I.    The Spending Clause Contains Significant Textual and Historical Limitations That the District Court Failed to Consider........................................................4

    A.    The Original Understanding of the Spending Clause Imposed Meaningful Limits on Congressional Spending Power..........................6

    B.    The Executive Branch Has the Constitutional Duty to Ensure that Federal Spending Complies with Constitutional Limitations..............14

II.    Supreme Court Precedent Confirms the "General Welfare" Limitation on Spending Power...........................................................................17

    A.    United States v. Butler Established "General Welfare" as a Judicially Enforceable Limitation........................................................17

    B.    South Dakota v. Dole Reaffirmed Rather Than Abandoned These Limits...............................................................................18

    C.    Lower Courts Have Misinterpreted These Precedents……...............19

III.    The District Court's Injunction Impermissibly Interferes with the Executive's Constitutional Duty to Ensure Faithful Execution of the Laws......................20

A.    The OMB Directive Was a Constitutionally Mandated Exercise of Executive Discretion............................................................20

B.    The District Court's Injunction Improperly Compels the Executive to Violate the Constitution....................................................25

C.    The District Court's Reasoning Collapses the Distinction Between Appropriation and Disbursement, Undermining the Constitutional Structure................................................................................27

CONCLUSION....................................................................................29

## <u>Table of Authorities</u>

**Cases**

*Bond v. United States*, 564 U.S. 211 (2011).............................................................2

*Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015)...................................................................................................................1

*Gundy v. United States*, 139 S.Ct. 2116 (2019). .....................................................2

*Helvering v. Davis*, 301 U.S. 619 (1937).............................................................19

*Kisor v. Wilkie*, 139 S.Ct. 2400 (2019). ...............................................................1

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)..............................................27

*Moyle v. United States* and *State of Idaho v. United States*, Nos. 23-726 and 23-727 (2024)..............................................................................................................1, 2

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012)......2

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977). ...........................................15

*Perez v. Mortgage Bankers Association*, 575 U.S. 92 (2015)..................................1

*Sackett v. EPA*, 598 U.S. 651 (2023)....................................................................1

*South Dakota v. Dole*, 483 U.S. 203 (1987) .................................................... 17-20

*Trump v. United States*, 603 U.S. 593 (2024). ......................................................15

*United States v. Butler*, 297 U.S. 1 (1936)................................................. 12, 17-20

*United States v. Lopez*, 514 U.S. 549 (1995). ......................................................28

*Van Wyhe v. Reisch*, 581 F.3d 639 (8th Cir. 2009). .............................................19

*West Virginia v. EPA*, 142 S.Ct. 2587 (2022). ...........................................................1

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). ......................................15

**Statutes**

Act of July 22, 1790, ch. 28, 1 Stat. 53, 54............................................................10

**Other Authorities**

2 Annals of Cong. (1790) .............................................................................9

3 Annals of Cong. (1792) .......................................................................10, 11

6 Annals of Cong. (1796) ......................................................................10, 21

30 Annals of Cong. (1817) .........................................................................9

39 Annals of Cong. (1822) ..................................................................11, 22, 23

Brutus, Essay VI (Dec. 27, 1787, reprinted in 2 The Complete Anti-Federalist 363
   (Herbert J. Storing ed., 1981). ..............................................................7

Eastman, John, *Restoring the "General" to the General Welfare Clause*, 4 Chap. L.
   Rev. 63 (2001) ........................................................... 2, 8, 10, 12, 14

Exec. Order No. 14,154, *Unleashing American Energy*, 90 Fed. Reg. 8353 (Jan. 29,
   2025). ................................................................... 4, 23, 25

28 H.R. Journal 29–30 (1834).................................................................11

Hamilton, Alexander, *Report on Manufactures* (1791), reprinted in 2 *The Founders'
   Constitution* 446–47 (Philip B. Kurland & Ralph Lerner eds., 1987). ........... 8, 12

Jefferson, Thomas, *Opinion on the Constitutionality of a National Bank* (1791).....8

Madison, James, *The Federalist No. 41*, at 263 (Clinton Rossiter ed., 1961)........7, 8

Story, Joseph, *Commentaries on the Constitution* § 909 (1833). ...........................13

Virginia Deed of Cession (Oct. 20, 1783), in 26 Journals of the Continental Congress

115 (Mar. 1, 1784). ..................................................................................7

**Constitutional Provisions**

U.S. Constitution Article II, § 1 ...............................................................6

U.S. Constitution Article II, § 3 ..............................................................14

U.S. Constitution, Article I, § 8 ......................................................2, 4, 7, 8, 11, 14

## INTEREST OF AMICI CURIAE[1]

The Claremont Institute's Center for Constitutional Jurisprudence is dedicated to promoting the principles of the American founding. In particular, the Center advances the principle that the Constitution establishes a federal government of limited and enumerated powers, with powers not delegated to the federal government reserved to the states or to the people. Among those limited powers is the power to tax and spend only for the "common defense and general welfare of the United States."

The Center and its attorneys have appeared regularly before the Supreme Court and Courts of Appeals as counsel for parties or as amicus curiae in cases addressing important structural provisions of the Constitution and separation of powers issues, including: *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024); *Sackett v. EPA*, 598 U.S. 651 (2023); *West Virginia v. EPA*, 142 S.Ct. 2587 (2022); *Moyle v. United States* and *State of Idaho v. United States*, Nos. 23-726 and 23-727 (2024); *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019); *Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015); *Perez v. Mortgage Bankers Association*, 575 U.S. 92 (2015); *National Federation of*

---

[1] No party's counsel in this case authored this brief in whole or in part. No party or party's counsel contributed any money intended to fund preparing or submitting this brief. No person, other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

*Independent Business v. Sebelius*, 567 U.S. 519 (2012); *Bond v. United States*, 564 U.S. 211 (2011); *Reisch v. Sisney*, 560 U.S. 925 (2010); and *Gundy v. United States*, 139 S.Ct. 2116 (2019). Several of these cases, including *Reisch, Moyle*, and *NFIB v. Sebelius*, directly addressed constitutional limitations on Congress's spending power.

John C. Eastman is the Founding Director of the Claremont Institute's Center for Constitutional Jurisprudence and a Senior Fellow at the Claremont Institute. He has written extensively on the Spending Clause and the original understanding of the Constitution's limitations on federal power, including "Restoring the 'General' to the General Welfare Clause," 4 Chapman Law Review 63 (2001).

The scope of this case implicates fundamental questions about the extent of Congress's spending power and of executive authority to faithfully execute the laws in accordance with constitutional limitations.

## SUMMARY OF ARGUMENT

This case presents a critical opportunity to restore proper constitutional boundaries to federal spending authority. The district court's preliminary injunction effectively mandates the disbursement of federal funds regardless of whether such expenditures comply with the Spending Clause's fundamental limitation that spending be for the "general welfare" of the United States. By enjoining the defendants from pausing funding to evaluate constitutional compliance, the court

below has impermissibly interfered with the Executive's constitutional duty to ensure faithful execution of the laws, including the Constitution itself. This Court should reverse the district court's judgment to preserve the separation of powers and constitutional limitations on government spending.

The Spending Clause of Article I, Section 8 contains two crucial limitations: first, as recognized by James Madison, Thomas Jefferson, and numerous other Founders, spending must further one of the other enumerated powers assigned to Congress; and second, spending must be for the "general welfare" of the United States rather than for local or partial interests.

Moreover, the President, as Chief Executive, has both the authority and obligation to ensure that federal funds are spent in accordance with constitutional limitations. The Executive Branch's review of federal spending programs to determine whether they comply with constitutional requirements is not only permissible but required under the President's oath to "preserve, protect and defend the Constitution of the United States" and to "take care that the laws be faithfully executed."

///

///

///

3

# ARGUMENT

## I.     The Spending Clause Contains Significant Textual and Historical Limitations That the District Court Failed to Consider

The Constitution's Spending Clause provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1.

The case before this Court is not properly framed as a dispute over administrative procedure. At its core, it raises fundamental questions about the constitutional boundaries of federal spending authority: Does the Executive Branch have not only the authority but the duty to evaluate whether federal spending programs comply with the constitutional limitation that such spending be for the "general welfare"?

That duty is not academic—it is precisely what the Executive sought to discharge in the actions at issue here. At the center of the enjoined executive actions were directives to pause and review federal funding, including significant disbursements appropriated by Congress through recent major legislation. Specifically, Executive Order 14154, "Unleashing American Energy," (the "Order") specifically directed all agencies to pause the disbursement of funds appropriated

under the Inflation Reduction Act of 2022 (Pub. L. No. 117-169) ("IRA") and the Infrastructure Investment and Jobs Act (Pub. L. No. 117-58) ("IIJA") and to conduct a comprehensive review of all processes, policies, and programs for issuing grants, loans, contracts, and other disbursements to ensure compliance with both statutory mandates and the national policy objectives set forth in the order. These objectives include eliminating burdensome, ideologically motivated regulations and ensuring that federal funds are not expended contrary to the law or the national interest, as specifically articulated in Sections 2 and 7 of the Order. The Office of Management and Budget (OMB) Memorandum M-25-13 subsequently broadened this directive, requiring federal agencies to temporarily halt disbursements and obligations under programs affected by these and related executive actions until it could be confirmed that such expenditures were fully consistent with applicable law and the policy imperatives outlined in the Order. In sum, the Executive Branch acted to ensure that the distribution of federal funds remained not only faithful to the statutory text but also to the broader constitutional duty to expend public funds only in a manner consistent with the law, the general welfare, and the President's independent obligation to uphold the Constitution.

The District Court's injunction prevents the Executive Branch from fulfilling its constitutional duty to review spending for compliance with the "general welfare" provision, which is precisely what the Executive Branch has attempted here to do.

Instead, the District Court effectively compels federal agencies to disburse funds without permitting any meaningful assessment of whether such disbursements are constitutionally valid. This Court should reverse the district court's ruling because it improperly prevents the Executive Branch from fulfilling its constitutional duty to ensure federal spending complies with the limitations inherent in the Spending Clause. The President's oath (U.S. Const. art. II, § 1, cl. 8) is to *the Constitution itself*, not to congressional statutes. When the two conflict, fidelity to the Constitution must prevail.

## A.     The Original Understanding of the Spending Clause Imposed Meaningful Limits on Congressional Spending Power

The text of the Spending Clause itself contains a significant limitation: expenditures must be for the "general welfare of the United States." The Founders did not understand this phrase as a grant of plenary power to fund any purpose Congress might deem desirable. Indeed, they did not view it as a grant of power at all, but rather as a substantive constraint—a restriction grounded in longstanding political and legal traditions that predated the Constitution.

One of the clearest antecedents to this understanding appears in the Virginia cession of western lands in 1783. There, Virginia transferred its vast territorial claims to the United States on the express condition that the land "shall be considered as a common fund for the use and benefit of such of the United States... and shall be

faithfully and bona fide disposed of for that purpose, and for no other use or purpose whatsoever." Virginia Deed of Cession (Oct. 20, 1783), in 26 Journals of the Continental Congress 115 (Mar. 1, 1784). This "common fund" principle—that national resources must serve national purposes—directly informed the Founders' conception of "general welfare," and became embedded in the logic of enumerated powers adopted in the Constitution itself, wherein Congress's powers were carefully enumerated and limited to subjects of national concern. The Spending Clause, like the rest of Article I, Section 8, was understood to authorize spending only on matters that served the collective interests of the states—not local or parochial aims.

Indeed, the Anti-Federalists widely recognized the potential danger of an expansive interpretation. Brutus, for example, warned that if the "general welfare" language were read as an independent and unlimited grant of power "has no bounds set to it, but the discretion of those who exercise it." Brutus, Essay VI (Dec. 27, 1787, reprinted in 2 The Complete Anti-Federalist 363 (Herbert J. Storing ed., 1981).

Madison, in defending the Constitution against these kinds of assaults, expressly addressed the contention that the phrase "general welfare" would give to Congress "a power to legislate in all cases whatsoever." The Federalist No. 41, at 264 (James Madison) (Clinton Rossiter ed., 1961), and put these concerns to rest by emphatically rejecting this interpretation: he declared that such a reading would render the subsequent enumeration of powers "completely useless" and would

transform the Constitution from one of enumerated powers to one conferring general legislative authority. Id. at 263-64.

Instead, Madison maintained that the "general welfare" clause was a limitation on the taxing power that immediately preceded it—taxes could *only* be laid to pay the debts and provide for the common defense and general welfare of the United States.

Indeed, even the most expansive interpretation of the founding era, most prominently espoused by Alexander Hamilton, still held that such spending must be *general* in nature—directed to the welfare of the nation as a whole, rather than to local or sectional interests. See *Report on Manufactures* (1791), reprinted in 2 *The Founders' Constitution* 446–47 (Philip B. Kurland & Ralph Lerner eds., 1987) (hereinafter "Founders' Constitution").

Thomas Jefferson also embraced a narrow construction of the spending power. In his 1791 opinion opposing the constitutionality of a national bank, Jefferson warned that to view the General Welfare Clause as an independent source of power would render the enumeration of powers elsewhere in Article I, Section 8 "completely useless." Thomas Jefferson, *Opinion on the Constitutionality of a National Bank* (1791), available at http://avalon.law.yale.edu/18th_century/bank-tj.asp; see also John C. Eastman, *Restoring the "General" to the General Welfare Clause*, 4 Chap. L. Rev. 63, 77 (2001). Jefferson applied this principle in 1792, when

8

he opposed a bill to provide relief to refugees from the Santo Domingo uprising on the ground that it used public funds for the benefit of particular individuals rather than the United States as a whole. *Id.*

When James Madison became President, he continued to adhere to this original understanding of the Spending Clause. In 1817, he vetoed the Bonus Bill, which would have appropriated federal funds for internal improvements such as roads and canals. In his veto message, Madison stated that such spending was not authorized by the Constitution because it was not within any of the enumerated powers, and the General Welfare Clause could not be construed as a separate and independent grant of legislative authority. See *30 Annals of Cong., Senate, 14th Cong., 2d Sess. 211–12* (1817). As Madison explained, a broad interpretation of the General Welfare Clause would "have the effect of giving to Congress a general power of legislation, instead of the defined and limited one hitherto understood to belong to them." *Id.*

The Founding generation consistently understood the "general welfare" to exclude spending for local or particular interests. During the First Congress, a proposal to loan money to a glass manufacturer was rejected after Members questioned whether such an appropriation was constitutional. *2 Annals of Cong., House of Representatives, 1st Cong., 2d Sess. 1686* (1790). The Fourth Congress even went so far as to decline to provide relief to the citizens of Savannah, Georgia,

after a devastating fire destroyed the city, concluding that such an expenditure did not serve the "general welfare." *6 Annals of Cong., House of Representatives, 4th Cong., 2d Sess. 1712–27* (1796).

That distinction was again drawn when Congress refused to fund the dredging of the Savannah River, a project anticipated to provide an economic benefit only to a single state, while approving a lighthouse appropriation for the Chesapeake Bay, which served national coastal commerce. *See* Act of July 22, 1790, 1 Stat. 53, 54; Eastman, *supra*, at 80–81.

In the 1792 cod fisheries debate, members of Congress expressed serious constitutional concerns about federal bounties. Representative Williamson argued that the "general" nature of the welfare restriction paralleled the apportionment requirement for direct taxes, warning that if bounties were permitted, "all manner of persons… may enter in at the breach, until they have eaten up the bread of our children." *3 Annals of Cong.*, 2d Cong., 1st Sess. 381 (1792). In considering the legislation, Madison again opposed the broad interpretation of the clause, rejecting the view that the general welfare language could confer "an abstract and indefinite delegation of power extending to all cases whatever." *Id.* at 386–87. Instead, he reiterated that the clause merely prefaced the enumeration of specific, limited powers, and to interpret it otherwise would render that enumeration "without any meaning." *Id.* The bill ultimately passed only after being narrowed to a refund of

10

duties improperly assessed, not a true bounty, to avoid conflict with the Export Clause in Article I, Section 9. *Id.* at 397–98.

President Monroe echoed the same principle in his 1822 veto of a bill to preserve the Cumberland Road, declaring that Congress's power to spend was limited "to purposes of common defence, and of general, not local, national, not state, benefit." *39 Annals of Cong., House of Representatives, 17th Cong., 1st Sess. 1838, 1849* (1822).[2]

President Jackson likewise rejected internal improvements legislation that served regional interests, warning in his 1834 veto of the Wabash River Act that such expenditures seduced Congress into patronage and corruption. 28 H.R. Journal 29–30 (1834).

This narrow reading of the General Welfare Clause was by no means limited to the Democratic-Republicans. Even those who rejected the view that the General Welfare Clause was a limitation on power—and instead regarded it as a broad, independent grant of authority—understood it to impose meaningful constraints. Hamilton is often said to have won the interpretive debate on this point, and while

---

[2] Though Monroe rejected Madison's position that the spending power was limited to the matters otherwise enumerated in Article I, Section 8, he nevertheless acknowledged a limitation to "general" matters found in the text of the General Welfare clause itself.

that conclusion is historically dubious[3], it is, more significantly for the purposes of this case, beside the point. While he and Madison certainly (and famously) disagreed on whether the General Welfare Clause was merely, as Madison held, a statement of purpose that qualified and limited the taxing power or a separate, independent power to spend for purposes that serve general welfare, under *either* the Hamiltonian or Madisonian understanding, the General Welfare Clause forbids federal spending that is not "general" in character but targets merely regional or parochial interests. To put it simply, both Hamilton and Madison agreed that spending must serve truly national purposes. Alexander Hamilton, *Report on Manufactures* (1791), reprinted in 2 Founders' Constitution ("the object to which an appropriation of money is to be made must be general, and not local; its operation extending in fact, or by possibility, throughout the Union, and not being confined to a particular spot"). Thus, the spending at issue here, encompassing Congressionally appropriated funds for a wide range of federal programs—including those related to energy and infrastructure projects under the IRA and IIJA, as well as initiatives concerning DEI, gender

---

[3] While the structural aspect of Hamilton's view (that the spending power is distinct from other enumerated powers) was later acknowledged in *United States v. Butler*, 297 U.S. 1, 65-66 (1936), the broader conclusion that Hamilton definitively "won" the interpretive debate regarding the *limits* on spending is historically dubious. *See generally Eastman, supra*, at 65-77 (arguing that Madison's more restrictive interpretation significantly influenced early American history, with Hamilton's expansive view being largely contested and a restrictive understanding of "general welfare" often prevailing through much of the 19th century).

ideology, and environmental policy, fails under *both* founding-era interpretations of the Clause.

What is critical is that this principle was not a partisan or factional view. Across the ideological spectrum, the Founding generation overwhelmingly agreed on at least one thing: that the term "general welfare" imposed a substantive limitation. Federal spending had to serve the interests of the nation as a whole—not particular regions, industries, or individuals.

Moreover, that consensus continued well beyond the founding generation. Even the ever-expansive Justice Story – no friend to strict limits on federal power – acknowledged that the power to provide for the general welfare was not without limits: "Congress has not an unlimited power of taxation," he wrote, "but it is limited to specific objects,—the payment of the public debts, and providing for the common defence and general welfare." 2 Joseph Story, *Commentaries on the Constitution* § 905 (1833). He emphasized that construing the clause as an independent grant of power would "render wholly unimportant and unnecessary the subsequent enumeration of specific powers" and "practically create an unlimited national government." *Id.* § 906. To do so, he explained, would be to accuse the Framers of "either … premeditated folly or premeditated fraud." *Id.* § 907. As Dr. Eastman has

explained previously, the original meaning of "general welfare" specifically excluded localized or particular benefits.[4] Eastman, *supra*, at 87.

Whichever view one adopts—Madison's narrower reading, Hamilton's more expansive one, or even Hamilton's formulation as filtered through Justice Story—the Spending Clause still imposes a real limitation: spending must serve national, not local, interests.

### B.    The Executive Branch Has the Constitutional Duty to Ensure that Federal Spending Complies with Constitutional Limitations

The President's constitutional duty to "take Care that the Laws be faithfully executed" extends not merely to statutes but to the Constitution itself, which is the supreme law of the land. U.S. Const. art. II, § 3; art. VI, cl. 2. It follows that the Executive Branch cannot be compelled to implement statutes, including appropriations, that transgress constitutional limits—particularly the substantive limitation in the Spending Clause that expenditures must be for the "general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

The Spending Clause does not grant Congress carte blanche to fund any project it deems worthwhile. As shown above, the Clause was universally

---

[4] The word "general," particularly when used to modify the word "welfare," meant the opposite of "local" or "particular," referring to welfare that was shared by the whole rather than welfare particularized to specific recipients. Eastman, *supra*, at 87.

understood by the Founding generation to bar appropriations for local or parochial purposes. That limitation has concrete force: if a spending program does not serve the general welfare as the Constitution requires, then no branch of government—not even Congress—has authority to compel its execution. The President, as the chief constitutional officer, is bound not to carry out such unlawful directives. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015) (Executive authority is defined and limited by the Constitution); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977) (each branch must independently interpret the Constitution); *Trump v. United States*, 603 U.S. 593, 617 (2024) (President retains constitutional discretion to act within the bounds of Article II, even in the face of statutory commands).

Accordingly, the Executive Branch not only may—but *must*—decline to execute appropriations that fail the Spending Clause's "general welfare" requirement. It is not a mere matter of administrative policy, but a constitutional necessity. In short, the President is not authorized to execute an unlawful directive from Congress or from anyone else.

Congressional appropriations do not override constitutional limitations. To hold otherwise would render the "general welfare" requirement meaningless, allowing Congress to subvert it by legislative fiat. Indeed, the very existence of constitutional limits on spending presupposes that someone must enforce them. If not the Executive, then who?

If the President cannot decline to disburse funds that serve only regional or ideological interests, then the "general welfare" limitation is a dead letter. Indeed, the President's duty to "take Care that the Laws be faithfully executed" necessarily includes a duty to *evaluate* whether an appropriation comports with the Constitution before disbursing funds. That duty does not depend on the outcome of litigation or on whether a court eventually finds the appropriation unconstitutional. Rather, it is the President's independent constitutional obligation to ensure compliance in the first instance. If the Executive could not pause and review potentially unlawful spending unless a court had already invalidated it, then the Spending Clause would offer no meaningful limitation on Congress at all—every expenditure would go out the door unless and until struck down, which in many cases would not occur until long after the expenditure was made and beyond recovery. The constitutional principles necessitate that the President actually interpret the Constitution, because he cannot fulfill his oath to "preserve, protect and defend the Constitution" without doing so.

The district court's failure to recognize this fundamental duty—treating the OMB's constitutional review as a mere matter of administrative delay—reflects a profound misunderstanding of the constitutional stakes. This is not a conflict over statutory procedure or agency discretion. It is a matter of constitutional obligation. The Executive must not be conscripted into violating the very Charter it is sworn to

uphold. The injunction below disregards all of this, treating the Constitution's structural limitations as subordinate to congressional will.

## II.    Supreme Court Precedent Confirms the "General Welfare" Limitation on Spending Power

Supreme Court precedent, particularly in *United States v. Butler* and *South Dakota v. Dole*, unequivocally confirms that the "general Welfare" language in the Spending Clause imposes meaningful and enforceable limits on Congress's spending authority.

### A.    *United States v. Butler* Established "General Welfare" as a Judicially Enforceable Limitation

In *United States v. Butler*, 297 U.S. 1 (1936), the Supreme Court offered its most thorough analysis of the constitutional limits imposed by the Spending Clause. While purporting to adopt Alexander Hamilton's broader construction, the Court nevertheless made clear that the phrase "general welfare" constitutes a substantive limitation on congressional power—not merely a preamble or aspirational guideline.

The Court held that Congress's "powers of taxation and appropriation extend only to matters of national, as distinguished from local, welfare." *Id.* at 67 (emphasis added). Citing Justice Story with approval, the Court warned that treating the General Welfare Clause as a plenary grant would "render wholly unimportant and

unnecessary the subsequent enumeration of specific powers." *Id.* at 66. As Justice Story explained, "[t]he power to tax is not unlimited."

Most significantly, the Court invalidated the spending program at issue precisely because it "invade[d] the reserved rights of the states." *Id.* at 68. In doing so, *Butler* confirmed that the "general welfare" limitation is not only substantive but also judicially enforceable. The Court forcefully rejected any reading of the clause that would permit Congress to circumvent the Constitution's structural safeguards, stating that such a construction would impute to the Framers "either premeditated folly or premeditated fraud." *Id.* at 66 (quoting Story).

**B.    *South Dakota v. Dole* Reaffirmed Rather Than Abandoned These Limits**

In *South Dakota v. Dole*, 483 U.S. 203 (1987), the Supreme Court reaffirmed that the Spending Clause is subject to substantive constitutional limitations. The Court began by stating that "the spending power is of course not unlimited," and that "the exercise of the spending power must be in pursuit of 'the general welfare.'" *Id.* at 207. Chief Justice Rehnquist, writing for the majority, identified four "general restrictions articulated in our cases," placing the general welfare requirement first among them. *Id.*

Although the Court noted that "courts should defer substantially to the judgment of Congress" in determining whether an expenditure serves public

purposes, this deference applies only to Congress's assessment of whether a program serves *welfare*, not to the judicial duty to ensure that the welfare is *general*—national rather than local in scope. *Id.* The Court cited *Helvering v. Davis*, 301 U.S. 619, 640 (1937), which reaffirmed that "the line must still be drawn between one welfare and another, between particular and general." *Id.*

Nothing in *Dole* contradicts the limitation articulated in *Butler*, nor does it suggest abandonment of judicial responsibility to enforce the national character of spending programs. Indeed, the Court expressly recognized the possibility of unconstitutional conditions and coercion, but found that the 5% highway funding penalty at issue did not cross that line. *Dole*, 483 U.S. at 211–12.

Justice O'Connor's dissent forcefully restated the risks of ignoring the limitation: "If the spending power is to be limited only by Congress' notion of the general welfare, the reality... is that the Spending Clause gives 'power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed.'" *Id.* at 217 (O'Connor, J., dissenting) (quoting *Butler*, 297 U.S. at 78).

### C.    Lower Courts Have Misinterpreted These Precedents

Unfortunately, lower courts have misread *Dole*'s deference to Congress as applying not just to the "welfare" determination but to the "general" limitation as well. The Eighth Circuit's analysis in *Van Wyhe v. Reisch*, for example, omits the

crucial "general" qualification in its description of judicial deference, stating only that "the concept of welfare or the opposite is shaped by Congress." 581 F.3d 639, 650 (8th Cir. 2009).

This misinterpretation effectively eliminates a key constitutional constraint. The circuit courts have failed to focus on the distinction between national and local welfare that was critical to this Court's decision in *Butler* and reaffirmed in *Dole*. Without proper enforcement of the "general welfare" limitation, Congress's spending power becomes effectively unlimited—precisely the outcome the Framers sought to prevent.

## III.    The District Court's Injunction Impermissibly Interferes with the Executive's Constitutional Duty to Ensure Faithful Execution of the Laws

The Constitution obligates the Executive to ensure that federal spending complies with constitutional limits. The district court's injunction overrides that duty and forces the Executive to disburse funds without regard to legality.

### A.    The OMB Directive Was a Constitutionally Mandated Exercise of Executive Discretion

The Office of Management and Budget's Memorandum M-25-13 ("OMB Directive"), which temporarily paused certain grant and financial assistance programs for review, was an exercise of this constitutional obligation. The memorandum expressly cited concerns over funding initiatives grounded in "DEI,

woke gender ideology, and the green new deal"—programs that, by their nature, appear to serve narrow ideological, identity-based, or local interests rather than the general welfare of the nation. OMB Mem. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025).

These are precisely the kinds of expenditures the Founders rejected as incompatible with the "general welfare." To consider several examples, programs that allocate funds exclusively to "queer communities of color" in select urban areas are manifestly particularized—both geographically and demographically.

The Community Wildfire Defense Grant Program (IIJA § 40803 (f)(1)) provides funds to specific "at-risk communit[ies]… having high or very high wildfire hazard potential" for localized planning and mitigation efforts.[5] This kind of geographically targeted expenditure closely echoes Congress's 1796 refusal to appropriate federal funds to rebuild Savannah, Georgia, after a devastating fire. *6 Annals of Cong., House of Representatives, 4th Cong., 2d Sess. 1712–27* (1796). There, Congress made clear that even urgent need, in the wake of *actual* disaster (not merely an anticipated, hypothetical one), did not convert a local matter into a national one.

---

[5] Curiously, the program also gives priority to "low-income communit[ies]," apparently irrespective of their wildfire hazard potential. IIJA § 40803(f)(2)(B).

The same constitutional infirmity arises with respect to programs such as the Safe Streets and Roads for All initiative which supports "*local* initiatives to prevent death and serious injury on roads and streets," (IIJA § 24112 (emphasis added)) – explicitly a targeted grant to specific municipalities for improvements tailored to their particular geographic, demographic, or political priorities. Indeed, this spending is precisely the type of "internal improvement" that President Monroe vetoed in the 1822 Cumberland Road bill on precisely this constitutional principle. *39 Annals of Cong., House of Representatives, 17th Cong., 1st Sess. 1838, 1849* (1822).

This pattern of parochial allocation recurs throughout the challenged appropriations. For instance, New Jersey's Resilient Food Systems Infrastructure ("RFSI") program provides cost-share grants directly to that state's farmers to strengthen local supply chains. This is a direct economic benefit conferred on a single industry within a single state—precisely the kind of sectional favoritism rejected in the cod fisheries bounty debates. See Mot. for TRO, Doc. 3-1 at 83-84 (Wengryn Decl. ¶¶ 6-7).

Even with respect to federal programs ostensibly addressing issues of plainly uniform, general concern—such as climate change—the actual expenditures frequently serve narrow, local constituencies. The Healthy Streets Program, for example, funds tree cover and "cool pavements" to mitigate "urban heat islands" in

designated neighborhoods. IIJA § 11406. But these projects are neither national in scale nor general in effect. They are geographically and demographically particularized to specific municipalities (and even subdivisions thereof) and thus constitutionally suspect. Like the Cumberland Road bill vetoed by Monroe, they fail not because their goals are trivial, but because their benefits are narrowly distributed. *39 Annals of Cong., House of Representatives, 17th Cong., 1st Sess. 1838, 1849* (1822).

Other provisions raise similar constitutional concerns. The Grants for Energy Efficiency and Renewable Energy Improvements at Public School Facilities (IIJA § 40541) allocate federal funds to particular schools for infrastructure upgrades. Though framed in terms of national energy policy, the disbursements are directed at specific, localized beneficiaries. Whether these grants serve truly general purposes—or merely cloak local appropriations in the language of federal policy— is a question that necessitates review by the executive. Executive Order 14154 mandates precisely that kind of scrutiny.

The Constitution does not permit Congress to redistribute national funds to serve ideological factions or regional interests. That sort of targeted favoritism is the very definition of parochial spending and falls outside the ambit of the general welfare.

Moreover, these programs share a core defect: they are structurally incapable of benefiting the nation as a whole, even in principle. Unlike lighthouse construction or uniform defense expenditures, these initiatives are bounded by geography and identity. Their intended impact is not national but sectional. No matter how noble the purpose, the Constitution forbids such appropriations from being carried out by federal officers.

Critically, it is precisely to make such constitutional assessments—to differentiate between expenditures that serve the "general Welfare of the United States" and those that unconstitutionally benefit only particularized interests—that the Executive Branch initiated the review enjoined by the district court. The duty to "preserve, protect and defend the Constitution of the United States" and "take Care that the Laws be faithfully executed" requires the Executive to evaluate the constitutionality of congressional enactments, including appropriations, *before* disbursing public funds. Such a review is indispensable to ensure fidelity to constitutional limitations, irrespective of whether some of the paused grants might ultimately be determined to be valid exercises of the spending power upon closer examination. The district court's injunction improperly halts this essential constitutional diligence, thereby effectively compelling the unconstitutional expenditure of taxpayer funds and undermining the very structure of separated powers and enumerated authorities that the Constitution establishes.

24

**B.**     **The District Court's Injunction Improperly Compels the Executive to Violate the Constitution**

The district court's sweeping preliminary injunction—prohibiting the Executive from "pausing, freezing, blocking, canceling, suspending, [or] terminating" any disbursement of appropriated funds based on the OMB Directive— effectively compels the President to execute spending programs irrespective of any constitutional infirmity they may have. *State of New York v. Trump*, No. 25-1236, slip op. at 6–7 (1st Cir. Mar. 26, 2025). That order usurps the Executive's independent duty to assess the constitutionality of government action and undermines the separation of powers.

The assumption underlying the injunction—that once Congress appropriates funds, the Executive must disburse them without regard to constitutional constraints—is not only incorrect but dangerous. It would elevate statutory commands over the Constitution itself, precisely the inversion that the Supremacy Clause forbids.

Executive Order 14154, *Unleashing American Energy*, confirms that the President was acting pursuant to this constitutional obligation. It directs agencies to "immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117–169) or the Infrastructure Investment and

Jobs Act (Public Law 117–58)" and to review these programs for consistency with law and policy. This pause is not just lawful—it is constitutionally required. Among the programs affected is the IRA's $27 billion "Greenhouse Gas Reduction Fund," which provides grants to state and local governments to subsidize "low and zero emission technologies." These grants—targeted at select jurisdictions and favored industries—raise precisely the kind of constitutional concern the Founders sought to avoid: the diversion of national resources to local or factional projects.

The district court's approach also upsets the Constitution's system of checks and balances. If the Executive cannot pause or decline funding based on constitutional concerns, then the only remaining check on unconstitutional spending would be judicial review—a safeguard often unavailable due to justiciability doctrines like standing, ripeness, and the political question doctrine. If both executive and judicial checks are removed, Congress is left as the sole judge of its own constitutional limits—a result the Framers expressly rejected.

By requiring the Executive to disburse funds without assessing their constitutionality, the district court's injunction removes the "general welfare" limitation as a meaningful constraint on federal power. It transforms the President's duty to uphold the Constitution into a duty to disregard it.

**C.    The District Court's Reasoning Collapses the Distinction Between Appropriation and Disbursement, Undermining the Constitutional Structure**

The district court's opinion erroneously proceeds as if Congress's appropriation of funds necessarily compels the Executive to disburse them. That conclusion is not only doctrinally unsupported—it is constitutionally dangerous. The power to appropriate resides with Congress, but the duty to disburse appropriated funds belongs to the Executive, and that duty is constrained by the Constitution itself.

The court's reasoning effectively treats appropriation as self-executing, nullifying the Executive's duty to assess constitutional compliance. But a statutory appropriation cannot override constitutional limits. See *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("an act repugnant to the Constitution is void"). If the Executive were compelled to disburse all appropriated funds, no matter how parochial, ideological, or constitutionally suspect, the general welfare limitation would cease to be judicially or administratively enforceable. Congress could fund anything it pleased and insulate that decision from both Executive and judicial review.

That is not how our tripartite system of government functions. Appropriation is a necessary condition for disbursement, but not a sufficient one. The Executive

must still ensure that disbursement complies with constitutional constraints. The court's opinion fails even to acknowledge this separation-of-powers question.

Given these serious constitutional concerns, the preliminary injunction should be reversed. The Executive must be permitted to fulfill its constitutional duty to ensure that federal spending complies with the Spending Clause's "general welfare" limitation.

Moreover, if neither the Executive Branch nor the courts may enforce the "general welfare" limitation, then that constitutional constraint becomes functionally meaningless. The Spending Clause was not intended to authorize an unchecked congressional power to fund regional, ideological, or parochial interests under the guise of federal purpose.

As the Court stated in *United States v. Lopez*, "[t]he Constitution mandates . . . withholding from Congress a plenary police power." 514 U.S. 549, 567 (1995). The same must be true of the Spending Clause. The judiciary, no less than the Executive, has a duty to ensure that federal expenditures comply with the Constitution. To treat appropriations as self-executing obligations, immune from review for constitutional compliance, is to erase the most fundamental limitation on Congress's fiscal authority.

The district court's injunction thus not only undermines the Executive's constitutional duty, but also impairs the judiciary's role as guardian of constitutional

structure. This Court should reverse to preserve the separation of powers and restore the general welfare limitation to its rightful place in the constitutional order.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's preliminary injunction. The injunction impermissibly interferes with the Executive's constitutional duty to ensure that federal spending complies with the Spending Clause's "general welfare" limitation. By requiring the Executive to disburse funds without assessing their constitutionality, the injunction undermines both the constitutional system of checks and balances and the fundamental limitation on federal spending power. These serious constitutional violations provide a strong basis for reversing the district court's judgment.

Executed this 5th day of June, 2025.

/s/ Alexander Haberbush
Alexander Haberbush
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Boulevard, Suite 1403
Long Beach, CA 90802
Telephone: (562) 435-9062
FAX: (562) 600-7570
E-mail: ahaberbush@ccg1776.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6140 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 5th day of June, 2025.

/s/ Alexander Haberbush
Alexander Haberbush
CONSTITUTIONAL COUNSEL GROUP
444 W Ocean Boulevard, Suite 1403
Long Beach, CA 90802
Telephone: (562) 435-9062
FAX: (562) 600-7570
E-mail: ahaberbush@ccg1776.com
