# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; OFFICE OF THE GOVERNOR OF KENTUCKY, ex rel. ANDREW BESHEAR, in their official capacity as Governor of the Commonwealth of Kentucky,

Plaintiffs-Appellees,

*(caption continued on next page)*

_____

On Appeal from the United States District Court
for the District of Rhode Island (No. 1:25-cv-00039)
The Honorable John J. McConnell, Jr.

## PLAINTIFFS-APPELLEES' SUPPLEMENTAL APPENDIX

LETITIA JAMES
Attorney General
State of New York

BARBARA D. UNDERWOOD
Solicitor General
JUDITH N. VALE
Deputy Solicitor General
MARK S. GRUBE
Senior Assistant Solicitor General
28 Liberty Street
New York, NY 10005

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General
ALEX HEMMER
Deputy Solicitor General
R. SAM HORAN
Assistant Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-5526
alex.hemmer@ilag.gov

*(additional counsel on signature page)*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; US AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET

PETRO, in their official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration,

Defendants-Appellants.

# TABLE OF CONTENTS

**Page**

Unleashing American Energy,
Exec. Order No. 14,154, 90 Fed. Reg. 8,353 (Jan. 20, 2025)
(Doc. No. 68-1) .............................................................................. SA1

Protecting the American People Against Invasion,
Exec. Order No. 14,159, 90 Fed. Reg. 8,443 (Jan. 20, 2025)
(Doc. No. 68-3) .............................................................................. SA9

Defending Women from Gender Ideology Extremism and
Restoring Biological Truth to the Federal Government,
Exec. Order No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025)
(Doc. No. 68-5) ............................................................................ SA16

Declaration of Lindy Harrington
(Doc. No. 68-32) .......................................................................... SA21

Declaration of Jeni Kitchell (excerpted)
(Doc. No. 68-34) .......................................................................... SA30

Declaration of Theresa A. Maldonado
(Doc. No. 68-37) .......................................................................... SA54

Declaration of Laura Roche (excerpted)
(Doc. No. 68-56) .......................................................................... SA69

Declaration of Department of Environmental Protection
(Doc. No. 68-59) .......................................................................... SA89

Declaration of Harry Coker Jr.
(Doc. No. 68-65) ........................................................................ SA110

Declaration of Travis Boeskool
(Doc. No. 68-73) ........................................................................ SA118

Declaration of Elizabeth Groginsky
    (Doc. No. 68-86) ....................................................... SA123

Declaration of Melissa A. Clayton
    (Doc. No. 68-93) ....................................................... SA131

Declaration of Erin McMahon
    (Doc. No. 68-99) ....................................................... SA137

Declaration of Tom Riel
    (Doc. No. 68-101) ..................................................... SA143

Declaration of Emily Cahoon-Horvath (excerpted)
    (Doc. No. 68-106) ..................................................... SA149

Declaration of Will Toor (excerpted)
    (Doc. No. 68-123) ..................................................... SA176

Affirmation of Theodore McCombs
    (Doc. No. 160-1) ...................................................... SA197

# Thomas-Jensen Affirmation

# Exhibit # 1

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8353

# Presidential Documents

Executive Order 14154 of January 20, 2025

## Unleashing American Energy

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Background*. America is blessed with an abundance of energy and natural resources that have historically powered our Nation's economic prosperity. In recent years, burdensome and ideologically motivated regulations have impeded the development of these resources, limited the generation of reliable and affordable electricity, reduced job creation, and inflicted high energy costs upon our citizens. These high energy costs devastate American consumers by driving up the cost of transportation, heating, utilities, farming, and manufacturing, while weakening our national security.

It is thus in the national interest to unleash America's affordable and reliable energy and natural resources. This will restore American prosperity—including for those men and women who have been forgotten by our economy in recent years. It will also rebuild our Nation's economic and military security, which will deliver peace through strength.

**Sec. 2**. *Policy*. It is the policy of the United States:

(a) to encourage energy exploration and production on Federal lands and waters, including on the Outer Continental Shelf, in order to meet the needs of our citizens and solidify the United States as a global energy leader long into the future;

(b) to establish our position as the leading producer and processor of non-fuel minerals, including rare earth minerals, which will create jobs and prosperity at home, strengthen supply chains for the United States and its allies, and reduce the global influence of malign and adversarial states;

(c) to protect the United States's economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation;

(d) to ensure that all regulatory requirements related to energy are grounded in clearly applicable law;

(e) to eliminate the "electric vehicle (EV) mandate" and promote true consumer choice, which is essential for economic growth and innovation, by removing regulatory barriers to motor vehicle access; by ensuring a level regulatory playing field for consumer choice in vehicles; by terminating, where appropriate, state emissions waivers that function to limit sales of gasoline-powered automobiles; and by considering the elimination of unfair subsidies and other ill-conceived government-imposed market distortions that favor EVs over other technologies and effectively mandate their purchase by individuals, private businesses, and government entities alike by rendering other types of vehicles unaffordable;

(f) to safeguard the American people's freedom to choose from a variety of goods and appliances, including but not limited to lightbulbs, dishwashers, washing machines, gas stoves, water heaters, toilets, and shower heads, and to promote market competition and innovation within the manufacturing and appliance industries;

(g) to ensure that the global effects of a rule, regulation, or action shall, whenever evaluated, be reported separately from its domestic costs and

benefits, in order to promote sound regulatory decision making and prioritize the interests of the American people;

(h) to guarantee that all executive departments and agencies (agencies) provide opportunity for public comment and rigorous, peer-reviewed scientific analysis; and

(i) to ensure that no Federal funding be employed in a manner contrary to the principles outlined in this section, unless required by law.

**Sec. 3**. *Immediate Review of All Agency Actions that Potentially Burden the Development of Domestic Energy Resources.* (a) The heads of all agencies shall review all existing regulations, orders, guidance documents, policies, settlements, consent orders, and any other agency actions (collectively, agency actions) to identify those agency actions that impose an undue burden on the identification, development, or use of domestic energy resources—with particular attention to oil, natural gas, coal, hydropower, biofuels, critical mineral, and nuclear energy resources—or that are otherwise inconsistent with the policy set forth in section 2 of this order, including restrictions on consumer choice of vehicles and appliances.

(b) Within 30 days of the date of this order, the head of each agency shall, in consultation with the director of the Office of Management and Budget (OMB) and the National Economic Council (NEC), develop and begin implementing action plans to suspend, revise, or rescind all agency actions identified as unduly burdensome under subsection (a) of this section, as expeditiously as possible and consistent with applicable law. The head of any agency who determines that such agency does not have agency actions described in subsection (a) of this section shall submit to the Director of OMB a written statement to that effect and, absent a determination by the Director of OMB that such agency does have agency actions described in this subsection, shall have no further responsibilities under this section.

(c) Agencies shall promptly notify the Attorney General of any steps taken pursuant to subsection (a) of this section so that the Attorney General may, as appropriate:

(i) provide notice of this Executive Order and any such actions to any court with jurisdiction over pending litigation in which such actions may be relevant; and

(ii) request that such court stay or otherwise delay further litigation, or seek other appropriate relief consistent with this order, pending the completion of the administrative actions described in this order.

(d) Pursuant to the policy outlined in section 2 of this order, the Attorney General shall consider whether pending litigation against illegal, dangerous, or harmful policies should be resolved through stays or other relief.

**Sec. 4**. *Revocation of and Revisions to Certain Presidential and Regulatory Actions.* (a) The following are revoked and any offices established therein are abolished:

(i) Executive Order 13990 of January 20, 2021 (Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis);

(ii) Executive Order 13992 of January 20, 2021 (Revocation of Certain Executive Orders Concerning Federal Regulation);

(iii) Executive Order 14008 of January 27, 2021 (Tackling the Climate Crisis at Home and Abroad);

(iv) Executive Order 14007 of January 27, 2021 (President's Council of Advisors on Science and Technology);

(v) Executive Order 14013 of February 4, 2021 (Rebuilding and Enhancing Programs to Resettle Refugees and Planning for the Impact of Climate Change on Migration);

(vi) Executive Order 14027 of May 7, 2021 (Establishment of the Climate Change Support Office);

(vii) Executive Order 14030 of May 20, 2021 (Climate-Related Financial Risk);

(viii) Executive Order 14037 of August 5, 2021 (Strengthening American Leadership in Clean Cars and Trucks);

(ix) Executive Order 14057 of December 8, 2021 (Catalyzing Clean Energy Industries and Jobs Through Federal Sustainability);

(x) Executive Order 14072 of April 22, 2022 (Strengthening the Nation's Forests, Communities, and Local Economies);

(xi) Executive Order 14082 of September 12, 2022 (Implementation of the Energy and Infrastructure Provisions of the Inflation Reduction Act of 2022); and

(xii) Executive Order 14096 of April 21, 2023 (Revitalizing Our Nation's Commitment to Environmental Justice for All).

(b) All activities, programs, and operations associated with the American Climate Corps, including actions taken by any agency shall be terminated immediately. Within one day of the date of this order, the Secretary of the Interior shall submit a letter to all parties to the ''American Climate Corps Memorandum of Understanding'' dated December 2023 to terminate the memorandum, and the head of each party to the memorandum shall agree to the termination in writing.

(c) Any assets, funds, or resources allocated to an entity or program abolished by subsection (a) of this section shall be redirected or disposed of in accordance with applicable law.

(d) The head of any agency that has taken action respecting offices and programs in subsection (a) shall take all necessary steps to ensure that all such actions are terminated or, if necessary, appropriate, or required by law, that such activities are transitioned to other agencies or entities.

(e) Any contract or agreement between the United States and any third party on behalf of the entities or programs abolished in subsection (a) of this section, or in furtherance of them, shall be terminated for convenience, or otherwise, as quickly as permissible under the law.

**Sec. 5.** *Unleashing Energy Dominance through Efficient Permitting.* (a) Executive Order 11991 of May 24, 1977 (Relating to protection and enhancement of environmental quality) is hereby revoked.

(b) To expedite and simplify the permitting process, within 30 days of the date of this order, the Chairman of the Council on Environmental Quality (CEQ) shall provide guidance on implementing the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.,* and propose rescinding CEQ's NEPA regulations found at 40 CFR 1500 *et seq.*

(c) Following the provision of the guidance, the Chairman of CEQ shall convene a working group to coordinate the revision of agency-level implementing regulations for consistency. The guidance in subsection (b) and any resulting implementing regulations must expedite permitting approvals and meet deadlines established in the Fiscal Responsibility Act of 2023 (Public Law 118–5). Consistent with applicable law, all agencies must prioritize efficiency and certainty over any other objectives, including those of activist groups, that do not align with the policy goals set forth in section 2 of this order or that could otherwise add delays and ambiguity to the permitting process.

(d) The Secretaries of Defense, Interior, Agriculture, Commerce, Housing and Urban Development, Transportation, Energy, Homeland Security, the Administrator of the Environmental Protection Agency (EPA), the Chairman of CEQ, and the heads of any other relevant agencies shall undertake all available efforts to eliminate all delays within their respective permitting processes, including through, but not limited to, the use of general permitting and permit by rule. For any project an agency head deems essential for the Nation's economy or national security, agencies shall use all possible

authorities, including emergency authorities, to expedite the adjudication of Federal permits. Agencies shall work closely with project sponsors to realize the ultimate construction or development of permitted projects.

(e) The Director of the NEC and the Director of the Office of Legislative Affairs shall jointly prepare recommendations to Congress shall:

(i) facilitate the permitting and construction of interstate energy transportation and other critical energy infrastructure, including, but not limited to, pipelines, particularly in regions of the Nation that have lacked such development in recent years; and

(ii) provide greater certainty in the Federal permitting process, including, but not limited to, streamlining the judicial review of the application of NEPA.

**Sec. 6.** *Prioritizing Accuracy in Environmental Analyses.* (a) In all Federal permitting adjudications or regulatory processes, all agencies shall adhere to only the relevant legislated requirements for environmental considerations and any considerations beyond these requirements are eliminated. In fulfilling all such requirements, agencies shall strictly use the most robust methodologies of assessment at their disposal and shall not use methodologies that are arbitrary or ideologically motivated.

(b) The Interagency Working Group on the Social Cost of Greenhouse Gases (IWG), which was established pursuant to Executive Order 13990, is hereby disbanded, and any guidance, instruction, recommendation, or document issued by the IWG is withdrawn as no longer representative of governmental policy including:

(i) the Presidential Memorandum of January 27, 2021 (Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking);

(ii) the Report of the Greenhouse Gas Monitoring and Measurement Interagency Working Group of November 2023 (National Strategy to Advance an Integrated U.S. Greenhouse Gas Measurement, Monitoring, and Information System);

(iii) the Technical Support Document of February 2021 (Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990); and

(iv) estimates of the social cost of greenhouse gases, including the estimates for the social cost of carbon, the social cost of methane, or the social cost of nitrous oxide based, in whole or in part, on the IWG's work or guidance.

(c) The calculation of the "social cost of carbon" is marked by logical deficiencies, a poor basis in empirical science, politicization, and the absence of a foundation in legislation. Its abuse arbitrarily slows regulatory decisions and, by rendering the United States economy internationally uncompetitive, encourages a greater human impact on the environment by affording less efficient foreign energy producers a greater share of the global energy and natural resource market. Consequently, within 60 days of the date of this order, the Administrator of the EPA shall issue guidance to address these harmful and detrimental inadequacies, including consideration of eliminating the "social cost of carbon" calculation from any Federal permitting or regulatory decision.

(d) Prior to the guidance issued pursuant to subsection (c) of this section, agencies shall ensure estimates to assess the value of changes in greenhouse gas emissions resulting from agency actions, including with respect to the consideration of domestic versus international effects and evaluating appropriate discount rates, are, to the extent permitted by law, consistent with the guidance contained in OMB Circular A–4 of September 17, 2003 (Regulatory Analysis).

(e) Furthermore, the head of each agency shall, as appropriate and consistent with applicable law, initiate a process to make such changes to

any rule, regulation, policy or action as may be necessary to ensure consistency with the Regulatory Analysis.

(f) Within 30 days of the date of this order, the Administrator of the EPA, in collaboration with the heads of any other relevant agencies, shall submit joint recommendations to the Director of OMB on the legality and continuing applicability of the Administrator's findings, ''Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act,'' Final Rule, 74 FR 66496 (December 15, 2009).

**Sec. 7.** *Terminating the Green New Deal.* (a) All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 (Public Law 117–169) or the Infrastructure Investment and Jobs Act (Public Law 117–58), including but not limited to funds for electric vehicle charging stations made available through the National Electric Vehicle Infrastructure Formula Program and the Charging and Fueling Infrastructure Discretionary Grant Program, and shall review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined in section 2 of this order. Within 90 days of the date of this order, all agency heads shall submit a report to the Director of the NEC and Director of OMB that details the findings of this review, including recommendations to enhance their alignment with the policy set forth in section 2. No funds identified in this subsection (a) shall be disbursed by a given agency until the Director of OMB and Assistant to the President for Economic Policy have determined that such disbursements are consistent with any review recommendations they have chosen to adopt.

(b) When procuring goods and services, making decisions about leases, and making other arrangements that result in disbursements of Federal funds, agencies shall prioritize cost-effectiveness, American workers and businesses, and the sensible use of taxpayer money, to the greatest extent. The Director of OMB shall finalize and circulate guidelines to further implement this subsection.

(c) All agencies shall assess whether enforcement discretion of authorities and regulations can be utilized to advance the policy outlined in section 2 of this order. Within 30 days of the date of this order, each agency shall submit a report to the Director of OMB identifying any such instances.

**Sec. 8.** *Protecting America's National Security.* (a) The Secretary of Energy is directed restart reviews of applications for approvals of liquified natural gas export projects as expeditiously as possible, consistent with applicable law. In assessing the ''Public Interest'' to be advanced by any particular application, the Secretary of Energy shall consider the economic and employment impacts to the United States and the impact to the security of allies and partners that would result from granting the application.

(b) With respect to any proposed deepwater port for the export of liquefied natural gas (project) for which a favorable record of decision (ROD) has previously been issued pursuant to the Deepwater Port Act of 1974 (DWPA), 33 U.S.C. 1501 *et seq.,* the Administrator of the Maritime Administration (MARAD) shall, within 30 days of the date of this order and consistent with applicable law, determine whether any refinements to the project proposed subsequent to the ROD are likely to result in adverse environmental consequences that substantially differ from those associated with the originally-evaluated project so as to present a seriously different picture of the foreseeable adverse environmental consequences (seriously different consequences). In making this determination, MARAD shall qualitatively assess any difference in adverse environmental consequences between the project with and without the proposed refinements, including any potential consequences not addressed in the final Environmental Impact Statement (EIS), which shall be considered adequate under NEPA notwithstanding any revisions to NEPA that may have been enacted following the final EIS. MARAD shall submit this determination, together with a detailed justification, to the Secretary of Transportation and to the President.

(c) Pursuant to subsection (b) of this section, if MARAD determines that such refinements are not likely to result in seriously different consequences, it shall include in that determination a description of the refinements to supplement and update the ROD, if necessary and then no later than 30 additional days, he shall issue a DWPA license.

(d) If MARAD determines, with concurrence from the Secretary of Transportation, that such proposed refinements are likely to result in seriously different consequences, it shall, within 60 days after submitting such determination, issue an Environmental Assessment (EA) examining such consequences and, with respect to all other environmental consequences not changed due to project refinements, shall reaffirm the conclusions of the final EIS. Within 30 days after issuing the EA, MARAD shall issue an addendum to the ROD, if necessary, and shall, within 30 additional days, issue a DWPA license consistent with the ROD.

**Sec. 9**. *Restoring America's Mineral Dominance.* (a) The Secretary of the Interior, Secretary of Agriculture, Administrator of the EPA, Chairman of CEQ, and the heads of any other relevant agencies, as appropriate, shall identify all agency actions that impose undue burdens on the domestic mining and processing of non-fuel minerals and undertake steps to revise or rescind such actions.

(b) The Secretaries of the Interior and Agriculture shall reassess any public lands withdrawals for potential revision.

(c) The Secretary of the Interior shall instruct the Director of the U.S. Geological Survey to consider updating the Survey's list of critical minerals, including for the potential of including uranium.

(d) The Secretary of the Interior shall prioritize efforts to accelerate the ongoing, detailed geologic mapping of the United States, with a focus on locating previously unknown deposits of critical minerals.

(e) The Secretary of Energy shall ensure that critical mineral projects, including the processing of critical minerals, receive consideration for Federal support, contingent on the availability of appropriated funds.

(f) The United States Trade Representative shall assess whether exploitative practices and state-assisted mineral projects abroad are unlawful or unduly burden or restrict United States commerce.

(g) The Secretary of Commerce shall assess the national security implications of the Nation's mineral reliance and the potential for trade action.

(h) The Secretary of Homeland Security shall assess the quantity and inflow of minerals that are likely the product of forced labor into the United States and whether such inflows pose a threat to national security and, within 90 days of the date of this order, shall provide this assessment to the Director of the NEC.

(i) The Secretary of Defense shall consider the needs of the United States in supplying and maintaining the National Defense Stockpile, review the legal authorities and obligations in managing the National Defense Stockpile, and take all appropriate steps to ensure that the National Defense Stockpile will provide a robust supply of critical minerals in event of future shortfall.

(j) Within 60 days of the date of this order, the Secretary of State, Secretary of Commerce, Secretary of Labor, the United States Trade Representative, and the heads of any other relevant agencies, shall submit a report to the Assistant to the President for Economic Policy that includes policy recommendations to enhance the competitiveness of American mining and refining companies in other mineral-wealthy nations.

(k) The Secretary of State shall consider opportunities to advance the mining and processing of minerals within the United States through the Quadrilateral Security Dialogue.

**Sec. 10**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of OMB relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented in a manner consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01956
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

# Thomas-Jensen Affirmation

# Exhibit # 3

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8443

# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

SA10

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9.** *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10.** *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11.** *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12.** *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13.** *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

**8446**    **Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14.** *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15.** *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16.** *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17.** *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18.** *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19.** *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20.** *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

# Thomas-Jensen Affirmation

# Exhibit # 5

# Presidential Documents

Executive Order 14168 of January 20, 2025

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1.** *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2.** *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) ''Sex'' shall refer to an individual's immutable biological classification as either male or female. ''Sex'' is not a synonym for and does not include the concept of ''gender identity.''

(b) ''Women'' or ''woman'' and ''girls'' or ''girl'' shall mean adult and juvenile human females, respectively.

(c) ''Men'' or ''man'' and ''boys'' or ''boy'' shall mean adult and juvenile human males, respectively.

(d) ''Female'' means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) ''Male'' means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) ''Gender identity'' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3**. *Recognizing Women Are Biologically Distinct From Men.* (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms ''sex'', ''male'', ''female'', ''men'', ''women'', ''boys'' and ''girls'' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term ''sex'' and not ''gender'' in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4**. *Privacy in Intimate Spaces.* (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5.** *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6.** *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7.** *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) "The White House Toolkit on Transgender Equality";

(ii) the Department of Education's guidance documents including:

(A) "2024 Title IX Regulations: Pointers for Implementation" (July 2024);

(B) "U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students";

(C) "U.S. Department of Education Supporting LGBTQI+ Youth and Families in School" (June 21, 2023);

(D) "Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela" (June 21, 2023);

(E) "Supporting Intersex Students: A Resource for Students, Families, and Educators" (October 2021);

(F) "Supporting Transgender Youth in School" (June 2021);

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

Thomas-Jensen
Affirmation

Exhibit # 32

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK; et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00039-JJM-PAS |
| DONALD TRUMP, in his official capacity as President of the United States; et al., | |
| Defendants. | |

1

SA22

## DECLARATION OF LINDY HARRINGTON

I, Lindy Harrington, declare as follows:

1.    I am a resident of the State of California. I am over the age of 18 and have

personal knowledge of all the facts stated herein, except to those matters stated upon information

and belief; as to those matters, I believe them to be true. If called as a witness, I could and would

testify competently to the matters set forth below.

2.    I am currently employed by the California Department of Health Care Services

(DHCS) as the Assistant State Medicaid Director. I have held the Assistant State Medicaid

Director position since 2023. As Assistant State Medicaid Director my responsibilities include

assisting the State Medicaid Director in overseeing all aspects of the Medicaid and Children's

Health Insurance Programs (CHIP) as governed by state and federal rules. My experience

includes over 17 years of various executive leadership roles within DHCS, including over 7

years as the Deputy Director, Health Care Financing, where I was responsible for the

development, promotion, and implementation of financing for California's Medicaid program

(Medi-Cal) prior to my appointment as Assistant State Medicaid Director. Additionally, I have

approximately 8 years of executive leadership within the administrative functions of the

Department, including but not limited to financial management (including accounting, budgeting

and fiscal forecasting) as the Deputy Director, Administration, for approximately 2 years. I also

served as the Chief, Financial Management Branch for approximately 6 years. My

responsibilities in that role included oversight for financial management of all DHCS health care

programs, not limited to Medi-Cal.

3.    I understand that on January 27, 2025, the acting director of the U.S. Office of

Management and Budget (OMB), Matthew J. Vaeth, issued OMB Memorandum M-25-13, a

"Memorandum for the Heads of Executive Departments and Agencies" regarding "Temporary

2

SA23

Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("OMB Memorandum"). The OMB Memorandum directed all federal agencies to "pause all activities related to obligation or disbursement of all Federal financial assistance . . . including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

4.      I am providing this declaration to explain certain adverse impacts on the State of California that were caused by the federal government pausing activities related to the obligation or disbursement of federal financial assistance to the State through DHCS, and to explain more generally certain adverse impacts that are or might be caused when the federal government pauses such activities.

5.      The California Department of Health Care Services (DHCS) is the backbone of California's healthcare safety net. DHCS is the single state agency responsible for administering the state's Medicaid program, Medi-Cal, which provides comprehensive health care services at no or low cost for low-income individuals. Medi-Cal is authorized and funded through the Medicaid federal-state partnership. California administers its own Medicaid program under broad federal requirements and the terms of its "plan for medical assistance," also known as a State Plan. Social Security Act § 1902; 42 C.F.R. Part 430, subpart B. Once the U.S. Centers for Medicare and Medicaid Services (CMS) approves the State Plan, a state is entitled to receive the federal Medicaid funding contribution, known as "Federal Financial Participation" (FFP), for a percentage of its program-related expenditures for eligible enrollees.

6.      Medi-Cal programs cover physical health, mental health, substance use disorder, pharmacy, dental, and long-term services and supports. As of January 2025, Medi-Cal serves approximately 14.5 million Californians, making the Department the largest health care

SA24

purchaser in California. Besides Medi-Cal, DHCS also administers and oversees the Children's Health Insurance Program (CHIP), and several health-related federal grants. The Department also administers programs for special populations and several other programs funded with state funds, as well as county-operated community mental health and substance use disorder programs. Among those 14.5 million Californians covered by DHCS programs are 5 million children—more than half of all California's kids, 2.3 million seniors and people with disabilities, and 3.4 million working Californians—nearly one in five of all California workers.

7.     As Assistant State Medicaid Director, my responsibilities include the management of the Medi-Cal program, including its funding, budgets, staffing, and programs. Among the programs administered by DHCS, some are part of Medi-Cal, and mandated and/or financed by the federal government, while others are mandated and financed by state law. These programs include: American Indian Infant Health Initiative; Mental Health and Substance Use Disorder Services; Medi-Cal Access Program; California Children's Services program; Child Health and Disability Prevention program; the Genetically Handicapped Persons Program; the Newborn Hearing Screening Program; the Family Planning, Access, Care, and Treatment program; Program of All-Inclusive Care for the Elderly; the Health Care Program for Children in Foster Care; Projects for Assistance in Transition from Homelessness; and Every Woman Counts.

8.     For California's Fiscal Year 2024-25 (July 1, 2024 to June 30, 2025), the DHCS budget includes a total of $166.3 billion, the vast majority of which relates to Medi-Cal and CHIP. Of that amount, $1.4 billion funds state operations (DHCS operations), while $164.9 billion supports local assistance (funding for program costs, partners, and administration). The budgeted federal Medicaid funding is $107.5 billion, which is 65% of DHCS's annual budget.

SA25

9.      In addition to Medicaid, DHCS receives significant funding from other federal programs, including the Substance Abuse and Mental Health Services Administration (SAMHSA), the Health Resources and Services Administration (HRSA), Title V and Title X funds from the U.S. Department of Health & Human Services (HHS), and the Federal Emergency Management Administration (FEMA). Together, DHCS receives more than $125,000,000 annually from these other programs.

10.      DHCS will suffer immediate negative impacts if DHCS does not receive the federal money it is relying on, or if receipt of that money is delayed. For instance, within the fee for service delivery system (which includes some health care services, and all prescription medication), a pause in funding may be felt within days since DHCS will be unable to timely reimburse for these claims. In the managed care delivery system, DHCS makes monthly capitation payments to managed care plans in the state. If DHCS is unable to process the capitation payments for the next month, it could lead to significant cash flow and funding challenges for California's contracted managed care plans creating a waterfall to negatively impact their ability to timely reimburse claims.

11.      DHCS's Fiscal Year 2024-25 budget relies on federal Medicaid funds, and we made plans and allocated funding for staffing and programming based on the anticipated receipt of Federal funding pursuant to California's approved State Plan and other agreements with CMS. In developing its annual budget, DHCS did so with the expectation that it would in fact promptly receive the federal funds to which it is entitled under its existing agreements under the aforementioned federal programs, on the specific timetables set forth under those agreements and programs. A disruption in the receipt of anticipated federal funds would create budgetary chaos for DHCS, the programs and offices it oversees, and the many entities that receive DHCS

funding. In California, county and local partners administer the vast majority of health and human services programs. If the federal administration is permitted to withhold federal funding for these programs, it will have a devastating effect on local communities.

12.     As mentioned above, any pause in the receipt of our federal funding would cause significant problems for DHCS's operations and programs, which could result in devastating effects on the health care delivery and funding system in California. An indefinite or lengthy pause would result in State and local programs being unable to absorb such a loss without cutting staff and services. State and local governments would be unable to make up this shortfall in funding, and health care services could be drastically curtailed or even cease altogether as a consequence. Even a short pause would result in DHCS being unable to reimburse providers in the fee-for-service delivery system, while a longer pause would wreak havoc in the managed care system.

13.     DHCS cannot absorb even a short-term loss in funding. For instance, on January 27, 2025, when the federal U.S. Department of Health and Human Services Payment Management Service (PMS) portal was unavailable, DHCS did not receive the almost $200 million it expected to receive overnight between January 27 and January 28, 2025. DHCS managed to continue operations for January 28, 2025, but did not have sufficient funds to meet future financial obligations without intervention from other funding sources. Pursuant to Medicaid laws and regulations, DHCS is required to disburse the federal funds it receives for health care services within three days of receipt. Thus, DHCS cannot maintain federal funds in reserve for any anticipated pause or freeze in funding, and with an annual budget of over $106 billion in federal participation, DHCS is unable to backfill the loss of Medicaid Medi-Cal funding for even a few days. The loss of federal Medicaid funding in California for an indefinite

period would significantly impede the delivery of basic health care services to 14.5 million low-income, elderly, and pregnant individuals, as well as individuals with disabilities. Numerous studies have shown that the inability to access affordable health care coverage leads low-income individuals to postpone or forgo needed medical treatment, including both preventive treatment as well as treatments for major acute or chronic conditions. Lack of access to timely treatment leads to increased emergency room use and hospitalizations, and a decline in overall health. Additionally, when uninsured individuals ultimately undergo medical treatment, as everyone eventually must, they often receive unaffordable medical bills, causing serious financial harm. These can include medical debt and bankruptcy.

14.     On average, DHCS receives disbursements of almost $11.7 billion every month from the PMS. DHCS draws federal funds for Medi-Cal from the PMS twice weekly, on Mondays and Wednesdays, and makes additional draws for other federal grant programs as needed each week. Once DHCS draws down the funds, they are transferred to the State, and DHCS then releases the funds to its program partners within three days.

15.     Accordingly, DHCS relies on the flow of federal money on a daily basis to operate its Medi-Cal and other federally funded programs.

16.     DHCS was unexpectedly unable to access the PMS portal on January 28, 2025, and did not receive any advanced notice or warning from CMS that the portal would be unavailable or that funding would be "paused." DHCS only learned of the delay when it did not receive the expected disbursements overnight between January 27 and 28, 2025. DHCS did not receive any information regarding the "pause" until the OMB memo was publicized in news media on January 27. Prior to learning of the OMB memo, DHCS reached out to CMS on January 28 to ascertain why DHCS could not access the portal and why DHCS had not received

the expected overnight reimbursement. DHCS did not receive any substantive information from CMS other than confirming that the system was not available.

17.     The lack of information from CMS caused confusion and significant work to address the issue. DHCS received inquiries from its many partners regarding the freeze and consequences of the freeze, but did not have information to provide to stakeholders. DHCS continues to receive inquiries as to the impact on DHCS's programs and whether services are available to members.

18.     Access to PMS was restored late in the afternoon of January 28, 2025. At that time, DHCS was able to once again access the portal and request its necessary draws.

19.     DHCS continues to be concerned that the funding will again be delayed or denied, and if it is, whether Medicaid will be included in any future pause. Even if Medicaid is not included in a future pause, DHCS is concerned that the $125,000,000 in other federal grants it receives annually that support health care for women, children, and the disabled will be withheld, preventing the most vulnerable Californians from receiving lifesaving care they desperately need. As I mentioned above, these other federal grants support programs such as the American Indian Infant Health Initiative; Mental Health and Substance Use Disorder Services; the Family Planning, Access, Care, and Treatment program; Projects for Assistance in Transition from Homelessness; Every Woman Counts; and programs supported by SAMHSA, HRSA, Title V and Title X funds from HHS, and FEMA. All of these programs would be at risk if funding is delayed or stopped.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 5, 2025, at Sacramento, California.

_Lindy Harrington_

_____

Lindy Harrington

8

SA29

Thomas-Jensen
Affirmation

Exhibit # 34

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK; et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00039-JJM-PAS |
| DONALD TRUMP, in his official capacity as President of the United States; et al., | |
| Defendants. | |

1

## <u>DECLARATION OF JENI KITCHELL</u>

I, Jeni Kitchell, declare as follows:

1.      I am a resident of the State of California. I am over the age of 18 and have personal knowledge of all the facts stated here, except those matters stated upon information and belief (which includes the verification of all exhibits); as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by the California State University as Assistant Vice Chancellor, Finance & Budget Administration and Controller.  The California State University is responsible for the provision of higher education services to students across the state of California.  Consisting of 23 university campuses, nearly a dozen off-campus centers, and over 90 auxiliary organizations, the CSU educates more than 450,000 undergraduate and graduate students each year and employs more than 63,000 employees.

3.      The CSU is the largest public university system in the United States and is the state's greatest producer of bachelor's degrees – awarding nearly 127,000 degrees each year – and drives the economy in agriculture, information technology, business, hospitality, life sciences, healthcare, public administration, education, media and entertainment.  In 2022-23, more than half of CSU students graduated with zero debt and about 78% of CSU's students received financial aid, including federal financial aid.

4.      As the Assistant Vice Chancellor, Finance & Budget Administration/Controller, I am responsible for oversight of financial operations at the CSU and financial reporting from all sources, including federal funding.

5.      The CSU receives federal research funding. A hallmark of CSU research is immersive student learning and discovery that addresses society's most urgent challenges,

2

including those in agriculture, water, fire prevention and cybersecurity. Undergraduate students who participate in faculty-mentored research are better prepared for future careers, graduate education and leadership roles that contribute to their respective communities.

6.     CSU and its auxiliary organizations receive nearly $600 million in federal funding for research projects each year from agencies such as the Department of Energy, the Environmental Protection Agency, the Health Resources & Services Administration, National Institutes of Health, the Department of Health & Human Services, the Centers for Disease Control, NASA, the National Forest Foundation (and U.S. Forest Service), the National Science Foundation, the Department of the Navy, the Department of Transportation, the U.S.G.S., and USAID.  These projects enrich teaching quality and prepare students for professional success through hands-on experiences. This amount also covers Maritime Administration (MARAD) funding for support of the maritime education provided at the California State University Maritime Academy, the only U.S. Merchant Marine Academy on the west coast.

7.     CSU's students receive over $2.2 billion each year in federal grants and loans for financial aid.  A freeze or pause in federal funds would reduce access to those critical student resources and could have an immediate impact of over $1 billion for this spring semester alone.

8.     Over 80% of students receive some type of financial aid with over 50% of CSU students eligible for Pell Grants.

9.     Even if Pell Grants and direct loans are not included, students who rely on Supplemental Education Opportunity Grants (SEOG) and federal work-study funds to support themselves in college would suffer from this pause. Those funds total approximately $48 million for the 2023-24 aid year.

3

10.     Throughout the CSU, a total of 207,118 students received an aggregate of over $1 billion in federal aid from July 1, 2023, to June 30, 2024. As a result of the extensive aid provided by the federal government, two-thirds of CSU students graduated with zero student loan debt, which allows them to move seamlessly into the workforce and pursue all types of careers without concern for carrying significant debt and helps to ensure a robust workforce and fill high and low-need employment positions.

11.     As described in more detail below, the freeze on federal funding caused by the OMB Memo did have and, if reinstated or reissued under any other name, would have significant and detrimental impacts on the CSU.

12.     I have reviewed the Memorandum for Heads of Executive Departments and Agencies, M-25-13, dated January 27, 2025, issued by the Executive Office of the President of the United States, Office of Management and Budget, Matthew J. Vaeth, Acting Director, regarding "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("OMB Memo"). It is my understanding that the OMB Memo required all federal agencies to "pause" all activities related to disbursement of all federal financial assistance, which I understand would include disbursements to the California State University, including its 23 university campuses and auxiliary organizations, the research, financial aid, and student support programs, and the funds used to support the education of license track cadets at the California State University Maritime Academy, which we oversee under our current federal funding sources.

13.     The wording in the OMB Memo regarding the pause in federal funding was vague and unclear in its scope, reach and impact to the California State University. In the broadest scope, it could have an existential effect on higher education in California and across the country

4

as it could have immediately eliminated both student support and employee jobs. For example, although it varies by grant, commonly about half of contract or grant funding supports employment-related expenses (e.g., salaries and benefits). The pause could also stop us for an indefinite period from serving and meeting some of our critical missions, including research and development that supports critical government interests, such as health and safety and national security.

14.    Further, the OMB Memo created confusion and uncertainty for the California State University and its 23 university campuses and auxiliary organizations about whether and when we would receive federal grant disbursements, including how long those disbursements would be "paused." This confusion has remained since the distribution of the OMB Memo, through last week, and ongoing. Additionally, since the OMB Memo was issued, we have received dozens and dozens of notices from a variety of federal agencies containing conflicting and inconsistent information regarding whether there is a pause or freeze. Just a few examples are described below.

15.    Many grant awardees scheduled award drawdowns in anticipation of the impending "pause." Yet even timely award drawdowns were cancelled.

16.    For example, the National Science Foundation announced by email at 1:52 p.m. PT on Tuesday, January 28 that "[t]he Award Cash Management Service (ACM$) will be temporarily unavailable beginning Tuesday, January 28, 2025 at 5:00 p.m. EST, while NSF performs a comprehensive review of the award portfolio to ensure compliance with recent Executive Orders, pursuant to Office of Management and Budget (OMB) Memorandum M-25-13, issued on January 27, 2025. Therefore, all payments under active awards will be paused as the agency conducts the required reviews and analysis." (Ex. A, a true and correct copy of which

5

is attached.)  The email went on to announce that grant awardees would be "receiving cancellation notices for any pending payment transactions to enable resubmission, pending additional guidance, to ensure only eligible activities are included in future payment requests."

17.     The NSF then sent a follow-up email on Thursday, January 30 at 11:45 a.m. PT notifying its grant awardees that "all ACM$ transactions that were submitted on Tuesday 01/28/2025 have been cancelled."  (Ex. B, a true and correct copy of which is attached.)  This included all drawdowns submitted before the OMB Memo 5 p.m. ET deadline.  It was not until Monday, February 2 at noon EST that the ACM$ system was expected to be available again for drawdowns.  (Ex. C, a true and correct copy of which is attached.)

18.     Even after the access portals for the various agencies were re-opened this week, some agencies imposed barriers to access that were not in place before the OMB memo and TRO were issued.

19.     For example, the National Institutes of Health (NIH) had previously allowed constant (24-hour) access to the portal to drawdown awarded grant funds.  After the TRO was issued, several CSU campuses had difficulty finding a window when the portal was opened.  It turns out that the NIH payment management system had instituted reduced hours, but did not notify its grant recipients until February 4, when it notified them that "[e]ffective immediately, PMS is only available during the hours of 5:00AM to 4:00PM ET Monday through Friday and 9:00 AM to 9:00 PM ET Saturday and Sunday.  The limited hours are in effect until further notice." (Ex. D, a true and correct copy of which is attached.)

20.     This means that for grant awardees whose administrative staff are on the West Coast and do not work on weekends (such as the CSU), the portal is available for drawdowns only during morning work hours each weekday.   Both lack of notice and the reduced hours

6

resulted in late drawdowns of needed resources, thereby impacting cash flow and other business processes.

21.    Allowable costs to be covered by a grant are predetermined by the grant-awarding agency through a legally binding contract that by regulation (2 CFR § 200.300 *et seq.*) generally cannot be amended or terminated without notice to both the agency and its awardees.

22.    Drawdowns by an awardee are generally done monthly or more frequently on a cost-recovery basis to reimburse the awardee for allowable costs already incurred, such as equipment purchases and payroll for researchers (including faculty and student employees), and student stipends. This means that the drawdowns that the CSU university campuses and auxiliaries attempted to make during the week of January 27 and after were costs that were incurred well before that date, and in most cases before the new administration came into office.

23.    When the pause was implemented, it meant that student and staff employees' jobs were at risk for lack of funding.

24.    As one example, one of the CSU campuses funds the director of the McNair Scholars fully through grant awards. The McNair Scholars at CSUDH (https://www.csudh.edu/mcnair/) are students who are first-generation, low-income students interested in research-based education through the graduate level. One of the key outcomes of the program is the number of students who graduate with a Ph.D. in ten years. These students go on to highly productive careers that support the engine of the economy. The McNair Scholars Program at CSUDH was established in 2004 and has achieved a 93% graduate school acceptance rate. The university relies completely on grant funding to support this program.

25.    Losing this federal funding would have an immediate and detrimental effect on students; the uncertainty of funding due to the vagueness of federal directives has a highly

7

destabilizing effect on this program and many others similarly situated.  In fact, due to the disruptions caused by even a short interruption to the process, some grant awardees are now drawing down more frequently – up to weekly – to reduce the risk that the awardee will be denied access to awarded funds for any length of time, thereby suffering cash flow issues that could impact wage payments and organizational viability.  These business process changes were necessitated by the OMB Memo even if it is never reactivated.

26.    The general notices CSU received also create practical impediments to meet the required fiscal and programmatic compliance of each award. The CSU accepts each award with a commitment to comply diligently with the award's objectives, terms and conditions.  However, the vague and generalized notices have caused confusion and disruption to compliance because the grant-awarding agency does not identify which part of the award will be impacted, but then places on the university the entire risk of failure to comply now with the agency's unknown future action.

27.    For example, one federal agency (NSF) funded a project that requires the grantee to conduct surveys; however, because the approved theoretical framework guiding the survey metrics and proposed analysis of the results may fall afoul of upcoming requirement changes, as per the agency communication (discussing "frameworks," see https://new.nsf.gov/executive-orders), the grant awardee must either continue on course with the approved framework (to meet the project timeline) and risk the agency deciding not to pay after the work is done, or to defer the work (and miss timelines) in anticipation of a *possible* change in survey metrics and analytical framework.  Absent more specific and detailed information, the program administrators are left guessing whether the program is impacted or will be impacted by uncertain funding freezes.  This chills current research work, which then adversely impacts

8

research advancements and finding solutions to real world problems through research previously meritoriously reviewed and approved.

28.     The harm to the CSU will continue if further delays in funding and cost allowability are not resolved. As described above, commonly at least half of grant funding supports the personnel doing or supporting the research.  Uncertainty in funding sources, or instability in fund availability will have real-world consequences to jobs, procurement, and education.  This affects not only those directly funded by the grants, but indirect funding (administrative support) as well.  In addition, procurement agreements made based on committed grant funds, and subawards will require stop work notices. The avoidable instability caused by abrupt decommitment to previously-approved projects will also impede faculty from carrying out their educational program goals. Overall, research and scholarly activities will be negatively impacted resulting in lost science and value to the public. The impacts of this could reverberate through the system for some time, if the loss of trust in the government to honor its contractual commitments lingers.

29.     We continue to be concerned that the funding will again be delayed or denied, especially because we continue to be told that some of our reimbursement requests will not be paid. For example, on February 4, 2024, CSU Monterey Bay received a phone call from the U.S. Economic Development Administration that they will receive requests for reimbursements, but that they were directed not to process and pay reimbursements for a program that relates to the Monterey Bay Small Business Assistance and Resilience Program.

30.     Additionally, I reviewed the "Notice of Court Order" issued by the United States Department of Justice (DOJ) on February 3, 2025 (Notice) (Ex. E, a true and correct copy of which is attached), which referred to and attached the temporary restraining order issued in this

9

matter on January 31, 2025. While the Notice states that "Federal agencies cannot pause, freeze, impede, block, cancel, or terminate any awards of obligations on the basis of the OMB Memo, or on the basis of the President's recently issued Executive Orders," it also states that "Agencies may exercise their own authority to pause awards or obligations, provided agencies do so purely based on their own discretion – not as a result of the OMB Memo or the President's Executive Orders – and provided the pause complies with all notice and procedural requirements in the award, agreement, or other instrument relating to such pause." The ambiguities in the language of this United States Department of Justice Notice give us further concern that the funding will be delayed or denied by federal awarding agencies.

31.    As discussed above, the CSU's budget relies heavily on student financial aid support, multi-year federal research and sponsored programs funding, as well as federal support for the California State University Maritime Academy.  Federal funding contributes to the operational budgets of all 23 CSU campuses, and a freeze could lead to tremendous budget shortfalls, forcing campuses to cut back on student services, employees, and resources.

32.    CSU formulated its plans and allocated funding for staffing and student support based on the anticipated receipt of promised federal funding. Federal financial assistance, such as Pell Grants, Work Study funds, and student loans, is crucial for many CSU students. It the Federal government reinstitutes or reissues a freeze it could jeopardize this support, making it harder for students to afford their education and achieve their degrees.

33.    A freeze could jeopardize ongoing research projects and research support and delay new projects. Additionally, various public service programs are supported by federal funds at the CSU, including those aimed at improving low-income students' readiness for college and

recruiting teachers for high-need schools. These programs could face significant disruptions, affecting both students and the communities the CSU serves.

34.    If the federal funding is again paused, blocked, denied or delayed suddenly, it would have an immediate and substantial detrimental effect on the CSU.   A loss of or pause in federal funding can severely disrupt research continuity and trajectories. While research *can* resume, lost time, momentum, and the potential dispersal of research teams (including undergraduate and graduate students) create setbacks from which it is difficult, and sometimes impossible, to fully recover. This has cascading effects on future breakthroughs and innovation. Specific situations facing disruption include clinical trials where an interruption in research means the loss of the entire research project due to loss of research subjects or degradation of the research plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 5, 2025, at Long Beach, California.

_____
Jeni Kitchell (Feb 5, 2025 10:49 PST)
_____
Jeni Kitchell

11

EXHIBIT A

SA42

**From:** ACMS Financial Points-of-Contact <ACMS_POC@LISTSERV.NSF.GOV> on behalf of Justin Poll
<jpoll@NSF.GOV>
**Sent:** Tuesday, January 28, 2025 1:52 PM
**To:** ACMS_POC@LISTSERV.NSF.GOV <ACMS_POC@LISTSERV.NSF.GOV>
**Subject:** ACM$ Unavailable Starting Tuesday 1/28/2025

**CAUTION:** This email originated from outside of CSUCI. Do not click links or open attachments unless you validate
the sender and know the content is safe. Contact ITS if you have any concerns

The Award Cash Management Service (ACM$) will be temporarily unavailable beginning
Tuesday January 28, 2025 at 5:00 p.m. EST, while NSF performs a comprehensive review of
the award portfolio to ensure compliance with recent Executive Orders, pursuant to Office of
Management and Budget (OMB) Memorandum M-25-13, issued on January 27, 2025.
Therefore, all payments under active awards will be paused as the agency conducts the
required reviews and analysis.
You will be receiving cancellation notices for any pending payment transactions to enable
resubmission, pending additional guidance, to ensure only eligible activities are included in
future payment requests.
NSF has created an Executive Order Implementation webpage to ensure the widest
dissemination of information and updates. We will continue to communicate with you as we
receive additional guidance.
##################################################################

EXHIBIT B

**From:** ACMS Financial Points-of-Contact <ACMS_POC@LISTSERV.NSF.GOV> on behalf of Justin Poll <jpoll@NSF.GOV>

**Sent:** Thursday, January  0, 2025 11:  5 AM

**To:** ACMS_POC@LISTSERV.NSF.GOV <ACMS_POC@LISTSERV.NSF.GOV>

**Subject:** ACM$ Transactions from 01/28/2025 have been canceled

**CAUTION:** This email originated from outside of CSUCI. Do not click links or open attachments unless you validate the sender and know the content is safe. Contact ITS if you have any concerns

Our top priority is resuming our funding actions and services to the research community and our sta eholders. We are wor ing expeditiously to conduct a comprehensive review of our pro ects, programs and activities to be compliant with the existing executive orders.

 lease note that all ACM$ transactions that were submitted on Tuesday 01 28 2025 have been cancelled.  lease remember that award recipients must comply with agency policies regarding the timing of payments and are encouraged to review  A     2  -1 Ch. 8.C.2.a for additional guidance before preparing any resubmissions once ACM$ is bac  online.

For certain programs, such as SBI  STT  , there may also be program specific guidance you may need to refer to.  NSF has created an Executive Order Implementation webpage to ensure the widest dissemination of information and updates. We will continue to communicate through this site as we receive additional guidance.

#############################################################################

EXHIBIT C

**From:** NSF e usiness Outreach <E USINESS@LISTSERV.NSF.GOV> on behalf of NSF usiness Applications <NSF_ usiness_Applications@NSF.GOV>
**Sent:** Sunday, February 2, 2025 10:58 AM
**To:** Sain , Patricia <patricia.sain @csuci.edu>
**Subject:** MESSAGE TO NSF PI COMMUNIT

You don't often get email from nsf_business_applications@nsf.gov. Learn why this is important

**CAUTION:** This email originated from outside of CSUCI. Do not click links or open attachments unless you validate the sender and know the content is safe. Contact ITS if you have any concerns

MESSAGE to the NSF PI Community,

On Friday, January 1, 2025, a Federal Court issued a Temporary Restraining Order TRO directing Federal grant-making agencies, including the National Science Foundation NSF , to ...not pause, free e, impede, block, cancel, or terminate... awards and obligations to provide federal financial assistance to the States, and... not impede the States access to such awards and obligations, e cept on the basis of the applicable authori ing statutes, regulations, and terms. Although the language of the TRO is directed at State institutions, the Department of Justice has determined that it applies to all NSF award recipients. ou can review the TRO here.

In order to comply with the TRO, the NSF Award Cash Management Service ACM$ system is available for awardees to re uest payments as of 12:00pm EST, February 2, 2025.

This message is also available on the E ecutive Order Implementation webpage. Please check back regularly as we add fre uently asked uestions FA s based on community feedback.

SA47

Sethuraman Panchanathan
Director

EXHIBIT D

Websites that we are utilized are open for drawdowns:

- **PMS (NIH) has limited usage time**





- **NSF or Research.gov**



- **Department of Education**



- **ASAP served Department of Energy, Nuclear Regulatory Commission, Department of Interior, Department of Justice)**



**Broadcast Message**

- (Updated on 09.05.24) Attention Microsoft Internet Explorer Users: As of June 15, 2022, compatible with both Microsoft Edge and Chrome browsers. Visit the following webpage https://fiscal.treasury.gov/asap/software-browser-requirements.html

- (Posted 8.28.24) Department of Commerce (DoC) Recipients: The National Oceanic and open ASAP accounts from September 22, 2024 thru October 16, 2024 This will impact th 13200001 - EDA The last day for Recipients to submit payment requests for awards with recipients must withdraw the necessary funding for the period before 3:00 PM EDT Sept eduled to be paid from September 20, 2024 through October 16, 2024 as they will be rej contact either the Regional Grants Specialist or email EDAGrants@noaa.gov. Questions the Grants Management Specialist (GMS) responsible for administering the award(s).

- (Posted 5.3.23) Are you new to ASAP or need help requesting payments? Register for o

- Attention Department of Justice recipients: At the end of each month, DOJ will temporari financial statement reporting requirements of the Office of Management and Budget. (Th previous Grants Payment Request System (GPRS)). For each month except September September (fiscal year end), access will not be available for the last 5 business days. All prior to the cutoff day each month.

- Attention National Institute of Food and Agriculture (USDA-NIFA) recipients: USDA-NIFA business days of each month. All USDA-NIFA recipients (ALC 12402200 & 12402200/01 of each month. Accounts will re-open the 1st business day of each month. This effort wil captured in USDA-NIFA's accounting systems and reconciled with Treasury's Central Ac

Thank you,
Chi

Thomas-Jensen
Affirmation

Exhibit # 37

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK; et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00039-JJM-PAS |
| DONALD TRUMP, in his official capacity as President of the United States; et al., | |
| Defendants. | |

1

## DECLARATION OF THERESA A. ALDONADO

I, Theresa A. Maldonado, declare as follows:

1. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am a resident of the State of California. Since 2020, I have been employed by the University of California (UC) Office of the President as the systemwide Vice President for Research & Innovation. In addition to my current role, I have a Ph.D. in electrical engineering and over 30 years' academic experience.

3. The UC system is comprised of ten research-intensive campuses, six medical schools, and three affiliated U.S. Department of Energy ("DOE") national laboratories. UC's mission is to support higher education, research, health care, and public service, and UC is recognized as an international leader in each of those areas.

4. As Vice President for Research & Innovation, I lead UC researchers and administrators in research policy, funding for systemwide programs, and the innovation and entrepreneurship ecosystem. We work to build UC-wide partnerships, help shape effective policies and provide a strong voice nationally for research and innovation on behalf of UC.

5. As the systemwide leader for research and innovation, I work very closely with the Vice Chancellors for Research from each UC campus, and am in regular contact with them to identify any issues impacting UC systemwide research, including concerns related to research funding.

6. UC is one of the nation's leading research institutions, with almost 9% of all U.S. academic research being conducted by UC researchers.

2

7. Federal funds are UC's single most important source of support for its research, accounting for more than half of UC's total research awards.

8. In FY 2023, the total amount of federal research awards to UC was $3.84 billion, with over 10,000 distinct federal awards from a wide range of federal agencies, including from National Institutes of Health ("NIH") and National Science Foundation ("NSF"). Some of UC's smaller campuses rely almost entirely on federal agencies as the primary source of funding for research projects and programs.

9. UC also has 18 health sciences schools and six academic medical centers, which are widely recognized as among the best in the nation and are international leaders in the education of health professionals who provide life-saving care to people across the nation, in research that develops new cures and treatments for some of the nation's most pressing health issues, and in public service that provides healthcare for all Californians regardless of ability to pay.

10. UC's budget relies on federal funding for its research mission. The research mission at UC includes, but is not limited to, allocated funding for staffing, clinical trials, dissemination of results, public outreach, teaching and training, equipment, and numerous other activities to fulfill the research mission and serve the people of California and the United States.

11. On January 27, 2025, the Office of Management and Budget ("OMB") issued a Memorandum for Heads of Executive Departments and Agencies, M-25-13, "Temporary Pause of Agency, Grant, Loan and Other Financial Assistance Programs" ("OMB Memo"). This OMB memo referred to a number of Executive Orders (EOs) related to limiting or ceasing government funding in certain areas.

12. UC also received notices issued by a number of federal agencies, including but not limited to NSF, Centers for Disease Control and Prevention ("CDC"), Department of Labor, Health

Resources & Services Administration ("HRSA"), USDA, the U.S. Agency for International Development ("USAID"), NASA, and the Department of State.

13. With respect to our NSF awards, we received notices regarding ceasing or pausing funding that were sent to large groups of UC's Principal Investigators (PIs) funded by an agency (*see, e.g.*, NSF's Notice to the PI Community, Exhibit A).

14. These Federal agency notices and the OMB Memo caused widespread confusion in the UC research community, negatively impacting researchers, administrators, graduate students, and UC's overall ability to perform research. Specifically, I received reports of confusion and uncertainty from UC Campus Vice Chancellors for Research related to reimbursements for work performed on federally-funded projects, and whether or not UC campuses would be able to draw down federal funds in order to process payroll and other award expenses.

15. UC has many employees paid in whole or in part from extramural funds, and the vast majority of extramural funding at UC is from Federal awards. In addition, there are some employees, including Graduate Student Researchers and several hundred Postdoctoral researchers, who are directly paid by Federal agencies.

16. I understand that some of those direct-paid employees could not access NSF payment portals to request/receive payments during the short period when NSF payment portals were closed/down. Because of serious concerns about the impact on those individuals, there was discussion about whether the institution could issue no-interest emergency loans to cover salaries for those workers, something that would have required the institution to identify a funding source to cover the costs.

17. Though the issue was resolved when NSF re-opened their payment portals on or about February 2, 2025, there was widespread confusion and worry and administrative costs that

were incurred trying to determine how to pay and plan for meeting obligations in the wake of uncertainty of federal funding.

18. Further, on January 28, 2025, some of our campuses received notice that all USAID funding for foreign assistance programs was "paused" pursuant to the OMB Memorandum. (See Exhibit B.)

19. In developing its annual budget, UC did so with the expectation that it would receive the federal funds which are now potentially at risk, and to which it is entitled under its contractual and grant agreements with Federal agencies. A sudden disruption in anticipated federal funds would greatly jeopardize the rigorously peer-reviewed projects and cause budgetary and operational chaos.

20. Any pause in Federal funding would have a detrimental effect on the UC research enterprise, including students, staff, and faculty members supported by funding, and the public which benefits directly from UC's research, health care, and other public services.

21. Any pause in funding, a funding freeze, or inability to drawdown funds from Federal sources creates confusion and uncertainty for research accounting offices that we oversee about whether and when we will receive our federal grant disbursements, including how long they will be "paused."

22. Also, any pause in funding, immediate ceasing of Federal funds, or inability to drawdown Federal funds will cause operational chaos across the UC system for research administration, finance administration, research compliance, and reporting.

23. Cutting off access to Federal payment systems, even for a short period of time, can have a profound negative impact. Any renewed broad-reaching freeze or pause on federal disbursements, as was directed by the OMB memo, will cause significant disruption to UC

campuses, which will need to take significant measures to address and mitigate a loss of funding and which will have to devote substantial time and resources to planning for and coping with the severe operational impacts that would be caused by a federal Funding freeze.

24. Freezes or even temporary delays in the ability of UC to draw down Federal funding from Federal awards are costly to UC.

25. Upon consultation with the UC Controller's office, it is my understanding that in a typical month (based on January 2024 figures), UC spends an average of more than $20 million a day in of Federal funds from all agencies. As a result, for every working day that UC cannot draw down funds, UC would be spending in excess of $20 million more than it is taking in. While not all agencies pay UC via drawdowns, and while not all agencies stopped payment in the most recent action, it is my belief that these numbers are evidence of the serious negative impact of even a temporary federal Funding freeze.

26. If the Federal funding is again paused, blocked, denied or delayed suddenly, the risk and stress to the UC system is exacerbated by the uncertainty of whether we will get paid for expenses incurred in good faith based upon the government s prior commitments. This uncertainty has been exacerbated by Acting Secretary of the US Department of Health and Human Services (HHS) instructing agencies within HHS to freeze all external communications, shortly after President Trump took office; as of the date of this Declaration, my understanding is that agencies within HHS are still not permitted to speak with grantees.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this __ day of February, 2025, at Oakland, California.

*Theresa A Maldonado*

Theresa A. Maldonado, Ph.D., P.E.

7

# Exhibit A

| From: | U.S. National Science Foundation |
| To: | |
| Subject: | Message to the NSF PI Community |
| Date: | Tuesday, January 28, 2025 1:36:04 PM |

**CAUTION: EXTERNAL EMAIL**



Dear Colleagues;

The Office of Management and Budget (OMB) Memorandum M-25-13, issued on January 27, 2025, directs all Federal agencies to conduct a comprehensive review of their financial assistance programs to determine programs, projects, and activities that may be implicated by the recent Executive Orders. Therefore, all review panels, new awards, and all payments of funds under open awards will be paused as the agency conducts the required reviews and analysis. NSF has created an **Executive Order Implementation webpage** to ensure the widest dissemination of information and updates. We will continue to communicate with you as we receive additional

guidance.

All NSF grantees must comply with these Executive Orders, and any other relevant
Executive Orders issued, by ceasing all non-compliant grant and award activities.
Executive Orders are posted at **https://www.whitehouse.gov/presidential-
actions/**. In particular, this may include, but is not limited to conferences, trainings,
workshops, considerations for staffing and participant selection, and any other grant
activity that uses or promotes the use of DEIA principles and frameworks or violates
Federal anti-discrimination laws. Please work with your institutional research office to
assist you in complying with the Executive Orders. You can also direct your questions
through the form on this NSF **webpage**.

Thank you for your work advancing science, engineering, technology and innovation
for our nation.

Sethuraman Panchanathan
Director

Policy Outreach Website | Resource Center | Update Notifications
Event Questions | Policy Office Questions



Davis Management Group on behalf of the U.S. National Science Foundation | 2415
Eisenhower Ave | Alexandria, VA 22314 US

Unsubscribe | Update Profile | Constant Contact Data Notice

# Exhibit B

January 28, 2025

## USAID's Implementation of the Funding Pause for Foreign Assistance Programs

Dear USAID Implementing Partners,

In accordance with the President's Executive Order on <u>Reevaluating and Realigning United States Foreign Aid</u>, OMB Memorandum M-25-13 ("Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs"), direction from the Department of State, and the previously issued <u>Notice on Implementation of Executive Order on Reevaluating and Realigning United States Foreign Aid</u>, USAID is working to immediately implement the funding pause for foreign assistance programs, and all Federal financial assistance programs. We recognize that this pause will impact programming, our implementing partners at every tier, and the communities served by foreign assistance-funded activities. To that end, our focus is on ensuring that the funding pause and subsequent reviews are implemented efficiently to ensure full compliance with Presidential direction and policy, and so approved programming can resume as appropriate.

To facilitate this process, USAID has issued additional instructions to all Contracting Officers and Agreement Officers (COs/AOs) on appropriate next steps, timelines, and considerations for implementing the funding pause. This includes guidance on addressing existing awards, pausing or canceling new solicitations and notices of funding opportunity (NOFOs), and refraining from issuing new awards.

<u>Immediate Actions</u>

To implement the funding pause, this communication from the M/OAA Director in his capacity as the Senior Procurement Executive and Assistance Executive serves as official notice to all implementing partners to:

1. ***Take immediate action to pause implementation of USAID program-funded activities and otherwise refrain from further commitments or expenditures of USAID funding, until further notice.***
2. Confirm receipt and acknowledge the requirements of this notice with the cognizant CO/AO for your award, as soon as possible.

Subject to individual award terms, this notice applies to all awards (e.g., contracts, grants, cooperative agreements, and other funding mechanisms) and funding at every tier, unless an implementing partner has received formal notification from their cognizant CO/AO that their award is covered, in whole or in part, by a current waiver. Prime contractors and recipients are responsible for ensuring subcontractors, subrecipients, and all other sub-tier contractors and awardees similarly comply with this notice.

<u>What to Expect Moving Forward</u>

Current implementing partners should expect to receive formal notifications and instructions from their COs/AOs imminently, if they have not already. Depending on award type, this may be a stop-work order (contracts) or a suspension or request for bilateral amendment (grants and cooperative agreements). These formal notifications will require implementing partners to pause or mitigate further obligations or cost incurrence, consistent with the terms and conditions of their awards.

SA66

As directed by the Executive Order and Department of State, a government-wide comprehensive review of all foreign assistance shall be completed within eighty-five days of January 24, 2025. Once reviews are completed, COs/AOs will promptly communicate award decisions and take appropriate next steps to resume, modify/amend, or terminate awards. Because the funding pause will have schedule and cost implications for implementing partners, COs/AOs will negotiate equitable adjustments as a result of stop work orders, suspension notices, or termination settlements, as appropriate. Implementing partners are encouraged to review their specific award terms and conditions.

Prospective implementing partners should expect all solicitations/NOFOs and any pre-award discussions or negotiations to stop immediately. COs/AOs may issue formal amendments to solicitations/NOFOs (publicly available on SAM.gov or Grants.gov) or otherwise communicate this pause to implementing partners that have already submitted a proposal or application in response to a funding opportunity.

Once proposed activities are reviewed, COs/AOs will issue subsequent amendments or communications to announce whether or not the solicitation/NOFO or pre-award process will continue, be modified, or canceled.

### Who to Contact

A copy of this notice has been posted to USAID's Implementing Partner Notices portals. Any questions related to this notice or to actions required for specific awards should be directed to your cognizant CO/AO.

Sincerely,

Jami J. Rodgers
USAID Senior Procurement Executive and
Director, Bureau for Management, Office of Acquisition & Assistance

Visit WorkwithUSAID.gov today to learn more about how to navigate the
USAID partnership process!

**Take action on WorkwithUSAID.gov**
Register your organization in the Partner Directory
Take the Pre-Engagement Assessment
Stay up-to-date with the latest News & Insights
Explore the Resource Library
Visit the Events Page
Check out the Funding Essentials Page



Manage Subscriptions | Unsubscribe All | Help



SA67

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

This email was sent to ██████████ using govDelivery Communications Cloud on behalf of: United States Agency for International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004



Thomas-Jensen
Affirmation
(redacted)

Exhibit # 56

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF ILLINOIS,<br><br>                 Plaintiffs,<br><br>        v.<br><br>DONALD TRUMP, *in his Official Capacity as President of the United States*,<br><br>                 Defendants. | C.A. No. 25-cv-39-JJM-PAS |

**DECLARATION OF LAURA ROCHE**

I, Laura Roche, hereby depose and state as follows:

1.      I am a resident of Illinois and over 18 years of age.   If called as a witness herein, I could and would competently testify to the matters set forth below.

2.      I am the Chief of Staff at the Illinois Environmental Protection Agency ("IEPA"). I have held this position since June 1, 2019.  I make this declaration as a representative of the State of Illinois, in part based on IEPA's business records and in part based on my personal knowledge and experience.  In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

**U.S. EPA Has Awarded IIJA Grants to IEPA**

3.      After Congress passed the Infrastructure Investment and Jobs Act ("IIJA"), IEPA applied to the United States Environmental Protection Agency ("U.S. EPA") for grants to fund a

1

variety of different programs aimed at protecting the environment and improving human health
for Illinois citizens.

4.      U.S. EPA then confirmed that IEPA had been approved for these grants.  True and
accurate copies of the grant award documents, including the terms and conditions applicable to
the grant awards, are attached hereto as Exhibit A.

5.      U.S. EPA awarded these grants to IEPA for projects including to protect clean
drinking water; to ensure that Illinois' rivers, streams, and lakes are suitable for recreational
activities and aquatic life; to clean up polluted sites for redevelopment; and to improve
infrastructure for post-consumer recycling.

### U.S. EPA Has Awarded IRA Grants to IEPA

6.      After Congress passed the Inflation Reduction Act ("IRA"), IEPA applied to U.S.
EPA for grants under the new law.

7.      U.S. EPA subsequently confirmed that IEPA had been approved for these grants.
True and accurate copies of the grant award documents, including the terms and conditions
applicable to the grant awards, are attached hereto as Exhibit B.

8.      U.S. EPA awarded these grants to IEPA for projects including to reduce air
pollution from the transportation sector, expand the clean energy workforce pipeline, retrofit
homes and commercial buildings to decrease energy usage and lower utility bills, and install
energy efficient appliances.

### Funding from IRA Grants Remains Frozen

9.      Currently, IEPA remains unable to draw money from grants under the IRA to fund
continued operation of its work.

2

10.     On January 28, 2025, my staff accessed the website operated by the United States Department of the Treasury called Automated Standard Application for Payments ("ASAP"), which IEPA uses to draw down funds from federal awards for the projects described above. On January 28, ASAP listed over $1 billion of funds set aside for IEPA. True and accurate copies of ASAP records that my staff accessed are attached hereto as Exhibit C.

11.     On January 29, 2025, my staff again accessed ASAP, which then listed a balance of $52 million set aside for IEPA. Many accounts that had appeared in ASAP on January 28 were entirely deleted and unable to be accessed. True and accurate copies of ASAP records that my staff accessed on January 29 are attached hereto as Exhibit D.

12.     Grants awarded to IEPA by U.S. EPA under the IIJA are currently accessible in ASAP and IEPA's ability to draw down funds from these accounts was restored as of February 5, 2025.

13.     All accounts associated with grants to IEPA by U.S. EPA under the IRA remain deleted from ASAP and are not visible to my staff. For example, my staff still cannot view any information about IRA-approved funding under U.S. EPA's Climate Pollution Reduction Grants. These U.S. EPA-approved grants have been deleted from the ASAP system and remain completely inaccessible by my staff, even just to view. True and accurate copies of ASAP records that my staff accessed on February 5, 2025 are attached hereto as Exhibit E.

14.     Without supplemental State financial support, cancellation or delayed payment of funds obligated pursuant to the IIJA and IRA will have the consequence of endangering human health and the environment in Illinois. Without these additional funds, IEPA could become unable to fulfill important federal and state mandates such as ensuring safe drinking water for all Illinois citizens, reducing air pollution, and remediating contaminated sites.

3

SA72

**U.S. EPA Staff Have Instructed IEPA Not to Draw Down Funding Essential to Treat a Polluted Groundwater Aquifer**

15.    IEPA oversees a corrective action contractor that conducts groundwater treatment in the area of Rockford, Illinois, in an area polluted by volatile organic compounds ("VOCs"). The contamination is near several homes and a public park, presenting a significant risk to human health and the environment if left untreated.  IEPA and U.S. EPA have worked collaboratively to address groundwater contamination at this site for over twenty years.

16.    Since 2020, U.S. EPA has approved funding for IEPA to use to pay for the operation of the groundwater treatment system, more recently approving IIJA funding for the treatment.  True and accurate copies of funding agreements, including the terms and conditions applicable to the funding, are attached hereto as Exhibit F.  IEPA currently has unpaid costs allowable under its funding.  No other available funding sources are presently adequate to continue this work.

17.    On January 30, 2025, U.S. EPA Region 5 staff notified IEPA staff by email that IEPA should not draw down its funding supporting the groundwater treatment system, because it was funded by IIJA.  A true and accurate copy of this email is attached hereto as Exhibit G.

18.    On February 4, 2025, IEPA staff called U.S. EPA Region 5 staff to ask whether IIJA funding for groundwater treatment in Rockford would be available in light of this court's Temporary Restraining Order.  U.S. EPA Region 5 staff stated that the matter had been conveyed to U.S. EPA's Office of Land and Emergency Management in Washington D.C.

19.    Currently, IEPA has not received any written confirmation from U.S. EPA that funding for the groundwater treatment system can be drawn down.

**SIGNED UNDER THE PENALTIES OF PERJURY THIS 6th DAY OF FEBRUARY, 2025.**

Laura Roche
Chief of Staff of the
Illinois Environmental Protection Agency

5

SA74

# EXHIBIT C

SENSITIVE BUT UNCLASSIFIED



**Account Balance Inquiry**

Date: 01/28/2025
Time: 2:21 PM

| ALC/Region: | Agency Short Name: | Account ID: | |
|---|---|---|---|
| 68128933 | RTP-Grants | N/A | |
| **Recipient ID:** | **Requestor ID:** | **Account Status:** | **As of Date:** |
| ███████ | N/A | Open | Jan 27, 2025 |

**Inquiry Results:**

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| ████ | ILEPA | ████ | $40,675,000.00 | $0.00 | $40,675,000.00 |
| ████ | ILEPA | ████ | $3,500,000.00 | $0.00 | $3,500,000.00 |
| ████ | ILEPA | ████ | $80,494,000.00 | -$80,494,000.00 | $0.00 |
| ████ | ILEPA | ████ | $94,270,000.00 | -$83,580,159.37 | $10,689,840.63 |
| ████ | ILEPA | ████ | $102,852,000.00 | -$27,321,641.49 | $75,530,358.51 |
| ████ | ILEPA | ████ | $67,885,000.00 | -$67,885,000.00 | $0.00 |
| ████ | ILEPA | ████ | $63,895,000.00 | -$63,599,956.86 | $295,043.14 |
| ████ | ILEPA | ████ | $69,753,000.00 | -$31,963,758.28 | $37,789,241.72 |
| ████ | ILEPA | ████ | $32,734,000.00 | -$24,805,954.81 | $7,928,045.19 |
| ████ | ILEPA | ████ | $32,999,000.00 | $0.00 | $32,999,000.00 |
| ████ | ILEPA | ████ | $1,713,333.00 | -$1,496,895.33 | $216,437.67 |
| ████ | ILEPA | ████ | $0.00 | $0.00 | $0.00 |
| ████ | ILEPA | ████ | $106,964,000.00 | -$5,851,002.93 | $101,112,997.07 |
| ████ | ILEPA | ████ | $239,745,000.00 | $0.00 | $239,745,000.00 |
| ████ | ILEPA | ████ | $1,936,194.00 | -$1,495,763.89 | $440,430.11 |
| ████ | ILEPA | ████ | $733,568.00 | -$2,000.00 | $731,568.00 |
| ████ | ILEPA | ████ | $859,213.00 | -$63,488.91 | $795,724.09 |
| ████ | ILEPA | ████ | $3,000,000.00 | -$338,537.04 | $2,661,462.96 |
| ████ | ILEPA | ████ | $430,251,378.00 | $0.00 | $430,251,378.00 |
| ████ | ILEPA | ████ | $1,110,081.00 | $0.00 | $1,110,081.00 |
| ████ | ILEPA | ████ | $2,997,998.00 | $0.00 | $2,997,998.00 |
| ████ | ILEPA | ████ | $92,058,008.00 | $0.00 | $92,058,008.00 |
| ████ | ILEPA | ████ | $270,626.00 | -$230,169.83 | $40,456.17 |
| ████ | ILEPA | ████ | $171,097.00 | -$45,000.00 | $126,097.00 |
| ████ | ILEPA | ████ | $8,450,000.00 | -$7,166,805.00 | $1,283,195.00 |
| ████ | ILEPA | ████ | $23,880,678.00 | -$19,951,534.30 | $3,929,143.70 |
| ████ | ILEPA | ████ | $726,000.00 | -$53,355.68 | $672,644.32 |
| ████ | ILEPA | ████ | $1,385,000.00 | -$59,393.41 | $1,325,606.59 |
| ████ | ILEPA | ████ | $1,392,000.00 | $0.00 | $1,392,000.00 |

SA76

| | | | |
|---|---|---|---|
| ILEPA | $1,509,000.00 | $0.00 | $1,509,000.00 |
| ILEPA | $6,748,000.00 | -$3,809,969.31 | $2,938,030.69 |
| ILEPA | $6,930,000.00 | -$4,245,367.72 | $2,684,632.28 |
| ILEPA | $6,930,000.00 | -$1,392,579.40 | $5,537,420.60 |
| ILEPA | $6,930,000.00 | $0.00 | $6,930,000.00 |
| ILEPA | $6,685,600.00 | $0.00 | $6,685,600.00 |
| ILEPA | $308,824.00 | -$281,428.84 | $27,395.16 |
| ILEPA | $52,330,000.00 | -$52,330,000.00 | $0.00 |
| ILEPA | $33,926,000.00 | -$33,926,000.00 | $0.00 |
| ILEPA | $36,922,000.00 | -$36,922,000.00 | $0.00 |
| ILEPA | $749,115.00 | $0.00 | $749,115.00 |
| ILEPA | $935,220.00 | $0.00 | $935,220.00 |
| ILEPA | $42,014,000.00 | -$41,505,000.00 | $509,000.00 |
| ILEPA | $26,439,000.00 | -$26,434,397.00 | $4,603.00 |
| ILEPA | $14,957,128.00 | -$14,757,128.00 | $200,000.00 |
| ILEPA | $14,143,000.00 | -$13,377,280.00 | $765,720.00 |
| ILEPA | $179,977.00 | -$152,986.63 | $26,990.37 |
| ILEPA | $297,395.00 | -$17,311.77 | $280,083.23 |
| ILEPA | $177,175.00 | $0.00 | $177,175.00 |
| ILEPA | $2,260,000.00 | $0.00 | $2,260,000.00 |
| ILEPA | $1,893,296.00 | $0.00 | $1,893,296.00 |
| ILEPA | $200,000.00 | -$74,347.94 | $125,652.06 |
| ILEPA | $300,000.00 | $0.00 | $300,000.00 |
| ILEPA | $190,000.00 | $0.00 | $190,000.00 |
| ILEPA | $675,007.00 | -$530,061.91 | $144,945.09 |
| ILEPA | $781,924.00 | $0.00 | $781,924.00 |
| ILEPA | $1,803,000.00 | $0.00 | $1,803,000.00 |
| ILEPA | $2,389,000.00 | $0.00 | $2,389,000.00 |
| ILEPA | $1,042,000.00 | $0.00 | $1,042,000.00 |
| ILEPA | $121,277.00 | -$75,001.58 | $46,275.42 |
| ILEPA | $1,220,269.00 | -$1,083,290.10 | $136,978.90 |
| ILEPA | $350,000.00 | -$227,528.53 | $122,471.47 |
| ILEPA | $1,681,556.00 | -$1,573,257.00 | $108,299.00 |
| ILEPA | $5,890,000.00 | -$4,319,442.42 | $1,570,557.58 |
| ILEPA | $73,095.00 | -$13,165.24 | $59,929.76 |
| ILEPA | $750,212.00 | -$37,309.36 | $712,902.64 |
| ILEPA | $71,635.00 | -$57,284.15 | $14,350.85 |
| ILEPA | $25,000.00 | $0.00 | $25,000.00 |
| ILEPA | $543,322.00 | -$270,955.39 | $272,366.61 |
| ILEPA | $251,083.00 | -$160,699.82 | $90,383.18 |
| ILEPA | $112,500.00 | -$32,221.04 | $80,278.96 |
| ILEPA | $57,189.00 | -$37,750.86 | $19,438.14 |
| | $1,788,493,973.00 | -$654,048,181.14 | $1,134,445,791.86 |

SENSITIVE BUT UNCLASSIFIED
SA77

# EXHIBIT D



**Account Balance Inquiry**

Date: 01/29/2025
Time: 1:43 PM

| | | | |
|---|---|---|---|
| **ALC/Region:** | **Agency Short Name:** | **Account ID:** | |
| 68128933 | RTP-Grants | N/A | |
| **Recipient ID:** | **Requestor ID:** | **Account Status:** | **As of Date:** |
| ⬛ | 1734800 | Open | Jan 28, 2025 |

**Inquiry Results:**

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| | ILEPA | | $270,626.00 | -$230,169.83 | $40,456.17 |
| | ILEPA | | $171,097.00 | -$45,000.00 | $126,097.00 |
| | ILEPA | | $8,450,000.00 | -$7,166,805.00 | $1,283,195.00 |
| | ILEPA | | $23,880,678.00 | -$19,951,534.30 | $3,929,143.70 |
| | ILEPA | | $726,000.00 | -$53,355.68 | $672,644.32 |
| | ILEPA | | $1,385,000.00 | -$59,393.41 | $1,325,606.59 |
| | ILEPA | | $1,392,000.00 | $0.00 | $1,392,000.00 |
| | ILEPA | | $1,509,000.00 | $0.00 | $1,509,000.00 |
| | ILEPA | | $6,748,000.00 | -$3,809,969.31 | $2,938,030.69 |
| | ILEPA | | $6,930,000.00 | -$4,245,367.72 | $2,684,632.28 |
| | ILEPA | | $6,930,000.00 | -$1,392,579.40 | $5,537,420.60 |
| | ILEPA | | $6,930,000.00 | $0.00 | $6,930,000.00 |
| | ILEPA | | $6,685,600.00 | $0.00 | $6,685,600.00 |
| | ILEPA | | $308,824.00 | -$281,428.84 | $27,395.16 |
| | ILEPA | | $52,330,000.00 | -$52,330,000.00 | $0.00 |
| | ILEPA | | $33,926,000.00 | -$33,926,000.00 | $0.00 |
| | ILEPA | | $36,922,000.00 | -$36,922,000.00 | $0.00 |
| | ILEPA | | $749,115.00 | $0.00 | $749,115.00 |
| | ILEPA | | $935,220.00 | $0.00 | $935,220.00 |
| | ILEPA | | $42,014,000.00 | -$41,505,000.00 | $509,000.00 |

SENSITIVE BUT UNCLASSIFIED



**Account Balance Inquiry**

Date: 01/29/2025
Time: 1:43 PM

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| | ILEPA | | $26,439,000.00 | -$26,434,397.00 | $4,603.00 |
| | ILEPA | | $14,957,128.00 | -$14,757,128.00 | $200,000.00 |
| | ILEPA | | $14,143,000.00 | -$13,377,280.00 | $765,720.00 |
| | ILEPA | | $179,977.00 | -$152,986.63 | $26,990.37 |
| | ILEPA | | $297,395.00 | -$17,311.77 | $280,083.23 |
| | ILEPA | | $177,175.00 | $0.00 | $177,175.00 |
| | ILEPA | | $2,260,000.00 | $0.00 | $2,260,000.00 |
| | ILEPA | | $1,893,296.00 | $0.00 | $1,893,296.00 |
| | ILEPA | | $200,000.00 | -$74,347.94 | $125,652.06 |
| | ILEPA | | $300,000.00 | $0.00 | $300,000.00 |
| | ILEPA | | $190,000.00 | $0.00 | $190,000.00 |
| | ILEPA | | $675,007.00 | -$530,061.91 | $144,945.09 |
| | ILEPA | | $781,924.00 | $0.00 | $781,924.00 |
| | ILEPA | | $1,803,000.00 | $0.00 | $1,803,000.00 |
| | ILEPA | | $2,389,000.00 | $0.00 | $2,389,000.00 |
| | ILEPA | | $1,042,000.00 | $0.00 | $1,042,000.00 |
| | ILEPA | | $121,277.00 | -$75,001.58 | $46,275.42 |
| | ILEPA | | $1,220,269.00 | -$1,083,290.10 | $136,978.90 |
| | ILEPA | | $350,000.00 | -$227,528.53 | $122,471.47 |
| | ILEPA | | $1,681,556.00 | -$1,573,257.00 | $108,299.00 |
| | ILEPA | | $5,890,000.00 | -$4,319,442.42 | $1,570,557.58 |
| | ILEPA | | $73,095.00 | -$13,165.24 | $59,929.76 |
| | ILEPA | | $750,212.00 | -$37,309.36 | $712,902.64 |
| | ILEPA | | $71,635.00 | -$57,284.15 | $14,350.85 |
| | ILEPA | | $25,000.00 | $0.00 | $25,000.00 |
| | ILEPA | | $543,322.00 | -$270,955.39 | $272,366.61 |

SENSITIVE BUT UNCLASSIFIED



**Account Balance Inquiry**

Date: 01/29/2025
Time: 1:43 PM

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| | ILEPA | | $251,083.00 | -$160,699.82 | $90,383.18 |
| | ILEPA | | $112,500.00 | -$32,221.04 | $80,278.96 |
| | ILEPA | | $57,189.00 | -$37,750.86 | $19,438.14 |
| | | Totals: | $318,068,200.00 | -$265,150,022.23 | $52,918,177.77 |

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT E



**Account Balance Inquiry**

Date: 02/05/2025
Time: 11:43 AM

| ALC/Region: | Agency Short Name: | Account ID: | |
|---|---|---|---|
| 68128933 | RTP-Grants | N/A | |
| **Recipient ID:** | **Requestor ID:** | **Account Status:** | **As of Date:** |
| 1734800 | 1734800 | Open | Feb 4, 2025 |

Inquiry Results:

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| | ILEPA | | $40,675,000.00 | $0.00 | $40,675,000.00 |
| | ILEPA | | $3,500,000.00 | $0.00 | $3,500,000.00 |
| | ILEPA | | $80,494,000.00 | -$80,494,000.00 | $0.00 |
| | ILEPA | | $94,270,000.00 | -$83,580,159.37 | $10,689,840.63 |
| | ILEPA | | $102,852,000.00 | -$27,321,641.49 | $75,530,358.51 |
| | ILEPA | | $67,885,000.00 | -$67,885,000.00 | $0.00 |
| | ILEPA | | $63,895,000.00 | -$63,599,956.86 | $295,043.14 |
| | ILEPA | | $69,753,000.00 | -$31,963,758.28 | $37,789,241.72 |
| | ILEPA | | $32,734,000.00 | -$24,805,954.81 | $7,928,045.19 |
| | ILEPA | | $32,999,000.00 | $0.00 | $32,999,000.00 |
| | ILEPA | | $1,713,333.00 | -$1,496,895.33 | $216,437.67 |
| | ILEPA | | $0.00 | $0.00 | $0.00 |
| | ILEPA | | $106,964,000.00 | -$5,851,002.93 | $101,112,997.07 |
| | ILEPA | | $239,745,000.00 | $0.00 | $239,745,000.00 |
| | ILEPA | | $1,936,194.00 | -$1,495,763.89 | $440,430.11 |
| | ILEPA | | $733,568.00 | -$2,000.00 | $731,568.00 |
| | ILEPA | | $270,626.00 | -$230,169.83 | $40,456.17 |
| | ILEPA | | $171,097.00 | -$45,000.00 | $126,097.00 |
| | ILEPA | | $8,450,000.00 | -$7,166,805.00 | $1,283,195.00 |
| | ILEPA | | $23,880,678.00 | -$19,951,534.30 | $3,929,143.70 |

SENSITIVE BUT UNCLASSIFIED



**Account Balance Inquiry**

Date: 02/05/2025
Time: 11:43 AM

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| | ILEPA | | $726,000.00 | -$53,355.68 | $672,644.32 |
| | ILEPA | | $1,385,000.00 | -$59,393.41 | $1,325,606.59 |
| | ILEPA | | $1,392,000.00 | $0.00 | $1,392,000.00 |
| | ILEPA | | $1,509,000.00 | $0.00 | $1,509,000.00 |
| | ILEPA | | $6,748,000.00 | -$3,809,969.31 | $2,938,030.69 |
| | ILEPA | | $6,930,000.00 | -$4,245,367.72 | $2,684,632.28 |
| | ILEPA | | $6,930,000.00 | -$1,392,579.40 | $5,537,420.60 |
| | ILEPA | | $6,930,000.00 | $0.00 | $6,930,000.00 |
| | ILEPA | | $6,685,600.00 | $0.00 | $6,685,600.00 |
| | ILEPA | | $308,824.00 | -$281,428.84 | $27,395.16 |
| | ILEPA | | $52,330,000.00 | -$52,330,000.00 | $0.00 |
| | ILEPA | | $33,926,000.00 | -$33,926,000.00 | $0.00 |
| | ILEPA | | $36,922,000.00 | -$36,922,000.00 | $0.00 |
| | ILEPA | | $749,115.00 | $0.00 | $749,115.00 |
| | ILEPA | | $935,220.00 | $0.00 | $935,220.00 |
| | ILEPA | | $42,014,000.00 | -$41,505,000.00 | $509,000.00 |
| | ILEPA | | $26,439,000.00 | -$26,434,397.00 | $4,603.00 |
| | ILEPA | | $14,957,128.00 | -$14,757,128.00 | $200,000.00 |
| | ILEPA | | $14,143,000.00 | -$13,377,280.00 | $765,720.00 |
| | ILEPA | | $179,977.00 | -$152,986.63 | $26,990.37 |
| | ILEPA | | $297,395.00 | -$17,311.77 | $280,083.23 |
| | ILEPA | | $177,175.00 | $0.00 | $177,175.00 |
| | ILEPA | | $2,260,000.00 | $0.00 | $2,260,000.00 |
| | ILEPA | | $1,893,296.00 | $0.00 | $1,893,296.00 |
| | ILEPA | | $200,000.00 | -$74,347.94 | $125,652.06 |
| | ILEPA | | $300,000.00 | $0.00 | $300,000.00 |

SA85

SENSITIVE BUT UNCLASSIFIED



**Account Balance Inquiry**

SENSITIVE BUT UNCLASSIFIED

Date: 02/05/2025
Time: 11:43 AM

| Recipient ID | Short Name | Account ID | Cumulative Authorizations | Cumulative Draws/RP/BE | Current Available Balance |
|---|---|---|---|---|---|
| | ILEPA | | $190,000.00 | $0.00 | $190,000.00 |
| | ILEPA | | $675,007.00 | -$530,061.91 | $144,945.09 |
| | ILEPA | | $781,924.00 | $0.00 | $781,924.00 |
| | ILEPA | | $1,803,000.00 | $0.00 | $1,803,000.00 |
| | ILEPA | | $2,389,000.00 | $0.00 | $2,389,000.00 |
| | ILEPA | | $1,042,000.00 | $0.00 | $1,042,000.00 |
| | ILEPA | | $121,277.00 | -$75,001.58 | $46,275.42 |
| | ILEPA | | $1,220,269.00 | -$1,083,290.10 | $136,978.90 |
| | ILEPA | | $350,000.00 | -$227,528.53 | $122,471.47 |
| | ILEPA | | $1,681,556.00 | -$1,573,257.00 | $108,299.00 |
| | ILEPA | | $5,890,000.00 | -$4,319,442.42 | $1,570,557.58 |
| | ILEPA | | $73,095.00 | -$13,165.24 | $59,929.76 |
| | ILEPA | | $750,212.00 | -$37,309.36 | $712,902.64 |
| | ILEPA | | $71,635.00 | -$57,284.15 | $14,350.85 |
| | ILEPA | | $25,000.00 | $0.00 | $25,000.00 |
| | ILEPA | | $543,322.00 | -$270,955.39 | $272,366.61 |
| | ILEPA | | $251,083.00 | -$160,699.82 | $90,383.18 |
| | ILEPA | | $112,500.00 | -$32,221.04 | $80,278.96 |
| | ILEPA | | $57,189.00 | -$37,750.86 | $19,438.14 |
| | | **Totals:** | **$1,258,217,295.00** | **-$653,646,155.19** | **$604,571,139.81** |

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT G

| From: | Lewis, Bertanna |
|---|---|
| To: | Lake, Paul; Hill, Christopher |
| Cc: | Paller, Max |
| Subject: | [External] SE Rockford Drawdowns |
| Date: | Thursday, January 30, 2025 1:01:15 PM |
| Importance: | High |

Good afternoon Chris and Paul,

As you know, there has been a pause in funding actions related to the Infrastructure Investment and Jobs Act (IIJA). With that being said, there should be no drawdowns from the following CAs.

Southeast Rockford Area 7 LTRA V-00E02954
Southeast Rockford Area 11 V-00E01229

I will keep you posted when we know more.

Thank you!

Bertanna M. Lewis
State Project Officer – Illinois
Superfund & Emergency Management Division
U.S. EPA Region 5
lewis.bertanna@epa.gov
(312) 886-2838

SA88

# Thomas-Jensen Affirmation (redacted)

# Exhibit # 59

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

      Plaintiffs,

      v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

      Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## DECLARATION OF DEPARTMENT OF ENVIRONMENTAL PROTECTION

I, Bonnie Heiple, declare as follows:

1.     I am a resident of the Commonwealth of Massachusetts. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I am currently employed by the Massachusetts Department of Environmental Protection ("MassDEP") as its Commissioner.

3.     MassDEP is responsible for implementing a myriad of state statutes and federal delegations of authority to protect public health, public safety, public welfare and the environment. Our agency's purview includes safe drinking water, clean air, safe handling, transport, treatment and disposal of hazardous waste, sanitary disposal of wastes, protection of the state's surface and groundwaters from undue pollution, protection of natural resources, prompt assessment and remediation of releases of oil and hazardous materials and substances, incentivization of redevelopment of contaminated brownfields, incentivization of recycling of

1

SA90

waste materials, reduction in the use of toxic materials, as well as oversight of numerous environmental professionals and organizations, such as sampling laboratories, waste site cleanup professionals, well drillers and sanitary inspectors, among other programs.

4.      As Commissioner, I oversee all programs and divisions of MassDEP, including the MassDEP programs that apply for and receive federal grant funding, and the fiscal division of our agency which manages, tracks, and oversees spending pursuant to federal grant awards. The MassDEP programs that received the grant awards discussed in this affidavit and the MassDEP fiscal division reported information to me to verify the information, to the best of their knowledge and belief, to which I attest in this affidavit.

5.      MassDEP is the recipient of nine grants awarded by the U.S. Environmental Protection Agency ("EPA"), authorized under the Inflation Reduction Act ("IRA") or the Infrastructure Investment and Jobs Act ("IIJA"). The nine grants and accompanying financial details are identified in Exhibit A, attached hereto.

6.      To date, EPA has awarded to MassDEP a total of $74.9 million for all nine grant programs.  Of that, MassDEP has contracted for the disbursement of $25.9 million and has disbursed $5.8 million, as of January 31, 2025.

7.      MassDEP administers these grants by contracting, approving, and expending funds, and then seeking reimbursement up to the amount of the grant award from the federal Automated Standard Application for Payment, or "ASAP," system.

8.      During the week of January 27, 2025, MassDEP issued payments associated with five of those nine grant accounts, totaling $1,863,116. On January 27 and 29, 2025, MassDEP attempted to draw reimbursements for those payments (totaling $1,863,116) from the ASAP system. As of February 3, 2025, at 12:00 p.m., none of the aforementioned reimbursements had

2

been issued. MassDEP fiscal personnel checked the status of the nine federal grant accounts in the ASAP system, and all such accounts were listed as "suspended." As of February 3, 2025, at 2:00 p.m., one account was updated to "open," while the other eight remained suspended. Included in Exhibit B are copies of screenshots from the ASAP system for eight of the nine grant accounts as of February 3, 2025, after 4 pm. Only one grant account, the CERCLA Brownfields Community-Wide Assessment Grant ("CERCLA Brownfields 104 Grant") program account, showed open as of that date and time.

9.     These federal funds will have a critical impact on Massachusetts communities.

    a.   The two Emerging Contaminants in Small or Disadvantaged Communities Grants ("EC-SDC grants" or "EC-SDC Grant #1" and "EC-SDC Grant #2") will help more than 47 Massachusetts cities and towns remove contaminants from drinking water. These grants are focused specifically on small and economically disadvantaged communities, where they will have a direct impact on the long-term health of hundreds of thousands of residents of the Commonwealth. EC-SDC grant funds will begin to address the more than $485 million in documented needs of these communities for water treatment, new water sources, connecting small water systems and private wells to larger and better equipped public water suppliers, and increasing efficiency of public water systems to provide safe drinking water and maximize public health protection. This grant program is the first opportunity in the history of the Safe Drinking Water Act (SDWA) for small and economically disadvantaged public water systems to receive grants to address PFAS and other emerging contaminant issues, such as

3

SA92

manganese. These systems and communities often do not have the technical or financial capacity to tackle these issues on their own and routinely struggle to pay for necessary treatment or other strategies to remove man-made industrial contaminants like PFAS. Traditional financing, such as low-interest loans through the Drinking Water State Revolving Fund programs, are out of reach for many small systems because they are not equipped to manage the application process, nor do they have the financial resources to repay the loans.

b.  The Long Island Sound Program Grant ("LISP Grant") will help reduce water pollution, particularly excess nitrogen, in the Long Island Sound watershed, which stretches along the coastline and up the Connecticut River and includes disadvantaged communities such as the city of Chicopee, Massachusetts. Reductions in nitrogen will reduce harmful algal blooms, contribute to the restoration of tidal wetlands and eelgrass, and improve conditions for aquatic organisms. The funding is awarded to municipalities to upgrade wastewater treatment facilities, which discharge nitrogen within the Massachusetts portion of the watershed. These wastewater infrastructure improvements are part of a decades-long effort to achieve compliance with the requirements of the federal Clean Water Act in Long Island Sound. The funding specifically benefits economically disadvantaged municipalities that would otherwise be unable to fund wastewater treatment plant upgrades – including through Clean Water State Revolving Fund loans – due to prohibitive costs.

4

c. The two Brownfields grant awards – the CERCLA Brownfields 104 Grant and the CERCLA Section 128(a) State and Tribal Response Program Grant ("CERCLA Brownfields 128 Grant") – will fund critical work to assess and respond to releases of oil and hazardous materials. In addition to the environmental and public health benefits of cleaning up pollution, redevelopment of formerly contaminated properties leads to economic revitalization, job creation, and tax revenue for the host community.

d. The Clean Air Act – Cumulative Impact Analysis Grant ("CAA-CIA Grant") will support expert modeling and analysis of traffic and vehicle emissions in areas of Massachusetts disproportionately affected by those sources of air pollution. This funding is critical to enable MassDEP to assess these types of impacts and design appropriate requirements for proposed projects to mitigate pollution emissions.

e. Two other Clean Air Act grants, the Clean Air Act – Air Sensors Grant ("CAA-AS Grant") and the Clean Air Act – Disadvantaged Communities Air Monitoring Grant ("CAA-DCAM Grant"), support MassDEP's air monitoring program in disadvantaged communities by providing funding to maintain 50 multi-pollutant air sensors, replace outdated equipment, and establish a new air monitoring station. This funding is critical to provide information to residents about air quality, and to inform MassDEP's permitting and regulatory processes to mitigate air pollution.

f. The Post-Consumer Materials Management Infrastructure Grant Program (also known as the "SWIFR" Grant) supports MassDEP's Recycle Smart

5

MA initiative, an education and awareness program providing residents with easy-to-access information about recycling. Educating residents on what can and cannot be recycled improves recycling efficiency, saves municipalities from paying contamination charges, and decreases the amount of municipal solid waste sent for disposal instead of recycling – thereby reducing the need for new landfills and incinerators.

10.    MassDEP's budget relies on the funds from these grant awards. For example, EC-SDC Grants permit MassDEP to reimburse municipalities for installing treatment systems to remove PFAS or other contaminants or connecting to safe drinking water supplies; MassDEP has contracted more than $16 million to subcontractees and has already paid out approximately $3.7 million in reimbursement to municipalities and other subgrantees. MassDEP will not have sufficient funds to honor reimbursements without the federal funding it was awarded. Likewise, MassDEP has contracted for more than $7 million in projects through the LISP Grant related to addressing water pollution in the Long Island Sound watershed and has already disbursed nearly $1 million. This project cannot continue, and those contracts cannot be paid, without the awarded federal funding.

11.    Any pause in or elimination of the awarded federal funding would cause the following harms to public health, public safety, and the environment, as well as to the public welfare in economic effects from these programs:

   a.  If funding for the EC-SDC Grants is unavailable, small public water systems may not be able to make necessary upgrades or connect to larger public water systems and therefore will continue to rely on drinking water polluted by PFAS and/or other emerging contaminants. PFAS has been

6

SA95

linked to health effects, including increased risk of cancer, decreased immune function, and reproductive effects. Small or economically disadvantaged public water systems would be forced to either abandon improvement projects or pass along costs to their ratepayers—further exacerbating disparities in economically disadvantaged communities.

b.  Without the continued funding of the LISP Grant, the Long Island Sound watershed will continue to be plagued by nitrogen and other pollution, in contravention of both state water quality standards and the federal Clean Water Act. Discontinuation of funding will irreparably harm municipalities that have contracted approximately $1 million dollars of work completed to date, and approximately $9.5 million of work for which reimbursement has not yet been sought. Work was planned, designed, and contracted based on the federal government's award of grant funding. It would be extremely challenging for MassDEP to provide replacement funding, as detailed in paragraph 13 below. Abandoning on-going construction for treatment plant upgrades may not be feasible, and the Commonwealth and the municipalities may suffer monetary damages as a result. Additionally, costs likely would be passed on to ratepayers in these economically disadvantaged communities.

c.  Paused or eliminated CERCLA Brownfields 128 and CERCLA Brownfields 104 Grants would stop cleanup and assessment of oil and hazardous materials contamination. This means the economic revitalization, job creation and enhanced protection of persons and the

environment from the impacts of oil and hazardous materials described in Paragraph 9(c) above would not occur. The impacted municipalities likely do not have the funds to perform this assessment and cleanup work themselves, and, as detailed in paragraph 13 below, it would be extremely challenging for MassDEP to replace these funds. Private investment is often insufficient to perform these cleanups, as the underlying property values may not currently justify the investment and risk. These federal grants represent a significant opportunity to bring substantial improvements to blighted, post-industrial communities in Massachusetts.

d. Without the CAA-CIA Grant to hire and pay contractors to model traffic/vehicle emissions, it would be difficult for MassDEP to identify neighborhoods with higher traffic/vehicle related air pollution and assess health risks to residents, hampering MassDEP's ability to protect public health of vulnerable communities through its air permitting program.

e. A pause or elimination of the CAA-AS or CAA-DCAM Grants would hamper MassDEP's ability to monitor air pollution in Massachusetts communities, which directly affects information-sharing with the public so residents can take actions to protect their health, as well as the ability of the agency to formulate appropriate requirements for pollution mitigation.

f. Without the SWIFR Grant, efforts to reduce contamination in recycling – which costs municipalities hundreds of thousands of dollars a year – will be hampered and the poor quality of recovered materials will impact the value of these commodities reused by manufacturers. Diverting wastes

8

SA97

from disposal to recycling prevents the need for more landfills and incinerators, which have a detrimental impact on public health and the environment.

12.    We continue to be concerned that the funding will again be delayed or denied because the federal administration has announced policies that federal funds accounts should be frozen as part of a global change of policy. The initial announcement was covered by all major media outlets, see, e.g., article by the Associated Press at https://apnews.com/article/donald-trump-project-2025-grants-freeze-6cb624cd3ef92805a5600fe5622733f0. In addition, despite the issuance by the Court of a Temporary Restraining Order on January 31, 2025, eight of the nine MassDEP grant accounts remained suspended up to February 3, 2025, as of 4 p.m.

13.    These nine federal grant programs support critical environmental protection and public health work ranging from clean air to clean drinking water to clean land. The $74.9 million total awarded to MassDEP almost equals the agency's entire state-funded annual operating budget of $87 million. While MassDEP would strive to seek replacement funding for the important programs supported by these federal grants, replacing this magnitude of funds would be virtually impossible, particularly with the required expediency given that much work is already underway or critical to perform immediately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 5, 2025, at ___Boston MA_____.
                                                          [city, state]


_____
Bonnie Heiple
Commissioner


9

SA98

# EXHIBIT A

**EXHIBIT A**

| FEDERAL GRANT I.D. # | GRANT NAME | EPA AWARDED TO DATE | GRANT END DATE | MASSDEP CONTRACTS TO DATE | MASSDEP EXPENDITURES TO DATE | STATUTORY AUTHORITY | CATALOG OF FEDERAL DOMESTIC ASSISTANCE DESCRIPTION |
|---|---|---|---|---|---|---|---|
| 4W00A01201 | CERCLA Section 128(a) State and Tribal Response Program ("CERCLA Brownfields 128") Grant | $2,645,000 | 9/30/2027 | $1,166,237 | $479,276 | CERCLA: Sec. 128(a) & Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 66.817 - State and Tribal Response Program Grants |
| 4B00A01605 | CERCLA Brownfields Community-Wide Assessment ("CERCLA Brownfields 104") Grant | $2,000,000 | 9/30/2029 | $0 | $0 | CERCLA: Secs. 104(k)(2) and 104(k)(5)(e) and Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 66.818 - Brownfields Multipurpose, Assessment, Revolving Loan Fund, and Cleanup Cooperative Agreements |
| 4S00A00885 | Long Island Sound Program Grant ("LISP") | $10,500,000 | 7/31/2028 | $7,127,138 | $923,456 | Clean Water Act: Sec. 119(d) & Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 66.437 - Long Island Sound Program |
| 4800A01226 | Emerging Contaminants in Small or Disadvantaged Communities - Grant #1 ("EC-SDC Grant #1") | $38,204,000 | 9/30/2029 | $15,412,733 | $3,794,607 | Safe Drinking Water Act: Sec. 1459A &Infrastructure Investment and Jobs Act (IIJA) (PL117-58) | 66.442 - Water Infrastructure Improvements for the Nation Small and Underserved Communities Emerging Contaminants Grant Program |
| 4800A01613 | Emerging Contaminants (EC) in Small or Disadvantaged Communities - Grant #2 ("EC-SDC Grant #2") | $19,249,000 | 9/30/2030 | $1,327,073 | $145 | Safe Drinking Water Act: Sec. 1459A & Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 66.442 - Water Infrastructure Improvements for the Nation Small and Underserved Communities Emerging Contaminants Grant Program |
| 5A00A01208 | Clean Air Act - Cumulative Impact Analysis ("CAA-CIA") Grant | $681,932 | 9/30/2025 | $460,372 | $213,589 | | |
| 4200A01215 | Post-Consumer Materials Management Infrastructure Grant Program (also known as the "SWIFR" Grant Program) | $410,563 | 9/30/2025 | $77,398 | $306,669 | 33 USC 4282 & Infrastructure Investment and Jobs Act (IIJA) (PL 117-58) | 66.920 - Solid Waste Infrastructure Financing - Save Our Seas Act Grants |
| 5U00A01250 | Clean Air Act - Air Sensors ("CAA-AS") Grant | $21,925 | 6/30/2029 | $0 | $0 | Clean Air Act: Sec. 103 Inflation Reduction Act: Sec. 60105c IRA | 66.034 - Surveys-Studies-Investigations-Demonstrations and Special Purpose Activities relating to the Clean Air Act |
| 5Q00A01601 | Clean Air Act - Disadvantaged Communities Air Monitoring ("CAA-DCAM") Grant | $1,170,472 | 6/30/2029 | $284,082 | $46,611 | Clean Air Act: Sec. 103 Inflation Reduction Act: Sec. 60105(a) IRA | 66.034 - Surveys-Studies-Investigations-Demonstrations and Special Purpose Activities relating to the Clean Air Act |
| **GRAND TOTAL:** | | $74,882,892 | | $25,855,033 | $5,764,353 | | |

Data Updated 1/31/25

SA100

# EXHIBIT B



**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:48 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
███████

**Recipient ID:**
████

**Recipient Short Name:**
EQE

Inquiry Results:

### ACCOUNT DETAILS

| | | |
|---|---|---|
| Requestor ID | : | ██████ |
| Account ID | : | ██████ |
| Account Description | : | CERCLA 128(A) RESPONSE PROGRAM |
| 1031/LOC Account | : | No |
| Account Type | : | Regular Account |
| Group ID | : | ████ |
| Control Account | : | No |
| Account Status Indicator | : | Suspended |
| Available Balance | : | $2,134,786.00 |
| Create Date | : | 01/17/2023 |
| Begin Date | : | 01/01/2023 |
| Performance Period End Date | : | 09/30/2027 |
| End Date | : | 01/30/2028 |
| TAS Distribution Method | : | Percentage by Account |
| Allow Book Entry Adjustment | : | Yes |
| Allow Warehoused Payments | : | Yes |
| CMIA Indicator | : | No |

### CUMULATIVE AUTHORIZATIONS

| | | |
|---|---|---|
| Cumulative Authorized Amount | : | $2,645,000.00 |
| Cumulative Authorized Amount Reset Period | : | |
| Annual Reset Month | : | |

### GRANT DETAILS

| | | |
|---|---|---|
| Grant | : | Yes |
| Federal Award Identification Number (FAIN) | : | ████ |
| CFDA Number | : | ████ |
| Total Estimated Grant Amount | : | $0.00 |

### AGENCY PAYMENT REVIEW

| | | |
|---|---|---|
| Agency Review | : | No |
| Threshold Amount | : | |
| Reason for Review | : | |

### DRAW AMOUNTS

| | | |
|---|---|---|
| Max Total Draw Amount | : | |
| Max Daily Draw Amount | : | |
| Max Monthly Draw Amount | : | |
| Max Quarterly Draw Amount | : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | | |
|---|---|---|
| Authorized Renewal Amount | : | $0.00 |
| Certified Date | : | |
| Renewal Frequency | : | |
| Pending Renewal Frequency | : | |
| Pending Automated Renewal Amount | : | $0.00 |
| Rollover Reset Quarter | : | |
| Default Action | : | |

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:45 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
██████████

**Recipient ID:**
██████

**Recipient Short Name:**
EQE

Inquiry Results:

| ACCOUNT DETAILS | |
|---|---|
| Requestor ID : | 2563074 |
| Account ID : | ██████████ |
| Account Description : | LONG ISLAND SOUND WATERSHED |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | ██████ |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $9,576,543.93 |
| Create Date : | 09/08/2022 |
| Begin Date : | 10/01/2022 |
| Performance Period End Date : | 07/31/2028 |
| End Date : | 12/01/2028 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

| CUMULATIVE AUTHORIZATIONS | |
|---|---|
| Cumulative Authorized Amount : | $10,500,000.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

| GRANT DETAILS | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | ██████ |
| CFDA Number : | ██████ |
| Total Estimated Grant Amount : | $0.00 |

| AGENCY PAYMENT REVIEW | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

| DRAW AMOUNTS | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

| AUTOMATED AUTHORIZATION RENEWALS | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

**ASAP.gov**
Automated Standard
Application for Payments
BUREAU OF THE FISCAL SERVICE

**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:39 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
█████████

**Recipient ID:**
█████████

**Recipient Short Name:**
EQE

## Inquiry Results:

### ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | ████████ |
| Account ID : | ████████ |
| Account Description : | MASSDEP EC-SDC GRANT PROGRAM |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | ████ |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $33,963,178.56 |
| Create Date : | 08/31/2023 |
| Begin Date : | 10/01/2023 |
| Performance Period End Date : | 09/30/2029 |
| End Date : | 01/30/2030 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $38,204,000.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

### GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | ██████ |
| CFDA Number : | █████ |
| Total Estimated Grant Amount : | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

### DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:42 PM

**ALC/Region:** ▮

**Agency Short Name:** RTP-Grants

**Account ID:** ▮

**Recipient ID:** ▮

**Recipient Short Name:** EQE

**Inquiry Results:**

### ACCOUNT DETAILS

| | | |
|---|---|---|
| Requestor ID | : | ▮ |
| Account ID | : | ▮ |
| Account Description | : | MASSDEP EC-SDC GRANT PROGRAM 2 |
| 1031/LOC Account | : | No |
| Account Type | : | Regular Account |
| Group ID | : | ▮ |
| Control Account | : | No |
| Account Status Indicator | : | Suspended |
| Available Balance | : | $19,248,854.92 |
| Create Date | : | 09/11/2024 |
| Begin Date | : | 10/01/2024 |
| Performance Period End Date | : | 09/30/2030 |
| End Date | : | 01/30/2031 |
| TAS Distribution Method | : | Percentage by Account |
| Allow Book Entry Adjustment | : | Yes |
| Allow Warehoused Payments | : | Yes |
| CMIA Indicator | : | No |

### CUMULATIVE AUTHORIZATIONS

| | | |
|---|---|---|
| Cumulative Authorized Amount | : | $19,249,000.00 |
| Cumulative Authorized Amount Reset Period | : | |
| Annual Reset Month | : | |

### GRANT DETAILS

| | | |
|---|---|---|
| Grant | : | Yes |
| Federal Award Identification Number (FAIN) | : | ▮ |
| CFDA Number | : | 66442.000 |
| Total Estimated Grant Amount | : | $0.00 |

### AGENCY PAYMENT REVIEW

| | | |
|---|---|---|
| Agency Review | : | No |
| Threshold Amount | : | |
| Reason for Review | : | |

### DRAW AMOUNTS

| | | |
|---|---|---|
| Max Total Draw Amount | : | |
| Max Daily Draw Amount | : | |
| Max Monthly Draw Amount | : | |
| Max Quarterly Draw Amount | : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | | |
|---|---|---|
| Authorized Renewal Amount | : | $0.00 |
| Certified Date | : | |
| Renewal Frequency | : | |
| Pending Renewal Frequency | : | |
| Pending Automated Renewal Amount | : | $0.00 |
| Rollover Reset Quarter | : | |
| Default Action | : | |

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:52 PM

SENSITIVE BUT UNCLASSIFIED

**ALC/Region:** ████

**Agency Short Name:** RTP-Grants

**Account ID:** ████

**Recipient ID:** ████

**Recipient Short Name:** EQE

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | ████ |
| Account ID : | ████ |
| Account Description : | ENHANCING PROTECTION OF ENVIRO |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | ████ |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $512,298.72 |
| Create Date : | 06/26/2023 |
| Begin Date : | 10/01/2023 |
| Performance Period End Date : | 09/30/2025 |
| End Date : | 01/30/2026 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $681,932.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

## GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | ████ |
| CFDA Number : | ████ |
| Total Estimated Grant Amount : | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

## DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:49 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
██████████

**Recipient ID:**
██████

**Recipient Short Name:**
EQE

**Inquiry Results:**

### ACCOUNT DETAILS

| | | |
|---|---|---|
| Requestor ID | : | ██████ |
| Account ID | : | ████████ |
| Account Description | : | RECYCLESMART MA INITIATIVE |
| 1031/LOC Account | : | No |
| Account Type | : | Regular Account |
| Group ID | : | ████ |
| Control Account | : | No |
| Account Status Indicator | : | Suspended |
| Available Balance | : | $79,315.03 |
| Create Date | : | 08/09/2023 |
| Begin Date | : | 10/01/2023 |
| Performance Period End Date | : | 09/30/2025 |
| End Date | : | 01/30/2026 |
| TAS Distribution Method | : | Percentage by Account |
| Allow Book Entry Adjustment | : | Yes |
| Allow Warehoused Payments | : | Yes |
| CMIA Indicator | : | No |

### CUMULATIVE AUTHORIZATIONS

| | | |
|---|---|---|
| Cumulative Authorized Amount | : | $410,563.00 |
| Cumulative Authorized Amount Reset Period | : | |
| Annual Reset Month | : | |

### GRANT DETAILS

| | | |
|---|---|---|
| Grant | : | Yes |
| Federal Award Identification Number (FAIN) | : | ██████ |
| CFDA Number | : | ████ |
| Total Estimated Grant Amount | : | $0.00 |

### AGENCY PAYMENT REVIEW

| | | |
|---|---|---|
| Agency Review | : | No |
| Threshold Amount | : | |
| Reason for Review | : | |

### DRAW AMOUNTS

| | | |
|---|---|---|
| Max Total Draw Amount | : | |
| Max Daily Draw Amount | : | |
| Max Monthly Draw Amount | : | |
| Max Quarterly Draw Amount | : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | | |
|---|---|---|
| Authorized Renewal Amount | : | $0.00 |
| Certified Date | : | |
| Renewal Frequency | : | |
| Pending Renewal Frequency | : | |
| Pending Automated Renewal Amount | : | $0.00 |
| Rollover Reset Quarter | : | |
| Default Action | : | |

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

# ASAP.gov
Automated Standard
Application for Payments
BUREAU OF THE FISCAL SERVICE

**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:51 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
▮▮▮▮▮▮

**Recipient ID:**
▮▮▮▮

**Recipient Short Name:**
EQE

**Inquiry Results:**

## ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | ▮▮▮▮ |
| Account ID : | ▮▮▮▮▮▮ |
| Account Description : | MA AIR SENSOR PROGRAM 60105C |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | ▮▮▮ |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $21,925.00 |
| Create Date : | 08/28/2024 |
| Begin Date : | 07/01/2024 |
| Performance Period End Date : | 06/30/2029 |
| End Date : | 10/30/2029 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

## CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $21,925.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

## GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | ▮▮▮▮ |
| CFDA Number : | ▮▮▮▮ |
| Total Estimated Grant Amount : | $0.00 |

## AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

## DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

## AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED



**Account Profile Inquiry**

Date: 02/03/2025
Time: 4:50 PM

**ALC/Region:**
68128933

**Agency Short Name:**
RTP-Grants

**Account ID:**
███████

**Recipient ID:**
█████

**Recipient Short Name:**
EQE

**Inquiry Results:**

### ACCOUNT DETAILS

| | |
|---|---|
| Requestor ID : | ██████ |
| Account ID : | ████████ |
| Account Description : | AMBIENT AIR MONITORING IN MASS |
| 1031/LOC Account : | No |
| Account Type : | Regular Account |
| Group ID : | ████ |
| Control Account : | No |
| Account Status Indicator : | Suspended |
| Available Balance : | $1,024,522.83 |
| Create Date : | 09/09/2024 |
| Begin Date : | 07/01/2024 |
| Performance Period End Date : | 06/30/2029 |
| End Date : | 10/30/2029 |
| TAS Distribution Method : | Percentage by Account |
| Allow Book Entry Adjustment : | Yes |
| Allow Warehoused Payments : | Yes |
| CMIA Indicator : | No |

### CUMULATIVE AUTHORIZATIONS

| | |
|---|---|
| Cumulative Authorized Amount : | $1,170,472.00 |
| Cumulative Authorized Amount Reset Period : | |
| Annual Reset Month : | |

### GRANT DETAILS

| | |
|---|---|
| Grant : | Yes |
| Federal Award Identification Number (FAIN) : | ██████ |
| CFDA Number : | ██████ |
| Total Estimated Grant Amount : | $0.00 |

### AGENCY PAYMENT REVIEW

| | |
|---|---|
| Agency Review : | No |
| Threshold Amount : | |
| Reason for Review : | |

### DRAW AMOUNTS

| | |
|---|---|
| Max Total Draw Amount : | |
| Max Daily Draw Amount : | |
| Max Monthly Draw Amount : | |
| Max Quarterly Draw Amount : | |

### AUTOMATED AUTHORIZATION RENEWALS

| | |
|---|---|
| Authorized Renewal Amount : | $0.00 |
| Certified Date : | |
| Renewal Frequency : | |
| Pending Renewal Frequency : | |
| Pending Automated Renewal Amount : | $0.00 |
| Rollover Reset Quarter : | |
| Default Action : | |

SENSITIVE BUT UNCLASSIFIED

# Thomas-Jensen Affirmation

# Exhibit # 65

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

     Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

     Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## DECLARATION OF Harry Coker Jr.

I, Harry Coker Jr., declare as follows:

1.  I am a resident of the Commonwealth/State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.  I am currently employed by the Maryland Department of Commerce ("Commerce") as Acting Secretary.

3.  Commerce is responsible for economic development for the State of Maryland.

4.  As Acting Secretary, I am an Authorizing Official for federal grants that Commerce receives.

5.  Commerce receives federal grants for several programs including, but not limited to:

1

a. Federal funding from the Department of Defense's ("DoD") Office of Local Defense Community Cooperation.

b. Federal funding from (1) American Rescue Plan, State Small Business Credit Initiative (SSBCI), through Treasury, and (2) American Rescue Plan, through the Economic Development Administration ("EDA").

c. Federal funding through the National Endowment for the Arts' Partnerships (State & Regional).

## DoD Funded Grants

6.      There are three federal grants from the DoD's Office of Local Defense Community Cooperation ("OLDCC") with obligations to be drawn down. These are reimbursable grants totaling $2,184,577.00 in federal award dollars; $$641,573.00 has been received by Commerce and $1,543,004.00 in anticipated payments.

7.      OLDCC funds initiatives that further the priorities of the National Defense Strategy by supporting the readiness and resiliency of military installations and defense communities across the country. Two of the grants Commerce receives fund DefTech, a critical technology transfer program that provides no-cost education and consulting support to 41 early-stage Maryland technology companies interested in partnering with federal labs. Another grant funds a unique Installation Resilience project which will task the state with developing a collaborative framework for Maryland and its local defense communities to address resiliency concerns threatening critical infrastructure that, if impacted by climate change or other stressors, could negatively impact Maryland's installations and the $61.4B they contribute to Maryland's economy.

2

SA112

8.      Commerce's budget for this year relies on federal funding and we allocated funding for staffing and critical economic development programs based on the anticipated receipt of federal funding promised from OLDCC.

9.      Any pause in our federal funding would greatly inhibit Commerce from 1) being able to operate the DefTech Center, threatening Maryland's and DoD's technology transfer goals, harming its innovation economy, and technology-focused businesses and 2) would limit the execution of the Installation Resilience project, which would not only threaten the $61.4B economic impact from Maryland's military installations but could also threaten national security if the critical missions at those installations were lost as a result of the loss of military readiness.

10.     Additionally, any vendors Commerce partners with to execute the above programs, including TEDCO, which operates the Maryland DefTech program, would potentially halt all program activities due to the chilling effect of not receiving payment for services.

11.     Commerce is currently scheduled to receive disbursements of $127,583.63 under our current federal grants in obligated but not disbursed funds.

12.     Over the life of these grants, we expect to receive an additional $1,685,164.00 in federal funding. If we do not receive such disbursements, it will negatively impact Maryland's economy by potentially halting programs that support small businesses, harm technology focused startups currently receiving services, and threaten the resilience of Maryland's defense communities and military installations.

13.     On January 28, 2025, during the threat of the federal funding freeze, Commerce received communications from OLDCC that they were temporarily pausing payments to grantees while they evaluated their programs.

3

14.     If the federal funding is paused, blocked, denied or delayed suddenly, Commerce would potentially be unable to continue the programs described above, harming Maryland's economy and potentially military readiness as it relates to installation resiliency risks impacting military missions.

## Small Business Loans

15.     Under the American Rescue Plan ("ARPA"), State Small Business Credit Initiative (SSBCI), Commerce was awarded $30,000,000 from the U.S. Department of Treasury.

16.     SSBCI is a program to support small businesses and entrepreneurship in communities throughout Maryland by providing capital and technical assistance to promote small business stability, growth, and success. All communities in Maryland are affected especially those with low income and high unemployment. The inability to disburse funds under current grant agreements effect 100s of small businesses and 1,000s of existing and future employees. Additionally, freezing federal funding could further reduce funding by eliminating the matching private sector investments into distressed communities receiving the federal funding.

17.     Also, under ARPA, Commerce was awarded $1,384,000.00 from the EDA for the State's Maryland Economic Adjustment Fund (MEAF).

18.     MEAF uses the EDA funds to help targeted small businesses survive and/or recover from the business disruption caused by the COVID crisis. The inability to disburse funds under the current grant agreements affects small businesses looking to upgrade or modernize operations or expand commercial applications for technology or enter and compete in new markets. Lack of this funding would harm underserved businesses that are unable to qualify for loans from traditional lending sources by removing a much needed source of funding.

4

SA114

19. Commerce's budget for this year has relied on the SSBCI and EDA funding, and we made plans and allocated funding for staffing based on the anticipated receipt of Federal funding promised under the SSBCI and EDA grants.

20. Any pause in our federal funding would harm underserved small businesses and communities.

21. Small businesses are the backbone of any state economy. Not having access to this critical funding could potentially slow economic growth in the state but more importantly would cut critical funding to these businesses, essentially putting them out of business.

22. In the next six months, we are scheduled to receive disbursements of approximately $15,000,000.00 under our current SSBCI and EDA federal grants.

23. The freeze is causing confusion in the small business community that has started the process for loans related the SSBCI and MEAF/EDA funds and whether or not these funds will be available.

24. If the federal funding is again paused, blocked, denied or delayed suddenly, the State may have to cancel those loans that were going to be funded with federal funds. Furthermore, some Commerce military programs are wholly federally funded and the grant manager position in Commerce's military affairs unit is almost wholly federally funded; if the funds are paused, blocked, denied or delayed, the programs that are federally funded would potentially be canceled.

**Arts Programs**

25. The Maryland State Arts Council ("MSAC") helps meet Commerce's economic development, business attraction, and business retention goals by supporting Maryland's arts sector.

5

SA115

26.    MSAC receives federal funds through the National Endowment for the Arts' Partnerships (State & Regional).  MSAC received Award 1932219-61-24 with a period of performance July 1, 2024 through June 30, 2025.  The award totals $995,800.00. To date, $635,505.31 has been requested and approved for payment.

27.    National Endowment for the Arts ("NEA") funding supports MSAC's activities, specifically supporting staff salaries, folklife activities, and Maryland's participation in the national Poetry Out Loud competition. Overall, MSAC's grant programs support 341 organizations that employ 9,082 Maryland residents, serve 8.6 million constituents, and have a total economic impact of $986 million.

28.    MSAC's budget for this year has relied on federal funding and MSAC made plans and allocated funding for staffing and programs that support Maryland's arts organizations and artists based on the anticipated receipt of Federal funding promised by the NEA.

29.    Any pause in our Federal funding would impact the funding of projects and programs the Federal funding supports, this would greatly harm MSAC's ability to provide services to constituents and arts development activities critical to MSAC's mission.

30.    Additionally, we anticipate that arts organizations will scale back programs and plans for providing arts programs to Maryland residents, chilling a sector of the economy that supports 80,202 jobs and makes up 2.7% of the State's economy.

31.    Through June 30, 2025, we are scheduled to receive disbursements of $830,586.40 under our current federal grant.

32.    If by June 30, 2025 we do not receive such disbursements, it will necessitate the scaling back of programs with detriment to the arts programming, economic impact, and jobs discussed above.

6

33.     If the federal funding is again paused, blocked, denied or delayed suddenly, MSAC will likely have to cancel a number of arts programs as MSAC does not have the funds to service those programs on its own without federal assistance. Moreover, MSAC would also have to scale back on hiring being currently undertaken to support local art development organizations as it would not have the funds to support those positions, thereby denying the local art development organizations much needed State support.

## Conclusion

34.     Commerce continues to be concerned that the funding will again be delayed or denied because of lack of communication from Federal funding agencies on whether the Federal grants received by Commerce will be impacted by future freezes or termination.

35.     If the Federal funding is again paused, blocked, denied or delayed suddenly, Commerce will be forced to potentially scale back on its staffing plans and cut programs until assurances that awarded federal funds will be paid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 6, 2025, at Baltimore, Maryland.

Harry Coker, Jr.

7

SA117

Thomas-Jensen
Affirmation

Exhibit # 73

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK, et al.,

Plaintiffs,

v.

DONALD TRUMP, et al.,

Defendants.

_____

C.A. No. 25-cv-39-JJM-PAS

**DECLARATION OF TRAVIS BOESKOOL (MICHIGAN)**

I, TRAVIS BOESKOOL, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1.     I am the deputy director of the Michigan Department of Environment, Great Lakes, and Energy (EGLE), a position I have held since 2023.  As deputy director, I am part of the core leadership team of EGLE in its mission of protecting Michigan's environment and public health by managing air, water, land, and energy resources.  As part of this leadership role, I oversee the agency's budget and resource allocation and I work with federal agencies, local governments, and other state departments on environmental and energy matters.

2.     As the deputy director, I have personal knowledge of the programs and funding discussed below, or have knowledge of these matters based on my review of information and records compiled by my staff.

3.     EGLE works extensively with federal agencies to implement programs to assist in the provision of safe drinking water, pollution control, protection of

1

SA119

public health, environmental cleanup, safe management of solid and hazardous
waste, and community outreach and education, to name only a few of EGLE's
important programs.  In Fiscal Year 2024, EGLE expended more than $550 million
in federal dollars, with much of that assistance provided directly to local
governments and communities to help them improve their drinking water and
wastewater infrastructure, including the critical replacement of lead service lines,
treatment of sewage, and more.  This fiscal year, EGLE expects grant agreements
and funding agreements with local governments to utilize more federal dollars for
these purposes, in the range of $750-800 million dollars.

4.    A pause in federal funding received by EGLE would have a direct,
immediate, and adverse impact on the State of Michigan's ability to operate these
programs, and would directly, immediately, and adversely impact Michigan's
residents who rely on these programs.

5.    Of the more than $550 million in federal dollars expended by EGLE in
Fiscal Year 2024, more than $470 million was direct aid to local communities
related to water infrastructure.  These community construction projects remain
ongoing, with communities reliant on these federal funds for continuing
construction and paying hardworking contractors.  A pause in the flow of federal
dollars through EGLE could result in work stoppages, unpaid bills, and disruption
of projects that would otherwise protect public health and the environment.
EGLE's water infrastructure funding and financing programs have invested a total
of $5.3 billion in Michigan since 2019, resulting in an estimated 57,000 jobs created.

2

SA120

6.    In addition, other programs that rely on federal funding and could be affected by a pause in federal funding include:  Michigan's Air Pollution Control Program, tasked with safeguarding citizens from air pollution; the Superfund program, responsible for cleaning up some of Michigan's most contaminated land to protect public health; the Brownfield program, which provides grants and assistance to redevelop and reuse contaminated properties while creating jobs and stimulating economic development; Michigan's Safe Drinking Water program, to oversee and ensure the provision of reliable and safe drinking water; energy programs; and numerous programs to monitor and safeguard Michigan's most precious resource – our water and Great Lakes.

7.    About one third of EGLE's more than 1,500 public servants in these programs are supported in part or in full by federal funding, risking EGLE's capability to fulfill its mission of protecting Michigan's environment and public health by managing air, water, land, and energy resources.

8.    Since the pause in federal funding resulting from the Office of Management and Budget's (OMB) memorandum titled "Memorandum for Heads of Executive Departments and Agencies," issued on January 27, 2025, M-25-13, (the "OMB Memo"), eight accounts administered by the Environmental Protection Agency (EPA) remain suspended and EGLE is unable to draw federal funding from these accounts.  The accounts are related to grant funding awarded under the Inflation Reduction Act (IRA).  Specifically, the programs are referred to as IRA Clean Air Act, two Climate Pollution Reduction Grants, Solar For All, IRA Air

3

SA121

Monitoring Grant 60150(a), IRA Air Quality Sensors Grant 60105c, Clean Ports Planning, and Clean Heavy Duty Vehicles.  Continuation of the freeze in these funds will halt Michigan's ability to access and utilize the remaining $296 million in already-awarded grant funds.  If EGLE is unable to access these funds, the public in Michigan will suffer the consequences through negative future outcomes to public health and the environment.  These grants fund critical work to enhance, modernize, and upgrade the air quality monitoring network that EGLE operates, protect air quality through reducing pollutant emissions, save citizens hundreds of dollars a month on their energy bills and more.  Continued withholding of the funds, many of which are under contract at the state level already, will mean those future benefits cannot be realized, to the detriment of the public, communities, and the state as a whole.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  February 5, 2025

Travis Boeskool, Deputy Director
Michigan Department of
Environment, Great Lakes, and
Energy

4

SA122

# Thomas-Jensen Affirmation

# Exhibit # 86

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

---

STATE OF NEW YORK; et al.,

        Plaintiffs,

      v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

        Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

---

**DECLARATION OF ELIZABETH GROGINSKY, CABINET SECRETARY OF THE NEW MEXICO EARLY CHILDHOOD EDUCATION AND CARE DEPARTMENT**

I, Elizabeth Groginsky, declare as follows:

1. I am a resident of the State of New Mexico. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Cabinet Secretary of the New Mexico Early Childhood Education and Care Department (ECECD), a position I have held since 2020. As Cabinet Secretary, I have oversight of all ECECD's program operations.

3. ECECD's mission is to optimize the health, development, education, and well-being of babies, toddlers, and preschoolers in New Mexico through a family-driven, equitable, community-based system of high-quality prenatal and early childhood programs and services.

1

SA124

4. As Cabinet Secretary, I have personal knowledge of the federal funding that is received by ECECD, or I have knowledge of the federal funding based on my review of information and records gathered by my staff.

5. In Fiscal Year 2025, ECECD is on track to receive $147,154,200.00 of federal funds, which constitutes approximately 19% of ECECD's operating budget.

6. ECECD implements federal programs that rely on majority federal funding for their operation: the Child and Adult Care Food Program (CACFP), and the Summer Food Program under the United States Department of Agriculture and Head Start under the United States Department of Health and Human Services' Administration for Children and Families.

7. ECECD depends on federal funding to implement many of its programs, including:

   a. Child Care Assistance, which is funded in part by the Child Care and Development Fund (CCDF) under the United States Department of Health and Human Services' Administration for Children and Families;

   b. Maternal, Infant, and Early Childhood Home Visiting (MIECHV) Home Visiting, which is funded in part by Medicaid;

   c. Social and Emotional Early Development (SEED) Initiative, which is funded in part by the Preschool Development Grant- Birth through Five (PDG-5) through the United States Department of Education; and

   d. Family Infant Toddler Program, New Mexico's early intervention program for infants and toddlers under Part C of the Individuals with Disabilities Education Act (IDEA).

8. ECECD's estimated CCDF expenditures for the State Fiscal Year 2025 (July 1, 2024 to June 30, 2025) is $94,223,404.00.

SA125

a.  On average, ECECD serves 30,601 children per month across the state of New Mexico, with services to 7,956 children being funded by CCDF funding.

9.  ECECD's estimated CACFP and Summer Food Program expenditures for State Fiscal Year 2025 are $49,318,264.00.

a.  In State Fiscal Year 2025, ECECD served 34,559 children through the Summer Food Program, serving 732,798 total meals.

b.  In State Fiscal Year 2025, ECECD served an average of 38,028 children and adults per month through the CACFP, serving an average of 1,414,324 meals per month.

c.  If federal funding is not provided, thousands of low-income New Mexican children and vulnerable adults may not be able to access food, many of whom depend on ECECD's programming for food security.

10. ECECD's estimated MIECHV expenditures for State Fiscal Year 2025 is $2,978,000.00.

a.  In State Fiscal Year 2025, MIECHV contracted with 485 individual families.

b.  In State Fiscal Year 2025, MIECHV has expended $895,490.99, with a remaining balance of $2,082,509.10 in federal funds.

c.  Lack of continued federal funding jeopardizes ECECD's ability to provide important home visiting services to New Mexican families, which connects families to other resources in their community (for example WIC, Medicaid, employment and educational resources, housing support, parenting support classes, and resources on how to stop smoking)

SA126

    d.   Without MIECHV services, families will not have access to the program, which aims to improve the overall health of mothers and children, gets children ready to succeed in school, and improves families' economic well-being.

11. ECECD's budget for this year has relied on assertions from the federal agencies listed above. ECECD allocated funding for staffing, services, and contracted for services based on the anticipated $147,154,200.00 of Federal funding promised though our federal grants for FY2025.

12. Many providers that ECECD contracts with to provide services on a reimbursement for service basis have expressed uncertainty regarding getting reimbursed for those services based on the recent funding pause. Those providers have also expressed concern about providing services on ECECD's behalf due to a possible lack of federal funds afforded to ECECD.

13. Additionally, unclear communication from federal agencies regarding the future security of federal funds has created confusion across all ECECD programs impacted by the funding pause.

14. Under ECECD's current federal grants, ECECD receives monthly disbursements of federal funds between $7,000,000 and $11,000,000. Disbursements made to ECECD are based on reimbursement for services already provided. For example, in January 2025, ECECD received reimbursement for services provided in November 2024.

15. The timing of the next expected disbursement of federal funds to ECECD should occur between the first and the fifteenth of February for services provided in December.  If we do not receive such disbursements, it will create financial harm not only to ECECD, but to the providers that ECECD contracts with to provide important services to New Mexican children and families.

16. ECECD uses the Payment Management System (PMS) to draw down on federal funds received through the federal Department of Health and Human Services. On Monday, January 27, 2025, PMS displayed a notification that due to the impacts of the memorandum "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs," Matthew J. Vaeth, Acting Director of the Office of Management and Budget (January 28, 2025) ("OMB Memo"), there would be possible delays on claims and draws submitted. PMS was not operational beginning at approximately 8:00 a.m. on January 28, 2025. While ECECD was able to access PMS at approximately 2:00 p.m. on Tuesday, January 28, 2025, there was uncertainty as to what to do once PMS reopened, creating heightened concern regarding stability of funding and general anxiety regarding ECECD's ability to draw the funding needed with the threat of an impending federal payment pause or delay.

17. Access to funding portals used by ECECD, specifically, PMS, were restored the afternoon of January 28, 2025, but claims were processed much slower than usual. While claims submitted by ECECD are usually processed by PMS within 24 to 48 hours of submission, but ECECD's claims submitted on Tuesday, January 28, 2025 were not processed until Friday, January 31, 2025, after additional prompting from ECECD staff.

18. Further delays have been communicated by the Department of Agriculture, who communicated to ECECD on January 28, 2025, that the accounting system used to fund Grant of Awards allotments for the CACFP program will not be online until February 19, 2025. ECECD submitted an additional funding request for FY24 in December 2024, but has not received notification that this request is processing. However, it is not clear whether the Grant of Awards system is not operational due to federal funding pauses.

19. Any additional pause, block, denial or delay in our federal funding will have significant impacts across the entire early childhood education and care ecosystem within the state of New Mexico.

   a. ECECD currently employs 207 people whose positions are funded in whole or in part with federal dollars. 123 positions are entirely funded by federal funds.

   b. In addition to ECECD employees, many New Mexicans who work in child care facilities, head starts, home visiting programs, and food programs across the state depend on federal funding to serve their clients and operate their businesses.

   c. Thousands of New Mexican children and their families depend on ECECD's programs for food, child care, to access community resources, to receive  early childhood education, and for early intervention services.

20. We continue to be concerned that the funding will again be delayed or denied because communications from federal agencies have not been limited regarding the possibility of future funding pauses, denials, and delays.

21. If the federal funding is again paused, blocked, denied or delayed suddenly, it is likely that ECECD will not be reimbursed for services already provided to the New Mexican public,

SA129

and it is likely that service providers who contract with ECECD will be dissuaded from contracting with ECECD for fear that they will not be reimbursed for services provided.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2025, at Santa Fe, New Mexico.

_____
Elizabeth Groginsky
Cabinet Secretary
New Mexico Early Childhood Education and Care
Department

7

# Thomas-Jensen Affirmation

# Exhibit # 93

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br>        Plaintiffs, <br><br>    v. <br><br> DONALD TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, et al., <br><br>       Defendants. | C.A. No. 1:25-cv-00039 |

**DECLARATION OF MELISSA A. CLAYTON IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Melissa A. Clayton, hereby declare:

1.      I am the Director of the Bureau of State Accounting Operations within the Office of the New York State Comptroller ("OSC").

2.      The Comptroller is the head of the department of audit and control (NY Constitution Article V, §4) and New York's chief fiscal officer. OSC's duties and responsibilities include auditing all vouchers before payment and all official accounts, auditing the accrual and collection of revenues and receipts, and prescribing such methods of accounting as are necessary for the performance of the foregoing duties (Article V, §1).

3.      The Bureau of State Accounting Operations ("Bureau") is responsible for managing the accounting records of the State, including appropriations, tax collections, refunds, state revenues, and federal grants. BSAO is also responsible for the cash management operations of the State, ensuring there is adequate cash resources for daily State payments.

1

4.      The Federal Billing and Project Section of the Bureau establishes and monitors project, grant, and federal contract billing records and executes the daily draw down of federal funds to finance State-administered federal programs.

5.      I write this declaration to attest to disruptions we experienced from January 27, 2025 through February 5, 2025 in facilitating the draw down of federal funds for New York State agencies. Some of these have resolved but the issues described herein persisted until February 5, 2025.

6.      We had a delay in receiving all Payment Management System (PMS) draws of a combined $73,660,032.94 requested on Monday, January 27, 2025, which we generally expect to receive within a day. We received none of this until we received a part of the total— $2,186,475.22—on January 29, 2025.

7.      As of February 5, 2025, the State had not received $329,451,924.46 in draws from U.S. Department of Homeland Security (DHS) disaster grants. These normally would have been received the day after they were drawn:

| Draw Date | Deposit ID | Amount |
| --- | --- | --- |
| 1/29/2025 | DHSES2064 | $18,081,556.83 |
| 1/29/2025 | DHSES2061 | $58,945,662.36 |
| 1/29/2025 | DHSES2068 | $2,098,239.22 |
| 1/29/2025 | DHSES2069 | $166,098,742.59 |
| 1/29/2025 | DHSES2066 | $28,525,412.13 |
| 1/30/2025 | DHSES2065 | $18,549,012.60 |
| 1/30/2025 | DHSES2070 | $11,758,023.04 |
| 1/31/2025 | DHSES2071 | $1,311,960.95 |
| 1/31/2025 | DHSES2073 | $6,407,207.97 |
| 1/31/2025 | DHSES2072 | $1,196,902.14 |
| 2/3/2025 | DHSES2074 | $14,666,230.24 |
| 2/3/2025 | DHSES2076 | $1,812,974.39 |

2

There are a number of other draws that were still outstanding as of February 5, 2025:

| Draw Date | Agency | Reference Award | Amount | CFDA |
|---|---|---|---|---|
| 1/27/2025 | DOT01 | FAA - 3-36-0028-54-20 | $74,729.70 | 20.106 - Airport Improvement Program, Infrastructure Investment and Jobs Act Programs, and COVID-19 Airports Programs |
| 1/27/2025 | DOH01 | 23B04MC47435 | $556,553.13 | 93.994 Maternal and Child Health Services Block Grant to the States |
| 1/31/2025 | SED01 | S425D210022 | $5,763,492.00 | 84.425 Education Stabilization Fund |
| 1/31/2025 | NCS01 | 21ACFNY001 | $623,620.44 | 94.006 AmeriCorps State and National |
| 2/4/2025 | DOT01 | NY-2020-086 | $63,958.00 | 20.528 Rail Fixed Guideway Public Transportation System State Safety Oversight Formula Grant Program |
| 2/4/2025 | DOT01 | NY-2020-026 | $21,130.00 | 20.528 Rail Fixed Guideway Public Transportation System State Safety Oversight Formula Grant Program |
| 2/4/2025 | DOT01 | NY-2021-070 | $524,651.00 | 20.528 Rail Fixed Guideway Public Transportation System State Safety Oversight Formula Grant Program |

8.    We were having delays receiving funds drawn by same day wire. Two wires were requested during this period and both were received after 5PM, and thus too late to invest funds overnight.

9.    Any award on PMS showing *Pending Review* was taking more than a day to arrive, even for those that, before 01/27/2025, we would historically receive the next day.

10.    Department of Health (DOH) grants drawn from the Automated Standard Application for Payments (ASAP) draw system were temporarily suspended on January 27, 2025.

11.    As of February 5, 2025, we were still unable to draw funding on ASAP from the Drinking Water State Revolving Fund or funds awarded for National Cooperative Geologic Mapping although these funds did not appear in ASAP as currently suspended. Grant funding for the Earth Mapping Resources initiative is appearing as suspended on ASAP.

SA134

12.    Some State Administrative Matching Grants for the Supplemental Nutrition Assistance Program (SNAP) were still suspended in ASAP as of February 5, 2025.  These funds go to the New York Office of Temporary and Disability Assistance.

> 202424Q390344 – from US_AGRICULT – CFDA – 10.561 - State Administrative Matching Grants for the Supplemental Nutrition Assistance Program
> 202424S252044 – from US_AGRICULT – CFDA – 10.561 - State Administrative Matching Grants for the Supplemental Nutrition Assistance Program
> 202424S251944 - from US_AGRICULT – CFDA – 10.561 - State Administrative Matching Grants for the Supplemental Nutrition Assistance Program

13.    Were New York State unable to continue to receive any of these funds, the harm to state finances would be significant. The funding described above reimburses the state for funding already spent.  In other words, the State would have to cover the entire amount of funding frozen. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of February, 2025, in Albany, New York.

*Melissa A Clayton*

_____

Melissa A. Clayton

Thomas-Jensen Affirmation

Exhibit # 99

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

       Plaintiffs,

      v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

       Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## DECLARATION OF ERIN MCMAHON

I, Erin McMahon, declare as follows:

1.      I am a resident of the State of Oregon and I am over the age of 18.  I make this declaration based on my personal knowledge, OEM business records, or based on my knowledge of the matters set forth below based on my review of information and records provided by my staff.  If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am the Director of the Oregon Department of Emergency Management (OEM). I have held that position since September 2023.

3.      As OEM Director, I oversee emergency management and homeland security services for the State of Oregon, including disbursing federal funds for emergency management and homeland security grants.  OEM is currently entitled to approximately $52 million in federal funding that has already been committed by the federal government to Oregon, the vast majority of which will be disbursed to entities statewide, including counties, cities, tribes, OEM itself, other state agencies, local law enforcement, fire agencies, special districts (water/power/schools), and to non-profit organizations.

1

Level 3 - Restricted

4.      OEM coordinates and maintains a statewide emergency services system for

emergency and disaster communications in Oregon.  OEM supports 18 Emergency Support

Functions (ESFs) and more than 50 county, city, and tribal local emergency management offices

around the state.

5.      Emergency management services statewide—at both the state and local

government levels—are heavily subsidized by federal funding.  Many local, state, and tribal

emergency management services receive 50% of funding through our Emergency Management

Performance Grant, funded by the Federal Emergency Management Agency (FEMA).  OEM

distributes grant funds to local jurisdictions (36 counties, 6 cities, 6 tribal nations) statewide.

80% of EMPG funds are pushed down to local agencies, and specifically emergency

management programs in rural areas of the state are particularly dependent on federal grants.

6.      The federal emergency management grants that OEM oversees can be categorized

as addressing disaster preparedness, response, mitigation, and recovery planning, training, and

exercising in preparation and/or following disasters.  Preparedness grants help the state prepare

for nature disasters such as earthquakes, tsunamis, and fires, as well as other events.  FEMA

Public Assistance and Hazard Mitigation Grant Programs pay for the repair and restoration of

damaged public infrastructure (for example, roads and utilities) for federally declared disasters

and emergencies, promote community resiliency, and pay for specific mitigation projects to

mitigate future risks following natural disasters such as flooding, winter storms, tsunami threats,

and fires.

7.      Oregon has experienced several major federally declared natural, as well as state

declared disasters in recent years, including the 2020 wildfires—which burned over 1.2 million

acres, destroyed thousands of homes and structures, and caused billions of dollars in damage—

2

Level 3 - Restricted

COVID relief from 2020, the 2024 winter storm and most recently the 2024 wildfires.  OEM is actively disbursing billions of dollars in federal mitigation and recovery funds that have already been committed for these disasters by the federal government.

8.      I learned that the federal government was freezing OEMs funds when the OMB Directive freezing all federal funds came out on Monday, January 27, 2025.  I was in Washington D.C. at FEMA's Executive Crisis Leadership Forum, Vanguard, with other crisis professionals from across the nation, including federal government emergency management professionals who had no advance notice of the Directive.  The Directive unleashed a wave of confusion.

9.      No direct communication was provided to OEM by the federal government regarding how the Directive would impact OEM's federal grants.  However, on Tuesday, January 28, 2025, OEM was unable to withdraw federal funds for payroll because the federal payment system in use was offline.  As a result, OEM was unable to cover payroll with federal funds that day.

10.      The funding freeze caused confusion and disruption among not only OEM staff, but to emergency management services teams statewide.  OEM staff received many inquiries from our federal grant subrecipients who were worried that they would not be able to pay their staff or continue with federally funded programs.

11.      Although the federal grant payment system is now back online, any future disruption of funds—even a short "pause"—would cause severe disruption to emergency management services and would impede disaster mitigation and recovery statewide.  Oregon communities depend on this federal funding.  OEM would be unable to pay federal grant subrecipients such as cities and counties, tribes, nonprofits, and other organizations; would have

Level 3 - Restricted

to pause travel and other activities paid for by federal funds; and would be forced to consider furloughing or laying off staff whose positions are federally funded, given the cash flow shortage that would be caused by our funding being cut off.

12.     Based on OEM's business records from January 2025, the federal funding in jeopardy includes:

a.  $6,175,977 in Emergency Management Performance Grant funds (of $16,248,090 awarded).  These funds staff salaries at OEM as well as County, City and Tribal Emergency Managers across the state, and support planning, training, exercise and community preparedness activities at all levels.

b.  $20,774,196 in Homeland Security Grant funds (of $33,470,978 awarded). These grants fund staff salaries at OEM and the Regional Disaster Preparedness Office (RDPO). The funds also support planning, training, exercise, emergency equipment, and community preparedness activities at all levels.

c.  $7,357,653 in Non-Profit Security Program Grants (of $9,507,043.68 awarded).

d.  $8,994,049 in State Local Cybersecurity Grants (of $9,035,602 awarded).

e.  $220,837 in National Earthquake Hazard Reduction Grants (of $272,168 awarded).

f.  $8,392,850 in Emergency Operations Center Grants (of $8,411,038 awarded).

4

Level 3 - Restricted

    g.  $1.1 Billion in Mitigation and Recovery Grants already obligated and
waiting for payment.

13.    If a major disaster were to occur while federal emergency management funds to
Oregon are frozen, the consequences could be dire.  Pending preparedness training and
mitigation work may come to a stop and the incapacitation of federally funded emergency
management programs and services that would result from a federal funding freeze could very
well lead to increased loss of life and injury to Oregonians, slowed emergency response times,
greater risks to first responders, greater property damage, and delays to community recovery and
rebuilding.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2025, at Salem, Oregon.



_____
        ERIN MCMAHON

SA142

Level 3 - Restricted

# Thomas-Jensen Affirmation

# Exhibit # 101

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

       Plaintiffs,

      v.

DONALD TRUMP, in his official capacity as
President of the United States; et al.,

       Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## <u>DECLARATION OF TOM RIEL</u>

I, Tom Riel, declare as follows:

1.      I am the Director of Operations at Oregon's Higher Education Coordinating Commission ("HECC"). I have been in this position for three years. Prior to serving as HECC's Director of Operations, I served as HECC's Procurement Manager. I make this declaration based on personal knowledge and records maintained by HECC in the ordinary course of its business.  I would testify to the following facts if called as a witness.

2.      HECC is a state commission and administrative agency whose mission is to improve equitable access to and success in higher education and workforce training for Oregonians statewide. For HECC, higher education includes the full range of postsecondary education and training beyond high school, from apprenticeships and career certificates to two- and four-year degrees and doctorates. HECC coordinates with a wide network of organizations and groups, including community colleges, universities, trade schools, workforce and business partners, training organizations, community-based organizations, secondary schools, and state policymakers. HECC administers about $4 billion annually in funding that supports its efforts

1

to (1) establish methodologies for distributing public funding to support community colleges, public universities, workforce boards, and students; (2) coordinate postsecondary degrees and programs to develop academic pathways that meet the needs of students and Oregon businesses across the state; (3) administer financial aid, including scholarships, workforce training, and other programming; (4) provide strategic guidance to state leaders on Oregon higher education policy, planning, and funding; and (5) evaluate and report on the success of higher education and training efforts in attaining state higher education goals.

3.      The HECC Office of Operations supports HECC's operations in budgeting, procurement, payroll, accounting, and information technology. Part of procurement is securing and managing grants and contracts, including federal grants. HECC currently administers multiple federal grants from the U.S. Department of Labor, including several under Title I of the Workforce Innovation and Opportunity Act ("WIOA"), including a youth grant, adult grant, dislocated worker grant, and Quality Jobs, Equity, Strategy and Training (QUEST) grant, as well as a State Apprenticeship Expansion, Equity and Innovation grant.

4.      The WIOA Title I grants support the coordination of Oregon's public workforce system and the administration of career and training services to youths, adults, and dislocated workers in Oregon. Most of the funds HECC receives under these grants are subgranted to Oregon's nine local workforce development boards (LWDBs) across Oregon to develop and coordinate a regional approach to workforce development, and to oversee the provision of career and training services in their region. LWDBs are partnerships comprising employers, education/training providers, labor, community-based organizations, government, and others. These grants are paid by the federal government (Department of Labor) periodically on a reimbursement model. Contractors (local workforce development boards) submit draw requests

to the HECC for work performed under the grants, and then HECC submits a request to draw on the federally granted funds. For the life of these grants, the federal government has routinely released the requested grant funds within a day of HECC's draw requests. That routine practice changed last week.

5.      HECC's State Apprenticeship Expansion, Equity and Innovation grant supports diversity, equity, and inclusion efforts in apprenticeship programs and the development of pre-apprenticeships and registered apprenticeships in non-traditional occupations, including those hit hardest by the pandemic. The State Apprenticeship Expansion, Equity and Innovation grant is paid by the federal government (Department of Labor) periodically on a reimbursement model. Contractors perform work required under the grants, after which they invoice HECC on a monthly basis for the work they performed, and then HECC submits a request to draw on the granted funds. The federal government has routinely released the requested grant funds within a day of HECC's draw requests. That routine practice changed last week

6.      I became aware last week that the Acting Director of the Office and Management and Budget in the Executive Office of the President, Matthew J. Vaeth, issued a memorandum on January 27, 2025. That memorandum carried the subject line "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" ("OMB Memo").

7.      HECC submitted multiple draw requests last week that went unanswered and are still unanswered as of today the 4th of February. On Wednesday, January 29, HECC submitted a draw request to the Department of Labor under multiple grants for $2,883,947.59:

3

| Drawn Wednesday 1/29/2025 - (624) | |
| --- | --- |
| Award # | Amount |
| AA38551OE0 | 8,087.00 |
| AA38551OC0 | 21,270.20 |
| AA38551QH0 | 20,448.99 |
| AA38551QJ0 | 160,249.97 |
| AY000016IS0 | 99,355.36 |
| AT000049TJ0 | 20,000.00 |
| AW000041TL0 | 140,919.60 |
| AP36519YC1 | 70,816.52 |
| AY000070WB0 | 934,062.51 |
| AT000057VX0 | 92,739.06 |
| AW000092VZ0 | 145,798.00 |
| AT0000574O0 | 813,727.37 |
| AW0000924W0 | 356,473.01 |
| Total | 2,883,947.59 |

and under grant DW000012QL0 for $151,829.77, but HECC received no reimbursement. On Thursday, January 30, HECC submitted a draw request to the Department of Labor under grant DW000012QL0 for $38,190.09, but it received no payment.

8.     Under normal circumstances, HECC would have been reimbursed already for all the amounts requested. As of close of business on Tuesday, February 4, no funds were received for the above-mentioned grants. HECC has other existing federal grants as well, some issued by the Department of Labor and others by the Department of Education, but reimbursement under those grants was timely paid.

9.     The consequence to Oregon of HECC not receiving payment under its federal grants is that HECC will not be able to support the important workforce training and higher educational support work that it performs across Oregon. Not only will the contractors who are performing the work under the grant not be compensated for work they already performed, but

4

also their work will be discontinued and the Oregonians that they serve across the state will not receive the support they need to get job training and education to get back to work.

10.    HECC's inability to continue its important work under its existing federal grants, even over the short term, will have broad negative consequences across the state that cannot be repaired.  Without access to these grant funds, HECC and its subgrantees would need to cease the majority of our essential job training and business services, impacting job-seekers' ability to find quality employment and employers' ability to find the qualified workers they need to contribute to Oregon's economy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 4, 2025, at Salem, Oregon.

_____
TOM RIEL

5

Thomas-Jensen
Affirmation
(redacted)

Exhibit # 106

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF NEW YORK; et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>DONALD TRUMP, in his official capacity as<br>President of the United States; et al.,<br><br>   Defendants. | C.A. No. 1:25-cv-00039-JJM-PAS |

## DECLARATION OF EMILY CAHOON-HORVATH

I, Emily Cahoon-Horvath, hereby depose and state as follows:

1. I am the Chief Financial Officer at the Rhode Island Department of Environmental Management ("DEM"). I have worked at DEM for almost seven years and have held my current position since July 2023. Prior to my promotion, I was the Deputy Chief Financial Officer at DEM and was responsible for DEM's full catalog of federal grants. Before working at DEM, I spent 17 years at the Rhode Island Department of Health, in various financial management positions including federal grant management. I make this declaration as a representative of DEM, in part based on the business records of DEM and in part based on my personal knowledge, experience, and other sources of information I have obtained and reviewed in my official capacity. Based on these sources of information, I am familiar with and, if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

2. It is my understanding that starting on January 20, 2025, President Donald Trump issued a series of executive orders and Defendants undertook certain actions in accordance with

those executive orders. Together, these actions caused various disruptions to federal financial assistance to Rhode Island. Below, I describe the specific disruptions that DEM has experienced thus far and the impact of these disruptions.

3.      As background, DEM and the State of Rhode Island incur federal program expenses in advance of reconciliation and reimbursement per our federal funding award agreements, 2 C.F.R. § 200, and internal policies and procedures. Any changes to grant terms or amounts have only occurred through updates to the official Notice of Award and require advance notice from the federal agency. 2 C.F.R. § 200.208 (Specific Conditions) and 2 C.F.R. § 200.339 (Remedies for noncompliance) reference circumstances when a federal agency can impose conditions on an award recipient as well as the process the federal agency must follow.

4.      As of the date of this filing, DEM has not been informed that there have been issues with their compliance or performance expectations with regard to any of the federal funding agreements discussed below.

5.      In my approximately 23 years working in Rhode Island in multiple financial roles including federal grant management, I have not encountered interruptions in funding as DEM has in the past two weeks. There has never been an instance of denial of federal funding spent in accordance with active obligations in any of my 23 years of experience.

I.      **Specialty Crop Block Grant Program**

        **A. Background**

6.      Over the past several years, Rhode Island has applied for and received funding through the Specialty Crop Block Grant ("SCBG") program administered by the U.S. Department of Agriculture ("USDA"). The purpose of the SCBG program is to improve the competitiveness of U.S. specialty crop producers and increase the consumption of specialty

crops, which are defined as fruits and vegetables, dried fruit, tree nuts, and nursery crops including floriculture such as Christmas trees, cut flowers, honey, hops, and turf grass production.

7.      The vast majority of Rhode Island agriculture meets the USDA definition of "specialty crops" and the SCBG program is the primary program DEM uses to support this industry.

8.      Through these SCBG programs, DEM provides grants to subrecipients. DEM has previously received several grants from the SCBG program, including in 2021, 2022, 2023, and 2024. These four awards total approximately $1,175,580 and less than half of this funding has been spent to date. DEM is currently soliciting applications for its 2025 SCBG program.

9.      In 2024, SCBG provided an award of $270,657.79. The grant's performance project period began on September 30, 2024, and ends on September 29, 2027. DEM has not yet spent or invoiced any funds related to the 2024 SCBG. A true and accurate copy of the 2024 SCBG award is attached hereto as Exhibit A.

10.     In 2023, SCBG provided an award of $270,666.42. The grant's performance project period began on September 30, 2023, and ends on September 29, 2026. To date, $14,649.34 of the 2023 grant has been spent and $12,762.60 has been invoiced. A true and accurate copy of the 2023 SCBG award is attached hereto as Exhibit B.

11.     In 2022, SCBG provided an award of $270,342.13. The grant's performance period began on September 30, 2022, and ends on September 29, 2026. To date, $213,455.20 of the 2022 grant has been spent and $192,388.34 has been invoiced. A true and accurate copy of the 2022 SCBG award is attached hereto as Exhibit C.

12.     In 2021, SCBG provided an award of $363,910.51. The grant's performance period began on September 30, 2021, and ends on September 29, 2025. To date, $236,661.85 of the 2021 grant has been spent and $187,660.86 has been invoiced. A true and accurate copy of the 2021 SCBG award is attached hereto as Exhibit D.

13.     To access the money available through the SCBG program, DEM requests funds through Payment Management Services ("PMS"), which provides financial and administrative services related to federal agency grant payments as well as cash management. Requests for funds through PMS can only be submitted after DEM has incurred the costs.

### B.  Recent Developments

14.     On January 30, 2025, DEM attempted to draw $71,904.50 from PMS pursuant to the 2021, 2022, and 2023 SCBG programs.

15.     Specifically, DEM submitted draws for $49,000.99 from the 2021 SCBG, $21,006.86 from the 2022 SCBG, and $1,896.74 from the 2023 SCBG. Each draw request was submitted separately via email. In response to each request, DEM received an email from a Grant Management Specialist with USDA regarding the status of the three SCBG grants, explaining: "The agency is still awaiting further guidance, and until we receive additional information/clearances, payments will continue to be on hold at this time. We are continually monitoring for updates and will update you as soon as we have received any new information." On February 5, 2025, DEM responded to those emails attaching the Temporary Restraining Order issued in the District of Rhode Island and explaining that it was DEM's understanding that the funding associated with the reimbursement requests should be released. DEM further asked USDA to provide a timeline as to the review, approval, and payment of the draws. True and correct copies of these email exchanges are attached hereto as Exhibit E.

16.     On February 3, 2025, DEM received an updated email from a Grant Management Specialist with USDA regarding the status of the three SCBG grants: "The agency is still awaiting further guidance, and until we receive additional information/clearances, payments will continue to be on hold at this time. We are continually monitoring for updates and will update you as soon as we have received any new information." Regarding the Financial Year 2025 Request for Applications, the USDA Grant Management Specialist stated that they "do not have any specific dates that [they] can provide at this time" and "will provide further information once [they] receive it." A true and accurate copy of this email is attached hereto as Exhibit F.

17.     DEM has not received any communication from USDA indicating that any of its SCBG programs were out of compliance with the terms of the grant.

## C.  Impact

18.     DEM's access to the $72,000 submitted to PMS last week sought to reimburse expenses that DEM has already incurred. Not receiving federal funds spent in accordance with the grant award requires DEM to absorb those expenses within the general fund at the expense of other programs and the State of Rhode Island.

19.     Moreover, DEM continues to have contractual and subrecipient obligations, who also continue to incur expenses. DEM cannot immediately terminate contractual agreements, as this requires a minimum of 30 days' notice. Without the SCBG federal funds, DEM will have to consider terminating programs (with proper notice) and cover the cost of existing contractual obligations.

20.     These SCBG funds also support several full-time employees within DEM's Division of Agriculture and Forest Environment and between 2-4 seasonal intern positions annually. If these funds are paused indefinitely, these positions may be at risk, and DEM would

be required to work within the State of Rhode Island personnel rules and regulations to potentially layoff staff associated with this funding. DEM and the State of Rhode Island would continue to incur expenses throughout this process.

21.    For each SCBG, DEM has invested significant resources in developing a plan that would comply with all grant program requirements, help farmers who produce specialty crops, support Rhode Island's economy, improve access to fresh and local produce, and provide opportunities for low-income and disadvantaged Rhode Islanders. These programs provide significant benefits to Rhode Island citizens and visitors.

22.    DEM's 2023 and 2022 SCBG awards support the increased consumption, knowledge, and growing practices of specialty crops in Rhode Island through specific, notable projects.

23.    For example, one project under the 2023 SCBG allows the University of Rhode Island to research heat tolerant broccoli varieties suitable for the Northeast region and identify optimal varieties for local production. These research results will be shared with the Rhode Island vegetable farming community through a combination of events and publications.

24.    Another project provides funding to the African Alliance of Rhode Island to increase access to and consumption of specialty crops by expanding its summer farmers markets in underserved, low-food access communities. It also supports their work to involve young farmers of color and educate them about the importance of the specialty crops industry to the local community.

25.    Additional projects under the 2023 SCBG include funding for the Rhode Island Food Policy Council to provide training technical assistance for small and beginning specialty crop producers and for Farm Fresh Rhode Island to partner with farmers market operators for

monthly promotions that increase knowledge, access, and purchasing of Rhode Island grown specialty crops.

26.    One project under the 2022 SCBG provides funding for the Rhode Island Fruit Growers Association to install and maintain four weather stations and allow specialty crop growers to make timely and accurate pest management decisions.

27.    Another 2022 SCBG program funds the Rhode Island Food Policy Council's efforts to provide training and technical support services to small, beginning, and historically underserved communities of specialty crop producers. These technical support services include expanded risk identification and mitigation strategies, improved new market access identification and planning, and food safety strategies, all of which promote economic viability through new product and market development.

28.    DEM's 2022 SCBG also funds (1) Southside Community Land Trust's outreach to socially disadvantaged farmers for growing specialty crops to meet underserved markets; (2) Farm Fresh Rhode Island's efforts to educate culinary students and bring more local food into schools; and (3) Rhode Island Farm Incubator's project to share new integrated cropping techniques appropriate for use by small scale, organic, and beginning growers in the region.

29.    DEM's 2021 SCBG has been used to award 19 mini grants. These grants have been used for eligible expenses related to COVID-19 that benefit the production and distribution of Rhode Island specialty crops. These grants specifically relate to food safety, digital marketing, and direct COVID-19 experiences. Projects include, for example, "Food Safety Practices Implementation and Community Education" and "Specialty Cut Flowers & Herbs: Increase Health and Happiness While Decreasing Carbon Footprint."

30.     If the funds for the SCBG programs are cancelled or substantially further delayed, these programs will not go forward, and these benefits will be unrealized.

31.     If the program were to pause indefinitely, and DEM were to later be granted federal financial assistance, reinstating the programs would take significant time, effort, and additional investment.

## II.    Climate Pollution Reduction Grant

### A.  Background

32.     DEM receives funding from the federal government through the Climate Pollution Reduction Grant ("CPRG") program. This program is administered by the U.S. Environmental Protection Agency ("EPA").

33.     DEM's CPRG is a $3 million planning grant and was awarded on August 14, 2023. The grant runs through August 14, 2027. A true and accurate copy of the CPRG award is attached hereto as Exhibit G. A true and accurate copy of the CPRG Work Plan as submitted to EPA is attached hereto as Exhibit H.

34.     $2,424,909.30 of the CPRG balance remains unspent available at this time. $989,746 of the $3 million grant is currently contracted.

35.     DEM accesses its CPRG funds through ASAP.gov. "ASAP" stands for "Automated Standard Application for Payments" and is run by the Bureau of the Fiscal Service.

36.     The CPRG provides funding to DEM to develop a comprehensive, economy-wide, climate mitigation plan that will support actions to reduce greenhouse gases and harmful air pollutants and to conduct meaningful community engagement.

37.     The grant is intended to benefit all residents and visitors to Rhode Island through three main objectives: (1) tackling damaging climate pollution; (2) accelerating work to address

environmental injustice and empower community-driven solutions in overburdened
neighborhoods; and (3) delivering cleaner air by reducing harmful air pollution in places where
people live, play, and go to school. *See* Exhibit G at 4.

38.    Under the terms of the CPRG, Rhode Island must meet several reporting
requirements. Exhibit G at 6-7. These reporting requirements include the production of a
Comprehensive Climate Action Plan ("CCAP") (due December 2025) as well as a Status Report
due in the summer/fall of 2027 (at the end of the CPRG grant).

39.    Rhode Island has another similar report due in December 2025. The Resilient
Rhode Island Act established the Executive Climate Change Coordinating Council ("EC4"). *See*
RI Gen L § 42-6.2-1. Under state law, following an opportunity for public comment, EC4 must
submit a plan that "includes strategies, programs, and actions to meet economy-wide enforceable
targets" for specific greenhouse gas emission reductions targets, which are outlined in the statute.
RI Gen L § 42-6.2-2(a)(2). EC4 must submit this report (the "2025 Climate Action Strategy") to
the governor and general assembly by December 31, 2025. *Id.*

40.    There is significant and direct overlap in what the state needs to include in the
CCAP and in its state law-required 2025 Climate Action Strategy. These two required reports are
being worked on in tandem as specifically addressed in the CPRG Work Plan referenced above.
*See* Exhibit H at 1. Without CPRG, complying with this 2025 Climate Action Strategy
requirement will be significantly more difficult and costly, as explained further below. The same
can be said about Rhode Island's obligation to submit its CCAP to EPA in December 2025.

### B. Recent Developments

41.    On February 3, 2025, DEM noticed that its CPRG ASAP.gov account was "suspended." A true and accurate screenshot of DEM's CPRG ASAP.gov account as of February 4, 2025, at 9:18 am EST is attached hereto as Exhibit I.

42.    Because its CPRG account is suspended, DEM was unable to draw down approximately $44,000. As of February 5, 2025, the account remains suspended.

43.    DEM has not received any communication from EPA indicating that the CPRG grant was out of compliance with the terms of the grant.

44.    As of February 5, 2025, DEM has not received any communication from the EPA regarding the status of its attempted drawdown or the suspension of its CPRG program ASAP.gov account.

### C. Impact

45.    Rhode Island uses its CPRG award to hire contractor support for the preparation of the 2025 Climate Action Strategy that is required by state law. As a result, the elimination of this $3 million grant—approximately $2.5 million of which is outstanding—would make the EC4 committee's compliance with its statutory obligations substantially more difficult and more costly to the state, to the detriment of other essential programs.

46.    Specifically, Rhode Island has allocated $578,315.00 to a consulting team under contract with Rhode Island's Office of Energy Resources and $75,000 for the development of a new climate dashboard which will foster public transparency that tracks both emissions reductions and the sources of energy consumed by the state. The dashboard is nearly completed but not all invoices have been received from the vendor.

47.    The CPRG funds are also used to pay for half of the weekly time for three DEM employees through Summer 2027, as well as a portion of DEM's Climate Justice Specialist's salary, and for a 2025 University of Rhode Island Energy Fellow.

48.    Rhode Island also administers six Climate Change Community Engagement Grants with funding provided by its CPRG. These grants go to small community organizations that are under contract to provide engagement services and have already started working. Each of these grants are up to $40,000 and combined make up a total of $218,931.

49.    The CPRG funds are also used for payment to the Rhode Island Division of Statewide Planning for a Smart Comment subscription in 2024 and 2025.

50.    Thus, the CPRG funds represent a significant component of the development of the 2025 Climate Action Strategy.

51.    If the state law requirements are not met, serious consequences follow. Rhode Island law provides that EC4's obligation to produce the 2025 Climate Action Strategy may be enforced in the superior court by a plaintiff seeking either injunctive relief, a declaratory judgment, a writ of mandamus, or any combination thereof. *See* RI Gen L § 42-6.2-10. A prevailing plaintiff may also recover their litigation costs. *See id.* § 42-6-2.10(f).

52.    Not continuing with the 2025 Climate Action Strategy is thus not an option, so other programs will have to suffer. To avoid violating their statutory obligations, at their next meeting on February 10, 2025, EC4 is planning to discuss reprioritizing the use of up to $225,000 in state climate funding on a contingency basis to continue the development of the 2025 Climate Action Strategy. This constitutes a significant amount of state climate funding.

53.     This means that EC4 will redirect funds away from previously approved projects to instead support the costs required for the 2025 Climate Action Strategy—costs that were meant to be covered by the $3 million CPRG.

III.    **Other Affected Programs and Impact**

54.     DEM receives numerous other significant and essential grants from the federal government, including several others through the Inflation Reduction Act ("IRA") and Infrastructure Investment and Jobs Act ("IIJA"). These include funding for (1) an Air Monitoring Grant; (2) an Air Quality Sensor Grant; (3) Air Emissions Monitoring Special Studies; and (4) Solid Waste Infrastructure Financing.

55.     As explained further below, DEM's access to its ASAP.gov accounts for each of these programs has been suspended. In some cases, DEM has been unable to draw expended funds. There is no indication of how long these programs may be suspended, and if they will return at all.

56.     DEM has never received any communication from EPA indicating that any of these programs were out of compliance with the terms of the grant.

57.     If the funds for the programs are cancelled or substantially further delayed, these programs will not go forward, and these benefits will be unrealized.  The delay or cessation of these programs harms those in Rhode Island by impairing DEM's ability to monitor air quality and develop a strategy for addressing solid waste in the state.

A.  **Air Monitoring Grant**

58.     DEM received $870,472 for its Air Monitoring Grant, which funding is made available through the IRA and administered by the EPA. DEM received this award on August 23, 2024, and the grant performance period runs through June 30, 2029. A true and correct copy

of the Air Monitoring Grant is attached hereto as Exhibit J. A true and correct copy of the Air

Quality Sensor Grant Work Plan is attached hereto as Exhibit K.

59.     DEM's ASAP.gov account for this program was recently suspended. As of

February 5, 2025, DEM's ASAP.gov account for this program remains unavailable.

60.     DEM intends to use these funds for maintaining and upgrading the entire Rhode

Island air monitoring network by replacing aging air monitoring equipment at each air

monitoring site utilized as part of the state's air monitoring network required under the Clean Air

Act. DEM will also use these funds to create a new multipollutant monitoring site in

Woonsocket, Rhode Island. This Woonsocket multipollutant monitoring site is intended to

measure, at minimum, volatile organic compounds, PM25, and black carbon. *See* Exhibit K at 1,

7.

61.     Though the funds expended for this project so far have been fully drawn, DEM is

concerned about the ability to incur and receive reimbursement for expenses going forward.

62.     The delay or cessation of federal funding of this program will harm the health of

Rhode Island's residents and visitors by denying DEM the ability to maintain its air monitoring

network that allows it to monitor, study, address, and alert the public to air pollution in the state.

**B. Air Quality Sensor Grant**

63.     DEM received $21,925 for its Air Quality Sensor Grant, which funding is also

made available through the IRA and administered by the EPA. DEM received this award on

August 9, 2024, and the grant performance period runs through June 30, 2026. A true and correct

copy of the Air Quality Sensor Grant is attached hereto as Exhibit L. A true and correct copy of

the Air Quality Sensor Grant Work Plan is attached hereto as Exhibit M.

64.     DEM's ASAP.gov account for this program was recently suspended. As of February 5, 2025, DEM's ASAP.gov account for this program remains unavailable.

65.     Under the grant, DEM will use these funds to increase coverage of low-cost sensors across the state. During widespread wildfire smoke events, such a monitoring network has proven valuable in measuring, tracking, and forecasting wildfire smoke. There are currently several gaps across the state wherein particle data would prove valuable in tracking and timing the arrival of smoke. The funds from the Air Quality Sensor Grant are meant to address these gaps. *See* Exhibit M at 1-2.

66.     Additionally, the funds will be used to provide sensors for other special situations where monitoring may be valuable and for citizen science and educational purposes. They will also be used to purchase two 24-hour volatile organic compound sensors to be placed in disadvantaged communities or other areas experiencing unique air quality issues where there is a need for additional data. *See* Exhibit M at 2.

67.     This funding has been obligated but DEM has not yet incurred expenses. Still, DEM has invested significant resources in planning for the program. Even more importantly, the delay or cessation of this program will harm the health of Rhode Island's residents and visitors by denying DEM the ability to further monitor, study, address, and alert the public to air pollution in the state.

## C. Air Emissions Monitoring Special Studies

68.     DEM's Air Emissions Monitoring Special Studies are funded through a Clean Air Act grant under the IRA, and the grant program is administered by the EPA.

69.     DEM received $214,709 from the EPA for its Air Emissions Monitoring Special Studies. DEM received this award on July 25, 2023, and the grant performance period runs

through June 30, 2026. A true and correct copy of the Air Emissions Monitoring Special Studies

award is attached hereto as Exhibit N. A true and correct copy of the Air Emissions Monitoring

Special Studies Work Plan is attached hereto as Exhibit O.

70.     DEM's ASAP.gov account for this program was recently suspended. As of

February 5, 2025, DEM's ASAP.gov account for this program remains unavailable.

71.     At the moment, DEM has $2,232.07 in unreimbursed expenditures under this

program. DEM is unable to draw these funds because of the suspended ASAP.gov account.

72.     DEM is using these funds to obtain air monitoring data in areas that currently lack

such monitoring. DEM will use this data to make informed decisions that will ultimately reduce

exposures to both criteria and toxic air pollutants in Rhode Island. The areas evaluated include

areas throughout Rhode Island, as well as environmental justice focus areas—areas that are

disproportionately impacted by environmental and public health risks and where people lack

opportunities to access the state's open spaces. With these proposed projects, DEM will be able

to better understand air quality in these areas and seek possible solutions. *See* Exhibit O at 1.

73.     The inability to access these funds means that the Air Emissions Monitoring

Special Studies program will be unable to go forward. Impacted work includes the installation of

a permanent air monitoring site in the Port of Providence, the implementation of mobile air

quality monitoring equipment, and the utilization of air quality sensors to study emissions in

areas of interest. These areas of interest include, but are not limited to, schools operating non-

certified wood boilers, quarries, asphalt plants, and crematories.

74.     The delay or cessation of this program will harm the health of Rhode Island's

residents and visitors, including school children and the state's most disadvantaged populations,

by denying DEM the ability to further monitor, study, address, and alert the public to air
pollution in the state.

D. **Solid Waste Infrastructure Financing**

75.     DEM received $551,877 for its Solid Waste Infrastructure Financing, which
funding is also made available through the IIJA and administered by the EPA. DEM received
this award on August 22, 2023, and the grant performance project period runs through September
30, 2026. A true and correct copy of the Solid Waste Infrastructure Financing award is attached
hereto as Exhibit P.

76.     DEM's ASAP.gov account for this program was recently suspended. On the
morning of February 4, 2025, DEM's ASAP.gov account for this program remained unavailable.
Access to the account appears to have been restored as of 1:30pm on February 5, 2025.

77.     This financing encompasses several sub-awards. These include funding for
statewide planning to deal with solid waste in a more comprehensive way and align with the
Rhode Island statutory guidelines and federal requirements for solid waste management. Other
sub-awards include funding for (1) the Rhode Island Recycling Project to advance their
grassroots programs for recycling and organics diversion by formalizing training manuals, hiring
staff, and expanding into more schools; (2) the Center of Eco Technology to advance existing
and new efforts to reduce food loss, expand organics processing capacity, and mobilize efforts
for a circular economy; (3) the University of Rhode Island to convene a cross-disciplinary task
force to embark on the broad topic of bioplastics with a focus on the points of consideration for
biotechnology and biomanufacturing and shifting away from petroleum-based plastics; and (4) a
non-profit organization to do outreach in disadvantaged communities and to identify
opportunities and barriers for increasing recycling and reducing food waste.

78.     Though the funds expended for this project so far have been fully drawn, DEM is concerned about the ability to incur and receive reimbursement for expenses going forward.

79.     Without funding through the Solid Waste Infrastructure Financing, Rhode Island will be delayed in developing its Solid Waste Management Plan that complies with federal and state law. It will also be unable to move forward with programs designed to broadly address solid waste through, for example, recycling and bioplastics research and analysis. This harms Rhode Islanders' ability to live in a clean and sustainable environment.

*       *       *

80.     The federal funding mentioned above is critical to DEM's operations in Rhode Island. Should receipt of funding be delayed or denied altogether, the numerous programs that DEM operates for the health and safety of the citizens of Rhode Island will suffer and perhaps have to cease altogether. Disadvantaged communities in the state are most likely to feel the most significant and immediate impact of a delay or suspension of many of the affected programs. However, given the scope of federal financial assistance at issue here, the impact would extend statewide, disrupting programs that safeguard public health, environmental protection, and emergency response efforts.

**SIGNED UNDER THE PENALTIES OF PERJURY THIS ___ DAY OF FEBRUARY, 2025.**

Emily Cahoon-Horvath
Chief Financial Officer
Rhode Island Department of Environmental Management

SA166

# EXHIBIT E

**Wednesday, February 5, 2025 at 16:14:51 Eastern Standard Time**

**Subject:** FW: AM22SCBPRI1166 Drawdown
**Date:** Wednesday, February 5, 2025 at 12:37:44 PM Eastern Standard Time
**From:** ████████████
**To:** ████████████
**CC:** ████████████
**Attachments:** image001.png, image002.png, RI Temporary Restraining Order Notice 01-31-2025.pdf, SF-270 Signed.pdf

Good afternoon ,

Per the Rhode Island Temporary restraining order (attached) issued 1/31/2025, it is our understanding that the funding associated with this reimbursement request should be released. Can you provide a timeline as to when you will review and approved the attached SF-270 and when we can anticipate payment to be initiated?

Thank you,



████████████
Assistant Director, Financial and Contract Management

**Rhode Island Department of Environmental Management**
**Office of Management Services**
235 Promenade Street, Providence, RI 02908

████████████

*Follow DEM on Facebook, Instagram, and Twitter*
*Please consider the environment before printing this e-mail.*

**From:** ████████████
**Sent:** Thursday, January 30, 2025 2:31 PM
**To:** ████████████
**Subject:** RE: AM22SCBPRI1166 Drawdown

| **This Message Is From an External Sender** | Report Suspicious |
|---|---|
| This message came from outside your organization. | |

,
Sorry for the delayed response.
*"The agency is still awaiting further guidance, and until we receive additional information/clearances, payments will continue to be on hold at this time. We are continually monitoring for updates and will update you as soon as we have received any new information."*

█████████████

Grants Management Specialist
Specialty Crop Block Grant Program(SCBGP)
USDA, Agricultural Marketing Service
Phone: ████████████
Email: ████████████

**From:** ████████████████████
**Sent:** Thursday, January 30, 2025 1:15 PM
**To:** ████████████████
**Subject:** AM22SCBPRI1166 Drawdown

Hey ██████,

See attached SF-270 for your approval.

Thank you!



████████████████
Principal Accountant

**Rhode Island Department of Environmental Management
Office of Management Services**
235 Promenade Street, Providence, RI 02908

██████████████████████████

Follow DEM on Facebook, Instagram, and Twitter
Please consider the environment before printing this e-mail.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Wednesday, February 5, 2025 at 16:17:34 Eastern Standard Time**

**Subject:** FW: SF-270 for SCBPS21
**Date:** Wednesday, February 5, 2025 at 12:36:12 PM Eastern Standard Time
**From:** ███████████
**To:** ███████████
**CC:** ███████████
**Attachments:** image001.png, image002.png, RI Temporary Restraining Order Notice 01-31-2025.pdf, SF-270 Signed.pdf

Good afternoon ████ ,

Per the Rhode Island Temporary restraining order (attached) issued 1/31/2025, it is our understanding that the funding associated with this reimbursement request should be released. Can you provide a timeline as to when you will review and approved the attached SF-270 and when we can anticipate payment to be initiated?

Thank you,

 
Assistant Director, Financial and Contract Management

**Rhode Island Department of Environmental Management**
**Office of Management Services**
235 Promenade Street, Providence, RI 02908

███████████

*Follow DEM on Facebook, Instagram, and Twitter*
*Please consider the environment before printing this e-mail.*

**From:** ███████████
**Sent:** Thursday, January 30, 2025 2:31 PM
**To:** ███████████
**Subject:** RE: SF-270 for SCBPS21

| **This Message Is From an External Sender**  This message came from outside your organization. | Report Suspicious |
|---|---|

████ ,
Sorry for the delayed response.
*"The agency is still awaiting further guidance, and until we receive additional information/clearances, payments will continue to be on hold at this time. We are continually monitoring for updates and will update you as soon as we have received any new information."*

1 of 2

███████████████

Grants Management Specialist
Specialty Crop Block Grant Program(SCBGP)
USDA, Agricultural Marketing Service
Phone: █████████████
Email: ████████████████

---

**From:** ████████████████████████████

**Sent:** Thursday, January 30, 2025 2:24 PM

**To:** ████████████████████████

**Subject:** SF-270 for SCBPS21

Hey ██████ ,

Please review and approve the SF-270 for this drawdown.

Thank you!



████████████████████
Principal Accountant

**Rhode Island Department of Environmental Management**
**Office of Management Services**
235 Promenade Street, Providence, RI 02908
████████████████████████

Follow DEM on Facebook, Instagram, and Twitter
Please consider the environment before printing this e-mail.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Wednesday, February 5, 2025 at 16:18:05 Eastern Standard Time**

**Subject:** FW: SF-270 for SCBGP23S
**Date:** Wednesday, February 5, 2025 at 12:33:48 PM Eastern Standard Time
**From:** ▬▬▬▬▬▬
**To:** ▬▬▬▬▬▬▬ S
**CC:** ▬▬▬▬▬▬
**Attachments:** image001.png, image002.png, RI Temporary Restraining Order Notice 01-31-2025.pdf, SF-270 Signed.pdf

Good afternoon ▬▬,

Per the Rhode Island Temporary restraining order (attached) issued 1/31/2025, it is our understanding that the funding associated with this reimbursement request should be released. Can you provide a timeline as to when you will review and approved the attached SF-270 and when we can anticipate payment to be initiated?

Thank you,




Assistant Director, Financial and Contract Management

**Rhode Island Department of Environmental Management**
**Office of Management Services**
235 Promenade Street, Providence, RI 02908

▬▬▬▬▬▬▬▬▬

*Follow DEM on Facebook, Instagram, and Twitter*
*Please consider the environment before printing this e-mail.*

**From:** ▬▬▬▬▬▬▬▬
**Sent:** Thursday, January 30, 2025 2:31 PM
**To:** ▬▬▬▬▬▬▬
**Subject:** RE: SF-270 for SCBGP23S

| **This Message Is From an External Sender** | ‎ Report Suspicious ‎ |
|---|---|
| This message came from outside your organization. | |

▬▬ ,
Sorry for the delayed response.
*"The agency is still awaiting further guidance, and until we receive additional information/clearances, payments will continue to be on hold at this time. We are continually monitoring for updates and will*

*update you as soon as we have received any new information."*

████████████
Grants Management Specialist
Specialty Crop Block Grant Program(SCBGP)
USDA, Agricultural Marketing Service
Phone: ████████████
Email: ████████████████

---

**From:** ████████████████████████
**Sent:** Thursday, January 30, 2025 2:23 PM
**To:** ████████████████████
**Subject:** SF-270 for SCBGP23S

Hey ████ ,

Please review and approve the SF-270 for this drawdown.

Thank you!



Principal Accountant

**Rhode Island Department of Environmental Management**
**Office of Management Services**
235 Promenade Street, Providence, RI 02908

████████████████████████

*Follow DEM on Facebook, Instagram, and Twitter*
*Please consider the environment before printing this e-mail.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

# EXHIBIT F

**From:** ████████████████████████████████████

**Sent on:** Monday, February 3, 2025 3:39:01 PM

**To:** ████████████████████████████████

**CC:** ████████████████████████████████████████████

**Subject:** Fw: Updates

Passing this along regarding Specialty Crop.

████████

---

**From:** ████████████████████████████████████

**Sent:** Monday, February 3, 2025 10:14 AM

**To:** ████████████████████████████████

**Subject:** Updates

---

| **This Message Is From an External Sender** | Report Suspicious |
|---|---|
| This message came from outside your organization. | |

Dear State Contacts,

Payment Status-"The agency is still awaiting further guidance, and until we receive additional information/clearances, payments will continue to be on hold at this time.  We are continually monitoring for updates and will update you as soon as we have received any new information."

FY25 RFA Status- We do not have any specific dates that we can provide at this time, and we will provide further information once we receive it.

Thanks,

████████████████

Grants Management Specialist

Specialty Crop Block Grant Program

USDA, Agricultural Marketing Service

████████████████████████

---

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

# Thomas-Jensen
# Affirmation
# (redacted)

# Exhibit # 123

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 25-CV-39-JJM-PAS |
| DONALD TRUMP, et al., | |
| Defendants. | |

**DECLARATION OF WILL TOOR IN SUPPORT OF
THE STATES' REQUEST FOR PRELIMINARY INJUNCTION**

I, Will Toor, hereby declare and state as follows:

1.       I am the current Director of the Colorado Energy Office for the State of Colorado,

which is organized within the Office of the Governor. I have served in this role since 2019.  As

Executive Director, I guide the Energy Office in meeting its statutory mission to "(a) Support

Colorado's transition to a more equitable, low-carbon, and clean energy economy and promote

resources that reduce air pollution and greenhouse gas [("GHG")] emissions, including pollution

and emissions from electricity generation, buildings, industry, agriculture, and transportation; (b)

Promote economic development and high quality jobs in Colorado through advancing clean

energy, transportation electrification, and other technologies that reduce air pollution and [GHG]

emissions, including helping to finance those investments; (c) Promote energy efficiency; (d)

Promote an equitable transition toward zero emission buildings; (e) Promote an equitable

transition to transportation electrification, zero emission vehicles, transportation systems, and

land use patterns that reduce energy use and [GHG] emissions; (f) Increase energy security; (g)

1

Support lower long-term consumer costs and support reduced energy cost burden for lower-income Coloradans; and (h) Protect the environment and public health."[1]

2.    I make this declaration as a representative of the Colorado Energy Office, in part based on the business records of the Colorado Energy Office and the State of Colorado, and in part based on my personal knowledge and experience. In my official capacity and based on my personal knowledge and other sources of information I have obtained and reviewed in that official capacity, I am familiar with, and if called upon to do so, would be competent to testify to the facts and circumstances set forth herein.

3.    I submit this declaration in support of Plaintiff States' Request for Preliminary Injunction in this matter, which challenges the federal funding freeze triggered by various Executive Orders issued by President Trump and federal agency actions that seek to implement aspects of those Orders. In particular, this declaration addresses the effects of federal agencies' attempt to pause disbursement of federal grant and loan funds appropriated by Congress under the Inflation Reduction Act of 2022 (IRA) and the Infrastructure Investment and Jobs Act (IIJA).

4.    The Colorado Energy Office has been awarded over $500 million in grants under the IRA and IIJA. This funding includes both formula funding and competitive grants. The largest grants that have been awarded and contracted include a $156 million Solar For All award from the Environmental Protection Agency (EPA), $132 million in Climate Pollution Reduction Grant funding from the EPA, $140 million in funding awarded by the Department of Energy (DOE) to support rebates for energy upgrades for low and moderate income homes, $50 million in weatherization funds awarded by DOE to support energy upgrades for low income homes, $37 million in energy code grants from the DOE, and $25 million in Grid Resilience and Innovation

---

[1] § 24-38.5-101, C.R.S.

Partnerships (GRIP) funds awarded by DOE to support grid security and resilience. The Energy

Office also administers National Electric Vehicle Infrastructure funds, allocated by USDOT, to

the Colorado DOT; Colorado has $44 million awarded in this program. Consistent with the

instructions of the IRA and IIJA, Colorado uses these funds to support a wide array of programs

designed to benefit Coloradans, reduce energy costs, prevent pollution, and grow the economy.

Details regarding several specific grants are set forth below.

5.    As of the date of this declaration, the Executive Orders, and federal agency

actions attempting to implement the Orders, have had crippling effects on the operations of the

Colorado Energy Office, including but not limited to interrupted and delayed disbursement of

funds that Colorado has been awarded, and uncertainty on whether and when these funds will be

disbursed. The interruption and uncertainty have led to clear harm in the following areas:

a.    The Colorado Energy Office has many subcontracts with private sector entities,
nonprofits, and local governments. These subcontractors have been working in
good faith on implementing these programs: hiring staff, buying and installing
equipment, and other activities in which they both incur expenses and make
financial commitments. Examples include local governments and utilities
implementing grid resilience upgrades, local government projects funded by IIJA
Energy Efficiency Community Block Grants that have been allocated by the
Energy Office, EV charging stations being constructed under the National Electric
Vehicle Infrastructure program, and weatherization upgrades across the state. The
funding freeze has created uncertainty for the ability of the state to reimburse
these subcontractors for work they have already done and expenses they have
already incurred, as well as creating great uncertainty in continuing their work. If
the funding freeze continues, the Energy Office will be forced to direct
subcontractors to pause work, which will impact critical services for communities
across the state.

b.    The Energy Office has had to delay signing contracts for work that has statutory
deadlines, which we may now miss. As an example, the Energy Office was just
finishing a long procurement process for a contractor to conduct an analysis of the
potential of nuclear energy and other advanced energy technologies to provide
jobs and tax base in communities with retiring coal plants when the freeze was
initiated. This was to be paid for with EPA Climate Pollution Reduction Grant
program funds that were subject to the funding freeze, so this study, which is
important to the economic future of several rural communities in Colorado, is
now on hold.

3

    c.   The Colorado Energy Office's ability to hire talented staff in an extremely competitive hiring environment has been impacted. Specifically, the Energy Office has lost the top candidates for several new roles due to the uncertainty and delays related to the Orders.

    d.   The Colorado Energy Office's ability to execute contracts for goods and services that rely on federal funding.

    e.   The provision of services to Coloradans that rely on federal funds, including the weatherization of low income households and installation of energy saving appliances.

## COMMUNICATIONS FROM FEDERAL AGENCIES

6.    The Colorado Energy Office also received confusing communications from federal agencies regarding the status of federal grant funds, some of which appear to unilaterally change the terms and condition of existing grant agreements, or to direct the Energy Office to cease work which is required under existing grant agreements. For example, the Colorado Energy Office received a memorandum dated January 27, 2025, that was issued by the Acting Chief Financial Officer of the Environmental Protection Agency (EPA), attached hereto as Exhibit A. That memorandum indicates that all disbursements for unliquidated obligations funded by the IRA and the IIJA are paused to allow for review of the programs pursuant to section 7 of the Unleashing American Energy Executive Order. It is unclear how this review could impact Colorado's funding appropriated under the IRA and IIJA.

7.    The Colorado Energy Office received an email on January 28, 2025 that indicated EPA was pausing IRA and IIJA funding pursuant to the Executive Order. It stated, "Dear Grant Recipient, EPA is working diligently to implement President Trump's Unleashing American Energy Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order." A true and

accurate copy of the email is attached hereto as Exhibit B. The Colorado Energy Office has since

received an updated communication from EPA indicating that funding has resumed as a result of

a court directive. However, the Energy Office is still unable to access multiple online accounts

that are used to request disbursements, and it is unclear if or when funding will actually be

restored.

8.    The result of these communications has been to create confusion and uncertainty

regarding the status of the federal funds that the Colorado Energy Office relies on to implement

its statutory mission. In addition, because of this uncertainty, the Colorado Energy Office has

delayed executing award agreements with subgrantees and has delayed extending employment

offers for positions expected to be funded by grants already awarded by the federal government.

## STATUS OF FEDERAL FUNDING PORTALS

9.    Following issuance of the now rescinded OMB memorandum on January 27,

2025, all of the Colorado Energy Office's accounts on the federal government funding portals

ASAP and VIPERS became frozen, with the Office unable to draw funds pursuant to existing

grant agreements.

10.    Starting on February 4, 2025, the Office began receiving correspondence from

federal agencies indicating that grant funding for IRA and IIJA grants would resume. However,

as of the afternoon of February 5, 2025, the Office has still not been able to access most of its

grant accounts in the relevant federal portals. During the time the funds have been frozen and

inaccessible, the Colorado Energy Office has experienced the serious disruptions to its

operations described above. In light of the continued effect of the "Unleashing American

Energy" Executive Order, which directs all agencies to immediately pause disbursement of

SA181

certain funds appropriated through the IRA and IIJA, the Office expects its funding to continue to be in jeopardy absent court intervention.

**GRID RESILIENCE IIJA FORMULA FUNDS**

11.    Colorado has applied for and been approved for several grants to support grid resilience. On April 26, 2023, the Colorado Energy Office applied for approximately $17,200,000 over the first and second years of the Grid Resilience State and Tribal Formula Grant, which is a FORMULA program under the IIJA. Per the IIJA, section 40101(d), this program is to be a five year program.  A true and accurate copy of the grant application materials is attached hereto as Exhibit C. On August 30, 2023, the Colorado Energy Office received confirmation from the Department of Energy Grid Deployment Office that the Colorado Energy Office had been awarded the grant, with a total award of $17,249,786.  True and accurate copies of the grant award documents are attached hereto as Exhibit D.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on August 30, 2023 are attached hereto as Exhibit E.

12.    On April 12, 2024, the Colorado Energy Office applied for approximately $8,300,000 for the third year of the Grid Resilience State and Tribal Formula Grant. A true and accurate copy of the grant application materials is attached hereto as Exhibit F. On August 15, 2024, the Colorado Energy Office received confirmation from the Department of Energy Grid Deployment Office that the Colorado Energy Office had been awarded the third year of the grant, with an additional award of $8,359,178, for a total award of $25,608,964.  True and accurate copies of the grant award documents are attached hereto as Exhibit G.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on August 15, 2024 are attached hereto as Exhibit H.

13.    The funding mechanism is on a reimbursement basis. The distribution of this formula funding to the State of Colorado supports three separate competitive grant programs run by the Colorado Energy Office and the Colorado Department of Local Affairs.

14.    Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "Summary payments cannot include draws that are subject to agency reviews." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system

15.    This Grid Resilience grant in Colorado supports the Grid Hardening for Small and Rural Communities Program, the Advanced Grid Monitoring Program, and the Microgrids for Community Resilience Program. The beneficiary subrecipients are local retail electrical rural cooperative and municipal utilities. The selected projects, which are approved both by an interagency State selection committee and the U.S. Department of Energy, will enable utilities to reduce the duration and frequency, and impact of power outages, particularly in communities that experience a high prevalence of power outages. Thus far, seventeen projects have been awarded by the state, of which fifteen have been contracted and have initiated work. These projects are geographically dispersed throughout the State of Colorado, and the majority serve rural and small communities. The funded projects include undergrounding and reconductoring of critical and problematic distribution lines, vegetation management in remote and thickly forested areas, grid modelling with satellite and drone data collection to prioritize upgrades and future projects, and microgrids that will provide resiliency for fire departments, communications and resilience hubs, and communities in areas with high wildfire, avalanche, and flood risk.

SA183

16.     These projects are highly consequential for the communities they serve. The

application, state selection, federal review, and contracting with the state took on average 13

months for these projects. The Order and the uncertainty it has caused has delayed the

implementation of these programs, and further delay will result in increased likelihood of power

outages, increased costs, and lack of information for grid operators to evaluate and prioritize

future projects. Cancelling any of these projects would exacerbate these issues, as the

subrecipients (rural electric cooperatives and municipal utilities) would have to seek funding

elsewhere, most likely by raising electricity prices for their customers.

**WEATHERIZATION ASSISTANCE PROGRAM IIJA FORMULA FUNDS**

17.     On November 28, 2022, the Colorado Energy Office applied for DE-EE0009976,

which is a FORMULA program under the IIJA.  A true and accurate copy of the grant

application materials is attached hereto as Exhibit I.

18.     On January 20, 2023, the Colorado Energy Office received confirmation from the

United States Department of Energy that Colorado Energy Office was awarded the grant, with a

total award of $50,064,163.00.  True and accurate copies of the grant award documents are

attached hereto as Exhibit J.  True and accurate copies of the terms and conditions applicable to

those grant award documents, as conveyed on January 20, 2023, are attached hereto as Exhibit

K.

19.     The funding mechanism for these funds are reimbursement based and are awarded

by a county-based allocation formula to five subrecipients across the state who applied

competitively for the funds.

20.     The Colorado Weatherization Assistance Program's mission is to support low-

income households through the installation of DOE approved energy efficiency and health and

safety measures. The following is a non-exhaustive sample of the approved energy efficiency measures: attic, wall, and/or floor insulation, high efficiency furnace, storm windows, air and duct sealing, LED lightbulbs. The following is a non-exhaustive sample of the approved health and safety measures: smoke and carbon monoxide detectors, water heater repairs or replacements, furnace replacements (if the prior water heater or furnace was leaking carbon monoxide). All installed measures are determined based on a whole-home audit using DOE approved audit software called Weatherization Assistant 10.0. Allowable energy efficiency measures must meet a savings to investment ratio of 1.0 or greater in order to be installed.

21.    Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "Summary payments cannot include draws that are subject to agency reviews." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system.

22.    The impact of the loss of IIJA/BIL funds to the Weatherization Assistance Program would be the loss of approximately $35 million in obligated funding that is dedicated to providing energy efficiency and in some cases life saving health and safety improvements to low income households. The primary objective of the program is to help residents to save money on their energy bills by protecting homes from the elements including cold, heat, water, and wind. This ultimately will reduce the ability of the program to deliver services to approximately 2,000 income-qualified households. The Weatherization Assistance Program serves residents in every county of Colorado. The Colorado Energy Office is currently contracted with four local non-profits and two county governments to provide services across the state. Work is underway and a pause in funding will impact their ability to pay their field staff who perform the work in homes

9

(i.e. home assessments, inspections, in-home work such as insulation, furnace replacements, health and safety work, and carry out other program elements.)

**SOLAR FOR ALL COMPETITIVE IRA FUNDS**

23.    On October 11, 2023, the Colorado Energy Office applied for the Environmental Protection Agency Solar for All grant program, which is a competitive program under the IRA. A true and accurate copy of the grant application materials is attached hereto as Exhibit L.

24.    On April 21, 2024, the Colorado Energy Office received confirmation from the Environmental Protection Agency that the Colorado Energy Office was awarded the grant, with a total award of $156,120,000.  True and accurate copies of the grant award documents including terms and conditions dated July 9, 2024 are attached hereto as Exhibit M.  True and accurate copies of the terms and conditions applicable to those grant award documents, as conveyed on July 21, 2024 are attached hereto as Exhibit N. True and accurate copies of the grant amendment with revised terms and conditions as conveyed on December 4, 2024 are attached hereto as Exhibit O.

25.    The funding mechanism is on a reimbursement basis and will support competitive grants across Colorado.

26.    Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "No accounts found matching criteria." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system.

27.    Colorado Solar for All (COS4A) will expand access to solar power by focusing on targeted and contextualized technical assistance and heavily subsidized financing products while also looking to address any localized barriers. The program will subsidize single-family

10

SA186

rooftop solar, multifamily rooftop solar, and community solar to balance serving the highest
energy burdened residents, maximizing the resident cost savings and emissions reductions, and
the market transformation potential of such a large scale program. The COS4A program will
dedicate 75% of the awarded funds towards financial assistance to ensure income-qualified
households have access to residential rooftop and residential-serving community solar energy
across Colorado. The mechanism to deploy the funds will be through a combination of fully
subsidized grants, low-interest loans and production based incentives for entities that guarantee
the benefits to flow to participating Colorado residents. COS4A is positioned to deliver the
benefits of solar to more than 20,000 households across Colorado, saving them money on utility
bills. The program will do this by providing technical assistance, training, and financial
incentives to increase the options for financial ownership, governance oversight, and wealth
building opportunities for members. The EPA's Solar for All grant will complement the robust
solar market in Colorado by enabling the state to increase the number of communities that can
take advantage of distributed solar investments and provide access to affordable, resilient, and
clean solar energy as well as the related benefits of lower utility bills, improved public health
through reduced pollution from power generation, and creation of wealth and jobs for local
communities. In addition to the financial assistance to directly support solar installations, the
program will also subsidize workforce development and technical assistance offerings in support
of implementing the program.

28.    On January 28, 2025, Colorado Energy Office Deputy Director Dominique
Gómez was notified that the EPA is working diligently to implement President Trump's
*Unleashing American Energy* Executive Order issued on January 20 in coordination with the
Office of Management and Budget. The agency has paused all funding actions related to the

Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

29.     The current uncertainty is causing delays in program launch. For example, hiring of the Quality Program Manager  has been put on hold which is a critical position in order to fulfill the quality program requirements of the EPA, as has the hiring of the Solar Program Manager which affects financial assistance programming and oversight. Canceling the program would be detrimental and the deployment of solar to 20,000 low-income households would be forfeited, the economic benefits of these investments, including substantial monthly energy bill cost savings, would not be realized and critical workforce development would be lost.

**HOME ENERGY REBATES IRA FORMULA FUNDS**

30.     In June 2023, the Colorado Energy Office applied for the Home Energy Rebates Program, which is a FORMULA program under the IRA.

31.     On August 1, 2023, the Colorado Energy Office received confirmation from the U.S. Department of Energy that the Colorado Energy Office had been awarded Early Administrative funds for both grants, $1,759,883 for 50121 Home Efficiency Rebates and $1,749,647 for 50122 Home Electrification and Appliance Rebates, with a total award of $3,509,530. This represents advance planning funding for the implementation of the full awards that total $140,242,735.00.  A total of $70,256,845 is for the 50121 program and a total of $69,985,890 is for the 50122 program.  The full award for 50122 Home Electrification and Appliance Rebates was awarded on September 3, 2024. The full award for 50121 Home Efficiency Rebates was awarded on September 10, 2024.  True and accurate copies of the grant

12

award documents are attached hereto as Exhibit P. True and accurate copies of the terms and conditions applicable to those grant award documents, are attached hereto as Exhibit Q.

32.    The funding mechanism is on a reimbursement basis and supports formula grants in the form of rebates provided to primarily low-income households across Colorado. As funds are expended and rebates issued reimbursement draws are completed by the Colorado Energy Office.

33.    Beginning on January 28, 2025, the Colorado Energy Office was not able to access the ASAP system to submit draws, receiving an error that said "Summary payments cannot include draws that are subject to agency reviews." As of Wednesday, February 5th the Colorado Energy Office has not been able to submit draws in this system

34.    Initial funds received are Early Administrative Funds, intended and utilized for hiring program staff, developing program design and strategy, develop program evaluation, selecting a vendor to assist with application and program administration, initiating program piloting, developing agreements supporting collaboration with community-based organizations, to conduct a strategic impact analysis as well as to consult with affordable housing professionals. As awarded in our Modification 1, current use of funds includes allowable administrative costs including state program staff (personnel, fringe, indirect, travel, supplies), and contractual. Upcoming use of funds includes allowable administrative costs including state program staff (personnel, fringe, indirect, travel, supplies), and contractual funds that include administrative, rebate delivery and rebate reimbursement funds. Allowable administrative costs include:

- program planning and design,
- state program staff,
- development of tools and systems, including websites, applications, rebate processing and reporting,

13

SA189

- program evaluation and customer satisfaction surveys,

- program monitoring and audits,

- consumer protection functions including resolution procedures, data review, contractor management, installation standards, continuous improvement,

- marketing, education, and outreach, including the funding of of local governments and place-based organizations to assist with these activities,

- implementation contract costs not including rebates and costs for activities directly related to delivery of rebates,

- Contractor training,

- Activities to improve access to rebates, facilitating leverage of private funds and financing mechanisms (e.g., loan loss reserves, interest rate reductions) where beneficial to efficiency and/or electrification projects,

- DAC (Disadvantaged Community) Incentive, and

- Technical assistance.

35.    Projects commenced include full use of Early Administrative Funds, and preparation for use of all Allowable Administrative Costs, Rebate Delivery Funds, and Rebate Reimbursement Funds. Rebate Delivery Funds include Equipment, tools, models, and procedures used to assess a building and estimate energy savings, Equipment, tools, models, and procedures used to verify installations and perform quality control (QC) including inspections and reporting, disadvantaged community delivery including targeted marketing and outreach, and disadvantaged community incentives.

36.    A January 23, 2025 e-mail communication received by Colorado Energy Office employee Raine Queenan from a DOE project officer noted that they were evaluating information from the new administration and would be pausing further communication. Also on January 23rd, Raine Queenan received phone communication from a DOE Project Officer providing the same context.

14

SA190

37.     On January 29th, Colorado Energy Office staff Annie Beall and Loren Ahonen received various communications via e-mail that a Technical Assistance program sponsored by DOE to aid rebate program delivery was being postponed.

38.     The current delays are impacting program launch activities including: vendor contract management, technical provider decision-making, staffing of five existing positions (and nine planned positions), and coordination with other internal and external programs. Without continued progress on these activities, the program will not reach its target launch date of June 2025. Further delaying and/or canceling these programs will result in wasteful spending of already completed activities.  Additionally, continued delay and/or canceling of these programs would forfeit needed improvements for residential homes and associated workforce benefits . Because rebate programs are delivered through contractors and other market entities that stimulate additional investment, delayed/and or cancelled funding eliminates that additional economic investment in the State of Colorado.

**SIGNED UNDER THE PENALTIES OF PERJURY THIS 5th DAY OF FEBRUARY, 2025.**

_Will Toor_
_____

Will Toor
Director, Colorado Energy Office

15

SA191

# EXHIBIT A



## THE CHIEF FINANCIAL OFFICER

WASHINGTON, D.C. 20460

January 27, 2025

# CUI//SP-BUDG

**MEMORANDUM**

**SUBJECT:**     Inflation Reduction Act and Infrastructure Investment and Jobs Act Funding Action Pause

**FROM:**     Gregg Treml, Chief Financial Officer (Acting)

GREGG TREML
Digitally signed by GREGG TREML
Date: 2025.01.27 16:59:02 -05'00'

**TO:**     Deputy Assistant Administrators
Deputy Associate Administrators
Deputy Regional Administrators

This message is being provided based on instruction from OMB.

In accordance with the Executive Order *Unleashing American Energy,* unobligated funds (including unobligated commitments) appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58) are paused. Pursuant to this pause, the Compass financial system will temporarily not allow obligations to be made in these lines of accounting. EPA is in discussions with the Office of Management and Budget on the continuation of payroll in IIJA and IRA.

Additionally, all disbursements for unliquidated obligations funded by any line of accounting including funds appropriated by the Inflation Reduction Act of 2022 (P.L. 117-169) and the Infrastructure Investment and Jobs Act (P.L. 117-58), are paused. Additional details on the pause in disbursements will be provided separately by the Office of the Controller.

This pause will allow for the review of processes, policies and programs as required by Section 7 of the Order.

All related actions, including new contract, grant, rebate and interagency actions, to include drawdowns, for IIJA and IRA are paused. Offices are not to put IIJA or IRA lines of accounting on any actions and all current actions are paused. Further, no IIJA or IRA funded travel is permissible at this time and all upcoming travel funded from either should be cancelled.

A process has been established at OMB for their review and approval of obligations and disbursements based on the Order. We will continue to update the community. We appreciate your work to ensure compliance with the Order.

cc: Lek Kadeli
    Meshell Jones-Peeler
    Paige Hanson
    Senior Resource Officials
    Senior Budget Officers
    Regional Comptrollers
    Funds Control Officers

# Controlled by U.S. Environmental Protection Agency

2

# EXHIBIT B



Gomez - CEO, Dominique <dominique.gomez@state.co.us>

---

## Pause EPA Grants

**EPA_Grants_Info** <EPA_Grants_Info@epa.gov>                                    Tue, Jan 28, 2025 at 2:41 PM

Dear Grant Recipient,

EPA is working diligently to implement President Trump's *Unleashing American Energy* Executive Order issued on January 20 in coordination with the Office of Management and Budget. The agency has paused all funding actions related to the Inflation Reduction Act and the Infrastructure Investment and Jobs Act at this time. EPA is continuing to work with OMB as they review processes, policies, and programs, as required by the Executive Order.

Thank you.

*Please do not reply to this message. This mailbox is not monitored.*

SA196

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF NEW YORK; et al.,

        Plaintiffs,

      v.

DONALD TRUMP, in his official capacity as President of the United States; et al.,

        Defendants.

C.A. No. 1:25-cv-00039-JJM-PAS

## AFFIRMATION OF THEODORE MCCOMBS

THEODORE MCCOMBS, an attorney admitted to practice *pro hac vice* before this Court and admitted to practice before the courts of the State of California, does hereby state the following under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.     I am Theodore McCombs, Deputy Attorney General in the Office of the Attorney General for the State of California, and I appear on behalf of the State of California in this action.

2.     I submit this declaration in support of Plaintiff States' Second Motion to Enforce the Court's January 31, 2025, Temporary Restraining Order (ECF No. 50), and subsequent orders regarding the TRO entered on February 10, 2025 (ECF No. 96) and February 12, 2025 (ECF No. 107). The facts set forth herein are based upon my personal knowledge and/or a review of the files in my possession.

3.     In this declaration, I highlight several grants from the Federal Emergency Management Agency (FEMA) to state agencies in Arizona, California, Colorado, Hawaii, Illinois, Maine, Maryland, Michigan, New Jersey, New York, Vermont, Washington, and Wisconsin that remain frozen and unavailable for drawdown.

4.    The Arizona Department of Emergency and Military Affairs is the recipient of an Emergency Management Performance Grant for Fiscal Year 2024. As of February 20, 2025, award of the grant is delayed pending review and approval of the Office of the Chief Counsel for compliance with the President's Executive Order.

5.    The Arizona Department of Homeland Security is the recipient of a grant under the Nonprofit Security Grant Program for Fiscal Years 2022 (grant number EMW-2022-UA-00008) and 2023 (grant number EMW-2023-UA-00017). On February 19, 2025, a hold was placed on both the 2022 and 2023 grants. A true and correct screen capture of the Payment and Reporting System ("PARS") portal reflecting freezes of the 2022 and 2023 grants is attached as Exhibit A.

6.    The California Governor's Office of Land Use & Climate Innovation (LCI), formerly the Office of Planning & Research, is the recipient of a Cooperative Technical Partnership grant (grant number CA-EMF-2022-00014) under the National Flood Insurance Program. On February 21, 2025, a hold was placed on LCI's grant. On February 24, FEMA staff responded to LCI's inquiry, "No FEMA funding is paused but the agency does continue to review program delivery to ensure alignment with all White House directions and Executive Orders." A true and correct screen capture of the PARS portal reflecting the freeze is reproduced below, and a true and correct copy of FEMA's February 24, 2025 email is attached as Exhibit B.



7.    The Colorado Department of Natural Resources is the recipient of thirty-four grants under the Floodplain Mapping Program - Cooperating Technical Partnership Award from Fiscal Years 2018 through 2022, all of which have been on hold in PARS since February 21 (grant numbers EMD-2022-CA-00022, EMD-2022-CA-00027, EMD-2022-CA-00024, EMD-2022-CA-00028, EMD-2022-CA-00018, EMD-2022-CA-00020, EMD-2020-CA-00020, EMD-2022-CA-00024, EMD-2020-CA-00021, EMD-2019-CA-00049, EMD-2022-CA-00023, EMD-2019-CA-00037, EMD-2019-CA-00038, EMD-2020-CA-00025, EMD-2019-CA-00057, EMD-2018-CA-00014, EMD-2021-CA-0027, EMD-2021-CA-0025, EMD-2019-CA-00050, EMD-2022-CA-00021, EMD-2021-CA-0029, EMD-2021-CA-0026, EMD-2022-CA-00018, EMD-2019-CA-00034, EMD-2020-CA-00027, EMD-2018-CA-00011, EMD-2019-CA-00028, EMD-2020-CA-00021, EMD-2021-CA-0025, EMD-2019-CA-00031, EMD-2021-CA-0024, EMD-2021-CA-0029, EMD-2022-CA-00023, and EMD-2021-CA-0028) A true and correct screen capture of the PARS portal reflecting the freeze for 2022 grant number EMD-2022-CA-00022 is attached as Exhibit C.

8.    The Colorado Division of Homeland Security & Emergency Management is the recipient of Emergency Operations Center Grant Program grants for Fiscal Years 2023 and 2022 (grant numbers EMD-2023-EO-00003 and EMD-2022-EO-00001), Homeland Security Grant Program grants for Fiscal Years 2023, 2022, 2021 (grant numbers EMW-2023-SS-00050, EMW-2022-SS-00041, EMW-2021-SS-00044), Nonprofit Security Grant Program grants for Fiscal Years 2023, 2022, and 2021 (grant numbers EMW-2023-UA-00047, EMW-2022-UA-00040, and EMW-2021-UA-00081), State and Local Cybersecurity Grant Program grants for Fiscal Years 2023 and 2022 (grant numbers EMW-2023-CY-00061, EMW-2022-CY-00045), and Targeted Violence and Terrorism Prevention Grant Program grants for Fiscal Year 2023 (EMW-

2023-GR-00129). These grants have been reported as becoming inaccessible for payment between February 19th and 21st and remain frozen.

9.     The Colorado Division of Homeland Security & Emergency Management is also the recipient of a Shelter and Services Program Grant. The agency has received correspondence from FEMA claiming that it is out of compliance with various requirements of federal law, and that FEMA intends to claw back the grant funds.

10.     The Hawaii Department of Law Enforcement is a recipient of Homeland Security Grant Program grants for Fiscal Years 2021, 2022, 2023, and 2024 (grant numbers EMW-2021-SS-00030, EMW-2022-SS-00026, EMW-2023-SS-00026, and EMW-2024-SS-05015); Nonprofit Security Grant Program grants for Fiscal Years 2022, 2023, and 2024 (grant numbers EMW-2022-UA-00027, EMW-2023-UA-00028, and EMW-2024-UA-05010); and State and Local Cybersecurity Grant Program grants for Fiscal Years 2022, 2023, and 2024 (grant numbers EMW-2022-CY-00024, EMW-2023-CY-00021, and EMW-2024-CY-05274). These funds have been reported to be inaccessible in PARS since at least February 25, 2025.

11.     The Illinois Emergency Management Agency-Office of Homeland Security is the recipient of Homeland Security Grant Program grants for Fiscal Years 2021, 2022, and 2023 (grant numbers EMW-2021-SS-0001, EMW-2022-SS-00025, and EMW-2023-SS-00013), and Nonprofit Security Grant Program grants for Fiscal Years 2021, 2022, and 2023 (grant numbers EMW-2021-UA-0002, EMW-2022-UA-00013, and EMW-2023-UA-00013. As of February 20, 2025, these grants appeared as "On Hold" in PARS. The Maine Emergency Management Agency is the recipient of Homeland Security Grant Program grants for Fiscal Years 2021, 2022 and 2023 (grant numbers EMW-2021-UA-00065, EMW-2022-UA-00032, and EMW-2023-UA-00012) and Nonprofit Security Grant Program Grants for 2021, 2022, and 2023 (grant numbers

EMW-2021-UA-00057, EMW-2022-UA-00032, and EMW-2023-UA-00012), as well as a Emergency Management Performance Grant (EMB-2023-EP-00004) and a Pre-Disaster Mitigation grant (EMB-2023-PD-004). No funds have been received since February 10 to cover regular reimbursed expenses and "holds" were placed on these grants in PARS between February 18 and 21.

12. The Maryland Department of Emergency Management is the recipient of Homeland Security Grant Program grants for Fiscal Years 2021, 2022, and 2023 (grant numbers EMW-2021-SS-00047, EMW-2022-SS-00009, EMW-2022-SS-00009, EMW-2023-SS-00011, EMW-2023-SS-00011), Nonprofit Security Grant Program grants for Fiscal Years 2022 and 2023 (grant numbers EMW-2022-UA-00006-S01 and EMW-2023-UA-00010), and State and Local Cybersecurity Grant Program grants for Fiscal Years 2022 and 2023 (grant numbers EMW-2022-CY-00028-501 and EMW-2023-CY-00006), as well as a Targeted Violence Prevention Program grant (grant number EMW-2022-GR-00056-S01), a Regional Catastrophic Preparedness Grant Program grant (grant number EMP-2022-CA-00011), and an Emergency Management Performance Grant (grant number EMP-2023-EP-0001). Holds were placed on each of these grants between February 21 and 27.

13. The Michigan State Police are recipients of Homeland Security Grant Program grants for Fiscal Years 2022 and 2023 (grant numbers EMW-2022-SS-00031 and EMW-2023-SS-00022) and Nonprofit Security Grant Program Grants for 2021, 2022, and 2023 (grant numbers EMW-2021-UA-00050, EMW-2022-UA-00031, and EMW-2023-UA-00039). Draws were submitted for the Nonprofit Security Grant on February 7; for the 2022 Homeland Security Grant Program grant on February 12; and for the 2023 Homeland Security Grant Program grant

on February 14. None of the grants have been disbursed in PARS. On February 19, a hold was placed on the Nonprofit Security Grant Program grants in PARS.

14.     The Michigan State Police are also recipients of a Safeguarding Tomorrow Revolving Loan Program grant for Fiscal Year 2024. The grant had initially been approved in September 2024 and since then had been in "final review." On February 18, 2025, the Regional Administrator stated that the terms and conditions of the grant were "being reviewed to ensure consistency with the President's Executive Orders."

15.     The New Jersey Department of Environmental Protection (NJDEP) is the recipient of a grant under the Community Assistance Program – State Support Services Element (CAP-SSSE), established by the National Flood Insurance Act of 1968. The grant number is EMN-2024-GR-05017. On February 18, 2025, NJDEP received a stop work order from the FEMA CAP-SSSE Program Lead for all activities relating to the terms "Disadvantaged, Marginalized, Underserved, Low-Income, Environmental Justice, Climate, Equity, Equitable, Inclusion, Diversity, Minority, Affirmative Action, Accessibility, Culture, Federal Flood Risk Management Standard (FFRMS), and Justice 40."

16.     The New York Department of Environmental Conservation is the recipient of a CAP-SSSE grant. New York has received a stop work order from the FEMA CAP-SSSE Program Lead for all activities relating to the terms "Disadvantaged, Marginalized, Underserved, Low-Income, Environmental Justice, Climate, Equity, Equitable, Inclusion, Diversity, Minority, Affirmative Action, Accessibility, Culture, Federal Flood Risk Management Standard (FFRMS), and Justice 40."

17.     The New York Division of Homeland Security and Emergency Services administers Preparedness and Disaster Recovery grants from FEMA. Between February 18 and

21, 2025, DHSES learned that all FEMA Preparedness Grants for FY 2020, FY 2021, FY 2022, and FY2023 have holds that prevent DHSES from submitting drawdown requests on PARS. Similarly, DHSES learned on February 21 that all Hazard Mitigation Assistance Grants for FY 2019-2024 had holds on drawdowns. Among the Preparedness grants that are affected are: Homeland Security Grant Program (HSGP), Nonprofit Security Grant Program (NSGP), Regional Catastrophic Grant Program (RCPGP), Emergency Management Performance Grant (EMPG), Emergency Management Performance Grant-American Rescue Plan Act (EMPG-ARPA), Emergency Operations Center Grant Program (EOCGP) and Targeted Violence and Terrorism Prevention (TVTP). Among the Hazard Mitigation Assistance Grants that are on hold are pre-Disaster Mitigation, Flood Mitigation Assistance, SWIFT Current (subset of FMA), Revolving Loan Fund (STORM Act), and Legislative Pre-Disaster Mitigation (Congressional Community Grants). All told, New York has hundreds of millions of dollars in FEMA grants that are inaccessible. When New York attempts to submit a drawdown request they have gotten error messages, of which the below true and correct screen capture is an example:



18.    The Vermont Agency of Natural Resources is the recipient of a CAP-SSSE grant.
The agency has received a stop work order from the FEMA CAP-SSSE Program Lead for all
activities relating to the terms "Disadvantaged, Marginalized, Underserved, Low-Income,
Environmental Justice, Climate, Equity, Equitable, Inclusion, Diversity, Minority, Affirmative
Action, Accessibility, Culture, Federal Flood Risk Management Standard (FFRMS), and Justice
40."

19.    The Washington Military Department Emergency Management Division is the
recipient of multiple FEMA public assistance grants. As of February 17, 2025, reimbursement of
the funds were being held "under review" by FEMA.

20.    The Wisconsin Department of Military Affairs is the recipient of Homeland
Security grants for 2021, 2022, and 2023 (grant numbers EMW-2021-SS-00068, EMW-2022-
SS-00035, and EMW 2023-SS-00041), and Nonprofit Security Grant Program grants for 2021,
2022, and 2023 (grant numbers EMW-2021-UA-00060, EMW-2022-UA-00039, and EMW-
2023-UA-00023). As of February 21, 2025, the Wisconsin Department of Military Affairs has
been unable to draw down these grants.

21.    Counsel for the parties has conferred extensively on these FEMA grants, as well
as other disruptions to awarded funding. On February 11, Plaintiff's counsel sent a chart of still-
frozen awards under the Infrastructure Investment and Jobs Act ("IIJA") and Inflation Reduction
Act ("IRA"). In the same email, Plaintiff's counsel raised public reporting that the Director of
the Office of Grant Administration for FEMA had directed her team to put financial holds on all
awards for fiscal years 2021, 2022, 2023, and 2024. In emails dated February 12, 13, and 14,
counsel continued to confer on whether FEMA had instituted a categorical freeze on awards, and
on February 18, Defendants' counsel provided redacted copies of two communications from the

Director of the Office of Grants Administration, dated February 10 and 11. A true and correct copy of the February 11 to 18 emails is attached as Exhibit D, with true and correct copies of the February 10 and 11 redacted emails attached as Exhibits D-1 and D-2, respectively.

22.    Over February 21 to 26, Plaintiffs' counsel continued to confer on FEMA grants as well as a similar issue with the Department of Energy's payment review process for IIJA/IRA funds. On the FEMA grants, the parties appear to have reached an impasse, with Defendants' counsel asserting that the manual payment review process resulting in widespread holds in PARS is neither a "hold" nor a "freeze." A true and correct copy of the February 21 to 26 correspondence is attached as Exhibit E.

23.    On February 28, shortly before filing the present motion, several Plaintiff States, including California, Illinois, and New York, received an email from the FEMA Recovery Directorate, stating that FEMA is implementing "an additional review process of allocations before releasing funds for all grants" and that "payment requests may take up to 30 days to process." The email cites "2 C.F.R. Part 200." A true and correct copy of the FEMA Recovery Directorate's email is attached as Exhibit F.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated:    San Diego, California
          February 28, 2025

Theodore A.B. McCombs
Office of the Attorney General
State of California

SA205

# Exhibit A



**Federal Emergency Management Agency**
**Payment And Reporting System (PARS)**



| Main | Payments |

Main Menu | Help | Logout

Grant
**Maintenance**
Payment
Requests

Your Vendor
Number is:
**866004801**

## Grant Maintenance

Request a Payment
This section allows you to request a payment from your grant.

**STEP 2:**
Enter the dollar amount of your payment request in the space provided below,
then click the "Submit Payment Request" button.

GRANT INFORMATION for : EMW-2022-UA-00008

Grant Number: EMW-2022-UA-00008
Grantee Name: HOMELAND SECURITY, ARIZONA OFFICE OF
Acceptance Date: 09/28/2022
Holds?

| Hold Date | Hold Amount |
|-----------|-------------|
| 02/19/2025 | $ 528053.27 |

Grant Amount: 2,906,542.10
Amount Previously Dispensed: 2,378,488.83 view payment history
Amount On Hold: 528053.27
Amount Available: 0.00 cancel payment request

Payment Request Amount: $ 0.00        Enter the requested amount in dollars.
Period Covered FROM: _____
Period Covered TO: _____

SUBMIT PAYMENT REQUEST

© 2024, Digital Systems Group, Inc.
build: 20240821_1018 {08/21/2024 10:18 AM sf269/rel}



# Federal Emergency Management Agency
# Payment And Reporting System (PARS)



| Main | Payments |

Main Menu  |  Help  |  Logout

**Grant Maintenance**

Payment Requests

Your Vendor Number is: **866004801**

## Grant Maintenance

Request a Payment
This section allows you to request a payment from your grant.

**STEP 2:**
Enter the dollar amount of your payment request in the space provided below, then click the "Submit Payment Request" button.

### GRANT INFORMATION for : EMW-2023-UA-00017

Grant Number:  EMW-2023-UA-00017
Grantee Name:  HOMELAND SECURITY, ARIZONA OFFICE OF
Acceptance Date:  08/31/2023
Holds?

| Hold Date | Hold Amount |
|---|---|
| 02/19/2025 | $ 1291146.67 |

Grant Amount:  4,075,729.00
Amount Previously Dispensed:  2,784,582.33 view payment history
Amount On Hold:  1291146.67
Amount Available:  0.00 cancel payment request

Payment Request Amount: $ 0.00    Enter the requested amount in dollars.
Period Covered FROM:  ⬦
Period Covered TO:  ⬦

**SUBMIT PAYMENT REQUEST**

© 2024, Digital Systems Group, Inc.
build: 20240821_1018 {08/21/2024 10:18 AM sf269/rel}

# Exhibit B

**From:** ███████████
**To:**
**Cc:** FEMA-R9-Grants-Services-Action-Office; ███████████
**Subject:** RE: Revision Needed: SF-425 for Award EMF-2022-CA-00014
**Date:** Monday, February 24, 2025 2:33:10 PM
**Attachments:** image001.png
image002.png

Hi ██████

No FEMA funding is paused but the agency does continue to review program delivery to ensure alignment with all White House directions and Executive Orders.

████████  ██████

Grants Management Specialist | Grants Management Division | Region 9
Mobile: ██████████████
████████████████████████

████████████████████

Monday, February 24, 2025 10:58 AM
FEMA-R9-Grants-Services-Action-Office ████████████████████████████
████████████████████████

Re: Revision Needed: SF-425 for Award EMF-2022-CA-00014

This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please select the Phish Alert Report button on the top right of your screen to report this email if it is unsolicited or suspicious in nature.

██████

██████

# Exhibit C



**Federal Emergency Management Agency**
**Payment And Reporting System (PARS)**

Main   Payments

**Grant Maintenance**
Payment Requests

Your Vendor Number is:
840644739E

## Grant Maintenance

Request a Payment
This section allows you to request a payment from your grant.

STEP 2:
Enter the dollar amount of your payment request in the space provided below
then click the "Submit Payment Request" button.

GRANT INFORMATION for : EMD-2022-CA-00022
Grant Number: EMD-2022-CA-00022
Grantee Name: DEPARTMENT OF NATURAL RESOURCES COLORADO
Acceptance Date: 10/24/2023
Holds?

| Hold Date | Hold Amount |
|-----------|-------------|
| 02/21/2025 | $ 1887751 |

Grant Amount: 1,887,751.00
Amount Previously Dispensed: 417,903.00 view payment history
Amount On Hold: 1887751.00
Amount Available: 0.00 cancel payment request

# Exhibit D



Schwei, Daniel S. (CIV) ████████████████
Tuesday, February 18, 2025 5:03 PM
Kate Sabatini ███████████████
Sarah Rice ███████████████; Muqaddam, Rabia ██████████████████; Thomas-Jensen, Molly ████████████████; Freidah, Andrew F. (CIV) ████████████████; Sirkovich, Eitan R (CIV) ████████████████
RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

As noted in my e-mail below, attached are redacted copies of the two FEMA e-mails.

Schwei, Daniel S. (CIV)
Tuesday, February 18, 2025 5:02 PM
'Kate Sabatini'
Sarah Rice ██████████████; ██████████████; Freidah, Andrew F. (CIV) ██████████████; Sirkovich, Eitan R (CIV) ██████████████
RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

Kate,

Regarding FEMA, I still do not think there is any basis for your continued concerns.  You have not identified any funding that has actually been "held" or otherwise paused, and as I've already explained, the press reports do not convey the full picture in light of the subsequent February 11 e-mail making clear that FEMA is "not holding on awards."  Thus, I do not think there is any basis for raising this issue with the Court, and certainly not on any sort of expedited timeline.  Nonetheless, in an effort to demonstrate our good faith (and without conceding that any inquiry into Defendants' internal processes or documents is warranted), I will attach redacted copies of the two communications in a follow-up message (to avoid any file-size issues).  I believe that these should resolve the matter.

For CDC, I believe this issue is now moot – I'm told that the relevant grants have been approved for release.  All Notices of Awards should have been issued earlier this afternoon, though recipients may not see the awards until later tonight or tomorrow.

Finally, on EPA IRA/IIJA grants, EPA has informed me that I can represent the following to you all:  "EPA intends to clear any remaining pauses on IRA/IIJA funds disbursement.  As of 10am on February 18, 2025, the Office of the Chief Financial Officer is still in the process of unlocking the relevant accounts.  That work should be completed no later than the morning of February 19th."

Thank you,
Daniel



Kate Sabatini ██████████████ >
Monday, February 17, 2025 7:43 PM
Schwei, Daniel S. (CIV) ██████████████ >
Sarah Rice < ██████████ >; ██████████████; ██████████████; Freidah, Andrew F. (CIV) ██████████████ >; Sirkovich, Eitan R (CIV) < ██████████████ >
[EXTERNAL] RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

SA214

Finally, we would like to return to the issue of the CDC Rape Prevention and Education Grants. In addition to California, we have now learned that New York's RPE Grants are suspended. You previously said that this was being done independently as an exercise of "agency discretion." But the authorizing statute does not provide the agency with any discretion. See 42 U.S.C. § 280b-1b ("The Secretary . . . shall award targeted grants to States . . . ."). This is squarely covered by the Court's TRO. As with the IRA/IIJA grants, we ask that you confirm to us no later than 5 pm EST tomorrow (Tuesday) that all such pauses or freezes have been ended, so that we can avoid motion practice.

Best,

Kate



**Kathryn M. Sabatini** (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI – 02903
[redacted] | www.riag.ri.gov |

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---



**From:** Schwei, Daniel S. (CIV) <[redacted]>
**Sent:** Friday, February 14, 2025 6:12 PM
**To:** Kate Sabatini <[redacted]>
**Cc:** Sarah Rice <[redacted]>; [redacted]; Freidah, Andrew F. (CIV) [redacted]; Sirkovich, Eitan R (CIV) [redacted]
**Subject:** RE: CA25-39IJM State of NY, et al. v. Trump, et al. : TRO Compliance

[External email: Use caution with links and attachments]
Sorry, one more technical clarification from DOE given the complexity of these programs. Payment to New York under the Methane Emissions Reduction Program (MERP) may not be ripe yet because there may still be some negotiations required between DOE and the State. So DOE's intent to make those payments is subject to the required negotiations.

Thank you,
Daniel

---



**From:** Schwei, Daniel S. (CIV)
**Sent:** Friday, February 14, 2025 5:32 PM
**To:** 'Kate Sabatini' [redacted]
**Cc:** 'Sarah Rice' <[redacted]>; [redacted]; Freidah, Andrew F. (CIV) [redacted]; Sirkovich, Eitan R (CIV) [redacted]
**Subject:** RE: CA25-39IJM State of NY, et al. v. Trump, et al. : TRO Compliance

Sorry, a couple slight corrections regarding DOE. First, the HER/HERE payment to NYSERDA has been approved, and I understand that HER/HERE payments for other states are in line for approval, but I'm not sure if those other states' payments have actually yet been approved. Second, regarding the spreadsheet, Solar for All is listed as a DOE program but it's an EPA program – so DOE "currently intend[ing] to make those payments," as stated in my email below, would not extend to Solar for All which is not their program.

Thank you,
Daniel

---



**From:** Schwei, Daniel S. (CIV)
**Sent:** Friday, February 14, 2025 4:57 PM
**To:** 'Kate Sabatini' <[redacted]>
**Cc:** 'Sarah Rice' <[redacted]>; '[redacted]'; [redacted]; Freidah, Andrew F. (CIV) [redacted]; Sirkovich, Eitan R (CIV) [redacted] >
**Subject:** RE: CA25-39IJM State of NY, et al. v. Trump, et al. : TRO Compliance

Kate,

Following up on the Department of Energy grants, with reference to the spreadsheet you provided in your e-mail of Tuesday

(February 11) at 4:55pm, my understanding is that Department of Energy currently intends to make those payments. I'm told that the HER/HERE payment to New York (NYSERDA) has already been approved for payment ($25,935.84 most recently), as well as HER/HERE payments to other states.

Regarding FEMA, I now have copies of two communications – both the February 10 e-mail (mentioned in news reports) and a follow-up February 11 e-mail making clear that "[w]e are not holding on awards, we will still be processing our awards but will be adding a level of internal controls to ensure that payment requests are reviewed prior to payments are released to recipients[.]" They are fairly programmatic in nature and I would not want them released publicly without review for potential redactions. But if providing copies would help avoid unnecessary motion practice, I am open to doing that – please let me know.

Thank you,
Daniel



Schwei, Daniel S. (CIV)
Friday, February 14, 2025 2:23 PM
Kate Sabatini <                              >
Sarah Rice <                    >;                                        Freidah, Andrew F. (CIV)
<                           >; Sirkovich, Eitan R (CIV) <                        >
RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

Kate,

Regarding "account suspensions in ASAP," I am not entirely sure as to which agency or grants you're referring. I assume that most of them are EPA grants (based on the spreadsheet you sent over earlier). We have again passed along your concerns to EPA and they are aware of the Court's Orders. Unfortunately, I don't have further information from EPA that I can share with you at this time.

To the extent the account suspensions in ASAP are also the Department of Energy grants listed on your earlier spreadsheet, DOE is looking into those. I may have more information soon about payments on the accounts listed in that spreadsheet, and will pass along any further information when I receive it.

For the CDC award referenced below, my understanding is that the program involved was paused based on a directive from the Acting Secretary on January 21, 2025 to pause issuing documents and public communications, which was done independently of the EOs and the OMB Memo. Because it was based on agency discretion separate from the OMB Memo and the EOs, it falls outside the scope of the TRO.

On FEMA, my understanding continues to be that, outside of a small number of programs such as SSP (as noted below), the press reports are inaccurate as to a general pause on funding. Despite your concerns based on those news reports, you have not identified any funding that has actually been "held" or otherwise paused. If you can identify specific funding that the Plaintiffs have not been able to access from FEMA, we can try to resolve any concerns regarding those specific items.

When I have further information to report, I'll let you know.

Thank you,
Daniel



Kate Sabatini <                        >
Thursday, February 13, 2025 9:21 PM
Schwei, Daniel S. (CIV) <                        >
Sarah Rice <                  >;                                    ; Freidah, Andrew F. (CIV)
<                          >; Sirkovich, Eitan R (CIV) <                        >
[EXTERNAL] RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

the TRO."

Plaintiff States still cannot access the federal funds appropriated in the Inflation Reduction Act and the Infrastructure Improvement and Jobs Act (nor the DERA clean diesel grants we mentioned in my previous email) in what seems to be a sweeping deletion of many of their grant accounts in ASAP. Furthermore, we are hearing that states may have to stop work on programs funded by these awarded grants. Given these facts, please explain why Defendants believe they are in compliance with the TRO. If there are any communications from EPA or other defendant agencies related to the account deletions in ASAP, please provide them.

Further, the detail you have provided regarding FEMA does not reassure the Plaintiff States that there is compliance with the TRO. Public reporting referenced a communication that ordered a general pause in funding. Your answer that FEMA is developing a review process does not answer whether FEMA is in compliance with the Order — it only raises more questions. Moreover, we note that the Order prohibits any such review from delaying or impeding funding. Can you provide the publicly reported communication please? If there were subsequent communications withdrawing that communication or otherwise modifying it, please provide those as well.

Finally, I wanted to share CA's CDC grant number: CDC-RFA-CE-24-0027

Thank you,
Kate

Kathryn M. Sabatini (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI – 02903
Office: ████
████ | www.riag.ri.gov |



The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

---

**From:** Schwei, Daniel S. (CIV) <████████>
**Sent:** Wednesday, February 12, 2025 7:47 PM
**To:** Kate Sabatini <████████>
**Cc:** Sarah Rice <████>; ████████; Freidah, Andrew F. (CIV) ████; Sirkovich, Eitan R (CIV) <████████>
**Subject:** RE: CA25-39IJM State of NY, et al. v. Trump, et al. : TRO Compliance

[External email: Use caution with links and attachments]
Kate,

Regarding California's OJJDP Title II grant, I'm told that there is a hold in place on that grant and that the hold has been in effect since December 6, 2024, which is the same date that the award itself was made.

My understanding is that, when reviewing California's application for Title II funding, OJJDP determined that the application lacked required information (or provided information that needed clarification in order for OJJDP to determine sufficiency). OJJDP nonetheless elected to make the award, but informed the State that drawdowns would be held under the award until such time as the State provided the missing information. The hold is still in effect because the State has not yet provided the required information to OJJDP. I'm told that OJJDP has been working with California to obtain the required information, and California is well aware of what the condition is and why the hold is in place.

In light of the above, I don't see how this hold relates to the issues in this case or any aspect of TRO compliance.

--Daniel

---

**From:** Schwei, Daniel S. (CIV)
**Sent:** Wednesday, February 12, 2025 6:05 PM
**To:** Kate Sabatini <████████>
**Cc:** Sarah Rice <████>; ████; Freidah, Andrew F. (CIV) ████; ████ ; Sirkovich, Eitan R (CIV) <████████>
**Subject:** RE: CA25-39IJM State of NY, et al. v. Trump, et al. : TRO Compliance

Kate,

I have passed along your concerns (both in this email and from last night) to EPA and am trying to get more information that I can provide to you all.

On FEMA, my understanding is that, with the exception of a small number of programs (such as the Shelter and Services Program, addressed in the Hamilton declaration filed last night), FEMA has not implemented a categorical pause or freeze on reimbursements for FEMA grants, but rather is developing a review process for payment requests, as part of FEMA's own statutory and regulatory authorities.

My contact at DOJ-OJJDP said he was unaware of California's Title II award being paused but is looking into it.

On the California CDC grant, do you have the grant number available? I have passed along your message but the grant number would likely help expedite efforts to identify what's happening there.

I hope you all can appreciate that we are doing our best to look into these issues while also complete our filing due tonight. I'll let you know when I have more information I can share.

Thanks,
Daniel



**From:** Kate Sabatini <　　　　　　>
**Sent:** Wednesday, February 12, 2025 4:49 PM
**To:** Schwei, Daniel S. (CIV) <　　　　　　>
**Cc:** Sarah Rice <　　　　　>; Freidah, Andrew F. (CIV) <　　　　　>; Sirkovich, Eitan R (CIV) <　　　　　　>
**Subject:** [EXTERNAL] RE: CA2S-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

Daniel:

We are continuing to hear from state agencies and nonprofits located in our states that their grants related to IRA/IIJA are unavailable in ASAP.

Additionally, Massachusetts is reporting that state Clean Diesel grants (Diesel Emissions Reduction Act Electric Solicitation Grants) have been suspended in ASAP. These grants fund important projects that accelerate the retirement of less efficient, more polluting diesel vehicles, engines, and equipment.

California is also reporting that its USDOJ Office of Juvenile Justice Delinquency Prevention Title II grant has been paused, and that there is no word on as to when the already awarded funds will be provided. This grant provides critical support for aftercare/reentry to avoid future recidivism, alternatives to juvenile detention and placement, and community-based programs (diversion, job training, mentoring, counseling, and training programs) that prevent crime and keep our communities safe.

In addition, California's award of funding from CDC for Rape Prevention and Education as part of the national sexual violence prevention program has been delayed; funding should have been received by or about January 31, 2025. The CDC portal for grants is not accessible.

Please share any information you have on these matters, or those raised last night in my email with respect to FEMA, as soon as possible.

Best,
Kate

Kathryn M. Sabatini (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI – 02903
Office:　　　　　| www.riag.ri.gov |



The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**From:** Schwei, Daniel S. (CIV) <　　　　　　>
**Sent:** Tuesday, February 11, 2025 8:16 PM
**To:** Kate Sabatini <　　　　　>



**Cc:** Sarah Rice █████████████ ▪ ██████████ ; Freidah, Andrew F. (CIV)
< █████████ >; Sirkovich, Eitan R (CIV) ◄ ██████████ >
**Subject:** RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

[External email: Use caution with links and attachments]
Kate,

As you saw, we filed a motion regarding FEMA funding for one program, which I believe is the subject of some of the reporting in that NBCNews article. As noted in our motion, the funding for that program was paused as an exercise of the agency's own authorities. In terms of the broader alleged pause reported in that article, I was not aware of it prior to reading the article. I've contacted my colleagues at DHS and FEMA, and my preliminary understanding is that there is not actually a blanket pause or freeze on funding for FEMA grants, but rather a new review process before releasing funds for reimbursement. I'm trying to get more details but I wanted to pass along what I have now.

As for EPA, I have also reached out to them and will let you know what I'm able to find out.

Thank you,
Daniel



**From:** Kate Sabatini ◄ ██████████ >
**Sent:** Tuesday, February 11, 2025 4:55 PM
**To:** Schwei, Daniel S. (CIV) < ██████████ >
**Cc:** Sarah Rice ◄ ██████████ ▪ ██████████ Freidah, Andrew F. (CIV)
◄ ██████████ >; Sirkovich, Eitan R (CIV) ◄ ██████████ >
**Subject:** [EXTERNAL] RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

Daniel:

Thank you for letting me know.

We had been planning to bring to your attention immediately some reports that we are receiving in the news and from various Plaintiff states about continued non-compliance with the Court's TRO, including reports in the news that Stacey Street, Director of the Office of Grant Administration for FEMA has directed her team to put financial holds on all awards for fiscal years 2021, 2022, 2023, and 2024. https://www.nbcnews.com/politics/donald-trump/fema-official-ignores-judge-order-freeze-grant-funding-rcna191674

We are also aware that EPA's Office of Budget and Planning announced to EPA staff that twenty-eight IIJA and IRA programs—including CPRG and air monitoring grants—"are temporarily paused for new obligations or disbursements for assistance agreements, loans, rebates, interagency agreements, procurements, and no-cost actions." Email from Budget & Planning re: Additional Information on IIJA and IRA – program review pause (Feb. 7, 2025). https://hillheat.com/2025/02/10/trump-epa-again-freezes-all-biden-era-programs. Consistent with this, at least ten plaintiff states have reported experiencing interruptions accessing IRA and IIJA funds. A chart identifying these issues is attached.

Please note that as we are sending you this communication, we are being advised of additional disruptions from additional states.

Please advise on the Defendants' compliance with respect to these disruptions as soon as possible.

Thank you,
Kate

Kathryn M. Sabatini (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI - 02903
Office: ██████████
██████████ | www.riag.ri.gov |



The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.



**From:** Schwei, Daniel S. (CIV) <■■■■■■■■■■■>
**Sent:** Tuesday, February 11, 2025 4:35 PM
**To:** Kate Sabatini <■■■■■■■■■■>
**Cc:** Sarah Rice <■■■■■■■■■■>; ■■■■■■■■■■■; Freidah, Andrew F. (CIV)
<■■■■■■■■■>; Sirkovich, Eitan R (CIV) <■■■■■■■■■■>
**Subject:** RE: CA25-39JJM State of NY, et al. v. Trump, et al. : Corrected Declaration

[External email: Use caution with links and attachments]
Kate,

Thanks for explaining that filing. As a heads up, I wanted to let you know that Defendants will be filing an emergency motion as soon as possible, pertaining to certain FEMA funding and requesting the Court's confirmation that Defendants may continue to withhold that funding.

Thank you,
Daniel

**From:** Kate Sabatini <■■■■■■■■■■>
**Sent:** Tuesday, February 11, 2025 12:15 PM
**To:** Schwei, Daniel S. (CIV) <■■■■■■■■■■>
**Cc:** Sarah Rice <■■■■■■■■■■>; ■■■■■■■■■■■; Freidah, Andrew F. (CIV)
<■■■■■■■■■>; Sirkovich, Eitan R (CIV) ■■■■■■■■■■■>
**Subject:** [EXTERNAL] CA25-39JJM State of NY, et al. v. Trump, et al. : Corrected Declaration

Daniel:

Wanted to let you know that we just filed a corrected declaration. Due to a technological issue when redacting, certain characters had been removed from the original declaration.

Thank you,
Kate

Kathryn M. Sabatini (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI - 02903
Office ■■■■■■■■ | www.riag.ri.gov |

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.

**IMPORTANT NOTICE:** This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to send it to you, do not disseminate, copy or otherwise use this e-mail or its attachments. Please notify the sender immediately by reply e-mail and delete the e-mail from your system.

# Exhibit D-1

| | |
|---|---|
| **From:** | ███████ |
| **Sent:** | Monday, February 10, 2025 4:31 PM |
| **To:** | ███████ |
| **Cc:** | ███████ |
| **Subject:** | URGENT: Holds on awards |

**Importance:**    High

Good afternoon, all.

AAD is handling for FEMA GO for FY24 awards – ████ is putting hold toggles on **all** programs listed in the Daily Dash.

For all awards FY23 and prior: put financial holds on _all_ of your awards – all open awards, all years (2021, 2022, 2023, 2024).

- ███████ you can toggle in **FEMA GO** and do so for all of your fire-related programs
- ███████ your team will need to go in **ND Grants** and put individual holds on all HSGP and NSGP awards
- ███████ your team will need to go in **ND Grants** and put individual holds on all EMPG, RCPGP, EOCGP, THSGP awards
- ███████, your team will need to go in **ND Grants** and put individual holds on all SLCGP and TCGP awards

Please confirm once completed.

███████

███████
Director, Office of Grants Administration
Grant Programs Directorate| Resilience
Office: ███████ | Mobile: ███████
███████

Federal Emergency Management Agency
fema.gov



# Exhibit D-2



**From:**
**Sent:** Tuesday, February 11, 2025 2:10 PM
**To:**
**Cc:**

**Subject:** Follow-up

**Importance:** High

Hi everyone, follow up to yesterday's verbal late afternoon discuss and to the subsequent Teams meeting we had just a short while ago. Here is our action plan going forward:

Awards will be amended so that the following grant programs will result in reimbursement requests being manually reviewed and, when approved by staff, manually reimbursed to recipients:

*Already Standard Manual Approach Employed (no changes needed)*
- Assistance to Firefighters Grant (AFG) Program
- Fire Prevention & Safety (FP&S) Grant Program
- Staffing for Adequate Fire and Emergency Response (SAFER)
- Shelter and Services Program (SSP)
- State and Local Cybersecurity Grant Program (SLCGP) (FY24)

*Existing awards (FY2024/2023/2022/2021/2020) will be modified so that reimbursement requests will be manually reviewed and manually processed upon approval by program/financial staff. Upon approval of reimbursement requests, GPD will have 30 days to process payment, per 2 CFR Part 200.*
- PSGP
- TSGP
- IBSGP
- THSGP
- RCPGP
- EOCGP
- HSGP
- NSGP
- EMPG
- SLCGP
- TCGP

I am setting up a training meeting today with our system colleagues so that they can walk us through steps. PMO will also be able to add rights to staff to help in amending existing awards.

I will set up a timeline action plan with timelines, roles, and responsibilities for all staff to complete the amendments. I will also coordinate with program colleague counterparts across Resilience and ORR to help ensure that they are aware and can also replicate across their grant program portfolios and will be asking our AAD-Mitigation team members to assist their program colleague counterparts in amending awards.

I am working with ▮▮▮▮ to craft an Information Bulletin that will explain this approach to our grant program recipient stakeholders.

Last but not least, ▮▮▮▮ and I will work to modify the CY25 performance plans to account for this scope of responsibility and ensure that, upon manual review *approvals*, payments will be made within the allotted 30-day maximum timeline noted by 2 CFR Part 200. We will also provide guidance very shortly on program office versus financial office roles and responsibilities with manual reviews and manual reimbursements. I expect that we will model the fire grants approach whereby program offices have primary lead on reimbursement reviews, approval determinations, and manual reimbursement release processings.

**Note that these are not "holds."** We are modifying our programs so that payment requests are now reviewed manually and processed manually. "Holds" implies what we were directed to originally due with OMB M-25-13, which was rescinded and a TRO injunction placed. We are not holding on awards, we will still be processing our awards but will be adding a level of internal controls to ensure that payment requests are reviewed prior to payments be released to recipients (in order to ensure that payments align to the award project, NOFO scope of allowability, 2 CFR Part 200 principles, etc.) For FY 2025, the intent is to have this approach as standard in the NOFOs.

Happy to discuss, thank you.

▮▮▮▮▮▮

▮▮▮▮▮▮▮
Director, Office of Grants Administration
Grant Programs Directorate| Resilience
Office: ▮▮▮▮▮▮▮▮ |

Federal Emergency Management Agency
fema.gov



# Exhibit E

| From: | Schwei, Daniel S. (CIV) |
|---|---|
| To: | Kate Sabatini; Theodore McCombs; Sirkovich, Eitan R (CIV) |
| Cc: | Sarah Rice; ██████████████████; Freidah, Andrew F. (CIV); Hall, Emily (CIV) |
| Subject: | RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance |
| Date: | Wednesday, February 26, 2025 8:48:42 AM |
| Attachments: | image001.png |

This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Kate,

I'm writing to follow-up on the FEMA issue in your message below. We disagree that a "review" process is the same as a "freeze" on funding. Under a review process, the agency fully intends to issue payments but is simply ensuring that all payments are appropriate, and doing so under the terms of the grant program itself – which is fundamentally different than the type of "freeze" that Plaintiffs challenged in this case and that is governed by the TRO. Thus, we do not think that FEMA's review process, implemented as part of the agency's own statutory and regulatory authorities, violates the TRO.

Regarding the February 10 e-mail, as I have already explained (and as the February 11 e-mail makes clear), FEMA did not intend to implement a "hold" in the sense of a pause or withholding of grant funds—*i.e.*, the type of action at issue in this case. Instead, the "hold" referred to in that e-mail was part of implementing the manual review process pursuant to FEMA's own authorities.

That is the same answer for the screenshot you have provided, which simply reflects that the remaining balance is on "hold," but does not reflect that FEMA is unwilling to pay that balance amount. FEMA has confirmed to me that, for the particular grant referenced in the screenshot (the Arizona Office of Homeland Security, number EMW-2022-UA-00008), FEMA will process payment requests and approve them for payment as appropriate. My understanding is that, within PARS itself, FEMA has included a description for the "hold" on funds, stating that the hold is for purposes of "Additional Manual Review" – not an unwillingness to make payments.

I'll circle back later today once I have more substantive information from DOE (probably even sooner than this evening).

Thank you,
Daniel



Schwei, Daniel S. (CIV)
Tuesday, February 25, 2025 8:52 PM
Kate Sabatini <██████████████████>; Theodore McCombs <██████████████████████>; Sirkovich, Eitan R (CIV)
<██████████████████>; Sarah Rice <██████████>; ████████████████████████; Freidah, Andrew F. (CIV)
<██████████████████>; Hall, Emily (CIV) <████████████████>
RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

Kate,

I'm conferring with my clients on your e-mail, and will circle back tomorrow morning regarding FEMA.

Regarding DOE, as noted in my prior email, DOE has been continually working to expedite its payments. Along those lines, my understanding is that DOE has recently implemented changes that should make its payment approval process faster, and that they think should eliminate your concerns going forward, with all programs directed to pay invoices. Given your list of sixteen accounts that are purportedly not available, obviously that is a concern as to whether the system is working. DOE would like to investigate those accounts but they are not able to do so before noon tomorrow (given that we did not receive your inquiry until after 4pm today, and given the inclusion of sixteen accounts on the list). DOE expects it should be able to provide a more substantive response by tomorrow evening, and hopefully avoid the need for motion practice on these issues.

Thank you,
Daniel



Kate Sabatini <████████████████>
Tuesday, February 25, 2025 4:12 PM
Schwei, Daniel S. (CIV) <██████████████████>; Theodore McCombs <██████████████████████>; Sirkovich, Eitan R (CIV)
<██████████████████>; Sarah Rice <██████████████>; ██████████████████████ Freidah, Andrew F. (CIV)
<██████████████████>; Hall, Emily (CIV) <████████████████>
[EXTERNAL] RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

identified a sixth frozen DOE grant, the Weatherization Assistance Program funded under the IIJA, and other Plaintiff States have identified further frozen DOE grants (see attachment).

In our view, DOE appears to have instituted an across-the-board funding freeze spanning multiple programs under the guise of a "review." Although we have attached a document that identifies affected grants in Plaintiff States, we disagree that we are under any obligation to identify specific grants to DOE in order to permit it to unfreeze the relevant funds. Rather, the TRO imposes an affirmative obligation on DOE to unfreeze those funds itself. We notice that many of the same programs are getting the same error messages in different States, so we assume the problems are more widespread among Plaintiff States than just those for which we are providing grant numbers for now. Indeed, at least one of our agencies has received a mass email from DOE attempting to suspend grants in which the email author wrote, "I am unable to provide your specific award number(s) as this email is going to all active awards for our office." If DOE isn't taking the time to identify which grants it is threatening by grant number, we are unsure why they are requiring it now.

It does not matter that DOE calls the freeze a "review." Many of our agencies' DOE grants have been frozen or missing in ASAP for three weeks or more, with some frozen or missing since the issuance of OMB M-25-13. A delay of this sort is unprecedented in our agencies' experience working with federal partners, and plainly reflects an express decision to freeze funding streams while reviewing federal programs for consistency with executive priorities. The freeze appears to be categorical in nature, and it applies only to "disfavored" programs, such as those funded by the IRA and IIJA. Under these facts, DOE's "review" process is simply a freeze by another name, and so it violates the TRO.

The same appears to be true at FEMA. As the emails you sent reflect, on February 10 (shortly after the issuance of the TRO), a FEMA official imposed "financial holds on *all* . . . awards – all open awards, all years (2021, 2022, 2024, 2024)." The February 11 email attempts to relabel this across-the-board freeze as a manual "review" process but, again, that is a distinction without a difference: many of our agencies have been waiting over two weeks to obtain funding under these grants, and FEMA's payment portal (see attached screenshot) states that these funds are still subject to "holds." Under these circumstances, too, FEMA's "review" process appears to be simply a freeze by another name, and it, too, violates the TRO.

We continue to hope to avoid motion practice on these matters. We therefore ask that DOE and FEMA cease freezing funds and resume funding to Plaintiff States under all grant programs that are currently subject to manual "review" processes. Please let us know by noon tomorrow whether your clients will do so.

Thank you,
Kate

Kathryn M. Sabatini (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI - 02903
Office:
████████████ | www.riag.ri.gov |



The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.



**From:** Schwei, Daniel S. (CIV) <████████████>
**Sent:** Monday, February 24, 2025 3:57 PM
**To:** Theodore McCombs <████████████>; Kate Sabatini <████████████>; Sirkovich, Eitan R (CIV)

**Cc:** Sarah Rice <████████████>; Hall, Emily (CIV) <████████████>; Freidah, Andrew F. (CIV)

**Subject:** RE: CA25-39JJM State of NY, et al. v. Trump, et al.: TRO Compliance

[External email: Use caution with links and attachments]

Kate, Ted,

Regarding your message below, we've conferred with our clients and do not believe there is any need or basis for motion practice.

In terms of the DOE grants, the only list of grant numbers we received was Ted's e-mail below – *i.e.*, listing five specific grants involving California agencies and entities. DOE has investigated those grants, and confirmed that all of them are available for Plaintiffs to receive funding from DOE. DOE therefore disagrees that those grants are or were "frozen." As you note, DOE is using a process for reviewing and approving payment requests, but that is not the same as a "freeze" on the relevant grants; to the contrary, DOE is continually working to expedite payments further.

Going forward, to the extent Plaintiffs identify other DOE funding that Plaintiffs believe is not properly available, DOE is willing to investigate – but their ability to do so requires knowing sufficient information about the relevant contract (*e.g.*, the DOE Contract Number, the state involved, the name of the grant, etc.). And it would be most useful if Plaintiffs submit any queries on a rolling basis as they arise, rather than asking DOE to investigate numerous different funding streams all at once. As the parties have already demonstrated, we think that working cooperatively in this manner is the best path for resolving any issues, rather than unnecessary (and potentially premature) motion practice.

As for the FEMA issue, FEMA has likewise informed us that none of the grant programs you list has been "suspended." Again, FEMA has expanded its manual review process to additional grant programs, including some of the ones you list below. (My understanding is that, even before this Administration, the State and Local Cybersecurity Grant Program was subject to this manual review process, as noted in the February 11th FEMA e-mail I previously attached.) Just as with DOE, however, we do not understand this review process, implemented based on the agency's own statutory and regulatory authorities, to violate the TRO. If there is specific FEMA funding that you believe has been improperly "suspended," please let us know and we can provide a more specific response.

Thank you,
Daniel



[EXTERNAL] RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

| DOE | CEC - California Energy Commission | Home Electrification and Appliance Rebates (HEEHRA) Program | DE-SE0000080 |
| DOE | CEC - California Energy Commission | State Energy Program (SEP) | DEEE0010060 |
| DOE | CEC - California Energy Commission | Energy Efficiency and Conservation Block Grant (EECBG) Program | DESE0000299 |
| DOE | SDSU - San Diego State University | Industrial Assessment Centers, SDSU (ITACs) | DE-EE0010197 (CFDA: 81.117) |
| DOE | SJSU - San Jose State University | Energy Efficiency and Renewable Energy Information Dissemination, Outreach, Training, and Technical Analysis/Assistance Grant | DE-EE001094 (CFDA: 81.117) |



RE: CA25-39JJM State of NY, et al. v. Trump, et al. : TRO Compliance

This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Eitan and Daniel:

Thank you for your emails.

With respect to the DOE grants, as a gesture of good faith, we will provide you with a list of the grant numbers that we are aware have been frozen in violation of the Court's TRO. At the same time, the TRO requires _all_ relevant grants to be unfrozen, not merely the grants whose grant numbers we provide to DOE. To the extent these freezes are attributable to a newly instituted process of review and approval by political appointees, that policy violates the TRO. We will send grant numbers as we have them in batches. We expect any grants we specifically identify today to be unfrozen no later than Monday at noon. If DOE does not unfreeze these specific grants, or if we identify further DOE grants that remain frozen as of 5 PM on Monday, we will proceed to seek relief from the Court.

We are continuing to hear about additional freezes from other agencies, which we will compile and share when we are able.

We also wanted to return to the FEMA issue. Several Plaintiff States are experiencing suspensions and delays of FEMA funds, in particular funds associated with the State and Local Cybersecurity Grant Program, Homeland Security Grant Program, Nonprofit Security Grant Program, and Emergency Management Performance Grant Program. The February 11 email that you provided to us appears to have instructed staff to institute what amounts to a hold, by instructing staff to institute a new requirement to manually review and process payment requests. The freezes that result from this new process are likewise an impediment to access obligated funds in violation of the TRO. These are essential health, safety and welfare funds that are not timely flowing to the states. We ask that you correct this violation immediately, but no later than 5pm on Monday.

Best,
Kate

Kathryn M. Sabatini (she/her)
Special Assistant Attorney General
Chief | Civil Division
Office of the Attorney General
150 South Main Street | Providence, RI - 02903
Office: ███████
█████████ | www.riag.ri.gov |

The information contained in this message and any attachments is intended only for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL, and exempt from disclosure under applicable law. If you have received this message in error, you are prohibited from copying, distributing, or using the information. Please contact the sender immediately by return e-mail and delete the original message from your system.



# Exhibit F

| From: | support.pagrants@fema.dhs.gov |
| To: | ███████ |
| Subject: | [External] FEMA PA Notification - Message to Grant Recipients on Review Process Updates |
| Date: | Friday, February 28, 2025 10:17:00 AM |

Dear Recipient,

The Federal Emergency Management Agency (FEMA) is taking swift action to ensure the alignment of its grant programs with Secretary Noem's direction. In accordance with this direction, FEMA and the Department of Homeland Security (DHS) are instituting additional reviews on the allowability of costs for all grant payments and obligations, as permitted by 2 C.F.R Part 200, where applicable.

Effective immediately, FEMA and DHS are implementing an additional review process of allocations before releasing funds for all grants. These actions will ensure that funding is obligated and disbursed in line with the Secretary's direction.

Upon completion of reviews, approved funding will be processed through the respective grant systems. Per 2 C.F.R. Part 200, payment requests may take up to 30 days to process depending on the size and scope of the submission. If additional information is needed, a request for information will be issued, and the timeline may be extended.

For existing payment requests currently in the system, FEMA will reach out if additional information is needed.

Thank you,
FEMA Recovery Directorate

---

If you require additional assistance with the FEMA Grants Portal, please contact the Grants Portal Hotline at (866) 337-8448 or FEMA-Recovery-PA-Grants@fema.dhs.gov

*Please do not respond to this e-mail. This mailbox is not monitored, and you will not receive a response.*

SA233

**CERTIFICATE OF SERVICE**

I hereby certify that on July 18, 2025, I electronically filed the foregoing supplemental appendix with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER