**Nos. 25-1236, 25-1413**

---

IN THE
## UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

---

STATE OF NEW YORK, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

---

**BRIEF OF SAMUEL R. BAGENSTOS AS *AMICUS CURIAE*
IN SUPPORT OFAPPELLEES**

---

Samuel R. Bagenstos
625 S. State St.
Ann Arbor, MI 48109
(857)231-1663
sbagen@gmail.com
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF THE *AMICUS CURIAE* ................................................... 1

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT ........................................................................................... 3

    THE DISTRICT COURT PROPERLY CONCLUDED THAT
    DEFENDANTS UNLAWFULLY IMPOUNDED FUNDS
    APPROPRIATED BY CONGRESS ................................................... 3

    A. The Constitution Gives Congress the Power to Determine
       How Much the Government Will Spend, for How Long,
       and for What Purposes ................................................... 5

    B. In its Fiscal Framework Statutes, Congress Underscored
       That the President Must Spend the Money It
       Appropriates for the Purposes to Which Congress Has
       Appropriated It ............................................................. 10

    C. The President May Not Delay Spending Appropriated
       Funds Based on a Disagreement with Congress's Policy
       Decisions or Based on an Effort to Determine Whether
       He Agrees with Congress's Policy Decisions ................ 17

    D. The District Court Properly Applied These Principles .... 22

CONCLUSION ...................................................................................... 26

CERTIFICATE OF COMPLIANCE ....................................................... 27

CERTIFICATE OF SERVICE ................................................................ 28

# TABLE OF AUTHORITIES

*Cases*

*Clinton v. City of New York*, 524 U.S. 417 (1998) .............................8, 9

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024)...........................................................5, 6, 7, 8, 9

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ............................10

*INS v. Chadha*, 462 U.S. 919 (1983) ...................................................15

*Lincoln v. Vigil*, 508 U.S. 182 (1993)..............................................9, 17

*New York v. Trump*, 133 F.4th 51 (1st Cir. 2025)...............................24

*State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973) .......................................................................................14

*Constitutional Provisions*

U.S. Const., Art. I ...................................................................................2

U.S. Const., Art. I § 8...........................................................................5, 7

U.S. Const., Art. I § 9..............................................................................5

U.S. Const., Art. II ..................................................................................2

U.S. Const., Art. II § 3 ........................................................................4, 8

*Statutes*

Impoundment Control Act............................................................*passim*

Pub. L. 93-344 § 1013, 88 Stat. 297, 334 (July 12, 1974) ............15

Pub. L. 100-119 § 206, 101 Stat. 754, 785 (Sept. 29, 1987) .........15

2 U.S.C. § 682 ...................................................................13, 15

2 U.S.C. § 683 ...........................................................................15

2 U.S.C. § 684 .................................................................13, 14, 15

2 U.S.C. § 685 ...........................................................................15

2 U.S.C. § 688 ...................................................................15

Antideficiency Act........................................2, 10, 11, 12, 14

    31 U.S.C. § 1341 ........................................................10,

    31 U.S.C. § 1512 ..............................................11, 12, 14

    31 U.S.C. § 1513 ........................................................11

    31 U.S.C. § 1517 ........................................................12

    31 U.S.C. § 1518 ........................................................12

    31 U.S.C. § 1519 ........................................................12

*Executive Orders*

    Exec. Order No. 6166 (June 10, 1933) .............................11

*Rules*

    Fed. R. App. P. 29 .......................................................1

*Administrative Decisions*

    *Dep't of Homeland Sec.—Border Barrier Constr. & Obligations*, B-335747 (GAO, Apr. 22, 2024) ....................................18, 19

    *Honorable Herb Kohl; Thad Cochran; Henry Bonilla*, B-291241 (Oct. 8, 2002) ...................................................................18

    *Off. of Mgmt. & Budget—Application of the Impoundment Control Act to 2019 Apportionment Letters & A Cong. Notification for State Dep't Foreign Mil. Fin.*, B-331564.1 (GAO, Feb. 10, 2022) .....18, 19, 20, 21

    *Off. of Mgmt. & Budget-Withholding of Ukraine Sec. Assistance*, B-331564 (GAO, Jan. 16, 2020) ....................................20, 21

*Other Authorities*

The Federalist, No. 58...............................................................7

GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW (3d ed. 2004) ................................................................7, 9

H.R. 4, 119th Cong., 1st Sess. (presented to the President on July 18, 2025) ................................................................................................15

Letter from Donald J. Trump, President, to the Congress of the United States (May 28, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf ............................................................................................15

Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 GEO. WASH. L. REV. 359 (2024) ........................................................13

## INTEREST OF THE *AMICUS CURIAE*

Samuel R. Bagenstos is the Frank G. Millard Professor of Law at the University of Michigan Law School and the Arlene Susan Kohn Professor of Social Policy at the University of Michigan Gerald R. Ford School of Public Policy.[1]    *Amicus* is an expert in budget and appropriations law and served from 2021 to 2022 as the General Counsel to the federal Office of Management and Budget.   He also served from 2022 to 2024 as the General Counsel to the United States Department of Health and Human Services.   *Amicus* offers this brief to set forth the basic constitutional and statutory principles of appropriations law on which the district court's injunction rested.[2]

## SUMMARY OF ARGUMENT

The district court properly enjoined Defendants' categorical freeze of congressionally appropriated funds.

---

[1] *Amicus* files this brief in his individual capacity.   Institutional affiliations are provided for identification purposes only.
[2] Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amicus* states:  No party's counsel authored this brief in whole or in part.   No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.   And no person, other than the *Amicus* (who is filing the brief *pro se*) contributed money that was intended to fund preparing or submitting the brief.

The Constitution vests Congress with exclusive authority over federal spending. Article I grants Congress the power to determine how much the government will spend, for how long, and for what purposes. Once Congress enacts an appropriations statute, Article II imposes on the President a constitutional duty to faithfully execute Congress's spending decisions. Although the President may exercise discretion to make policy decisions within the space left him by an appropriations statute, he may not substitute his own policy preferences for the policy adopted by Congress.

Federal fiscal framework statutes underscore these constitutional limitations. The Impoundment Control Act ("ICA") specifically prohibits the Executive Branch from withholding or delaying appropriated funds for policy reasons. And the ICA makes clear that Congress did not permit the President to use the apportionment requirements of the Antideficiency Act ("ADA") to displace Congress's policy judgments with his own—or even to seek to determine whether Congress's policy judgments accorded with his own. Once an appropriations statute becomes law, it binds the President.

These constitutional and statutory principles make clear that the lawfulness of a funding freeze depends on the reasons why the Executive Branch is pausing or withholding spending.  The Executive Branch may not withhold funds simply because of policy disagreements with Congress, nor may it delay spending in an effort to determine whether the President agrees with the policy reflected in an appropriations law.

The preliminary injunction properly applied these principles.  That order did not prohibit Defendants from exercising policy discretion that Congress actually granted them in specific appropriations statutes.  It merely barred Defendants from implementing a categorical freeze on appropriated funds.  The injunction thus enforces the basic constitutional principle that Congress, not the President, decides the purposes of federal expenditures.

## ARGUMENT

### THE DISTRICT COURT PROPERLY CONCLUDED THAT DEFENDANTS UNLAWFULLY IMPOUNDED FUNDS APPROPRIATED BY CONGRESS

The core constitutional issue presented by this case is straightforward.  Congress appropriated funds for grants that would serve a variety of purposes it specified.  The Executive Branch refused to

spend those funds until it determined whether the President agreed with the purposes to which Congress had directed them. Defendants did so first by means of a broad, government-wide memorandum freezing grants. When called on that action, they withdrew the *memorandum* but continued the *freeze*. Either way, Defendants' actions violate Congress's constitutional power of the purse, as reinforced by the provisions of the Impoundment Control Act. The Executive Branch may not refuse to spend appropriated funds based on a disagreement with the purposes to which Congress has directed those funds be spent. Nor may it freeze spending of those funds in order to determine whether the President agrees with Congress's determination of their proper purpose. Congress decides the purposes of federal spending, see U.S. Const. Art. I § 8, and the President has a duty to "take Care that" Congress's decisions are "faithfully executed," *id.* Art. II § 3.

Defendants seek to confuse the issue. Because they withdrew the memorandum that had memorialized the grants freeze, and because various appropriations provide the Executive Branch discretion to make policy judgments regarding how to spend the funds they appropriate, Defendants argue that the district court erred in its grant of relief. But

the district court properly determined that the withdrawal of the *memorandum* did not obviate the challenge to the continuing *freeze*. And it appropriately limited its relief to circumstances in which the Executive Branch was refusing to spend appropriated funds based on a disagreement, or a potential disagreement, with the policy judgments made by Congress. That relief directly enforced the core requirements of the Constitution.

## A. The Constitution Gives Congress the Power to Determine How Much the Government Will Spend, for How Long, and for What Purposes

Begin with constitutional first principles. The Constitution gave Congress the "power of the purse," *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 438 (2024)—the authority to decide what the federal government should spend and for what purposes. This power appears in the first clause of Article I, Section 8 (the "Spending Clause"), which authorizes Congress "to pay the Debts and provide for the common Defence and general Welfare of the United States." It is underscored by the seventh clause of Article I, Section 9 (the "Appropriations Clause"), which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."

These specific provisions aside, the congressional power of the purse was a basic presupposition of the Constitution. See *Consumer Fin. Prot. Bureau*, 601 U.S. at 438 (holding that the Appropriations Clause "presupposes" the congressional power of the purse but is not its source). The Founders adopted the Constitution in the wake of a long and successful struggle by the English Parliament, culminating in the Glorious Revolution of 1688, to wrest control of the public fisc from the Crown. See *id.* at 428-429. As Justice Thomas explained in his opinion for the Court in *Consumer Financial Protection Bureau*, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement. It was uncontroversial that the powers to raise and disburse public money would reside in the Legislative Branch." *Id.* at 431. The Founders recognized that vesting the power in the legislature would prove crucial to maintaining democratic government. As James Madison said, "[t]his power over the purse may, in fact, be regarded as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance,

and for carrying into effect every just and salutary measure." The Federalist, No. 58 (Madison).

The power of the purse has at least three components. Congress gets to decide *how much* money the government shall spend. See *Consumer Fin. Prot. Bureau*, 601 U.S. at 431 (noting that historically "[s]ome appropriations required expenditure of a particular amount, while others allowed the recipient of the appropriated money to spend up to a cap"). Congress gets to decide *when* the government shall spend the money. See *id.* at 431-432 (noting that historically "[s]ome appropriations were time limited, others were not"); *id.* at 436-437 (explaining that Congress is free to decide the period in which an appropriation is available, except for appropriations for the Army, which are limited to two years by Article I, Section 8, clause 12). And Congress gets to decide *for what purposes* the government shall spend it. See *id.* at 424 (holding that, to constitute a lawful appropriation, an appropriations statute must "authorize[] expenditures from a specified source of public money for designated purposes"). See generally GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 3-9 (4th ed. 2017) (stating that "purpose, time, and amount" are the three components to the "legal

availability" of federal funds and that "[a]ll three must be observed for the obligation or expenditure to be legal").

When Congress adopts a law that sets forth the purpose, time, and amount for an appropriation, those decisions are binding on the Executive Branch.  Indeed, the President has the constitutional duty to "take Care that" Congress's directives are "faithfully executed," id. Art. II § 3.  That follows from the basic constitutional fact that spending statutes, like any other statutes, are "laws" that the President lacks the power to change unilaterally.  See *Clinton v. City of New York*, 524 U.S. 417, 438–39 (1998).  When both houses of Congress pass a bill and present it to the President, he may choose to veto it.  But once the President signs a bill into law (or it is enacted over his veto), all of the provisions of that law become binding on the Executive Branch.  See *id.*

That does not mean that the President lacks all discretion in executing a spending law.  Often, Congress will define the purpose of an appropriation at a high level of generality, thus giving the Executive Branch substantial freedom of choice in determining how to carry it out.  See *Consumer Fin. Prot. Bureau*, 601 U.S. at 432 (noting that historically "the specificity with which appropriations designated the objects of the

expenditures varied greatly"); *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that Congress may pass "a lump-sum appropriation" that "give[s] an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way"); GAO, *supra*, at 3-20 ("Every appropriation has one or more purposes in the sense that Congress does not provide money for an agency to do with as it pleases, although purposes are stated with varying degrees of specificity."). Congress also will sometimes give the Executive Branch discretion over the amount to be spent, see *Consumer Fin. Prot. Bureau*, 601 U.S. at 432, 436 (noting that Congress sometimes appropriates "'sums not exceeding' a specified amount," which "provide[] the Executive discretion over how much to spend up to a cap"); *id.* at 442-443 (Kagan, J., concurring) (same); *Clinton*, 524 U.S. at 446 (same), or over the time in which it shall be spent, see *Consumer Fin. Prot. Bureau*, 601 U.S. at 443-444 (providing examples). The President is free to exercise this discretion within the boundaries set by Congress.

But he is not free to override the congressional determinations contained in a duly enacted statute. Where a statute does not grant discretion over the amount to be spent, he may not spend less than

Congress has appropriated. And he may not refuse to spend appropriated funds because he disagrees with the purposes to which Congress has directed them. To do so would be a basic violation of the Take Care Clause. See *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (explaining that, under "settled, bedrock principles of constitutional law," the "President may not decline to follow a statutory mandate or prohibition simply because of policy objections").

### B. In its Fiscal Framework Statutes, Congress Underscored That the President Must Spend the Money It Appropriates for the Purposes to Which Congress Has Appropriated It

Congress has adopted a number of statutes that provide a general framework for the exercise of its power of the purse. These statutes impose certain duties and prohibitions on the Executive Branch. They also establish key background principles for interpreting its appropriations laws. These statutes underscore the point that Congress—and not the President—gets to decide how much to spend, when, and for what purposes.

Two of these statutes are especially relevant here. The first is the Antideficiency Act ("ADA"). The ADA, enacted in 1870, prohibits federal officials from spending money in excess of an appropriation. See 31

U.S.C. § 1341(a)(1). Even after Congress first enacted that statute, Executive Branch officials too often spent down their appropriations early in the year and then came back to Congress seeking more. To prevent that from happening, Congress added a new requirement to the ADA in 1905—the requirement of "apportionment." Rather than spending all of an appropriation at once, the Executive Branch must dole it out prudently ("apportion" it) to ensure that it lasts as long as Congress intended it to. In its current form, the apportionment statute generally requires that "an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period," and "[a]n appropriation for an indefinite period and authority to make obligations by contract before appropriations shall be apportioned to achieve the most effective and economical use." 31 U.S.C. § 1512(a).

Congress empowered the President to make apportionments for funds appropriated to Executive Branch agencies, see 31 U.S.C. § 1513(b), though he has delegated that authority to the Director of the Office of Management and Budget, Exec. Order No. 6166, § 16 (June 10,

1933). OMB has discretion to apportion based on time (such as doling out a quarter of the year's appropriation every three months), function (such as doling out the money to lay the foundation for a construction project, then doling out the money for the frame, and so forth), or some combination of bases like these. See 31 U.S.C. § 1512(b).

An agency may not spend money until OMB apportions it, and it may not spend money beyond the apportioned amount. See 31 U.S.C. § 1517(a). See also 31 U.S.C. §§ 1518 (officials who violate that prohibition are subject to discipline up to and including termination), 1519 (officials who knowingly and willfuly violate that prohibition are subject to criminal penalties).

The ADA thus gives the President (through OMB's implementation of the apportionment requirement) significant discretion in determining how he will carry out Congress's appropriations laws. But the second key statute makes clear that the President's discretion is subject to significant limitations. That statute is the Impoundment Control Act ("ICA"), enacted in 1974.

Congress enacted the ICA in response to President Nixon's refusals, on multiple occasions, to spend the full amount of funds it had

appropriated.  A leading commentator describes the background of the statute:

> The Nixon Administration took the occasionally used presidential tool of impoundment—that is, precluding the obligation or expenditure of budget authority appropriated by Congress—to a new level, one generally understood to be so different in degree as to be different in kind.  The core of previous impoundments had been for efficiency or lack of necessity; the core of the Nixon Administration's impoundments were based in policy disagreements.  If the Administration had failed to achieve its policy goals during the appropriations process, it would simply use the budget execution process to do so.

Eloise Pasachoff, *Modernizing the Power of the Purse Statutes*, 92 GEO. WASH. L. REV. 359, 380 (2024) (footnotes omitted).

Congress responded in the ICA by imposing stringent limitations on the Executive Branch's "deferrals of budget authority."  2 U.S.C. § 684.  Congress defined "deferral of budget authority" broadly as "withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities" or "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of budget authority."  2 U.S.C. § 682(1).

The current version of the ICA provides that "[d]eferrals shall be permissible" in "only" three circumstances: (1) "to provide for contingencies"; (2) "to achieve savings made possible by or through

changes in requirements or greater efficiency of operations"; or (3) "as specifically provided by law." 2 U.S.C. § 684(b).  The statute emphasizes that "[n]o officer or employee of the United States may defer any budget authority for any other purpose." *Id.*  The ICA also amended the ADA to make clear that the apportionment process cannot be used to evade this limitation.    The ADA now provides that "[i]n apportioning or reapportioning an appropriation, a reserve may be established only" in the same three circumstances in which deferrals are permitted under the ICA: "to provide for contingencies"; "to achieve savings made possible by or through changes in requirements or greater efficiency of operations"; or "as specifically provided by law." 31 U.S.C. § 1512(c)(1).

These provisions make clear that the Executive Branch may not withhold spending because the President disagrees with the purposes for which Congress appropriated the money, nor may it delay spending in order to determine whether those purposes are consistent with the President's policy views.[3]  Policy disagreement is not one of the exclusive

---

[3] The new provisions reaffirmed the principle, recognized prior to enactment of the ICA, that apportionment under "cannot be used if it would jeopardize the policy of the [appropriations] statute." *State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973).

purposes for which Congress permitted the President to defer spending, see 2 U.S.C. § 684(b), and Congress specifically defined deferral as including "withholding" *or* "delaying" spending, 2 U.S.C. § 682(1).[4]

If the President wishes to withhold or delay appropriated funds for policy reasons, the ICA gives him a process to do so: He must transmit a special message to Congress proposing specific rescissions, with specific reasons and supporting facts as set forth in the statute. See 2 U.S.C. § 683. Once he does that, he may pause spending for up to 45 days to give Congress an opportunity to consider adopting a rescission bill under special fast-track procedures the ICA set up. See 2 U.S.C. §§ 683(b), 685, 688.[5]

---

[4] As originally adopted in 1974, the ICA did permit the President to defer spending for policy reasons. See Pub. L. 93-344 § 1013, 88 Stat. 297, 334 (July 12, 1974). But it subjected the President's deferral decisions to a one-house legislative veto. See *id.* § 1013(b), 88 Stat. at 335. After the Supreme Court invalidated the legislative veto in *INS v. Chadha*, 462 U.S. 919 (1983), Congress amended the ICA to add the current language limiting the purposes for which the President may defer spending. See Pub. L. 100-119 § 206, 101 Stat. 754, 785 (Sept. 29, 1987).

[5] President Trump employed this process to request 22 rescissions, totaling $9.4 billion. See Letter from Donald J. Trump, President, to the Congress of the United States (May 28, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/03/Proposed-Rescissions-of-Budgetary-Resources.pdf. Congress responded by adopting a modified version of his proposal. See H.R. 4, 119th Cong., 1st Sess. (presented to the President on July 18, 2025). That rescission bill

These statutes directly bind the President. They bar him from refusing to spend appropriated funds—temporarily or permanently—based on disagreements or potential disagreements with Congress's choices of the purposes to which those funds will be directed. And when Congress appropriates a specified amount of money for a particular purpose (as opposed to using the "sums not exceeding" formulation), these statutes make clear that Congress has withdrawn from the President any discretion to spend less than the appropriated amount. If the President wishes to spend less than the money Congress appropriated, or disagrees with the purposes for which Congress appropriated it, he must convince the legislature to adopt a new statute reflecting his policy views. Until then, he has a duty to faithfully execute the appropriations Congress has adopted. That is duty imposed directly by the Constitution. And the fiscal framework statutes show that Congress has not relieved the President of that duty.[6]

_____

does not affect the grant freezes for unrescinded spending challenged in this case. But it does demonstrate that the President can seek congressional approval if he wishes not to spend appropriated funds.

[6] Because the President's duty arises from the Constitution itself, and is merely reaffirmed by the fiscal framework statutes, whether those statutes themselves create a cause of action is irrelevant. Cf. Gov't Br. 28-31.

*C. The President May Not Delay Spending Appropriated Funds Based on a Disagreement with Congress's Policy Decisions or Based on an Effort to Determine Whether He Agrees with Congress's Policy Decisions*

These constitutional and statutory principles make clear that the lawfulness of a funding freeze depends on the reasons why the Executive Branch is pausing or withholding spending. The Executive Branch must spend the money Congress appropriates, for the things Congress appropriates it for, and during the time for which it is appropriated. It must make sure the money doesn't run out too soon, and may take reasonable and prudent steps to do so. And within whatever discretion Congress has accorded it in a particular appropriations statute, it may "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192. But "an agency is not free simply to disregard statutory responsibilities," including "restrictions in the operative statutes" that "circumscribe agency discretion to allocate resources." *Id.* at 193. Thus, the Executive Branch may not use its apportionment and administrative authority to substitute the President's policy judgments for those Congress incorporated in an appropriations law. Nor may the Executive Branch use that authority in a way that makes it unable to execute Congress's instructions.

The Government Accountability Office has described these principles as imposing on the Executive Branch a duty of "prudent obligation": "Unless Congress has enacted a law providing otherwise, executive branch officials must take care to ensure that they prudently obligate appropriations during their period of availability." *Dep't of Homeland Sec.—Border Barrier Constr. & Obligations*, B-335747 at 3 (GAO, Apr. 22, 2024) ("2024 DHS Border Barrier Opinion"). In applying this rule, GAO has recognized that sometimes a "delay[]" in releasing funds may be "unavoidabl[e]" when "an agency is taking reasonable and necessary steps to implement a program or activity." *Id.* at 4. That may be due to the complexities of implementation, see *id.* ("the project's complex contracting process and [another agency's] late return of unobligated funds" justified not obligating all funds by the end of the fiscal year), legal uncertainties, see *Honorable Herb Kohl; Thad Cochran; Henry Bonilla*, B-291241 at 10 (Oct. 8, 2002) (uncertainty "concerning the applicability of statutory restrictions" that "generated a 'vigorous and healthy internal legal discussion'" justified delay), and even interagency policy discussions within the zone of discretion Congress has granted the President in a particular appropriation, see *Off. of Mgmt. & Budget—*

*Application of the Impoundment Control Act to 2019 Apportionment Letters & A Cong. Notification for State Dep't Foreign Mil. Fin.*, B-331564.1 at 8 (GAO, Feb. 10, 2022) ("OMB Foreign Military Financing Opinion") ("policy discussions are a reasonable part of program execution where the President has significant discretion in administering the program").

As GAO has emphasized, the rule of prudent obligation "does not forbid executive branch officials from having policy preferences"—but neither does it "permit the executive to withhold amounts because of those preferences." 2024 DHS Border Barrier Opinion at 3. The apportionment process, GAO has said, may not "be used to substitute the President's policy priorities for those of the Congress." Foreign Military Financing Opinion at 5.

Based on these principles, "the reason for a delay, not the delay itself, is the key" question in determining whether the Executive Branch has acted lawfully in freezing funds. *Id.* at 4. The Executive Branch "may not withhold funds simply because he disagrees with the policy underlying a statute." *Id.* at 7 (internal quotation marks omitted). But it may withhold funds briefly in an effort to ensure that Congress's policy

is carried out reasonably, so long as it "consider[s] both programmatic needs and agency capacity to carry out these needs" to ensure that agencies "have sufficient time to prudently obligate amounts before they expire." *Id.* at 8.

GAO illustrated the proper application of this rule in its two decisions concerning the first Trump Administration's delay in spending funds to provide military assistance to Ukraine. The first decision involved a delay in spending funds Congress specifically appropriated "for security assistance to Ukraine." *Off. of Mgmt. & Budget—Withholding of Ukraine Sec. Assistance*, B-331564 at 1 (GAO, Jan. 16, 2020). From July 25, 2019, to September 12, 2019, the Office of Management and Budget issued apportionment documents that "withheld [those] funds from obligation." *Id.* at 2-3. In defending the pause in spending the appropriation, "OMB described the withholding as necessary to ensure that the funds were not spent 'in a manner that could conflict with the President's foreign policy.'" *Id.* at 5.

Although the delay in spending appropriated funds was less than two months, GAO concluded that OMB had violated the Impoundment Control Act. GAO explained that "[t]he ICA does not permit deferrals for

policy reasons," and "OMB's justification for the withholding falls squarely within the scope of an impermissible policy deferral." *Id.* The It emphasized that "[f]aithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law." *Id.* at 6.

The second decision involved OMB's delay in providing funds to Ukraine under the Foreign Military Financing ("FMF") program established by Congress. This delay occurred at roughly the same time as the Ukraine Security Assistance delay: In June and August 2019, the State Department submitted to OMB proposed congressional notifications describing plans to obligate certain FMF funds to Ukraine. But OMB refused to release the permit the State Department to notify Congress—a precondition to spending the funds—until September 2019. See 2022 Foreign Military Financing Opinion at 3. During the delay, the Executive Branch engaged in "interagency discussions" to determine whether Ukraine assistance was the best use of the FMF funds. *Id.* at 8.

Unlike with the Ukraine Security Assistance, GAO determined that the delay in spending the FMF funds was permissible. GAO emphasized that "Congress did not designate FMF funds for Ukraine, and the

administration was free to consider whether to provide any FMF assistance for Ukraine at all." *Id.* Given "[t]hat wide grant of discretion" from Congress, GAO found it appropriate for OMB to have engaged in "a policy process to permit executive branch officials to determine a use of the FMF funds that was consistent foremost with the law but also with the President's policy priorities." *Id.*

As GAO's two Ukraine opinions make clear, the Executive Branch may not delay spending in an effort to determine whether the President agrees with the policy judgments Congress wrote into an appropriations law. But the Executive Branch may delay spending for a brief period in order to determine how best to carry out the policy Congress adopted—including how to accomplish the President's policy goals within the area of discretion Congress has granted him. That is what GAO means by the duty of prudent obligation. And it simply reflects the basic constitutional principles described in Section A, *supra*—principles Congress reaffirmed and underscored in its fiscal framework statutes.

### D. The District Court Properly Applied These Principles

The district court did not prohibit the Executive Branch from exercising the policy discretion afforded it by Congress. It merely barred

22

the Executive Branch from refusing to spend appropriated funds based on a disagreement with Congress's policy judgments or an effort to determine whether the President agreed with those judgments. That is what respect for Congress's power of the purse demands.

From the very first sentence of its opinion granting the preliminary injunction, the district court emphasized that its objection was to the categorical nature of the funding freeze imposed by Defendants: "The Executive's categorical freeze of appropriated and obligated funds fundamentally undermines the distinct constitutional roles of each branch of our government." PI op. 4. The court concluded that Defendants had "imposed a categorical mandate on the spending of congressionally appropriated and obligated funds without regard to Congress's authority to control spending." *Id.* It found that the original OMB memorandum "amounted to a command, not a suggestion, that Agency Defendants shall execute a categorical, indefinite funding freeze to align funding decisions with the President's priorities." *Id.* at 23. Even aside from that memorandum, the district court found that the Defendant agencies themselves implemented a categorical funding freeze. See *id.* at 23-24. As this Court noted in ruling on Defendants'

motion for a stay pending appeal, "the record before the District Court included numerous notices and emails authored by Agency Defendants that support the finding that their funding freezes were categorical in nature, rather than being based on 'individualized assessments of their statutory authorities and relevant grant terms.'" *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).

The district court thus enjoined the Defendants from "reissuing, adopting, implementing, giving effect to, or reinstating under a different name the directives in" the original grant freeze memorandum, and it also enjoined them from "impos[ing] or appl[ying] a categorical pause or freeze of funding appropriated by Congress." *Id.* at 44. But it emphasized that its order did not prohibit the Executive Branch from exercising the discretion Congress had granted it in a given appropriations law: "The Court is not limiting the Executive's discretion or micromanaging the administration of federal funds. Rather, consistent with the Constitution, statutes, and caselaw, the Court is simply holding that the Executive's discretion to impose its own policy preferences on appropriated funds can be exercised only if it is authorized by the congressionally approved appropriations statutes." *Id.* at 4.

24

That "[f]ederal agencies *often* have broad discretion to determine how to implement funding programs, including to terminate funding based on policy preferences," Gov't Br. 23 (emphasis added); see also *id.* at 36-44, thus does not undermine the preliminary injunction. The district court did not in any way bar Defendants from exercising the policy discretion Congress granted them. Nothing in the preliminary injunction is properly read as reaching any program-specific action by a federal agency to determine how to act within the space that Congress has granted it under that program. The district court merely barred Defendants from pausing spending across the board—including in programs that did not accord policy discretion—to determine whether the President agreed with Congress's policy judgments. That injunction did nothing more than enforce basic constitutional requirements.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Samuel R. Bagenstos
Samuel R. Bagenstos
625 S. State St.
Ann Arbor, MI 48109
(857)231-1663
sbagen@gmail.com
Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of the Federal Rules of Appellate Procedure. The document contains 5,008 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface and type style requirements of the Federal Rules. The document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

<u>/s/ Samuel R. Bagenstos</u>
Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2025, the foregoing was filed and served upon all counsel of record electronically by filing a copy of the document with the Clerk through the Court's ECF system.

/s/ Samuel R. Bagenstos
Counsel for *Amici Curiae*
