Nos. 25-1236, 25-1413

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, OFFICE OF THE GOVERNOR OF KENTUCKY, ex rel. ANDREW BESHEAR, in their official capacity as Governor of the Commonwealth of Kentucky,

*Plaintiffs-Appellees*,

*(Caption continued on next page)*

---

*On Appeal from the United States District Court
for the District of Rhode Island*

---

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina G. Henry
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

*v.*

DONALD J. TRUMP, in their official capacity as President of the United States;
U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW
VOUGHT, in their official capacity as Director of the U.S. Office of Management
and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in
their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their
official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official
capacity as Secretary of the Department of Health and Human Services; U.S.
DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official
capacity as Secretary of Education; U.S. FEDERAL EMERGENCY
MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity
as Acting Administrator of the U.S. Federal Emergency Management Agency;
U.S. DEPARTMENT  OF TRANSPORTATION; SEAN P. DUFFY, in their
official capacity as Secretary of Transportation; U.S. DEPARTMENT OF
LABOR; LORI CHAVEZ-DEREMER, in their official capacity as Secretary of
Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT,
in their official capacity as Secretary of the U.S. Department of Energy; U.S.
ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their
official capacity as Administrator of the U.S. Environmental Protection Agency;
U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their
official capacity as Secretary of the Interior; U.S. DEPARTMENT OF
HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary
of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF
JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General;
NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN
PANCHANATHAN, in their official capacity as Director of the National Science
Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in
their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF
HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official
capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT
OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and
Acting Administrator of the United States Agency for International Development;
U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S.
DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as
Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS;
DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs;
U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official
capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE

ADMINISTRATION; JANET PETRO, in their official capacity as Acting
Administrator of National Aeronautics and Space Administration;
CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER
BASTRESS TAHMASEBI, in their official capacity as Interim Head of the
Corporation for National and Community Service; U.S. SOCIAL SECURITY
ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting
Commissioner of United States Social Security Administration; U.S. SMALL
BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity
as Acting Administrator of U.S. Small Business Administration,

*Defendants-Appellants*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ........................................................................................ 7

I.    To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse ......... 7

II.   For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Through Federal Legislation Governing Spending and Impoundments ................................................. 15

III.  The President and His Subordinates Have No Authority to Defy the Will of Congress by Categorically Freezing Appropriated Funds for Policy Reasons ..................................................................... 19

CONCLUSION ................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Campaign Clean Water, Inc. v. Ruckelshaus*,
  361 F. Supp. 689 (E.D. Va. 1973) ....................................................... 24

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
  601 U.S. 416 (2024) ........................................................................... 2, 9

*Citizens for Resp. & Ethics in Wash. v. OMB*,
  No. 25-cv-1051 (D.D.C. filed Apr. 8, 2025) ...................................... 19

*Citizens for Resp. & Ethics in Wash. v. OMB*,
  No. 25-cv-1051, 2025 WL 2025114 (D.D.C. July 21, 2025) ............. 19

*City & County of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ............................................................ 14

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) ........................................................... 16

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ................................................................... 6, 12, 22

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*,
  365 F. Supp. 1355 (D.N.J. 1973) ....................................................... 25

*Guadamuz v. Ash*,
  368 F. Supp. 1233 (D.D.C. 1973) ................................................. 23, 24

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1977) ........................................................... 15

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ................................................. 4, 13, 20

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*INS v. Chadha*,
    462 U.S. 919 (1983).................................................... 12, 14

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838)................................................... 5, 20, 21

*Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*,
    358 F. Supp. 60 (D.D.C. 1973)..................................... 24

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975)................................. 6, 24

*Maine v. Fri*,
    486 F.2d 713 (1st Cir. 1973)....................................... 23

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*,
    361 F. Supp. 897 (D.D.C. 1973).................................. 24

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974)..................................... 22

*OPM v. Richmond*,
    496 U.S. 414 (1990).................................................... 13

*Protect Democracy Project v. OMB*,
    No. 25-cv-1111 (D.D.C. filed Apr. 14, 2025).............. 19

*Rochester Pure Waters Dist. v. EPA*,
    960 F.2d 180 (D.C. Cir. 1992)..................................... 10

*Sioux Valley Empire Elec. Ass'n v. Butz*,
    504 F.2d 168 (8th Cir. 1974)....................................... 23

*State Highway Comm'n of Mo. v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973)..................................... 6, 23

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Train v. City of New York,*
  420 U.S. 35 (1975).................................................................. 6, 22

*United States v. MacCollom,*
  426 U.S. 317 (1976).................................................................. 12

*United States v. McIntosh,*
  833 F.3d 1163 (9th Cir. 2016) .............................................. 12

*United States v. Midwest Oil Co.,*
  236 U.S. 459 (1915).................................................................. 13

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
  665 F.3d 1339 (D.C. Cir. 2012) ............................................ 9, 15

*U.S. House of Representatives v. Mnuchin,*
  976 F.3d 1 (D.C. Cir. 2020) ................................................... 12

*Widakuswara v. Lake,*
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ............... 14

*Widakuswara v. Lake,*
  No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ............. 14

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952)............................................................ 4, 13, 19


CONSTITUTIONAL PROVISIONS

Articles of Confederation of 1781, art. IX, para. 6................................. 9

Del. Const. of 1776, art. VII ..................................................... 9

Mass. Const. of 1780, ch. 2, § 1, art. XI ......................................... 9

U.S. Const. art. I, § 8, cl.1....................................................... 3, 10, 11

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

U.S. Const. art. I, § 9, cl. 7.......................................................... 3, 11, 12

U.S. Const. art. II, § 3 ................................................................. 13, 20

STATEMENTS AND LEGISLATIVE MATERIALS

Act of Mar. 3, 1809, ch. 28, 2 Stat. 535...................................... 15

Act of Feb. 12, 1868, ch. 8, 15 Stat. 35 ..................................... 15

Act of July 12, 1870, ch. 251, 16 Stat. 251................................ 15

An Act Declaring the Rights and Liberties of the Subject and Settling
   the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2
   (Eng.)............................................................................................ 8

120 Cong. Rec. (1974) ................................................................. 17

Financial Services and General Government Appropriations Act,
   Pub. L. No. 117-103, 136 Stat. 239 (2022)......................... 18

Financial Services and General Government Appropriations Act,
   Pub. L. No. 117-328, 136 Stat. 4650 (2022)....................... 18

Louis Fisher, Cong. Rsch. Serv., Court Cases on Impoundment of
   Funds: A Public Policy Analysis (1974)............................. 25

General Appropriations Act of 1951, Pub. L. No. 81-759, 64 Stat. 595
   (1950) ...................................................................................... 16

H.R. Rep. No. 117-393 (2022)..................................................... 19

Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 .. 17

Pub. L. No. 100-119, 101 Stat. 754 (1987)................................. 18

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Pub. L. No. 118-47, 138 Stat. 460 (2024)................................................. 19

S. Rep. No. 93-688 (1974) ........................................................................ 17

2 U.S.C. § 683 ............................................................................... 5, 17, 18

2 U.S.C. § 684 ............................................................................... 5, 17, 18

31 U.S.C. § 1301(a) ............................................................................ 4, 15

31 U.S.C. § 1341 ................................................................................ 4, 16

31 U.S.C. § 1342 ................................................................................... 16

31 U.S.C. § 1349 ................................................................................... 16

31 U.S.C. § 1350 ................................................................................... 16

31 U.S.C. § 1512 ................................................................................... 16

31 U.S.C. § 1513 ................................................................................... 16

31 U.S.C. § 1517(a) ............................................................................... 16

31 U.S.C. § 1518 ................................................................................... 16

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Bruce Ackerman, *Taxation and the Constitution*,
    99 Colum. L. Rev. 1 (1999) ................................................................ 10

Gerhard Casper, *Appropriations of Power*,
    13 U. Ark. Little Rock L.J. 1 (1990).................................................... 8

Josh Chafetz, *Congress's Constitution: Legislative Authority and the
    Separation of Powers* (2017) .............................................................. 12

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) ............................... 3, 12

Ralph E. Erickson, Acting Assistant Attorney General, OLC, *Memorandum Re: Constitutional Power of Congress to Compel Spending of Impounded Funds* (Jan. 7, 1972) .................................... 27

*The Federalist No. 30* (Clinton Rossiter ed., 1961) ............................... 3, 10

*The Federalist No. 31* (Clinton Rossiter ed., 1961) ............................... 11

*The Federalist No. 47* (Clinton Rossiter ed., 1961) ............................... 14

*The Federalist No. 58* (Clinton Rossiter ed., 1961) ............................... 11

*The Federalist No. 78* (Clinton Rossiter ed., 1961) ............................... 11

Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207 (2009) ............................................................ 8

Alexander Hamilton, *Report on the Subject of Manufactures* (1791) .... 11

Paul Krawzak, *White House Scraps Public Spending Database*, Roll Call (Mar. 24, 2025), https://rollcall.com/2025/03/24/white-house-scraps-public-spending-database/ ....................................................... 19

Letter to Joseph Jones (May 31, 1780), *in The Writings of George Washington from the Original Manuscript Sources 1745-1799* (John C. Fitzpatrick ed., 1931) ............................................................ 10

F.W. Maitland, *The Constitutional History of England* (1908) .............. 8

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310 (1969) .... 7, 25

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The President's Veto Power*,
12 Op. O.L.C. 128 (1988) ..................................................... 26

*The Records of the Federal Convention of 1787* (Max Farrand ed.,
1911)............................................................................... 2, 9, 11

Robert J. Reinstein, *The Limits of Executive Power*,
59 Am. U. L. Rev. 259 (2009) ............................................. 7, 9

John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re:
Impoundment Authority* (Aug. 15, 1985)........................... 26

Richard D. Rosen, *Funding "Non-Traditional" Military Operations:
The Alluring Myth of a Presidential Power of the Purse*,
155 Mil. L. Rev. 1 (1998) .................................................. 2

Neil M. Soltman, *The Limits of Executive Power: Impoundment of
Funds*, 23 Cath. U. L. Rev. 359 (1973)............................... 16

Joseph Story, *Commentaries on the Constitution of the United States*
(1833) ................................................................................ 13

Ralph W. Tarr, Acting Assistant Attorney General, OLC, *Memorandum
Re: Legal Authority to Take Action to Forestall a Default* (Oct. 21,
1985)................................................................................... 27

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Although the district court based its injunction on Plaintiffs' Administrative Procedure Act claims, it recognized that this case involves important questions about the "checks and balances" and "separation of powers" that are "the lifeblood of our government."  Addendum A5.  This Court need not address those questions head-on, yet they provide critical background principles that should guide the resolution of this case.  The executive branch's categorical freeze of appropriated funds directly undermines our Constitution's Spending and Appropriations Clauses, which give Congress—not the executive branch—control over the public fisc.

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief.  All parties consent to its filing.

1

While the choice to vest Congress with control over appropriations and spending was "uncontroversial" at the Founding, *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 431 (2024), that consensus marked the culmination of centuries of struggle in England. Historically, British kings had used their royal prerogatives both to legislate and to tax and spend without the approval of Parliament. The result was a blurring of the lines between the monarch's pocket money and the national treasury, leading kings to spend public funds however they pleased. Only after the Glorious Revolution, when "[t]he whole basis for the monarchy had transformed," Richard D. Rosen, *Funding "Non-Traditional" Military Operations: The Alluring Myth of a Presidential Power of the Purse*, 155 Mil. L. Rev. 1, 42 (1998), were royal attempts to seize the purse strings finally squelched.

In "defining the . . . powers" of the new nation, the American Founders firmly rejected the historic "Prerogatives of the British Monarch." 1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) ["*Farrand's Records*"] (James Wilson). Indeed, almost every post-Revolution state constitution vested the spending and appropriations authorities in a legislative body. Even the Articles of Confederation, despite leaving the federal government without the power to raise revenue through taxation, granted the appropriations power to the Confederation Congress.

2

Against that backdrop, when the Framers gathered in Philadelphia to draft the new Constitution, there was no question that Congress would be granted the powers to tax, spend, and appropriate funds. The authority "to pay the Debts and provide for the common Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1, was deemed "indispensable" to the ability of the federal government to do its job, *The Federalist No. 30*, at 188 (Clinton Rossiter ed., 1961) (Alexander Hamilton). At the same time, the choice to vest this sweeping power in Congress—the people's representatives—was designed to check executive power by giving the legislature complete control over payments from the Treasury. That is why, as Edmund Randolph explained at the Virginia ratifying convention, the new office of the President need not be feared: "He can handle no part of the public money except what is given him by law." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 201 (Jonathan Elliot ed., 1836) ["*Elliot's Debates*"].

While the Spending Clause affirmatively empowers Congress, the text of the Appropriations Clause evinces a clear limitation on executive authority. Phrased in the negative, it declares that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Because appropriations must be made "by Law," *id.*, and the President's role in lawmaking is highly circumscribed, he has no power to designate or spend funds

3

without Congress's authorization.  In the Supreme Court's words, "the President's power to see that the laws are faithfully executed" is a direct "refut[ation] [of] the idea that he is to be a lawmaker," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952), particularly in a realm like appropriations or spending where he enjoys none of "his own constitutional powers," *id.* at 637 (Jackson, J., concurring).

These provisions, coupled with structural separation-of-powers principles, make clear that the executive has no power to unilaterally withhold funding appropriated by Congress.  Put simply, our Constitution does not allow the President to, for "policy reasons, . . . spend less than the full amount appropriated by Congress for a particular project or program."  *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).  All three branches of government have consistently espoused this view.

Congress, for its part, has passed legislation to protect its control over the purse since the Founding.  The Tenth Congress passed the precursor to what is now called the Purpose Statute, providing that "[a]ppropriations shall be applied only to the objects for which [they] were made."  31 U.S.C. § 1301(a).  Congress then passed the Antideficiency Act in 1870, explicitly prohibiting the executive branch from spending more than Congress appropriates.  *Id.* § 1341(a)(1)(A).  And with the Impoundment Control Act of 1974 (ICA), Congress made clear that the

President is prohibited from deferring funds for policy reasons, 2 U.S.C. § 684(b), or rescinding funds without obtaining Congress's approval, *id.* § 683. Both deferrals and proposed rescissions must be preceded by a "special message" from the President to Congress. *Id.* §§ 683-84. These laws, along with others passed more recently to enhance accountability and transparency in federal funding decisions, reaffirm that the President has no power to unilaterally withhold funding appropriated by Congress based on mere policy disagreement.

To be sure, Congress may *expressly* delegate discretion to the President and executive branch agencies with respect to federal spending. And the President may *ask* Congress to rescind funding—as long as he follows the ICA's procedures. But critically, in any of these scenarios, Congress retains the final word, guarding against the dangers posed by transfer of the purse strings to the branch that wields the sword.

In recognition of these foundational separation-of-powers principles, courts across the nation, including the Supreme Court, have also recognized that the President enjoys no constitutional power to impound funds appropriated by Congress. The Supreme Court first made this clear in 1838, unanimously rejecting the authority of a newly appointed Postmaster General to withhold funding appropriated by Congress for a contract that he claimed was tainted by political favoritism. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). The issue

came to a head again during the 1970s when "President Nixon, the Mahatma Gandhi of all impounders, asserted . . . that his constitutional right to impound appropriated funds was absolutely clear." *Clinton v. City of New York*, 524 U.S. 417, 468 (1998) (Scalia, J., concurring in part and dissenting in part) (quotation marks omitted).  A slew of decisions "proved him wrong," *id.*—sometimes explicitly, *e.g.*, *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1324-25 (D.D.C. 1975) ("the President's express or implied constitutional powers [do not] justify holding back authorized funds"), and other times implicitly, by scrutinizing the relevant statutory language to ascertain whether it expressly granted discretion to spend less than the full amount of funds appropriated, *e.g.*, *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973).  One of these cases made it all the way to the Supreme Court, which unanimously rejected Nixon's claim that the language of the governing statute gave him discretion to withhold environmental protection funds.  *See Train v. City of New York*, 420 U.S. 35, 42-47 (1975).

High-ranking executive branch attorneys have expressed the same view through a series of memoranda, including ones authored by future Chief Justices Rehnquist and Roberts.  As Rehnquist put it while leading the Justice Department's Office of Legal Counsel (OLC), it is "*extremely difficult* to formulate a constitutional theory to justify a refusal by the President to comply with a

congressional directive to spend." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Supp. Op. O.L.C. 303, 310 (1969) ["Rehnquist Memo"] (emphasis added). Every OLC opinion to address the issue since then has endorsed Rehnquist's position.

This unbroken line of authority refutes Defendants' claim that the President possesses some inherent "Article II authority" to "ensure that federal funding programs are aligned . . . with his policy priorities." Blue Br. 2-3. To the contrary, federal funding programs must align with *Congress's* policy priorities. Defendants' efforts may be brazen, but they are not novel—they have been repeatedly rejected as contrary to foundational constitutional principles for over a century.

## ARGUMENT

I.    **To Guard Against the Risk of a Tyrannical President, the Framers Vested Control of Appropriations and Spending in Congress, Ensuring the Structural Separation of the Sword and the Purse.**

**A.** When the Framers wrote the Constitution, they took pains to deny the President the kind of sweeping powers the King of England had enjoyed. In the seventeenth centuries, English kings had used their royal prerogatives both to legislate, and to tax and spend, without the approval of Parliament. *See, e.g.*, Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 272-77 (2009). "[U]nconstrained by the need to consult the representatives of the

people," Gerhard Casper, *Appropriations of Power*, 13 U. Ark. Little Rock L.J. 1, 4 (1990) (quotation marks omitted), monarchs generally spent public money on whatever they pleased. For many kings, that meant war with other European nations.

After centuries of struggle, Parliament finally succeeded in curtailing the King's abuses of power attendant to his sweeping authority over the purse. Following the Glorious Revolution, "in granting money to the crown," Parliament always "appropriated the supply to particular purposes more or less narrowly defined." F.W. Maitland, *The Constitutional History of England* 433 (1908). At the same time, the Bill of Rights of 1689 prohibited the various devices the King had used to raise money on his own, providing that "levying money for or to the use of the Crown by pretence of prerogative, without grant of Parliament, for longer time, or in other manner than the same is or shall be granted, is illegal." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., c.2, § 4 (Eng.). Finally, in 1782, Parliament eliminated the King's prerogative to determine how the "civil list"—the domestic budget—would be spent. Paul F. Figley & Jay Tidmarsh, *The Appropriations Power and Sovereign Immunity*, 107 Mich. L. Rev. 1207, 1229 (2009).

**B.** In drafting the Constitution, "the prerogatives that had been discredited in England were naturally rejected by the Framers." Reinstein, *supra*, at 307. After the American Revolution, most state governments required legislative authorization for the withdrawal of any funds from a state treasury. *See, e.g.*, Del. Const. of 1776, art. VII; Mass. Const. of 1780, ch. 2, § 1, art. XI. The Articles of Confederation similarly granted the Confederation Congress exclusive authority to "ascertain the necessary sums of Money to be raised for the service of the united states, and to appropriate and apply the same for defraying the public expenses," although they failed to give the central government the power to levy taxes, instead relying on the states for raising revenue. Articles of Confederation of 1781, art. IX, para. 6.

Still, "[b]y the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement." *CFPB*, 601 U.S. at 431. It was "uncontroversial" that the authority to raise, spend, and appropriate funds should "reside in the Legislative Branch" rather than with the chief executive. *Id.*; *see* 2 *Farrand's Records* 131, 274 (debate limited to whether power of the purse should be further confined to the direct representatives of the people in the House of Representatives). The Framers thus gave Congress, not the President, "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)

9

(Kavanaugh, J.) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)).

In the Taxing and Spending Clause, the Framers granted Congress the affirmative power to raise revenue and spend funds. The Clause is the first and one of the most sweeping enumerated powers the Constitution confers upon Congress, providing the power "[t]o lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. This Clause reacted to the failure of the Articles of Confederation to grant Congress the authority to tax and spend for the defense and general interests of the union, creating such an ineffectual central government that, according to George Washington, it nearly cost Americans victory in the Revolutionary War. *See* Letter to Joseph Jones (May 31, 1780), *in* 18 *The Writings of George Washington from the Original Manuscript Sources 1745-1799*, at 453 (John C. Fitzpatrick ed., 1931).

Indeed, it was the need "to provide adequate fiscal powers for the national government" that motivated the Framers to write a new Constitution. Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 6 (1999). Alexander Hamilton called the power to raise and spend funds "an indispensable ingredient in every constitution," *The Federalist No. 30*, *supra*, at 188, deeming "revenue" "the essential engine by which the means of answering the national

exigencies must be procured," *The Federalist No. 31*, *supra*, at 195.  James

Madison similarly explained that "[t]his power over the purse may, in fact, be

regarded as the most complete and effectual weapon . . . for obtaining a redress of

every grievance, and for carrying into effect every just and salutary measure."  *The*

*Federalist No. 58*, *supra*, at 359.

The Framers thus adopted Edmund Randolph's recommendation that

Congress should have the power "to pay the Debts and provide for the common

Defence and general Welfare of the United States," U.S. Const. art. I, § 8, cl. 1; *see*

2 *Farrand's Records* 493, 497, choosing a phrase that was as "comprehensive as

any that could have been used," Alexander Hamilton, *Report on the Subject of*

*Manufactures* 54 (1791).  The Founders were resolute in their conviction that such

sweeping power should be granted to the people's representatives in Congress—

the branch that "not only commands the purse but prescribes the rules by which the

duties and rights of every citizen are to be regulated," *The Federalist No. 78*,

*supra*, at 465 (Alexander Hamilton).

At the same time that they empowered Congress, the Framers limited

executive authority over finances: "[n]o Money shall be drawn from the Treasury,

but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.

Because the Appropriations Clause "is phrased as a limitation, it means that 'the

expenditure of public funds is proper only when authorized by Congress, not that

public funds may be expended unless prohibited by Congress.'" *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1, 8 (D.C. Cir. 2020) (quoting *United States v. MacCollom*, 426 U.S. 317, 321 (1976) (plurality opinion)). In this manner, "[t]he Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them." *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

The Clause's simple and uncontroversial command was repeatedly invoked during the ratification debates to assuage "Anti-Federalist fears of a tyrannical president." Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 57 (2017). As Charles Pinckney put it, "[w]ith this powerful influence of the purse, [Congress] will be always able to restrain the usurpations of the other departments." 4 *Elliot's Debates* 330. Or in Alexander Hamilton's words, "where the purse is lodged in one branch, and the sword in another, there can be no danger. 2 *id.* 349; *see also, e.g.*, 3 *id.* at 17 (George Nicholas); 3 *id.* at 201 (James Madison & Edmund Randolph).

These statements underscore that the executive's role in appropriating and spending funds is highly circumscribed. Because appropriations must be "made by Law," U.S. Const. art. I, § 9, cl. 7, the Clause requires adherence to the "single, finely wrought and exhaustively considered, procedure" for enacting legislation set forth in the Constitution. *Clinton*, 524 U.S. at 439-40 (quoting *INS v. Chadha*, 462

U.S. 919, 951 (1983)).  Under that procedure, "except for recommendation and veto, [the President] has no legislative power," *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring).  Thus, the Constitution's text, structure, and history embody the rule that "[a]ny exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury."  *OPM v. Richmond*, 496 U.S. 414, 425 (1990).

A critical corollary to this rule is that the President has no constitutional authority to, for "policy reasons, . . . spend less than the full amount appropriated by Congress for a particular project or program."  *In re Aiken County*, 725 F.3d at 261 n.1 (Kavanaugh, J.).  Such authority would give the President, not Congress, the ultimate "power to decide[] how and when any money should be applied for these purposes."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1342, at 213 (1833); *cf. United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915) (the Constitution "does not confer upon [the President] any power to enact laws or to suspend or repeal such as the Congress enacts").  And the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, further prohibits the executive branch from "redistribut[ing] or withhold[ing] properly appropriated funds in order to effectuate its own policy

goals." *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018).

Thus, failure to execute appropriations laws in accordance with their terms amounts to the "effective[] repeal[]" of those laws in violation of "the separation of powers, the Presentment Clause, the Appropriations Clause, the Spending Clause, and the Take Care Clause." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard J., dissenting); *see Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (vacating panel decision "substantially for the reasons explained by Judge Pillard"). The constitutional rule against impoundments recognizes that "[t]here can be no liberty where the legislative and executive powers are united in the same person[] or body." *The Federalist No. 47*, *supra*, at 302 (James Madison) (quoting Montesquieu). It ensures that the executive branch does not make an end-run around the "step-by-step, deliberate and deliberative process" the Framers prescribed for appropriating funds, undermining the careful "choices [that] were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked," *Chadha*, 462 U.S. at 959.

II.    **For Over Two Hundred Years, Congress Has Jealously Guarded Its Control Over the Purse Through Federal Legislation Governing Spending and Impoundments.**

Since the earliest days of the Republic, Congress has exercised its "plenary power to give meaning to the [Appropriations Clause]" through federal laws. *Harrington v. Bush*, 553 F.2d 190, 194-95 (D.C. Cir. 1977).

The story begins in the Tenth Congress with the predecessor of what is known today as the Purpose Statute.  *See* 31 U.S.C. § 1301(a) (current version). By passing that law, Congress commanded that "the sums appropriated by law for each branch of expenditure in the several departments shall be solely applied to the objects for which they are respectively appropriated, and to no other."  Act of Mar. 3, 1809, ch. 28, 2 Stat. 535, 535.  As originally enacted, the law included a narrow exception for instances when Congress was on recess and the secretary of a department petitioned the President for funds "necessary for the public service," *id.*, but even this limited exception was later repealed by Congress, *see* Act of Feb. 12, 1868, ch. 8, 15 Stat. 35, 36.  The foundational principle that appropriations must be carried out as authorized by Congress has been a "core tenet of appropriations law" ever since.  *Dep't of Navy*, 665 F.3d at 1348.

A few decades later, Congress passed the first version of the Antideficiency Act, making it unlawful "for any department of the government to expend . . . any sum in excess of appropriations made by Congress for that fiscal year."  Act of

July 12, 1870, ch. 251, § 7, 16 Stat. 251.  Congress subsequently amended the law to strengthen it, including by authorizing administrative and criminal penalties for certain violations, *see* 31 U.S.C. §§ 1349-50, 1518.  The law's core provisions establish an apportionment process, *id.* §§ 1512-13, prohibit accepting voluntary services, *id.* § 1342, and prohibit obligating funds in advance or in excess of an appropriation, *id.* §§ 1341, 1517(a).

Notably, in 1950, Congress amended the Antideficiency Act to clarify that "reserves may be established to provide for contingencies, or to effect savings whenever savings are made possible by or through changes in requirements, greater efficiency of operations, or *other developments* subsequent to the date on which such appropriation was made available."  General Appropriations Act of 1951, ch. 896, § 1211(a)-(c)(2), Pub. L. No. 81-759, 64 Stat. 595, 765-66 (1950) (emphasis added).  Although the full text and structure of the 1950 amendment made clear that it modernized and reaffirmed the central requirements of existing law, President Nixon abused the Act's new provision permitting reserves for "other developments" to unilaterally cut billions of dollars from federal programs.  *See* Neil M. Soltman, *The Limits of Executive Power: Impoundment of Funds*, 23 Cath. U. L. Rev. 359, 369 (1973).

Nixon's impoundments resulted in an explosion of litigation and congressional "furor," *City of New Haven v. United States*, 809 F.2d 900, 906

16

(D.C. Cir. 1987), leading to the passage of the ICA as a "reassert[ion]" of
Congress's "control over the budgetary process," *id.*  To avoid presidential
subversion of congressional policy, the ICA deleted the Antideficiency Act's
provision that had authorized the establishment of a reserve for "other
developments," *see* Pub. L. No. 93-344, tit. X, § 1002, 88 Stat. 297, 332 (1974),
making clear that "[t]he apportionment process is to be used only for routine
administrative purposes such as to avoid deficiencies in Executive branch
accounts, not for the making of policy or the setting of priorities," S. Rep. No. 93-
688, at 72 (1974).  Congress also expressly prohibited the President from
proposing to defer or rescind funds without sending a "special message" to
Congress justifying the decision.  2 U.S.C. §§ 683-84.

    In making these changes, Congress codified the longstanding constitutional
principles discussed earlier.  *See supra* part I.  As one Representative put it, the
ICA would "return to the Congress the basic powers of budgeting that were
originally intended by the Founding Fathers in the Constitution."  120 Cong. Rec.
19668 (1974) (Rep. Albert Ullman); *see also, e.g.*, *id.* at 20464 (Sen. Samuel
Ervin, Jr.) (The bill "is based on the assumption that the President has no power
under the Constitution to impound lawfully appropriated funds in the absence of a
delegation of such authority by the Congress."); S. Rep. No. 93-688, at 73-74
(cataloging pre-ICA cases rejecting impoundments as unconstitutional, and

17

explaining that the ICA is "consistent" with them in its rejection of the idea that federal funds can be withheld "for fiscal policy purposes").

Congress subsequently amended the ICA to make even more explicit the rule that deferrals may not be made for policy reasons. Pub. L. No. 100-119, tit. II, § 206, 101 Stat. 754, 785-86 (1987). Accordingly, under current law, budget deferrals must be "consisten[t] with legislative policy" and are "permissible only [when] . . . specifically provided by law," 2 U.S.C. § 684(b), and rescissions are subject to congressional approval, *id.* § 683. Through these provisions, the ICA makes clear that in the absence of express statutory discretion to withhold funds, the executive branch must spend the funds appropriated by Congress.

Finally, in the wake of President Trump's unlawful spending deferrals during his first term, Congress passed new laws to further secure its power of the purse. Legislation enacted in early 2022 required public reporting of apportionment decisions for that fiscal year and required all executive agencies to report unlawful delays or conditions on appropriations. Financial Services and General Government Appropriations Act, Pub. L. No. 117-103, §§ 204(a)-(d), 748, 136 Stat. 239, 256-57, 306 (2022). Later that same year, Congress made these accountability measures permanent and added new protections against unlawful impoundments, such as new reporting requirements for violations of the ICA. Financial Services and General Government Appropriations Act, Pub. L. No. 117-

18

328, §§ 204, 748-49, 136 Stat. 4650, 4667, 4718 (2022); *see* H.R. Rep. No. 117-393, at 12 (2022) ("Appropriations are laws like any other and can be rescinded only through the bicameralism and presentment procedures that the Constitution prescribes.").[2]  These transparency and reporting requirements have been enacted in appropriations laws passed since then, *e.g.*, Pub. L. No. 118-47, div. B. tit. VII, §§ 748-49, 138 Stat. 460, 586-87 (2024), reaffirming Congress's plenary power of the purse and pushing back against unauthorized executive attempts to usurp that power.

### III.  The President and His Subordinates Have No Authority to Defy the Will of Congress by Categorically Freezing Appropriated Funds for Policy Reasons.

Because the President's authority to act "must stem either from an act of Congress or from the Constitution itself," *Youngstown*, 343 U.S. at 585, that authority is at its "lowest ebb" when the President acts *contrary* to the will of Congress in a realm like appropriations and spending where he enjoys none of "his

---

[2] In March 2025, the Office of Management and Budget (OMB) ceased complying with the requirement to make apportionments public, *see, e.g.*, Paul Krawzak, *White House Scraps Public Spending Database*, Roll Call (Mar. 24, 2025), https://rollcall.com/2025/03/24/white-house-scraps-public-spending-database/, leading to multiple lawsuits that are currently pending, *see, e.g.*, *Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-cv-1051 (D.D.C. filed Apr. 8, 2025); *Protect Democracy Project v. OMB*, No. 25-cv-1111 (D.D.C. filed Apr. 14, 2025); *see also Citizens for Resp. & Ethics in Wash. v. OMB*, No. 25-cv-1051, 2025 WL 2025114, at *1 (D.D.C. July 21, 2025) (holding unlawful OMB's failure to make apportionment information public), *appeal docketed*, Nos. 25-5266 & 25-5267 (D.C. Cir. July 23, 2025).

own constitutional powers," *id.* at 637 (Jackson, J., concurring). The President and federal agencies "may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *In re Aiken County*, 725 F.3d at 260 (Kavanaugh, J.). To the contrary, the Constitution requires that the President "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, even when he disagrees with those laws.

Of course, if the President disagrees with the policy behind an appropriation, he may *propose* the rescission of funds to Congress and seek its approval pursuant to the ICA's procedures. And Congress itself may choose to *expressly* delegate discretion regarding how to implement the programs for which it appropriates money. But that discretion is always limited by statute, and typically restricted to the terms of implementation, not *whether* to implement at all.

In recognition of these core separation of powers principles, courts across the nation, including the Supreme Court, as well as high-ranking executive branch attorneys, have also consistently recognized that the President enjoys no constitutional power to unilaterally freeze, pause, rescind, or impound appropriated funds.

**A.** In *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838), the Court unanimously rejected newly appointed Postmaster General Amos Kendall's claim that he could withhold money that Congress had, by statute, required him to spend.

The Justices balked at the Attorney General's assertion that Kendall possessed some inherent constitutional authority to withhold appropriated funds, remarking that "[t]o contend that the obligations imposed on the President to see the laws faithfully executed, implies a power to forbid their execution; is a novel construction of the constitution, and is entirely inadmissible." *Id.* at 613. Sanctioning such a theory would be, according to the Court, "vesting in the President a dispensing power, which has no countenance for its support in any part of the constitution." *Id.* The Court refused to "assert[] a principle, which, if carried out in its results, to all cases falling within it, would be clothing the President with a power entirely to control the legislation of congress." *Id.*

Critically, it was irrelevant to the Court that Kendall claimed the impoundment was necessary because his predecessor had negotiated a contract tainted by political favoritism. As the Court put it: "The act required by the law to be done by the postmaster general is simply to credit the relators with the full amount of the award of the solicitor. This is a precise, definite act . . . about which the postmaster general had no discretion whatever." *Id.* In other words, the executive's policy justifications for withholding funds—however sound they might be—were irrelevant because the executive lacked discretion to withhold the funds in the first place.

21

In *Train v. City of New York*, 420 U.S. 35 (1975), the Supreme Court again unanimously rejected the executive branch's attempt to withhold funds in defiance of Congress. President Nixon, through his Environmental Protection Agency Secretary Russell Train, claimed authority to withhold funding appropriated by Congress to subsidize municipal sewer and water treatment projects under the Federal Water Pollution Control Act Amendments of 1972. *Id.* at 37-41. The Court held that Nixon had no such authority because the relevant statute did not delegate any discretion to withhold funds under the given circumstances. *Id.* at 42-49. Implicit in that conclusion was the premise that any presidential discretion to withhold appropriated funds must be granted by Congress as a matter of legislative grace. As Justice Scalia later succinctly summarized it, "our decision . . . in *Train* proved [President Nixon] wrong" in his claim to a "constitutional right to impound appropriated funds." *Clinton*, 524 U.S. at 468 (Scalia, J., concurring in part and dissenting in part) (citation and quotation marks omitted).

Courts of appeals across the country have similarly held that the President's discretion to spend less than the total amount of appropriated funds is limited by Congress's direction as expressed in the text of the relevant statute. In *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), the D.C. Circuit held that mandatory statutory language required the President to put into effect a pay raise for members of the plaintiff union. *Id.* at 601; *see id.* at 604

22

("[N]othing in the Constitution commits to the President the ultimate authority to construe federal statutes," and the President's duty to "take Care the Laws be faithfully executed" "does not permit the President to refrain from executing laws duly enacted by the Congress as those laws are construed by the judiciary.").  In *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973), the Eighth Circuit held that the Secretary of Transportation could not impound funds for state highway programs for reasons beyond those Congress had supplied. *Id.* at 1114; *see also id.* ("[W]hen the impoundment of funds impedes the orderly progress of the federal highway program, this hardly can be said to be favorable to such a program.  In fact, it is in derogation of it.").  Other appellate courts have reached similar conclusions compelling the executive branch to disburse funds in accordance with statutory commands, *e.g.*, *Sioux Valley Empire Elec. Ass'n v. Butz*, 504 F.2d 168, 178 (8th Cir. 1974), or, in the case of this Court, upholding preliminary injunctions to that effect, *e.g.*, *Maine v. Fri*, 486 F.2d 713, 716 (1st Cir. 1973).

District courts across the country have also squarely rejected the notion that the President possesses some inherent constitutional power to impound funds.  To give just one example, in *Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973), a district court rejected President Nixon's attempt to withhold funds appropriated to assist farmers and low-income property owners, reasoning that where "[m]oney

23

has been appropriated by the Congress to achieve the purposes of [a] program[,] . . . the Executive has no residual constitutional power to refuse to spend these appropriations." *Id.* at 1244.  The executive branch's policy justifications for the impoundment—to combat inflation, unemployment, and other economic problems—were irrelevant in the court's view, just as they had been in *Kendall*: "nowhere does our Constitution extol the virtue of efficiency and nowhere does it command that all our laws be fiscally wise.  It does most clearly, however, state that laws, good or bad, be enacted by the Congress and enforced by the President." *Id.* at 1243.

*Guadamuz* is part of a long and unbroken line of district court decisions that rejected President Nixon's claim that he had constitutional authority to withhold appropriated funds.  *See, e.g.*, *Brinegar*, 388 F. Supp. at 1324-25 (rejecting the "argument . . . that the President's express or implied constitutional powers justify holding back authorized funds"); *Nat'l Council of Cmty. Mental Health Centers, Inc. v. Weinberger*, 361 F. Supp. 897, 901 (D.D.C. 1973) ("[T]here is no basis for defendants' assertion of inherent constitutional power in the Executive to decline to spend in the face of a clear statutory intent and directive to do so."); *Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 77-78 (D.D.C. 1973) ("An administrator's responsibility to carry out the Congressional objectives of a program does not give him the power to discontinue that program."); *Campaign*

24

*Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973) ("More than a century ago the United States Supreme Court laid to rest any contention that the President has the power [of impoundment] suggested."); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973) ("The Executive Branch has no authority, even for motives such as the control of inflation, to decide for itself whether to obey a law after the President has signed a bill into law, or after Congress has overridden a Presidential veto."); *see also* Louis Fisher, Cong. Rsch. Serv., Court Cases on Impoundment of Funds: A Public Policy Analysis (1974) (cataloging cases rejecting attempts at impoundment during the Nixon years).  Many of these decisions were never even appealed; rather, perhaps in recognition of the weakness of its legal arguments, the Nixon administration paid out the mandated funds in accordance with district court orders effectuating the will of Congress.  *See* Fisher, *supra*, at 80-90.

**B.**  High-ranking executive branch attorneys, including some who went on to become Supreme Court justices, have also consistently rejected theories of a presidential authority to withhold appropriated funds.  Chief Justice William Rehnquist, writing in 1969 as the head of the Justice Department's OLC, explained that "[w]ith respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."  Rehnquist Memo 309.

Though "[i]t may be argued that the spending of money is inherently an executive function," he continued, "the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them." *Id.* at 310.

Fifteen years later, Chief Justice John Roberts reached a similar conclusion for the Reagan administration Office of White House Counsel. He wrote a memo seeking to "dampen any hopes that inherent constitutional impoundment authority may be invoked to achieve budget goals," warning that "[o]ur institutional vigilance with respect to the constitutional prerogatives of the presidency requires appropriate deference to the constitutional prerogatives of the other branches, and no area seems more clearly the province of Congress than the power of the purse." John G. Roberts, Jr., *Memorandum for Fred F. Fielding Re: Impoundment Authority* 1 (Aug. 15, 1985).

The Reagan administration OLC later adopted Roberts's position in a formal advisory opinion, declaring that "[t]here is no textual source in the Constitution for any inherent authority to impound" in "the face of an express congressional directive to spend." *The President's Veto Power*, 12 Op. O.L.C. 128, 166-67 (1988). Citing Rehnquist's earlier memorandum, the Office explained that "reliance upon the President's obligation to 'take Care that the Laws be faithfully executed' . . . to give the President the authority to impound funds in order to

26

protect the national fisc, creates the anomalous result that the President would be declining to execute the laws under the claim of faithfully executing them." *Id.* at 167.

Indeed, every other OLC opinion to consider the issue has reached the same conclusion. *See, e.g.*, Ralph E. Erickson, Acting Assistant Attorney General, OLC, *Memorandum Re: Constitutional Power of Congress to Compel Spending of Impounded Funds* (Jan. 7, 1972); Ralph W. Tarr, Acting Assistant Attorney General, OLC, *Memorandum Re: Legal Authority to Take Action to Forestall a Default* (Oct. 21, 1985). Thus, even the executive branch has conceded that, as the district court put it in this case, "the Executive's discretion to impose its own policy preferences on appropriated funds can be exercised only if it is authorized by the congressionally approved appropriations statutes." Addendum A4.

\* \* \*

In sum, there is no shortage of authority rejecting executive encroachment on Congress's power of the purse, whether under the guise of inherent presidential power, policy disagreement, or budget austerity. Defendants possess no authority to freeze billions of dollars of appropriated funds that Plaintiffs rely upon to provide critical services to their constituents. Rather, the Constitution obligates Defendants to execute congressional spending mandates consistent with foundational principles of the separation of powers.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's

judgments.

Respectfully submitted,

/s/ Brianne J. Gorod
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Miriam Becker-Cohen
Nina G. Henry
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: July 25, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,347 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 25th day of July, 2025.

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on July 25, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 25th day of July, 2025.


/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*