No. 25-1236, 25-1413

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, OFFICE OF THE GOVERNOR OF KENTUCKY, ex rel. ANDREW BESHEAR, in their official capacity as Governor of the Commonwealth of Kentucky,

Plaintiffs – Appellees

(*caption continued on next page*)

---

*On Appeal from the United States District Court
for the District of Rhode Island*

---

## BRIEF OF *AMICI CURIAE* FORMER OFFICE OF MANAGEMENT AND BUDGET OFFICIALS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Christina L. Wentworth
Nikhel S. Sus
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
PO Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
cwentworth@citizensforethics.org
*Counsel for Amici Curiae*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZDEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; US AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S.

DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET PETRO, in their official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration,
Defendants-Appellants.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29, and First Circuit Local Rules 26.1 and 29(a)(4)(A), no *amici* is a nongovernmental corporation.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF INTEREST.............................................................................1

SUMMARY OF ARGUMENT .......................................................................... 2

ARGUMENT ....................................................................................................5

I.     The President Can Implement Their Agenda Without Illegally Withholding
       Funds ...................................................................................................6

       A.   The President Can Temporarily Withhold Funds Using the Procedures in
            the Impoundment Control Act ........................................................6

       B.   The President Can Establish Their Priorities and Propose the
            Cancellation of Funds and Programs Through the Budget Process........12

       C.   The President Can Direct Agencies to Prioritize the President's Agenda
            in Agency Activities.....................................................................14

II.    Despite Available Legal Mechanisms for Implementing the President's
       Agenda, the Trump Administration Has Abused OMB's Authorities by
       Withholding Congressionally Appropriated Funds ...................................17

       A.   The History and Purpose of the Apportionment Process.......................17

       B.   OMB Uses the Apportionment Process to Illegally Withhold Funds
            during the first Trump Administration................................................19

       C.   Congress Responds by Passing Apportionment Transparency and
            Reporting Requirements.................................................................24

       D.   OMB Issues Memorandum Directing Agencies to Categorically and
            Indiscriminately Withhold Congressionally Appropriated Funds during
            the second Trump Administration.....................................................25

CONCLUSION.................................................................................................28

CERTIFICATE OF COMPLIANCE...................................................................30

CERTIFICATE OF SERVICE ...........................................................................31

ADDENDUM ..................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

*Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18 (D.C. Cir. 2015) ...............................................................................................22

*Citizens for Resp. & Ethics in Washington v. OMB*, 1:25-cv-1051 (D.D.C. Apr. 30, 2025), ECF No. 18-2................................................................... 25, 28

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) ...................8, 9

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) .........................................15

*Clinton v. City of New York*, 524 U.S. 417 (1998) ....................................................7

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J., Inc. v. Ash*, 365 F. Supp. 1355 (D.N.J. 1973)...................................................................................................8

*Harrington v. Bush*, 553 F.2d 190 (D.C. Cir. 1977)..................................................6

*Lincoln v. Vigil*, 508 U.S. 182 (1993). ....................................................................14

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973)...................................................................................................8

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239 (D.D.C. Jan. 31, 2025), ECF No. 24-3 ...................................................................................................3

*New York v. Trump*, No. 1:25-cv-39 (D.R.I. Jan. 28, 2025), ECF No. 3-1 ..........2, 3

*New York v. Trump*, No. 1:25-cv-39 (D.R.I. Mar. 6, 2025), ECF No. 161 ...............2

*State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099 (8th Cir. 1973) ................8

*Train v. City of New York*, 420 U.S. 35 (1975) ........................................................8

*United States v. MacCollom*, 426 U.S. 317 (1976) ..................................................6

iii

**Constitutional Provisions**

U.S. Const. art. 1, § 8, cl. 18 ..................................................................................6

U.S. Const. art. 1, § 9, cl. 7 ....................................................................................6

U.S. Const. art. I, § 7, cl.2......................................................................................7

U.S. Const. art. II, § 3 .............................................................................................7

**Statutes**

2 U.S.C. § 631 ........................................................................................................12

2 U.S.C. § 681 ........................................................................................................10

2 U.S.C. § 682 .................................................................................................... 9, 10

2 U.S.C. § 683 ............................................................................................... 8, 10, 27

2 U.S.C. § 684 ................................................................................................. passim

2 U.S.C. § 686........................................................................................................20

2 U.S.C. § 688 ........................................................................................................10

31 U.S.C. § 1105......................................................................................................12

31 U.S.C. § 1341......................................................................................................18

31 U.S.C. § 1342......................................................................................................18

31 U.S.C. § 1349......................................................................................................18

31 U.S.C. § 1350......................................................................................................18

31 U.S.C. § 1512............................................................................................. passim

31 U.S.C. § 1513............................................................................................. 18, 19

31 U.S.C. § 1513 note .............................................................................................24

31 U.S.C. § 1517............................................................................................. 18, 19

iv

31 U.S.C. § 1518...................................................................................... 18, 19

31 U.S.C. § 1519...................................................................................... 18, 19

Act of July 12, 1870, 16 Stat. 230..............................................................18

Pub. L. No. 118-47, 138 Stat. 460 (2024)...................................................25

**Congressional Materials**

H.R. Rep. No. 93-658 (1973)................................................................... 8, 24

H.R. Res. 755, 166 Cong. (Dec. 18, 2019) .................................................24

S. Conf. Rep. 93-924 (1974) .......................................................................23

S. Rep. No. 93-688 (1974) ....................................................................... 8, 23

**Regulations**

90 Fed. Reg. 24298 (June 9, 2025) ..............................................................11

90 Fed. Reg. 9737 (Feb. 18, 2025) ..............................................................19

**Executive Orders**

Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987)...................18

Exec. Order No. 12,677, 54 Fed. Reg. 18869 (May 2, 1989)...................16

Exec. Order No. 12,843, 58 Fed. Reg. 21881 (Apr. 23, 1993)..................16

Exec. Order No. 12,866, 58 Fed. Reg. 51735 (Oct. 4, 1993) ..................16

Exec. Order No. 13,198, 66 Fed. Reg. 8497 (Jan. 29, 2001)...................16

Exec. Order No. 13,520, 74 Fed. Reg. 62201 (Nov. 20, 2009) ...............16

Exec. Order No. 13,774, 82 Fed. Reg. 10695 (Feb. 9, 2017)..................16

Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 20, 2021)...................17

Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025)...................2

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025)....................................2

Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025)....................................2

Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025)....................................2

Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025)....................................2

Exec. Order No. 6,166 (June 10, 1933) ...................................................................18

**Rules**

Fed R. App. P. 29 ......................................................................................................1

**U.S. Government Accountability Office Materials**

GAO, B-241514.5 (May 7, 1991) ............................................................................9

GAO, B-291241, Funding for Technical Assistance for Conservation Programs
      Enumerated in Section 2701 of the 2002 Farm Bill (Oct. 8, 2002).....................21

GAO, B-319009, U.S. Secret Service—Statutory Restriction on Availability of
      Funds Involving Presidential Candidate Nominee Protection (Apr. 27, 2010)...15

GAO, B-329092, Impoundment of the Advanced Research Projects Agency-
      Energy Appropriation Resulting from Legislative Proposals in the President's
      Budget Request for Fiscal Year 2018 (Dec. 12, 2017).......................................15

GAO, B-330045, Impoundment Control Act of 1974: Review of the President's
      Special Message of May 8, 2018 (May 22, 2018)...............................................10

GAO, B-330045.3, Impoundment Control Act of 1974—Release of Withheld
      Amounts Due to Expiration of 45-day Period (July 3, 2018)..............................11

GAO, B-330330, Impoundment Control Act—Withholding of Funds through Their
      Date of Expiration (Dec. 10, 2018)............................................................. 7, 10

GAO, B-330828, Updated Rescission Statistics, Fiscal Years 1974–2020 (July 16,
      2020) ................................................................................................................11

GAO, B-331564, Office of Management and Budget—Withholding of Ukraine
      Security Assistance (Jan. 16, 2020) ............................................................. 4, 20

GAO, B-332868, Impoundment Control Act of 1974—Release of Withheld Amounts Due to Withdrawal of Rescission Proposals (Feb. 24, 2021) ..............11

GAO, B-333110, Office of Management and Budget and U.S. Department of Homeland Security—Pause of Border Barrier Construction and Obligations (June 15, 2021)..........................................................................................15

GAO, B-337137, U.S. Department of Transportation, Federal Highway Administration—Application of the Impoundment Control Act to Memorandum Suspending Approval of State Electric Vehicle Infrastructure Deployment Plans 16, 17 (May 22, 2025)....................................................................................10

GAO, GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process (Sept. 2005) ............................................................................ 9, 14, 19

GAO, GAO-10-320T, Impoundment Control Act: Use and Impact of Rescission Procedures (Dec. 16, 2009)..............................................................................9

## Other Authorities

Alfred H. Teichler et al., *Administrative Control of Funds—The Anti-Deficiency Story*, George Wash. Univ. Navy Grad. Fin. Mgmt. Program (1962).......... 17, 18

*Approved Apportionments*, OMB, https://perma.cc/5NMG-H2XV........................25

Budget Recissions and Deferrals, 63 Fed. Reg. 63949 (Nov. 17, 1998).................11

Budget Rescissions and Deferrals, 67 Fed. Reg. 34963 (May 16, 2002)................11

Dep. of Deputy Assoc. Dir. for Nat'l Sec. Programs, Permanent Select Committee on Intelligence, U.S. House of Representatives (Nov. 16, 2019)........................19

Letter from Gen. Couns., OMB, to Gen. Couns., GAO, *RE: B-331564, Office of Management and Budget—Withholding of Ukraine Security Assistance* (Dec. 11, 2019) ...........................................................................................................20

Letter from Gen. Couns., OMB, to Gen. Couns., GAO, *RE: B-331564, Office of Management and Budget—Withholding of Ukraine Security Assistance* (Jan. 19, 2021) ........................................................................................... 21, 24

Letter from Rep. Rosa L. DeLauro, Ranking Member, House Comm. on Appropriations, to Matthew J. Vaeth, Acting Dir., OMB (Feb. 3, 2025), https://perma.cc/AK9D-HRNZ ................................................................27

*Mandate for Leadership 2025: The Conservative Promise* (2023), https://perma.cc/9U6L-R8C6 ..............................................................19

*MAX Homepage*, https://apportionment-public.max.gov .......................................25

OMB, *An American Budget* (2018), https://perma.cc/2TX5-S2GY .......................12

OMB, *Analytical Perspectives* (2024), https://perma.cc/CSF7-ASH7 ...................12

OMB, *Appendix: Budget of the U.S. Government* (2017), https://perma.cc/98WZ-QWUE ...............................................................................................12

OMB, Circular No. A-11: Preparation, Submission, and Execution of the Budget (July 2024) ................................................................... 3, 10, 13, 19

OMB, OMB Mem. No. M-25-13, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (Jan. 27, 2025)................................ 2, 4, 26

OMB, OMB Mem. No. M-25-14, Rescission of M-25-13 (Jan. 29, 2025)..............2

Russ Vought, *The White House Announces Its Rescission Package,* Trump White House (May 8, 2018), https://perma.cc/KAB2-FWBM ......................................11

The President's Veto Power, 12 Op. O.L.C. 128 (1988)..........................................7

## STATEMENT OF INTEREST[1]

*Amici curiae* respectfully submit this brief in support of the plaintiffs-appellees. *Amici* are former Office of Management and Budget ("OMB") officials, with a collective 235 years of experience, who served at OMB under both Democratic and Republican administrations.[2] *Amici* are concerned by OMB's recent actions and believe that their knowledge, expertise, and objectivity concerning OMB's authorities and OMB's traditional role in implementing the administration's agenda will assist the Court in assessing this appeal.

---

[1] No counsel for a party authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* or their counsel contributed money that was intended to fund the preparation or submission of this brief. Fed R. App. P. 29(a)(4)(E).

[2] The addendum includes a list of *amici*.

1

## SUMMARY OF ARGUMENT

One week after President Trump issued several executive orders directing agencies to terminate or withhold federal funding for programs that did not align with the president's priorities,[3] OMB issued a government-wide memorandum directing that agencies "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance." OMB, OMB Mem. No. M-25-13, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, at 2 (Jan. 27, 2025) [hereinafter OMB Memorandum].[4] This categorical, indiscriminate direction to withhold federal funding sowed chaos, uncertainty, and fear for recipients of federal funding that, among many other affected programs, relied on such funds to provide suicide prevention services for veterans,[5] rental

---

[3] *See* Exec. Order No. 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025); Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025); Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025); Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[4] OMB rescinded the memorandum two days later. OMB, OMB Mem. No. M-25-14, *Rescission of M-25-13*, at 1 (Jan. 29, 2025). But the district court held that despite this rescission, the action was not moot because "the rationale underlying the OMB Directive's rescission makes it unreasonable to conclude that the Defendants will not reinstate the challenged funding freeze absent an injunction from this court." Mem. Order, at 16, *New York v. Trump*, No. 1:25-cv-39 (D.R.I. Mar. 6, 2025), ECF No. 161.

[5] Req. for TRO Ex. 1, at 11, *New York v. Trump*, No. 1:25-cv-39, (D.R.I. Jan. 28, 2025), ECF No. 3-1.

assistance for low-income individuals living with significant and long-term disabilities,[6] and healthcare for individuals in rural, underserved areas.[7]

Congress, not the president or OMB, holds the power of the purse. It is the president's duty, in turn, to faithfully execute the laws passed by Congress, and OMB assists the president in doing so by "overseeing the preparation of the President's Budget and . . . supervis[ing] its administration by the Executive Branch agencies." OMB, Circular No. A-11: Preparation, Submission, and Execution of the Budget § 10.8 (July 2024) [hereinafter OMB Circular A-11]. For decades, as part of this mission OMB has played a significant role in furthering the president's priorities, including by preparing special messages under the Impoundment Control Act of 1974 ("ICA"), sending guidance to and coordinating with agencies in preparing the president's budget, and overseeing the execution of awards of federal financial assistance.

But the first Trump administration abused OMB's authorities by using the apportionment process to illegally withhold foreign aid for policy reasons. *See* GAO, B-331564, Office of Management and Budget—Withholding of Ukraine Security Assistance 1 (Jan. 16, 2020) [hereinafter Withholding of Ukraine Security

---

[6] *Id.* at 41.

[7] Pls.' Opp'n to Mot. to Dismiss Ex. 3, at 9–10, *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-239 (D.D.C. Jan. 31, 2025), ECF No. 24-3.

Assistance]. And now, in President Trump's second term in office, the administration has again used OMB as a tool for abuse, broadly freezing federal financial assistance for the explicit purpose of furthering the president's policies. OMB Memorandum, at 2. These extraordinary exploitations of previously routine functions are inconsistent with OMB's authorities and mark yet another way in which the executive branch has caused harm and chaos by systematically intruding on Congress's constitutional prerogatives.

The government contends that the preliminary injunction is an "intrusion on the President's Article II authority to direct his subordinates and to ensure that federal funding programs are aligned, where legally permitted, with his policy priorities." Appellants' Br. at 2–3. But this assertion disregards the fact that for decades, across Democratic and Republican administrations and during presidential transitions, OMB has faithfully implemented the president's policies in accordance with both the Constitution and the laws passed by Congress. That the process for change takes more time than a president might desire is not a valid excuse for an administration to ignore the law.

This Court should affirm the district court's order granting a preliminary injunction.

4

## ARGUMENT

During the first Trump administration, OMB became increasingly central to the implementation of the president's agenda. This shift came to light when the Trump administration abused OMB's limited authority to apportion funds to withhold, and the House of Representatives impeached President Trump in part for illegally withholding, funds for security assistance for Ukraine. Congress responded to this overreach by passing transparency and reporting requirements for the apportionment process, but in the second week of this new administration OMB bypassed these procedures and instead ordered a categorical and unprecedented withholding of funds via a memorandum to executive branch agencies. The Trump administration took this action without any pretense of the program-by-program, fact-specific analysis required for proper budget execution, and despite the availability of legal mechanisms for implementing the president's policy agenda, including the ICA, the annual budget process, and congressionally provided discretion in the execution of certain programs. None of these mechanisms require a president to violate the law to implement their agenda.

## I.    The President Can Implement Their Agenda Without Illegally Withholding Funds

Before the district court, the government asserted that "it would be a fundamental intrusion on Article II for courts to require the President to wait a particular amount of time before directing agencies to implement his agenda to the extent permissible by law." Mem. in Opp'n to Pls.' Mot. for Prelim. Inj., at 36, *New York v. Trump*, No. 1:25-cv-39, ECF No. 113. But an order enjoining OMB from implementing the directives in the OMB Memorandum, including under a different name, would cause no such harm, as the current budget execution framework provides multiple legal pathways for implementing the president's agenda.

### A. The President Can Temporarily Withhold Funds Using the Procedures in the Impoundment Control Act

The Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. This provision, which permits the expenditure of public funds "only when authorized by Congress," reflects the legislative branch's affirmative authority over federal spending. *United States v. MacCollom*, 426 U.S. 317, 321 (1976); *see also Harrington v. Bush*, 553 F.2d 190, 194–95 (D.C. Cir. 1977) (explaining that "Congress has plenary power to give meaning to" the appropriations clause); U.S. Const. art. I, § 8, cl. 18 (Necessary and Proper Clause). The president must take care

6

to faithfully execute—and cannot unilaterally change—the laws passed by Congress. *See* U.S. Const. art. II, § 3 (Take Care Clause); *id.* art. I, § 7, cl. 2 (Presentment Clause); *Clinton v. City of New York*, 524 U.S. 417, 448 (1998) (holding that the Line Item Veto Act was unconstitutional because "it would authorize the President to create a different law—one whose text was not voted on by either House of Congress or presented to the President for signature").

Taken together, these provisions require the president to implement, without change, duly enacted laws, including laws making appropriations. Interpreting these provisions otherwise "would in effect be a 'superveto' with respect to all appropriations powers." The President's Veto Power, 12 Op. O.L.C. 128, 167 (1988) ("[R]eliance upon the President's obligation to 'take Care that the Laws be faithfully executed' . . . to give the President the authority to impound funds in order to protect the national fisc, creates the anomalous result that the President would be declining to execute the laws under the claim of faithfully executing them."); *see also* GAO, B-330330, Impoundment Control Act—Withholding of Funds through Their Date of Expiration 2–3 (Dec. 10, 2018).

Nevertheless, in the 1970s President Nixon launched an "unprecedented impoundment" by refusing to spend funds appropriated for, among other things, water pollution control, youth employment programs, community health centers,

7

and highway projects. H.R. Rep. No. 93-658 (1973); *see, e.g.*, *Train v. City of New York*, 420 U.S. 35, 37 (1975);[8] *Cmty. Action Programs Exec. Dirs. Ass'n of N.J., Inc. v. Ash*, 365 F. Supp. 1355, 1357, 1364 (D.N.J. 1973); *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 903 (D.D.C. 1973); *State Highway Comm'n of Mo. v. Volpe*, 479 F.2d 1099, 1114 (8th Cir. 1973). Although courts rejected and ordered the reversal of many of President Nixon's actions, these unilateral withholdings nonetheless "created chaos in the operations of State and local governments." *See, e.g.*, *Train*, 420 U.S. at 41; H.R. Rep. No. 93-658 (1973).

Members of Congress responded to this widespread turmoil by reiterating that "there is no authority either in Article II of the Constitution or in the case law, for the [government's] position that [the president] may achieve [control of federal spending] by refusing to comply with the terms of a statute." S. Rep. No. 93-688 (1974) (citation omitted); *see City of New Haven v. United States*, 809 F.2d 900, 907 (D.C. Cir. 1987) (explaining that "the '*raison d'etre*' of the entire legislative effort was to assert *control* over presidential impoundments"). Congress thus passed the ICA,[9] which prohibits the president from unilaterally withholding funds—even

---

[8] Although the Supreme Court decided *Train* after enactment of the ICA, the Court issued its holding without deciding "the reach or coverage" of that law. *Id.* at 41 n.8.

[9] The ICA applies to both obligations and disbursements. *See* 2 U.S.C. §§ 683, 684; GAO, GAO-05-734SP, A Glossary of Terms Used in the Federal Budget

8

temporarily—but gives the president strictly circumscribed authority to do so after following either of two "special message" procedures.

First, if a president wishes to temporarily withhold or delay the obligation or expenditure of budget authority, then the president can send a special message to Congress proposing a "deferral." 2 U.S.C. §§ 682, 684. A president may defer budget authority in only three narrow circumstances: "to provide for contingencies," "to achieve savings made possible by . . . changes in requirements or greater efficiency of operations," or "as specifically provided by law." *Id.* § 684(b). Budget authority may not be deferred for any other reason, including policy reasons, and withheld amounts must be released in time to be prudently obligated before the appropriation expires. GAO, GAO-10-320T, Impoundment Control Act: Use and Impact of Rescission Procedures 2 (Dec. 16, 2009); GAO, B-241514.5 (May 7, 1991); *cf. City of New Haven*, 809 F.2d at 909 (explaining that it would be "completely contrary to the will of Congress" for the president to defer funds for policy reasons under the ICA).

Second, if a president wishes to permanently cancel budget authority, the president can send a special message to Congress proposing a "rescission." 2 U.S.C.

---

Process 70 (Sept. 2005) [hereinafter *Budget Glossary*] (explaining that an obligation creates a legal liability on behalf of the government); *id.* at 45 (defining a disbursement as an amount paid "to liquidate government obligations").

9

§§ 682, 683. A president may propose a rescission for any reason, including policy reasons, and after the president sends the proposal to Congress the president generally may withhold the funds for up to 45 days while Congress considers whether to pass a rescission bill under expedited procedures.[10] 2 U.S.C. §§ 683(b), 688. But if Congress has not passed such a bill by the end of the 45-day period, the president must make available for obligation any withheld funds that Congress has not rescinded. *Id.* § 683. Importantly, the ICA includes transparency provisions, requiring that the president include certain information in any deferral or rescission proposal, such as the affected amount and account and the facts and circumstances relating to the special message. *Id.* §§ 683(a), 684(a). OMB prepares these special messages on behalf of the president. OMB Circular A-11 § 112.11.

---

[10] There are two exceptions to this 45-day withholding period. First, if a president transmits a special message proposing to rescind funds that are available for a fixed time period, and the 45-day withholding period approaches or spans the expiration date for those funds, the president must release the funds in time for the agency to prudently obligate them. GAO, B-330330, Impoundment Control Act—Withholding of Funds through Their Date of Expiration 6 (Dec. 10, 2018). Second, the president cannot withhold funds proposed for rescission if the law falls under what is known as the "fourth disclaimer." 2 U.S.C. § 681(4); *see also* GAO, B-330045, Impoundment Control Act of 1974: Review of the President's Special Message of May 8, 2018 10–11 (May 22, 2018). Under such a law, such as an appropriation for a formula grant, the executive branch does not have any discretion over the obligation of the funds. GAO, B-337137, U.S. Department of Transportation, Federal Highway Administration—Application of the Impoundment Control Act to Memorandum Suspending Approval of State Electric Vehicle Infrastructure Deployment Plans 16, 17 (May 22, 2025).

Since the enactment of the ICA, presidents of both parties have proposed amounts for deferral or rescission. *See, e.g.*, Budget Rescissions and Deferrals, 67 Fed. Reg. 34963 (May 16, 2002); Budget Recissions and Deferrals, 63 Fed. Reg. 63949 (Nov. 17, 1998); GAO, B-330828, Updated Rescission Statistics, Fiscal Years 1974–2020 (July 16, 2020). Indeed, during President Trump's first administration, he sent two special messages to Congress proposing funds for rescission, seeking to "eliminate outdated and ineffective programs across the federal government." Russ Vought, *The White House Announces Its Rescission Package,* Trump White House (May 8, 2018), https://perma.cc/KAB2-FWBM; GAO, B-330045.3, Impoundment Control Act of 1974—Release of Withheld Amounts Due to Expiration of 45-day Period 1 (July 3, 2018); GAO, B-332868, Impoundment Control Act of 1974—Release of Withheld Amounts Due to Withdrawal of Rescission Proposals 1 (Feb. 24, 2021). And since issuing the subject memorandum he has sent another special message to Congress, proposing to rescind $9.4 billion in budget authority. 90 Fed. Reg. 24298, 24298 (June 9, 2025).

Over the years, Congress has rescinded billions of dollars in response to rescission proposals submitted by presidents of both parties. *See* GAO, *Updated Rescission Statistics*. By following these prescribed procedures, presidents can—

11

consistent with their priorities—work with Congress to reduce federal spending outside the typical budget process.

### B. The President Can Establish Their Priorities and Propose the Cancellation of Funds and Programs Through the Budget Process

The congressional appropriations process formally begins with the submission of the president's budget. 2 U.S.C. § 631. The budget gives Congress important information about the financial condition of the government and serves as a statement of the administration's policy priorities, sharing the president's vision for the executive branch moving forward. 31 U.S.C. § 1105. The budget includes information about how much the president believes should be spent for each existing program, recommendations for new initiatives, and the proposed elimination of programs—or even entities—that the president believes are unnecessary. *See, e.g.*, OMB, *An American Budget* 14 (2018), https://perma.cc/2TX5-S2GY (proposing "to pay for increases for the military with $65 billion in reductions from the non-Defense discretionary caps"); OMB, *Analytical Perspectives* 79 (2024), https://perma.cc/CSF7-ASH7 (explaining that the proposed budget "creates a historic new program [for] . . . affordable, high-quality child care"); OMB, *Appendix: Budget of the U.S. Government* 381 (2017), https://perma.cc/98WZ-QWUE ("ARPA-E is being eliminated in the FY 2018 Budget in accordance with Administration priorities.").

12

The process of developing the president's budget for the next fiscal year begins almost immediately after the prior process ends, with OMB sending planning and policy guidance to executive branch agencies and working closely with those agencies in developing their proposals. OMB Circular A-11 § 10.5. OMB typically requires that agencies seek OMB clearance before sharing budget-related materials with Congress or the media, and once agencies submit their proposals to OMB, OMB reviews the proposals for consistency with the president's priorities, briefs the president on the proposed budget policies, and makes decisions on the agencies' budget requests. *Id.* §§ 10.5, 22.3; *see also id.* § 110.1 (explaining that any proposed changes to the budget "must conform to the policies of the President"). Agencies can appeal OMB's decisions, but the ultimate authority in resolving any disputes lies with the president. *Id.* § 10.5. Through these processes, OMB exercises strict control over agency communications with Congress to ensure uniformity within the executive branch and conformity with the president's policies.

Budget submissions or proposals from OMB or agencies are not law, but these documents outline the president's priorities for Congress. Congress, in turn, considers this information in establishing funding levels for the government, whether to eliminate or change existing programs or cancel funds for existing initiatives, and the need for any deficiency or supplemental appropriations. In this

13

way a president—with the support of the people's representatives in this co-equal branch of government—can shape policy for years to come.

### C. The President Can Direct Agencies to Prioritize the President's Agenda in Agency Activities

An administration need not wait for the budget process, however, to start implementing the president's agenda. Not only do some statutes provide discretion for the executive branch to use funds for multiple purposes, but presidents historically also have used executive orders, regulations, and other directives to influence federal policy in accordance with the law.

To begin, Congress may appropriate a "lump-sum" amount that can serve any number of purposes. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). "[T]he very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* Thus, subject to any limits Congress may impose on a particular appropriation account, an agency generally "may shift funds within an appropriation . . . account as part of their duty to manage their funds." *See Budget Glossary*, at 85. Congress also may provide an agency statutory authority to transfer funds between appropriation accounts, affording even greater flexibility in how the agency uses the funds Congress has provided. *Compare id.* at 95 ("Agencies may transfer budget authority only as specifically authorized by law."), *with id.* at 96

14

(defining "transfer authority").[11] Although none of these authorities give the president the ability to unilaterally pause funding, within these limits the executive branch may determine that a certain use of funds would better reflect the president's policy priorities and OMB, consistent with other laws, may coordinate with the agency to redirect the funds toward that purpose.[12]

The president also may set forth their policy preferences through government-wide executive actions, directing agencies to implement this congressionally provided flexibility in accordance with administration priorities.[13] For example:

---

[11] On the other hand, Congress may impose additional limits on an agency's use of funds, including by restricting an agency's ability to reprogram funds or by giving an agency no discretion in obligating funds for a program. *See* GAO, B-319009, U.S. Secret Service—Statutory Restriction on Availability of Funds Involving Presidential Candidate Nominee Protection 1–2 (Apr. 27, 2010) (reprogramming notification requirement); *City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (no discretion for formula grants).

[12] In such a situation, funds may temporarily go unobligated while the agency takes the necessary steps to redirect the funds. But not every temporary delay in obligation must be reported under or violates the ICA. *See* GAO, B-333110, Office of Management and Budget and U.S. Department of Homeland Security—Pause of Border Barrier Construction and Obligations 2 (June 15, 2021) ("Delays in spending . . . funds in order to satisfy applicable statutory requirements are programmatic delays, not impoundments."). A delay that results *despite* an agency's attempts to implement a program—even if the implementation differs from what the agency originally intended—is merely programmatic. *See* GAO, B-329092, Impoundment of the Advanced Research Projects Agency-Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018 3 n.6, 5 (Dec. 12, 2017).

[13] The Office of Information and Regulatory Affairs, a component of OMB, also reviews significant agency rules that "[r]aise novel legal or policy issues arising

- President George H. W. Bush declared a policy of "strengthen[ing] the capacity of historically Black colleges and universities to provide quality education," and directed each department to "establish an annual plan to increase the ability of historically Black colleges and universities to participate in federally sponsored programs." Exec. Order No. 12,677, 54 Fed. Reg. 18869, 18869 (May 2, 1989).
- President Bill Clinton established a policy of reducing the government's use of substances that cause ozone depletion and directed agencies to "revise their procurement practices and implement cost-effective programs both to modify specifications and contracts that require the use of" such substances. Exec. Order No. 12,843, 58 Fed. Reg. 21881, 21881 (Apr. 23, 1993).
- President George W. Bush directed several agencies to establish Centers for Faith-Based and Community Initiatives and directed the centers to coordinate an effort to "incorporate faith-based and other community organizations in department programs and initiatives to the greatest extent possible." Exec. Order No. 13,198, 66 Fed. Reg. 8497, 8497 (Jan. 29, 2001).
- President Barack Obama declared a policy of reducing improper payments, directed OMB to identify federal programs with the highest amounts of improper payments, and ordered the Secretary of the Department of Treasury to identify targets for reducing and recovering those payments. Exec. Order No. 13,520, 74 Fed. Reg. 62201, 62201 (Nov. 20, 2009).
- During his first administration, President Trump declared a policy of "enhanc[ing] the protection and safety of Federal, State, tribal, and local law enforcement officers," directed the Attorney General to "evaluate all grant funding programs" administered by the Department of Justice "to determine the extent to which its grant funding supports and protects Federal, State, tribal, and local law enforcement officers," and directed the Attorney General to recommend any changes to that funding. Exec. Order No. 13,774, 82 Fed. Reg. 10695, 10695 (Feb. 9, 2017).
- President Biden declared a policy of advancing racial equity and support for underserved communities, directed OMB to identify opportunities to promote equity in the president's budget proposal, and stated that the government "should, consistent with applicable law, allocate resources to

out of . . . the President's priorities." Exec. Order No. 12,866, 58 Fed. Reg. 51735, 51738 (Oct. 4, 1993).

16

address the historic failure to invest sufficiently, justly, and equally in underserved communities, as well as individuals from those communities." Exec. Order No. 13,985, 86 Fed. Reg. 7009, 7010 (Jan. 20, 2021).

Through these forward-looking executive actions, presidents—without directing the withholding of funds—took steps to ensure that the execution of federal programs would reflect their priorities.

## II. Despite Available Legal Mechanisms for Implementing the President's Agenda, the Trump Administration Has Abused OMB's Authorities by Withholding Congressionally Appropriated Funds

### A. The History and Purpose of the Apportionment Process

A century before Congress categorically rebuked the Nixon administration's *refusal* to spend funds by passing the ICA, Congress responded to executive overreach on the other end of the spectrum, namely, the *overspending* of funds, by passing another cornerstone of fiscal law: the Antideficiency Act ("ADA").

Through at least the end of the nineteenth century, the executive branch often ignored constitutional constraints on spending, disregarding and obligating funds in excess of the amounts established in laws making appropriations. Alfred H. Teichler et al., *Administrative Control of Funds—The Anti-Deficiency Story*, George Wash. Univ. Navy Grad. Fin. Mgmt. Program, 2 (1962). These "coercive deficiencies" gave Congress little choice but to pass supplemental appropriations covering these additional amounts. *Id.* at 3. So the executive branch proceeded with "perfect

17

confidence that Congress would appropriate supplementary sums when they were requested rather than stop" services procured by the government. *Id.*

But in 1870 Congress passed the first version of the ADA, codifying Congress's constitutional power of the purse by explicitly prohibiting the government from spending more than Congress appropriated in any fiscal year. Act of July 12, 1870, § 7, 16 Stat. 230, 251. Over time Congress strengthened this law, providing administrative discipline and criminal penalties for certain violations and, as relevant here, establishing an apportionment process to prevent further deficiencies.[14] 31 U.S.C. §§ 1349–50, 1512–13, 1518–19.

Under this law, the responsibility to apportion funds to executive branch agencies lies with the president, who has delegated that authority to OMB. 31 U.S.C. § 1513(b); Exec. Order No. 6,166 (June 10, 1933), *as amended by* Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987). OMB may apportion funds by time, activity, function, project, object, or any combination of these methods to "prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or

---

[14] The ADA also prohibits obligating or expending in excess of an appropriation, in advance of an appropriation, or in excess of the amount permitted by agency regulations, and the acceptance of voluntary services. 31 U.S.C. §§ 1341, 1342, 1517(a).

supplemental appropriation."[15] 31 U.S.C. §§ 1512(a), (b)(1), 1513(b). An agency cannot spend more than OMB apportions, and agency officials may be subject to administrative discipline or criminal penalties if they authorize an obligation or expenditure exceeding an OMB-approved apportionment. 31 U.S.C. §§ 1517–19. In this way, the apportionment process permits OMB to exercise significant control over the execution of the federal budget.

### B. OMB Uses the Apportionment Process to Illegally Withhold Funds during the first Trump Administration

Usually, apportionments are "routine." Dep. of Deputy Assoc. Dir. ("DAD") for Nat'l Sec. Programs, Permanent Select Committee on Intelligence, U.S. House of Representatives 18:2–18:3 (Nov. 16, 2019).[16] But during the first Trump administration, OMB adopted an expansive view of its apportionment authority. *See* Letter from Gen. Couns., OMB, to Gen. Couns., GAO, *RE: B-331564, Office of*

---

[15] For "[a]n appropriation for an indefinite period" and "authority to make obligations by contract," OMB must apportion the appropriation "to achieve the most effective and economical use." 31 U.S.C. § 1512(a); *see Budget Glossary*, at 22 (defining "no-year authority").

[16] Historically, career officials known as DADs approved apportionments. OMB Circular A-11 § 120.2. But in President Trump's first term, and again in this term, the administration delegated this authority to political appointees. Delegation of Apportionment Authority, 90 Fed. Reg. 9737 (Feb. 18, 2025); *see also Mandate for Leadership 2025: The Conservative Promise* 45 (2023), https://perma.cc/9U6L-R8C6 (describing this change as an "indispensable statutory tool" that "open[s] wide vistas of oversight that had escaped the attention of policy officials").

*Management and Budget—Withholding of Ukraine Security Assistance* 9 (Dec. 11, 2019) [hereinafter December Letter]. And in 2019, OMB issued a series of apportionments that made unavailable for obligation about $214 million that Congress had appropriated to the Department of Defense for security assistance to Ukraine. GAO, Withholding of Ukraine Security Assistance 1. According to OMB, the purpose of the withholding was to "ensure the funds were not spent 'in a manner that could conflict with the President's foreign policy,'" and any delay to "ensure compliance with presidential policy prerogatives" was merely programmatic.[17] GAO, Withholding of Ukraine Security Assistance 6, 7. The U.S. Government Accountability Office ("GAO") disagreed, holding that OMB's unilateral withholding of these amounts through the apportionment process, though temporary, had violated the ICA. *Id.* at 7. As GAO explained, "[f]aithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law." *Id.* at 7; *see* 2 U.S.C. § 686.

Although OMB agreed with this longstanding principle under the ICA, it nonetheless disputed GAO's conclusion that OMB's withholding was illegal. December Letter, at 6 (explaining that the president "may not defer funds simply

---

[17] *See, e.g.*, *supra* note 12 (explaining that a programmatic delay does not constitute an unlawful impoundment).

because he disagrees with the policy underlying a statute"); Letter from Gen. Couns., OMB, to Gen. Couns., GAO, *RE: B-331564, Office of Management and Budget— Withholding of Ukraine Security Assistance*, at 2 (Jan. 19, 2021) [hereinafter January Letter]. Explaining that apportionments are a "principal tool" for managing executive branch operations, OMB argued that federal law "*mandates*" that OMB apportion funds as "temporarily unavailable as OMB 'considers appropriate.'" January Letter, at 2 (citation omitted).[18] In other words, OMB relied on its duty under the ADA to prevent the government from spending money that Congress did *not* appropriate to justify a completely separate action and purpose—namely, "pausing" funds that Congress *did* appropriate—to further the president's policy agenda. *See* January Letter, at 2; *see also* Appellants' Br. at 32 (citing OMB's apportionment authority). This view belies the text and purpose of the ADA.

Under the ADA, an official must apportion funds as the official "considers appropriate." 31 U.S.C. § 1512(b)(2). But the statutory scheme, considered as a

---

[18] OMB also asserted that the executive branch "simply cannot function" if it is not permitted to delay spending to "determine the best policy in order to *comply* with the statute." January Letter, at 2. But a delay that results from legitimate programmatic factors, such as determining compliance with statutory requirements, is not a reportable deferral under the ICA. *See, e.g.*, *supra* note 12; *see also, e.g.*, GAO, B-291241, Funding for Technical Assistance for Conservation Programs Enumerated in Section 2701 of the 2002 Farm Bill 11–12 (Oct. 8, 2002) (temporary delay in apportionment because of legal questions about a statutory restriction was not an impoundment).

whole, demonstrates the limits of this authority. *See Am. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 796 F.3d 18, 23 (D.C. Cir. 2015) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (citation omitted)).

First, looking at the entirety of the provision cited by the government, the ADA permits an official to "apportion an appropriation *under paragraph (1) of this subsection* as the official considers appropriate." 31 U.S.C. § 1512(b)(2) (emphasis added). As described above, paragraph (1) outlines the specific ways in which an official may apportion funds: by time, project, or both. *See id.* § 1512(b)(1). These provisions, taken together, give an official discretion in determining which of these methods is appropriate for apportioning a particular appropriation. But neither overrides the statutory requirement that a fixed-period appropriation "be apportioned to prevent obligation or expenditure" at a rate that would exceed the appropriated amount, and neither permits the president to use the apportionment process to unilaterally withhold congressionally appropriated funds for policy reasons. *See id.* § 1512(a).

Indeed, another provision in the ADA prescribes the specific scenarios in which OMB may seek to establish a reserve for, rather than make available, the funds

22

Congress has appropriated. *See* 31 U.S.C. § 1512(c)(1). These scenarios—which are identical to those in which a president may propose funds for deferral under the ICA—do not permit OMB to establish a reserve for policy reasons. *Compare id.* (permitting OMB to establish a reserve only "to provide for contingencies," "achieve savings made possible by or through changes in requirements or greater efficiency of operations," or "as specifically provided by law"), *with* 2 U.S.C. § 684(b) (same for deferral proposals). And when OMB establishes such a reserve, it must report the reserve under the ICA. *See* 31 U.S.C. § 1512(c)(2).

Lest there be any doubt about the scope of OMB's apportionment authority, the legislative history of the ADA's reserve provision makes these limits clear. When Congress passed the ICA it also "tightened" the apportionment provision of the ADA, eliminating the administration's prior ability to establish a reserve for "other developments." S. Conf. Rep. 93-924 (1974). In making this change, a congressional committee explained that "[t]he apportionment process is to be used only for routine administrative purposes such as to avoid deficiencies in Executive branch accounts, not for the making of policy or the setting of priorities." S. Rep. 93-688 (1974). "By no interpretation is it reasonable to claim that the purpose of the [acts establishing the apportionment authority] was to empower administrative

agencies to withhold funds from expenditure. The sole objective was to avert overexpenditure of funds." H.R. Rep. 93-658 (1973).

At bottom, the responsibility to apportion funds does not carry with it an independent authority to withhold funds for policy reasons. During the first Trump administration, GAO held the same. But even after GAO concluded that OMB had violated the ICA, and even after the House impeached President Trump, in part, for conditioning the release of security assistance to Ukraine on Ukraine's public announcement of certain investigations, political appointees at OMB continued to maintain that the use of apportionments to withhold funds for policy reasons did not violate the ICA. January Letter, at 5; H.R. Res. 755, 166 Cong., at 1–2 (Dec. 18, 2019). Congress responded in turn.

### C. Congress Responds by Passing Apportionment Transparency and Reporting Requirements

Following OMB's abuse of apportionments during the first Trump administration, Congress—on a bipartisan basis—passed several provisions requiring apportionment transparency. First, Congress passed a law requiring that OMB publish apportionment documents, giving the public and Congress insight into a previously opaque process. 31 U.S.C. § 1513 note.[19] Moreover, Congress passed a

---

[19] OMB complied with this requirement from July 2022 until March 24, 2025, when OMB removed the public apportionment website. *Compare Approved*

law requiring agencies to tell Congress if OMB does not apportion funds in the time required under statute, conditions the availability of an appropriation on further action, or approves an apportionment that would hinder either program execution or the prudent obligation of funds. *See, e.g.*, Pub. L. No. 118-47, div. B. tit. VII, § 749, 138 Stat. 460, 586–87 (2024). These provisions serve to ensure that Congress receives timely information about any apportionment that may improperly withhold amounts.

Additionally, Congress passed a law requiring that the president or the head of the relevant department or agency report any violation of the ICA to Congress, including "all relevant facts and a statement of actions taken." *Id.* § 748, 138 Stat. at 586. This reporting requirement brings additional transparency to any unauthorized withholdings by the executive branch.

### D. OMB Issues Memorandum Directing Agencies to Categorically and Indiscriminately Withhold Congressionally Appropriated Funds during the second Trump Administration

On January 27, 2025, OMB issued the challenged memorandum, titled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance

---

*Apportionments*, OMB, https://perma.cc/5NMG-H2XV (last visited Mar. 19, 2025) , *with MAX Homepage*, https://apportionment-public.max.gov (last visited July 17, 2025) (displaying "Page Not Found" error message). *See also* Defs. Counter-Statement of Material Facts at 3–4, *Citizens for Resp. & Ethics in Washington v. OMB*, 1:25-cv-1051 (D.D.C. Apr. 30, 2025), ECF No. 18-2.

Programs." OMB Memorandum, at 1. In the memorandum, OMB explained that agencies were required to "identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements." *Id.* This directive, alone, would have been consistent with other orders issued by presidents seeking to implement their agenda in accordance with existing law. *See supra* Part I.C. But the memorandum went further, stating that agencies

> **must temporarily pause** all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal.

OMB Memorandum, at 2. The memorandum qualified this directive by limiting pauses "to the extent permissible under applicable law." *Id.* But generally, the only law that permits the executive branch to intentionally, temporarily withhold funds is the ICA. That law strictly circumscribes when the president can temporarily withhold funds, and requires that the president complete specific procedures before doing so. There is no indication that the president complied with such procedures before issuing the memorandum here.

Nor is there any indication that before issuing the memorandum OMB engaged in the meticulous, program-by-program analysis required for effective

26

budget execution. Rather, OMB issued an unprecedented, categorical, indiscriminate pause on federal funding that left the recipients who rely on this crucial assistance scrambling to understand and brace for the harsh impact of the sudden freeze.

Beyond the lack of legal support for OMB's directive, as a practical matter the breadth of the memorandum has rendered any oversight nearly impossible. *Cf.* Letter from Rep. Rosa L. DeLauro, Ranking Member, House Comm. on Appropriations, to Matthew J. Vaeth, Acting Dir., OMB (Feb. 3, 2025), https://perma.cc/AK9D-HRNZ (seeking "important clarity on the current state of budget execution" and requesting "a detailed tabulation of the funding that has been paused at the direction of the President's Executive Orders"). In contrast to OMB's government-wide memorandum, a special message under the ICA would have specified the amounts withheld, the affected accounts, the reasons for and estimated effects of the withholding, and, for a deferral proposal, the legal authority for the withholding. *See* 2 U.S.C. §§ 683, 684. Separately, a budget proposal seeking to cancel funds or eliminate programs would have identified those funds or programs and explained why Congress should pass a law to cancel or eliminate them. And if OMB had made any changes to an agency's apportionment, OMB would have been required to do so on an account-by-account basis and to publicly post the

27

apportionments. Through this process, Congress would have been able to see any changes in the apportionment of funds and evaluate the legality of any temporary delays.[20] OMB's decision to use a mechanism that lacks any of these accountability or transparency measures leaves the public largely in the dark as to the actual, or any lingering effects, of these unprecedented pauses.

## CONCLUSION

Neither the Constitution nor the budget execution framework permits the executive branch to unilaterally withhold funds appropriated by Congress. OMB's directive to intentionally, temporarily stop funding for nearly $3 trillion in federal financial assistance extended far beyond any executive branch authority to "faithfully execute" the laws passed by Congress, effectively prevented oversight of specific funding streams, and instilled in recipients of federal funding a sense of chaos and fear. There are myriad ways in which a president may implement their policy agenda without illegally withholding funds, and there is no reason OMB cannot use these other legal pathways to assist the current administration in doing so.

---

[20] *But see* Defs. Counter-Statement of Material Facts, *supra* note 19, at 4 (explaining that OMB has stated that it will no longer comply with the apportionment transparency requirement).

28

This Court should affirm the district court's order granting the preliminary injunction.

Dated: July 21, 2025

Respectfully submitted,

/s/ Christina Wentworth

Christina L. Wentworth
1st Cir. Bar No. 1215969
Nikhel S. Sus
1st Cir. Bar No. 1218784
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
PO Box 14596
Washington, D.C. 20044
Telephone: (202) 408-5565
Fax: (202) 588-5020
cwentworth@citizensforethics.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 29(b)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(f):

   [ X ] this document contains 6488 words, or

   [    ] this brief uses a monospaced typeface and contains [state the number of] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14pt Times New Roman; or

   [    ] this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

Dated: July 21, 2025                    /s/ Christina Wentworth
                                        Christina L. Wentworth
                                        *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2025, I electronically filed the foregoing document with the Clerk of Court of the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

/s/ Christina Wentworth

Christina L. Wentworth

*Counsel for Amicus Curiae*

# ADDENDUM

## *List of Amici Curiae*

- Barry Anderson, Assistant Director for Budget (1988–1998), Chief, Fiscal Affairs Branch (1985–1988), Chief, Commerce Branch (1984–1985), Budget Examiner, Housing Branch (1980–1984)

- Nicholas Batman, Advisor for Communications (2024–2025)

- Rodney Bent, Deputy Associate Director (1998–2003), Branch Chief (1986–1998), Fiscal Economist (1983–1986)

- Joe Carlile, Associate Director (2023–2025)

- Mary Cassell, Chief, Education Branch (2011–2025), Program Examiner, Education Branch (1995–2011)

- Christine Harada, Senior Advisor (2023–2025)

- Toni Hustead, Chief, Veterans Affairs and Defense Health Branch, National Security Division (1994–2007)

- Charles Kieffer, Acting Associate Director for Legislative Affairs & Chief for Appropriations Analysis (1995–2001), Chief for Appropriations Analysis (1990–1995), Special Assistant to the Director (1985–1990)

- Steve Redburn, Housing Branch Chief (1993–2006), Economist (1986–1993)

32

- Rosalyn Rettman, Associate General Counsel (1990–2008), Assistant General Counsel (1984–1990)

- Kenneth Schwartz, Deputy Associate Director (1987–2005), Branch Chief (1984–1987), Budget Examiner (1969–1972, 1974–1984)

- Jack Smalligan, Deputy Associate Director (2013–2018), Branch Chief (1998–2013), Policy Analyst (1990–1998)

- Kathy Stack, Senior Advisor for Evidence and Innovation (2013–2015), Deputy Associate Director for Education, Income Maintenance and Labor (2005–2013), Education Branch Chief (2000–2005), Program Examiner (1982–1991, 1995–1998, 1999–2000)

- Representative Melanie Stansbury, Program Examiner (2011–2015)