Nos. 25-1236, 25-1413

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; OFFICE OF THE GOVERNOR OF KENTUCKY, ex rel. ANDREW BESHEAR, in their official capacity as Governor of the Commonwealth of Kentucky,

*Plaintiffs-Appellees*,

*(Caption continued on next page)*

*On Appeal from the United States District Court*
*for the District of Rhode Island (No. 1:25-cv-00039)*

## BRIEF OF ILYA SOMIN AS *AMICUS CURIAE* IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

DAVID A. O'NEIL
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

BEATRICE A. WALTON
RAPHAEL M. VIM
WILLIAM F. GONCHER
DEBEVOISE & PLIMPTON LLP
66 Hudson Blvd.
New York, NY 10001

*Counsel for Amicus Curiae*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET PETRO, in their official capacity as Acting Administrator of National

Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration,

*Defendants-Appellants.*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................. 1

SUMMARY OF ARGUMENT .................................................... 4

ARGUMENT ................................................................. 6

I. THE EXECUTIVE'S SWEEPING AND CATEGORICAL IMPOUNDMENT OF FEDERAL FUNDS PLAINLY CONTRAVENES THE CONSTITUTION ........................................... 6

    A. The Constitution Vests Congress with the Power to Direct— and Withhold—Federal Spending .................................... 7

    B. Any Inherent Executive Authority to Impound Is Narrow and Cannot Justify the Executive's Actions Here ................................. 10

    C. Historical Practice Underscores the Entirely Unprecedented and Unlawful Nature of the Funding Freeze .................................. 17

II. IF IMPLEMENTED, THE FUNDING FREEZE WOULD DANGEROUSLY CONCENTRATE POWER IN THE EXECUTIVE AND UNDERMINE FEDERALISM ........................ 21

CONCLUSION ........................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........................................................ 27

*Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689
(E.D. Va. 1973) ............................................................................................. 20

*City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637
(N.D. Cal. May 3, 2025) .............................................................................. 23

*Clinton v. City of New York*, 524 U.S. 417 (1998) .................................. 10, 20

*Cmty. Action Programs Exec. Dirs. Ass'n of N.J., Inc. v. Ash*,
365 F. Supp. 1355 (D.N.J. 1973) ................................................................. 20

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.,
Ltd.*, 601 U.S. 416 (2024) ......................................................................... 7, 8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ..................................................... 24

*Guadamuz v. Ash*, 368 F. Supp. 1233 (D.D.C. 1973) ................................... 20

*Guste v. Brinegar*, 388 F. Supp. 1319 (D.D.C. 1975) .................................. 20

*Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983)................ 27

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ........................................ 14

*Kendall v. United States*, 37 U.S. 524 (1838)................................................ 12

*Lincoln v. Vigil*, 508 U.S. 182 (1993)............................................................ 16

*Local 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp.
60 (D.D.C. 1973) ..................................................................................... 17, 20

*Louisiana v. Weinberger*, 369 F. Supp. 856 (E.D. La. 1973)....................... 20

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*,
361 F. Supp. 897 (D.D.C. 1973)................................................................. 20

*New York v. United States*, 505 U.S. 144 (1992)..........................22

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)................22

*Pennsylvania v. Lynn*, 362 F. Supp. 1363 (D.D.C. 1973) ...........................20

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020)............................................................................................13

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...............................6, 14, 22, 24

*State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973) .......................................................................16

*Train v. City of New York*, 420 U.S. 35 (1975) ............................................20

*United States v. Butler*, 297 U.S. 1 (1936) ..................................................14

*United States v. Price*, 116 U.S. 43, (1885).................................................26

*United States v. Texas*, 599 U.S. 670 (2023) ...............................................12

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)...... 15, 19, 26

**Constitutional Provisions**

U.S. Const. art. I

§ 1 ..............................................................................................7

§ 7 ..............................................................................................9

§ 8 ....................................................................................... 7, 14

§ 9 ........................................................................................ 6, 7

U.S. Const. art. II

§ 1 ....................................................................................... 9, 14

§ 3 ................................................................................ 9, 11, 13

U.S. Const. art. VI

§ 1 ............................................................................... 14

**Statutes**

2 U.S.C.

§ 681 .......................................................................... 21

§ 684 .......................................................................... 15

§ 688 .......................................................................... 21

42 U.S.C.

§ 300x(a) .................................................................... 16

§ 300x-7(a) ................................................................. 16

§ 300x-21(a) ............................................................... 16

§ 300x-33(a) ............................................................... 16

Act of Feb. 28, 1803, ch. XI, § 3, 2 Stat. 206 ............................................. 18

Pub. L. No. 117-58, 135 Stat. 429 (2021) ................................................... 16

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ................................................. 16

**Legislative & Executive Materials**

Charles Cooper, *The President's Veto Power*, 12 Op. O.L.C.
128 (1988), available at https://tinyurl.com/y8ucbe6w .............. 11, 15, 18

Matthew J. Vaeth, Off. of Mgmt. & Budget, Exec. Off. of the
President, M-25-13, *Temporary Pause of Agency Grant,
Loan, & Other Financial Assistance Programs* (Jan. 27,
2025), available at https://tinyurl.com/26yfmsfr ........................ 13, 24, 25

*Mem. from John G. Roberts, Assoc. White House Couns., to Fred F. Fielding, Couns. to the President, Regarding Impoundment Auth.* (Aug. 15, 1985), available at https://tinyurl.com/2webrkvk ............................ 11

*Nom. of the Hon. Russell T. Vought, of Va., to be Dir. of the Off. of Mgmt. & Budget Before the S. Comm. on the Budget*, 119th Cong. 4, 12 (2025), available at https://tinyurl.com/yaw6sxuz ............................................................. 25

The President's News Conference of January 31, 1973, 1 Pub. Papers 62 (1973) .................................................................................................... 20

William H. Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303 (1969), available at https://tinyurl.com/bdtncssz ............ 12, 18

## Books

*Classics of American Political and Constitutional Thought* 73 (2007) ...... 12

Ilya Somin, *Democracy and Political Ignorance: Why Smaller Government Is Smarter* (rev. ed. 2016) ................................................................... 1, 2

Ilya Somin, *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022) ........................................................................................1

Ilya Somin, *The Grasping Hand:* Kelo v. City of New London *and the Limits of Eminent Domain* (2015) ............................................................1

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* (2017) ..................................................... 19, 20, 21

## Academic Articles & Commentary

David J. Barron & Martin S. Lederman, *The Commander in Chief at the Lowest Ebb − A Constitutional History*, 121 Harv. L. Rev. 941, 1061 (2008) ............................................................. 17

Ilya Somin, *American Federalism Can Push Back Against Executive Overreach*, UnPopulist (May 28, 2024), https://tinyurl.com/4pnyvejv .......................................................3

Ilya Somin, *Appeals Court Rules Against Trump in Border Wall Case*, Reason: Volokh Conspiracy (July 6, 2019, 4:37 PM), https://tinyurl.com/3v5fwwcz .......................................................3

Ilya Somin, *Closing the Pandora's Box of Federalism: The Case for Judicial Restriction of Federal Subsidies to State Governments*, 90 Geo. L. J. 461 (2002) ....................................................2

Ilya Somin, *Don't Let the Executive Abuse Emergency Powers to Raid the Treasury*, SCOTUSblog (Feb. 21, 2023), https://tinyurl.com/4hdcnty2 .......................................................3

Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy*, 97 Tex. L. Rev. 1247 (2019) .......................................................... 3, 22, 24

Ilya Somin, *Opinion: Why the Supreme Court Got it Right on Student Loans*, CNN (June 30, 2023, 7:01 PM), https://tinyurl.com/3ch89u2a ....................................................3

Ilya Somin, *Putting the "General" Back in the General Welfare Clause*, National Constitution Center, Interactive Constitution (2016), https://tinyurl.com/4pmwnz8n .................................................2

Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343 (1988) ..........9

Protect Democracy, *The Myth of Presidential Impoundment Power* (Mar. 2025), protectdemocracy.org/impoundment-myth .......................... 17, 21

Zachary Price, *Funding Restrictions and Separation of Powers*, 71 Vand. L. Rev. 357 (2018) ....................................................... 8, 9, 18

Zachary Price, *The President Has No Constitutional Power of Impoundment, by Zachary S. Price*, Yale J. Reg. Notice & Comment (July 18, 2024), https://tinyurl.com/4yvj864m ............................................................... 19

**Other Authorities**

*The Federalist* No. 47 (James Madison) (J. Cooke, ed. 1961)........................5

*The Federalist* No. 58 (James Madison) (J. Cooke, ed. 1961).................. 7, 8

Va. Decl. of Rights § 7 (1776) .................................................................... 12

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

Ilya Somin is Professor of Law at the Antonin Scalia Law School, George Mason University and the B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute. His research focuses on constitutional law, separation of powers, democratic theory, and federalism. He is the author of *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government is Smarter* (rev. ed. 2016), and *The Grasping Hand:* Kelo v. City of New London *and the Limits of Eminent Domain* (2015). His work has appeared in numerous scholarly journals, including the *Yale Law Journal*, *Stanford Law Review*, and *Northwestern University Law Review*, among others, and his amicus briefs and other writings have been cited by the Supreme Court, federal appellate courts, and multiple state supreme courts.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, the Parties have consented to the filing of this *amicus* brief. Also pursuant to Rule 29, undersigned counsel for *amicus curiae* certify that: (1) no counsel for a Party authored this brief in whole or in part; (2) no Party or Party's counsel contributed money that was intended to fund the preparation or submission of this brief; and (3) no person or entity—other than *amicus curiae*, and his counsel—contributed money intended to fund the preparation or submission of this brief.

Much of Professor Somin's work focuses on the constitutional and policy issues at the center of this case. He has previously written on the spending power, the role of courts in policing its boundaries, and the constitutional safeguards that serve to protect democratic institutions. Professor Somin has also been a longstanding critic of ballooning federal spending and government debt, as well as of the widespread dependency of states, local governments, and private entities on federal funding.[2] He has advocated for a smaller federal government footprint in numerous policy areas. *See generally* Ilya Somin, *Democracy and Political Ignorance*, *supra*.

Professor Somin is appearing here because the President's actions leading to this case go far beyond policy preferences—indeed they cut to the very core of separation of powers. Professor Somin has previously called attention to attempts by presidents across administrations to infringe on the legislative branch's power of the purse. These include President Biden's

---

[2] *See, e.g.*, Ilya Somin, *Closing the Pandora's Box of Federalism: The Case for Judicial Restriction of Federal Subsidies to State Governments*, 90 Geo. L.J. 461 (2002); Ilya Somin, *Putting the "General" Back in the General Welfare Clause,* National Constitution Center, Interactive Constitution (2016), https://tinyurl.com/4pmwnz8n.

attempt to cancel student loans,[3] as well as President Trump's efforts to divert funds for his border wall.[4]  Professor Somin has also defended so-called "sanctuary cities"—irrespective of cause and across administrations—against threats to cut off federal funding.[5]

But the Executive's actions in this case go further.  In fact, they involve one of the most sweeping and unsubstantiated attempts to override Congress's power of the purse seen since the Founding.  The Executive's implementation through a funding freeze of a series of extra-legislative policy preferences (on a range of controversial social and political issues) and the coercive effect of

---

[3] *See* Ilya Somin, *Opinion: Why the Supreme Court got it right on student loans*, CNN (June 30, 2023, 7:01 PM), https://tinyurl.com/3ch89u2a; Ilya Somin, *Don't Let the Executive Abuse Emergency Powers to Raid the Treasury*, SCOTUSblog (Feb. 21, 2023), https://tinyurl.com/4hdcnty2.

[4] *See* Ilya Somin, *Appeals Court Rules Against Trump in Border Wall Case*, Reason: Volokh Conspiracy (July 6, 2019, 4:37 PM), https://tinyurl.com/3v5fwwcz.

[5] *See* Ilya Somin, *Making Federalism Great Again: How the Trump Administration's Attack on Sanctuary Cities Unintentionally Strengthened Judicial Protection for State Autonomy*, 97 Tex. L. Rev. 1247, 1247–48 (2019); Ilya Somin, *American Federalism Can Push Back Against Executive Overreach*, UnPopulist (May 28, 2024), https://tinyurl.com/4pnyvejv.

these actions on grant recipients are equally exceptional and only add to the constitutional abuse.

Professor Somin accordingly submits this brief to develop the textual, structural, and historical evidence that support what should be a commonsense and politically neutral conclusion: Whatever their merit, changes to federal policy cannot be accomplished by the unconstitutional means of allowing the President to unilaterally seize control over federal spending.

## SUMMARY OF ARGUMENT

On January 20, 2025, the Trump Administration initiated a series of actions to halt hundreds of billions—if not trillions[6]—of dollars in funding across thousands of federal programs. These actions included the President's issuance of multiple executive orders (the "EOs") pausing funding across thousands of federal programs, pending evaluation by the Trump Administration of whether the covered programs align with the Administration's policy goals. A9–10 (Ord. Granting Prelim. Inj.). They also included the issuance by the White House Office of Management and Budget

---

[6] *See* A34 (Ord. Granting Prelim. Inj.); A181(TRO).

(the "OMB") of a now-rescinded memo (the "OMB Memo") one week later directing all federal departments and agencies to "temporarily pause" "all Federal Financial assistance programs and supporting activities" to enable a review for alignment with the EOs. A9–10. The result was the immediate freezing of congressionally authorized grants and mandated disbursements across a wide range of policy areas—including education, healthcare, job services, disaster relief, and critical transportation infrastructure—owed to states, organizations, and private entities. A36–41.

Such a sweeping and categorical halt to government funding by the Executive has little if any precedent in the history of our republic, and for good reason: it amounts to a massive assault on Congress's power of the purse. *See infra*, Part I.C. Indeed, the accumulation of so much legislative authority in the hands of one branch, and in fact in one person, deeply endangers our democracy. *See The Federalist* No. 47, at 324 (James Madison) (J. Cooke, ed. 1961) ("The accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny").

Yet the Administration's power grab has reached further still, to powers even Congress does not possess. This includes the President's actions to hold up funds to coerce compliance with his policies across a range of issues—from ending DEI to rolling back efforts to stop climate change—even where those policies are unrelated to the purposes for which Congress appropriated the funds in the first place. *Cf. South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). The President's actions in imposing these policy prescriptions on federal funding therefore further violate the separation of powers and cut against core principles of federalism. *Id.*

## ARGUMENT

## I. THE EXECUTIVE'S SWEEPING AND CATEGORICAL IMPOUNDMENT OF FEDERAL FUNDS PLAINLY CONTRAVENES THE CONSTITUTION

The Constitution gives Congress—not the President—control over the public fisc. U.S. Const. art. I, § 9, cl. 7. Here, by unilaterally impounding thousands of federal funding programs, the President has seized for himself powers that plainly belong to Congress, acted in excess of any of his predecessors, and surpassed all recognizable bounds on the separation of powers in the process.

**A. The Constitution Vests Congress with the Power to Direct— and Withhold—Federal Spending**

Beginning with the text, the Constitution makes clear in its very first enumerated power that "all" legislative powers are vested in Congress. *See* U.S. Const. art. I, § 1. As relevant to the issue of impoundment, those powers include the authority to decide when—and, critically, when not—to spend.

Under Article I, Congress has the power to raise taxes, finance government operations and programs, and dictate the terms of appropriations. *Id.* art. I, § 8, cl. 1; § 9, cl. 7. The Constitution further makes Congress the chief architect of government spending by precluding the use of funds except "in consequence of appropriations" made by Congress. *Id.* art. I, § 9, cl. 7; *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) ("[N]ot a dollar . . . can be used in the payment of any thing not . . . previously sanctioned through an appropriation made by Congress[.]" (internal quotation marks omitted)).

For the Framers, vesting spending authority with the legislature was critical to empowering Congress as an institution and enabling legislators to respond to their constituencies. As Madison explained, the "power over the

purse" was designed to equip Congress with a "complete and effectual weapon . . . for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure." *The Federalist* No. 58, at 394 (James Madison) (J. Cooke, ed. 1961). Control over the purse ensures Congress's influence over the government bureaucracy and its central place in government policymaking. *See* Zachary Price, *Funding Restrictions and Separation of Powers*, 71 Vand. L. Rev. 357, 368 (2018) ("[T]he president's ability to advance his own agenda is constantly beholden to Congress's willingness to fund it[.]"); *see also Consumer Fin. Prot. Bureau*, 601 U.S. at 421 ("Th[e] annual [budget] process forces [the Executive] to regularly implore Congress to fund [its] operations for the next year.").

At the same time, Congress's discretion not to fund certain policies is an equally essential component of its Article I authority and the separation of powers more broadly. Indeed, if the Framers envisioned anyone as holding the power to turn the lights off by withholding funding, it was clearly *Congress*—and as a check on the excesses of the President, not the other way around. As Madison explained, the power of the purse ensures a check against one branch "gradually enlarging the sphere of its activity and importance,"

and the capacity to "reduc[e] . . . all the overgrown prerogatives of the other branches." *The Federalist* No. 58, *supra*, at 394.

In practice, Congress's ability to cut off funding enables it to constrain the Executive quite powerfully—and indeed often more effectively than by other means, such as passing new legislation (which the President can veto) or initiating post-hoc investigations. *See* Kate Stith, *Congress' Power of the Purse*, 97 Yale L.J. 1343, 1360 (1988) (explaining the "genius" of the spending power: "that appropriations limitations . . . constitute a low-cost vehicle for effective legislative control over executive activity"). This power has proven increasingly relevant in recent decades as broadly written statutes have delegated enormous powers to the executive branch, and as administrations on both the left and right have consistently asserted greater executive authority. *See* Price, *Funding Restrictions*, *supra*, at 367–68.

In contrast to Congress, the President's constitutional role in the legislative process is far smaller: The President can recommend legislation or spending bills for consideration. U.S. Const. art. II, §§ 1, 3. And he may veto legislation passed by Congress. *Id*. art. I, § 7. However, once a bill— concerning spending or otherwise—is passed, there is no opportunity to veto;

the President *must* "take Care that the Laws be faithfully executed." *Id*. art. II, § 3. He cannot either spend money in ways unauthorized by Congress or withhold appropriations for reasons Congress has not outlined.

### B. Any Inherent Executive Authority to Impound Is Narrow and Cannot Justify the Executive's Actions Here

Arguments by the Government and some commentators that the President nonetheless has constitutional authority to impound are untenable. At the very least, they cannot justify the Executive's sweeping and categorical impoundments here.

*First*, it is clear from the structure and plain text of the Constitution that any impoundment authority under the President's Article II powers must be narrow in scope. *Contra* Br. for Appellants 49–50 (May 27, 2025) (arguing that the Executive's "unquestioned" Article II powers include "the authority to direct subordinate agencies how to exercise their own authorities" in relation to spending). The Constitution gives the President no express authority to pause appropriations, and if taken too far, such an authority would plainly amount to an extra-textual veto over congressional directives to spend. *See Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (rejecting the possibility that the President might, through the veto power, "play a different

role in determining the final text of what may 'become a law'" than the one specified in the Constitution, absent an Article V amendment).

In fact, impoundments of congressional directives to spend not only amount to a veto but a "'super veto'"—a veto Congress cannot override in the normal course of legislation. *See* Charles J. Cooper, *The President's Veto Power*, 12 Op. O.L.C. 128, 167 (1988), available at https://tinyurl.com/y8ucbe6w. "[C]arried to [its] logical conclusion," a broad impoundment authority would therefore "render congressional directions to spend merely advisory." *Id.*

Commenting on impoundments, now-Chief Justice Roberts concluded in a 1985 White House memo that an executive authority to impound under Article II therefore cannot exist as "general matter." *Mem. from John G. Roberts, Assoc. White House Couns., to Fred F. Fielding, Couns. to the President, Regarding Impoundment Auth.* (Aug. 15, 1985), available at https://tinyurl.com/2webrkvk. "[N]o area," he wrote, "seems more clearly the province of Congress than the power of the purse." *Id.*

*Second*, the President's Take Care authority is inconsistent with most executive impoundments and certainly with the enormous freeze here. U.S.

Const. art. II, § 3; *contra* Doc. 113 at 51–53 (D. Opp. Prelim. Inj.) (arguing that in issuing the freeze, OMB "took care to faithfully execute the laws" in accordance with the Take Care Clause).

In fact, the Supreme Court foreclosed a Take Care Clause-based argument for executive impoundment authority over a century ago. *Kendall v. United States*, 37 U.S. 524 (1838). After President Andrew Jackson refused to disburse funds mandated by Congress, the Supreme Court rejected as "entirely inadmissible" the position that the Take Care Clause allows the Executive to pay less than required by statute. *Id.* at 613.

In a 1969 Office of Legal Counsel ("OLC") memo, later-Chief Justice Rehnquist reached a similar conclusion, drawing on this precedent: It would be "anomalous," he explained, if the President—who is "bound to execute the laws"—"is free to decline to execute them."[7] *See* William H. Rehnquist,

---

[7] Moreover, the Take Care Clause-based argument for impoundment turns this clause on its head. The original history of the Take Care Clause demonstrates that it was enacted with the intent of preventing the Executive from *disobeying* the legislature's commands—not to provide a basis for the President to do so. *See United States v. Texas*, 599 U.S. 670, 732–35 (2023) (Alito J., dissenting) (observing that the Take Care Clause was enacted to curtail the "power to suspend the operation of existing statutes" claimed by English monarchs). The purported "Suspending

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 310 (1969), available at https://tinyurl.com/bdtncssz.

Furthermore, the President can rest on his Take Care authority only in relation to legitimate constitutional purposes. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 268 (2020) (Kagan J., concurring in part and dissenting in part) ("[T]he provision—'he shall take Care that the Laws be faithfully executed'—speaks of duty, not power." (quoting U.S. Const. art. II, § 3)). That is certainly not what the President has done here, where he has claimed far-reaching authority—to "align Federal spending and action with the will of the American people as expressed through Presidential priorities." Matthew J. Vaeth, Off. of Mgmt. & Budget, Exec. Off. of the

---

Power" asserted by King James II was among the most controversial of the Stuart dynasty's actions. Parliament protested in the English Bill of Rights against the king's "pretended power of suspending the laws or the executing of laws by regal authority without consent of Parliament." 1 *Classics of American Political and Constitutional Thought* 73 (2007). The Virginia Declaration of Rights, too, denounced "all power of suspending laws, or the execution of laws, by any authority without consent of the representatives of the people." Va. Decl. of Rights § 7 (1776).

President, M-25-13, *Temporary Pause of Agency Grant, Loan, & Other Financial Assistance Programs*, at 2 (Jan. 27, 2025), available at https://tinyurl.com/26yfmsfr. Article II of the Constitution simply does not contemplate the President suspending the implementation of statutes to accomplish "Presidential priorities."[8] *See* U.S. Const. art. II. It is, rather, the President's constitutional obligation to enforce *Congress's* priorities.[9] *Cf.*, *In*

---

[8] The wording of the Take Care Clause is revealing. Its wording is perhaps the most mandatory language in the entire Constitution. It includes not only the word "shall," and the word "care," but the phrase "faithfully execute"—which occurs in only one other place in the Constitution: the presidential oath. U.S. Const. art. II, § 1, cl. 8. Even the wording of the Supremacy Clause is not this emphatic. *See* U.S. Const. art. VI, § 1, cl. 2. The President's obligation to implement the law is therefore pitched at the very highest register of constitutional obligation.

[9] Nor can resorting to the General Welfare Clause to resurrect an argument in favor of an inherent impoundment authority rooted in the Take Care Clause. *Contra* Br. for John Eastman et al. as *Amici Curiae* Supporting Appellants (June 23, 2025); *see* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."). The General Welfare Clause is a limitation on congressional power. *See United States v. Butler*, 297 U.S. 1, 65–66 (1936). It does not give the President a roving commission to decide on the merits of congressionally approved spending. Current Supreme Court precedent gives Congress, not the President, the power to make such determinations. *See Dole*, 483 U.S. at 207 ("In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress.").

*re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections.").

*Third*, where the President impounds funds in the face of a clear congressional directive to spend, he is acting at the "lowest ebb" of his authority. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *cf. Cooper, supra*, at 166 ("[T]he weight of authority is against such a broad power in the face of an express congressional directive to spend."). As with the seizure of steel mills in the *Youngstown* case, the President is acting here not in the face of congressional silence, but in the face of existing statutes that govern the purported impoundment authority. His actions contradict the Impoundment Control Act ("ICA"), which creates a strict procedural framework allowing for impoundment *only* to provide for contingencies, to achieve savings, or as specifically provided by law and after notification to Congress. *See* 2 U.S.C. § 684 (proposed deferrals of budget authority).

The President's actions also conflict with the terms of numerous appropriations statutes. For example, the President has frozen numerous "categorical" or "formula" grants that apportion funds based on enumerated factors, such as population, leaving the Executive *no discretion* as to the allocation of funds. This includes over $14 billion in grants appropriated by the Infrastructure Improvement and Jobs Act for states' Clean Water funds; funds for projects reducing pollution and improving highways; funds for increasing broadband access under the Inflation Reduction Act; and funds for mental health and substance abuse treatment.[10]

Even under appropriations that expressly afford the Executive discretion to determine how to allocate funds, the President may not impound funds wholesale, or for reasons unrelated to the purpose of the funding. *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (holding that even where statutes provide agency discretion in relation to spending, agencies must use funds "to meet permissible statutory objectives"). Where the President does so, he

---

[10] *See* Pub. L. No. 117-58, 135 Stat. 429 (2021) (Infrastructure Improvement and Jobs Act); Pub. L. No. 117-169, 136 Stat. 1818 (2022) (Inflation Reduction Act); 42 U.S.C. §§ 300x(a), 300x-7(a), 300x-21(a), 300x-33(a) (mental health and substance abuse treatment).

again acts at *Youngstown*'s "lowest ebb." *See generally*, *State Highway Comm'n of Missouri v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973) (finding the executive branch could not impound funds for reasons outside the statute's purpose); *Local 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 75–76 (D.D.C. 1973) ("Congress, of course, may itself decide to terminate a program . . . But . . . [u]ntil that time, historical precedent, logic, and the text of the Constitution itself obligate the [Executive branch] to continue to operate the . . . programs.").

## C. Historical Practice Underscores the Entirely Unprecedented and Unlawful Nature of the Funding Freeze

Historical practice and case law reaffirm that, absent a specific congressional authorization, the President may not simply freeze federal funds appropriated by statute.

Since the Founding, presidents have almost never impounded funds in the face of a congressional directive to the contrary. *See* Protect Democracy, *The Myth of Presidential Impoundment Power* 12–13 (Mar. 2025), protectdemocracy.org/impoundment-myth (identifying only twelve historical instances in which presidents impounded funds against the will of Congress, two of which were justified on constitutional grounds); David J. Barron &

Martin S. Lederman, *The Commander in Chief at the Lowest Ebb — A Constitutional History*, 121 Harv. L. Rev. 941, 1061 (2008) (explaining that while presidents "occasion[ally]" impounded sums to save money or because of changed circumstances, they "generally made no claim of any constitutional prerogative to ignore Congress's will").

And while their appropriate scope is debatable, the exceptional circumstances where presidents have attempted to impound—including in relation to matters of wartime strategy and diplomacy—are narrow and plainly not relevant here. *See* Rehnquist, *supra*, at 310–11; Cooper, *supra*, at 168 (referring to a few exceptional scenarios where impoundment may be permissible); Price, *Funding Restrictions*, *supra*, at 434–35, 449–50.

Instead, the vast majority of impoundments that took place "occurred under statutes that did not contain a directive to spend." Cooper, *supra*, at 168. For example, while President Jefferson impounded naval funds in 1803, Congress had used permissive language in the relevant appropriation, allowing him to spend less than the maximum funds that had been allocated (though not more). *See* Act of Feb. 28, 1803, ch. XI, § 3, 2 Stat. 206 ("author[izing] and empower[ing]" the President to construct "a number not

exceeding fifteen gun boats" using "a sum not exceeding fifty thousand dollars"). Congress gave the President discretion to purchase fewer naval vessels than the statutory maximum, presumably based on potentially changing security threats.

Today, by contrast, Congress more often imposes precise mandates and guidelines in its spending decisions. *See* Zachary Price, *The President Has No Constitutional Power of Impoundment*, Yale J. Reg. Notice & Comment (July 18, 2024), https://tinyurl.com/4yvj864m. And no such option to spend less exists in the statutes at issue here.

Likewise, throughout history, Congress and the courts have pushed back on presidents who have attempted to unduly expand the scope of their authority through impoundments. *See* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 63 (2017); *cf. Youngstown Sheet & Tube Co.*, 343 U.S. at 610–11 (Frankfurter, J., concurring) (referring to a "gloss on 'executive Power'" rooted in "a *systematic*, *unbroken*, executive practice, long pursued to the knowledge of the Congress and *never before questioned*" (emphasis added)).

The closest historical analogue to the current funding freeze is President Nixon's attempt to impound an estimated $18 billion in funding, which lower courts blocked.[11]  *See* The President's News Conference of January 31, 1973, 1 Pub. Papers 62 (1973); Chafetz, *supra* at 64.  By the time the issue reached the Supreme Court, the Nixon Administration relied only on a statutory argument (claiming that the Federal Water Pollution Control Act Amendments of 1972 authorized the President's actions), which the Court also plainly rejected.  *Train v. City of New York*, 420 U.S. 35, 43 (1975); *see also Clinton*, 524 U.S. at 468 (Scalia, J. concurring) ("President Nixon . . . asserted that his 'constitutional right' to impound appropriated funds was 'absolutely clear' . . . Our decision two years later in *Train v. City of New York* proved him wrong[.]").

---

[11] *See Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 901, 903 (D.D.C. 1973); *see also Guadamuz v. Ash*, 368 F. Supp. 1233, 1243–44 (D.D.C. 1973); *Local 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60, 77 (D.D.C. 1973); *Louisiana v. Weinberger*, 369 F. Supp. 856, 864 (E.D. La. 1973); *Cmty. Action Programs Exec. Dirs. Ass'n of N.J., Inc. v. Ash*, 365 F. Supp. 1355, 1360 (D.N.J. 1973); *Campaign Clean Water, Inc. v. Ruckelshaus*, 361 F. Supp. 689, 696 (E.D. Va. 1973); *Pennsylvania v. Lynn*, 362 F. Supp. 1363, 1372 (D.D.C. 1973); *Guste v. Brinegar*, 388 F. Supp. 1319, 1324–25 (D.D.C. 1975).

Congress's concern with Nixon's impoundments further led to the passage of the ICA, which forbids impoundments except in very narrow circumstances. That Act brought an end to any historical understanding that the Executive could impound if Congress uses permissive language. *See* 2 U.S.C. §§ 681–88. Today, the President cannot impound without first resorting to Congress in the manner prescribed by the ICA. New legislation could potentially give the Executive added discretion; but he cannot claim to have it as a matter of inherent executive power.

Moreover, past presidents have largely complied with the ICA. *See* Chafetz, *supra* at 65. Indeed, since the ICA's enactment, no administration has asserted inherent power to impound against Congress's will let alone attempted an impoundment of this scale. *See* Protect Democracy, *supra*, at 32–33.

## II. IF IMPLEMENTED, THE FUNDING FREEZE WOULD DANGEROUSLY CONCENTRATE POWER IN THE EXECUTIVE AND UNDERMINE FEDERALISM

The President's use of the funding freeze to apply his own policy prescriptions further violates the separation of powers and cuts against federalism's core principles. The bottom-line risk is severe: increased

concentration of power in the Executive and the diminished capacity of Congress, the states, and public and private entities to resist the whims of the President.

Consider how conscientious courts have been to prevent Congress from using its spending powers in ways that would expand its authority beyond constitutional limits. They have made clear that Congress cannot impose funding conditions that intrude on state entities. *See generally New York v. United States*, 505 U.S. 144, 181–183 (1992). Congress also must unambiguously articulate any conditions on funding, so that states may "exercise their choice knowingly, cognizant of the consequences" of accepting federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). And Congress may only impose conditions related to the purposes of the funding, and such conditions must not amount to coercion of state and local governments. *See Dole*, 483 U.S. at 207–08 (1987).

The same principle must apply to the President's authority: it must not be perverted to achieve goals outside what Article II contemplates. And courts have been conscientious about this, too. During President Trump's first term, numerous lower courts struck down his attempts to impose conditions on

federal grants to penalize "sanctuary" jurisdictions when those conditions had not been authorized by Congress. *See* Somin, *Making Federalism Great Again, supra*, at 1250–54 (providing an overview of "sanctuary" jurisdiction litigation); *cf. City & Cnty. of San Francisco v. Trump*, 2025 WL 1282637, at *27–32 (N.D. Cal. May 3, 2025) (striking down similar Executive-imposed grant conditions under the current Trump Administration).

The present funding freeze, however, undermines constitutional constraints on executive imposition of spending conditions to an even greater extent. The "Byrne Grant" at the center of the "sanctuary" litigation totaled a mere $275 million per budget year. *See* Somin, *Making Federalism Great Again*, *supra*, at 1253 (citing U.S. Dep't of Just., *Justice Assistance Grant Program, 2016: Technical Report* 1–3 (2016)). By contrast, the amount of funding being withheld *in this litigation alone* has been estimated to be billions, if not trillions, of dollars. *See* A34 (Ord. Granting Prelim. Inj.); A181 (TRO).

Here, in imposing its policy preferences through the freeze, the Executive has blown past restrictions on Congress's Spending Clause power. The OMB Memo calls for a pause on "all activities related to obligation or

disbursement of all Federal financial assistance"—that is, funds already allocated by Congress—implicated by the EOs, "including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal." A72 (Compl.) (quoting Vaeth, *Temporary Pause*, *supra*, at 2). And of course, none of the issues listed in the EOs and OMB Memo relate to the central purposes of the funding at issue, let alone involve unambiguously stated conditions.

The consequences for federalism are troubling. Given the amounts the Executive is threatening to withhold from the states, the Executive's actions function as an impermissible "gun to the head" to enforce its policy preferences on the states. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (plurality op.). Indeed, the sheer breadth of the funding freeze "pass[es] the point at which pressure turns into compulsion" with respect to the policies outlined in the EOs, flattening the federalist structures of our democracy. *Dole*, 483 U.S. at 211 (quotations omitted); *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of

power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."); *see also* Somin, *Making Federalism Great Again*, *supra*, at 1284–88.

The Administration's characterization of these funding freezes as "temporary" does not lessen these concerns. Vaeth, *Temporary Pause*, *supra*, at 2. The OMB Memo provides no temporal limitation on the "pause,"[12] and in any case, there is no durational prerequisite to constitutional violations. A fifty-year funding freeze intended to pressure grant recipients is technically "temporary," but nonetheless coercive and unconstitutional.

Of course, some may sympathize with the President's sentiment regarding excessive federal spending or think that the public would be best served if states were less dependent on various federal grants. However, the danger of the Executive's actions here has nothing to do with the wisdom of

---

[12] Some administration officials, including OMB Director Russell Vought, have also gone further, implying the possibility of presidential authority to impound without limit. *See Nom. of the Hon. Russell T. Vought, of Va., to be Dir. of the Off. of Mgmt. & Budget Before the S. Comm. on the Budget*, 119th Cong. 4, 12 (2025), available at https://tinyurl.com/yaw6sxuz (then-OMB nominee Vought testifying that "[t]he President ran on a notion that the Impoundment Control Act is unconstitutional. I agree with that").

the Administration's policy preferences. "The Constitution did not subject th[e] law-making power of Congress to presidential . . . supervision or control." *Youngstown Sheet & Tube Co.*, 343 U.S. at 588. It is Congress alone that must fix the problems with our country's spending. *Cf. United States v. Price*, 116 U.S. 43, 44–45 (1885) (explaining that the Executive must not interfere with the disbursement of congressionally directed funds even where "[i]t may be that [C]ongress required the payment to be made under a mistake, or that the claim was not a just one").

The danger is instead in whether policy changes of such enormous magnitude may be accomplished by a President seizing unilateral control and substituting executive priorities for those of the people's elected legislators. If allowed here, it is easy to imagine both sides of the aisle using this power to achieve myriad policy goals that they would be unable to pass through Congress—including pressuring state and local governments in ways that obliterate federalism. The Administration seeks to impose a vast range of conditions on grant recipients, including prohibiting funding for "DEI" programs and certain types of healthcare, which are quintessentially local matters. *See* A9–10 (Ord. Granting Prelim. Inj.).

That cannot possibly be what the Founders—who meticulously divided powers between the branches and between federal and state governments—intended. *See Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983) ("The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility.").

In short, the dangers present in this case cut to the very core of our democracy. No matter the politics of the President, it is necessary to our constitutional order to prevent "one branch of government arrogating to itself power belonging to another" in the manner the Executive has done here. *Biden v. Nebraska*, 600 U.S. 477, 503 (2023).

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order.

Dated: July 25, 2025

Respectfully submitted,

/s/ David A. O'Neil

David A. O'Neil
*Debevoise & Plimpton LLP*
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
daoneil@debevoise.com
(202) 383-8000

Beatrice A. Walton
Raphael M. Vim
William F. Goncher
*Debevoise & Plimpton LLP*
66 Hudson Blvd.
New York, NY 10001
(212) 909-6000

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This amicus brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 29(a)(5) because it contains 5464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word 365 Times New Roman 14-point font.

Dated: July 25, 2025                    Respectfully submitted,

                                         /s/ David A. O'Neil
                                         _____

                                         David A. O'Neil
                                         *Debevoise & Plimpton LLP*
                                         801 Pennsylvania Avenue N.W.
                                         Washington, D.C. 20004
                                         (202) 383-8000

                                         *Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 25, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 25, 2025     Respectfully submitted,

            /s/ David A. O'Neil

            David A. O'Neil
            *Debevoise & Plimpton LLP*
            801 Pennsylvania Avenue N.W.
            Washington, D.C. 20004
            (202) 383-8000

            *Counsel for Amicus Curiae*