## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF
ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY;
COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA;
STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII;
STATE OF MAINE; STATE OF MARYLAND; STATE OF
MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA;
STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE
OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON;
STATE OF WISCONSIN, OFFICE OF THE GOVERNOR OF
KENTUCKY, *ex rel.* ANDREW BESHEAR, in their official capacity as
Governor of the Commonwealth of Kentucky,

Plaintiffs - Appellees,

v.

*(caption continued on next page)*

On Appeal from the United States District Court for the District
of Rhode Island

## BRIEF OF *AMICUS CURIAE* THE U.S. CONFERENCE OF MAYORS IN
## SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Vincent M. Nolette (*counsel of record*)
Amy E. Turner
  SABIN CENTER FOR CLIMATE CHANGE
  LAW COLUMBIA LAW SCHOOL
435 W. 116th St.
New York, NY 10027
(402) 320-4210
vmn2106@columbia.edu

DATED: July 25, 2025                    *Counsel for Amicus Curiae*

v.

DONALD J. TRUMP, in their official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL THURLOW VOUGHT, in their official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in their official capacity as Secretary of the Treasury; PATRICIA COLLINS, in their official capacity as Treasurer of the U.S.; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in their official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in their official capacity as Secretary of Education; U.S. FEDERAL EMERGENCY MANAGEMENT AGENCY; CAMERON HAMILTON, in their official capacity as Acting Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in their official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in their official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER ALLEN WRIGHT, in their official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in their official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS BURGUM, in their official capacity as Secretary of the Interior; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in their official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in their official capacity as Attorney General; NATIONAL SCIENCE FOUNDATION; DR. SETHURAMAN PANCHANATHAN, in their official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in their official capacity as Secretary of Agriculture; U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; SCOTT TURNER, in their official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in their official capacities as Secretary of State and Acting Administrator of the United States Agency for International Development; US AGENCY FOR INTERNATIONAL DEVELOPMENT; U.S. DEPARTMENT OF DEFENSE; PETE HEGSETH, in their official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS COLLINS, in their official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD LUTNICK, in their official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JANET

PETRO, in their official capacity as Acting Administrator of National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNITY SERVICE; JENNIFER BASTRESS TAHMASEBI, in their official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; LELAND DUDEK, in their official capacity as Acting Commissioner of United States Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, in their official capacity as Acting Administrator of U.S. Small Business Administration, Defendants-Appellants

**CORPORATE DISCLOSURE AND MONETARY CONTRIBUTIONS STATEMENT**

Pursuant to Fed. R. App. P. Rule 26.1, *amicus curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

Under Fed. R. App. P. 29(a)(4), *amicus curiae* state that no party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person—other than the *amicus curiae* or their counsel—contributed money intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE AND MONETARY CONTRIBUTIONS STATEMENT ................................................................ i

TABLE OF AUTHORITIES ................................................ iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................. 1

SUMMARY OF ARGUMENT ............................................... 2

ARGUMENT ........................................................... 4

I.   Local Governments Receive Enormous Benefits From State-Administered IRA and IIJA Funding ............................................... 4

   A. IRA Programs ................................................. 6

   B. IIJA Programs ............................................... 11

II.   USCM's Members Have Suffered—and Remain at Risk of Further Suffering—Irreparable Harm if the Preliminary Injunction is not Upheld. ........... 17

   A. Harm Due to Budget Impacts, Projects Paused, Services Interrupted, and Layoffs ...................................................... 18

   B.   Harm to Local Governments' Climate Efforts and Residents' Health, and Well-Being ................................................... 21

CONCLUSION ......................................................... 25

CERTIFICATE OF COMPLIANCE ...................................................................27

CERTIFICATE OF SERVICE ...............................................................................28

# TABLE OF AUTHORITIES

**Statutes**

33 U.S.C. § 1381(a) ...................................................................14

33 U.S.C. § 1384(a) ...................................................................14

42 U.S.C. § 300j-12(a)(1)(A)(C) .................................................14

42 U.S.C. § 7437 .....................................................................7, 9

42 U.S.C. 17155(c)(1)(A) ...........................................................15

IIJA § 11401 .............................................................................12

IIJA § 40101(c) .........................................................................16

IIJA § 40103(b) .........................................................................16

IIJA § 40107 .............................................................................16

IIJA § 40552 .............................................................................15

Inflation Reduction Act of 2022 (Public Law 117-169) ........................1, 5

Infrastructure Investment and Jobs Act of 2021 (Public Law 117-58) .................1, 5

IRA § 40001 ...............................................................................7

IRA § 40007 ...............................................................................7

IRA § 50121 ...............................................................................10

IRA § 50131 ...............................................................................6

IRA § 50152 ...............................................................................7

IRA § 60106 ...............................................................................6

IRA § 60107................................................................................6

IRA § 60114................................................................................6

IRA § 60501................................................................................6

IRA § 60505................................................................................7

IRA §§ 60103...............................................................................6

**Executive Orders**

Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 20, 2025).....................................2

**Other Authorities**

*CPRG Implementation Grants: General Competition Selections*, U.S. Env't.

    Protection Agency, (last accessed May 29, 2025),

    https://www.epa.gov/inflation-reduction-act/cprg-implementation-grants-

    general-competition-selections.............................................................24

About the Clean Water State Revolving Fund (CWSRF), U.S. Env't. Protection

    Agency, (last accessed May 29, 2025), https://www.epa.gov/cwsrf/about-clean-

    water-state-revolving-fund-cwsrf#works..............................................14

Carolyn Berndt and Peyton Siler Jones, *Municipal Water Projects Advance with*

    *State Revolving Fund Financing and Funding*, Nat'l League of Cities (Nov.

    14, 2023), https://www.nlc.org/article/2023/11/14/municipal-water-projects-

    advance-with-state-revolving-fund-financing-and-funding/...............................20

*CFI Round 1A FY 2022 and 2023 Grant Award Recipients,* U.S. DEP'T OF TRANSP.

(last accessed May 28, 2025),

https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1a/.............13

*CFI Round 1B Grant Award Recipients*, U.S. DEP'T OF TRANSP. (last accessed May

28, 2025),

https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1b/.............13

*CFI Round 2 Grant Award Recipients*, U.S. DEP'T OF TRANSP. (last accessed May

28, 2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_2/

....................................................................................................13

*Charging and Fueling Infrastructure Discretionary Grant Program*, U.S. DEP'T OF

TRANSP. (last accessed May 28, 2025),

https://www.fhwa.dot.gov/environment/cfi/ ......................................................12

*Charging and Fueling Infrastructure Program Grant Recipients, FY 2022 and

2023 Grant Award Recipients*, U.S. DEP'T OF TRANSP. (last accessed May 28,

2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1a/cfi-

awardees-project-description-table.pdf ...............................................................13

*Charging and Fueling Infrastructure Program Grant Recipients*, U.S. DEP'T OF

TRANSP. (last accessed May 28, 2025),

https://www.fhwa.dot.gov/environment/cfi/grant_recipients/ .............................12

*Climate action and the Inflation Reduction Act: A guide for local government leaders*, C40 CITIES CLIMATE LEADERSHIP (Oct. 2022), https://www.c40knowledgehub.org/s/article/Climate-action-and-the-Inflation-Reduction-Act-A-guide-for-local-government-leaders.........................................5

*EECBG Status Update: Many Eligible Midwest Communities Awarded Formula Grants*, MIDWEST ENERGY EFFICIENCY ALLIANCE (June 17, 2024), https://www.mwalliance.org/blog/eecbg-status-update-many-eligible-midwest-communities-awarded-formula-grants ...............................................15

Energy Efficiency and Conservation Block Grant (EECBG), R.I. OFF. OF ENERGY RES. (last accessed May 29, 2025), https://energy.ri.gov/leadbyexample/municipal-programs/energy-efficiency-and-conservation-block-grant-eecbg ..........................................................20

*EPA Research Partner Support Story: Wildfire Smoke Air Monitoring Response Technology Pilot*, U.S. ENV'T. PROTECTION AGENCY (last accessed May 12, 2025), https://www.epa.gov/research-states/epa-research-partner-support-story-wildfire-smoke-air-monitoring-response.............................................................11

*General Competition Selection Applications Table*, U.S. ENV'T PROTECTION AGENCY (last accessed May 28, 2025), https://www.epa.gov/inflation-reduction-act/general-competition-selected-applications-table ..............................................8

Glen Andersen, Megan Cleveland, and Daniel Shea, MODERNIZING THE ELECTRIC GRID: STATE ROLE AND POLICY OPTIONS, NAT'L CONF. OF STATE LEGS. (Sep. 22, 2021), https://www.ncsl.org/energy/modernizing-the-electric-grid ....................17

Gov. Pritzker Announces $14.9M in Federal Funding for Illinois' Community Charging Program, State of Illinois (Jan. 11, 2024), https://www.illinois.gov/news/press-release.29498.html......................................13

*Grid Resilience and Innovation Partnerships (GRIP) Program Projects*, U.S. DEP'T OF ENERGY (last accessed May 29, 2025), https://www.energy.gov/gdo/grid-resilience-and-innovation-partnerships-grip-program-projects...............................................................................................16

IPCC, AR6 SYNTHESIS REPORT: CLIMATE CHANGE 2023.........................................22

Jason G. Su et al., *Examining air pollution exposure dynamics in disadvantaged communities through high-resolution mapping*, 10 SCI. ADVANCES 32 (Aug. 7, 2024), https://www.science.org/doi/10.1126/sciadv.adm9986 .............................11

*Local Government Building Decarbonization Challenge*, CAL. GRANTS PORTAL (last accessed May 8, 2025), https://www.grants.ca.gov/grants/local-government-building-decarbonization-challenge-2/...............................................................20

*Mills Administration Announces $15 Million Federal Grant to Expand Maine's Electric Vehicle Charging Network*, Maine Gov. Off. of Pol'y and the Future

(Jan. 11, 2024), https://us5.campaign-

archive.com/?u=1996a43d794798c9e8d2e9643&id=c126b6d1e5 ......................13

*New York State Awards 23 Projects $7 Million in Urban and Community Forestry

Grants*, NEW YORK STATE URBAN FORESTRY COUNCIL (last accessed May 9,

2025), https://nysufc.org/new-york-state-awards-23-projects-7-million-in-urban-

and-community-forestry-grants/2024/08/14/ ......................................................25

*Program Guidance for Air Pollution Control Agencies*, U.S. ENV'T. PROTECTION

AGENCY, at 6 (last accessed May 29, 2025),

https://www.epa.gov/system/files/documents/2024-02/air-monitoring-grants-ira-

60105a-b-guidance-02-15-24_0.pdf ...................................................................20

*Ready to Rebuild*, NAT'L LEAGUE OF CITIES (last accessed May 28, 2025),

https://www.nlc.org/initiative/ready-to-rebuild/ ....................................................5

Robert Rohde, BERKELEY EARTH, GLOBAL TEMPERATURE REPORT FOR 2024 (Jan.

10, 2025), https://berkeleyearth.org/global-temperature-report-for-2024/ ..........22

*Solar for All Fast Facts*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29,

2025), https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all-fast-facts23

*Solar For All*, U.S. ENV'T. PROTECTION AGENCY (last accessed May 28, 2025),

https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all ...........................9

STATE OF COLORADO, COLORADO CLIMATE ACTION PLAN (Mar. 2024),

https://www.epa.gov/system/files/documents/2024-03/colorado-pcap.pdf .....7, 25

*State of Colorado*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/inflation-reduction-act/state-colorado ....................24

STATE OF ILLINOIS, PRIORITY CLIMATE ACTION PLAN (Mar. 1, 2024), https://epa.illinois.gov/content/dam/soi/en/web/epa/topics/climate/documents/Illinois%20Priority%20Climate%20Action%20Plan.pdf........................................25

*State of Illinois*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/inflation-reduction-act/state-colorado................................25

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The U.S. Conference of Mayors ("USCM"), founded in 1932, is the official nonpartisan organization of the more than 1,400 U.S. cities that are each home to 30,000 people or more. The Conference of Mayors established its Climate Protection Center and its Alliance for a Sustainable Future to assist local governments with implementation of both the 2005 Mayors Climate Protection Agreement and the goal to establish comprehensive decarbonization efforts to keep the global rise in temperature to the 1.5-degree Celsius level.

USCM's members and their residents rely on state-administered federal financial assistance, including under the Inflation Reduction Act of 2022 (Public Law 117-169) ("IRA") and the Infrastructure Investment and Jobs Act of 2021 (Public Law 117-58) ("IIJA"), in their efforts to protect the health and well-being of their residents, businesses, community organizations, and visitors and to mitigate and adapt to climate change, address emergencies, reduce pollution, and improve transportation and infrastructure. As discussed *infra*, the "Federal Funding Freeze," as described by Plaintiff States (*see e.g.,* Doc. 67 at 11-35), [1] paralyzed those efforts. Relying on a well-developed record, extensive briefing and two hearings, the District Court issued a preliminary injunction to halt the irreparably harmful effects of the Federal Funding Freeze for the Plaintiff States. Doc. 161. Lifting the injunction now

---

[1] Entries on the district court's docket are cited "Doc.," appellees' opening brief is cited "States' Br."

could lead to a refreezing of critical state-administered funds, triggering the same immediate, enduring, and irreparable harms to USCM's members and their residents, businesses, community organizations, and visitors.

USCM therefore submits this memorandum to respectfully urge the Court to uphold the District Court's preliminary injunction Doc. 161 (hereinafter "Op.") and its subsequent Order enforcing the injunction. Doc. 175.

## SUMMARY OF ARGUMENT

This case challenges the "abrupt, categorical, and indefinite pause" of obligated federal funds. Op. at 24. Under the January 27, 2025 Office of Management and Budget's ("OMB") Memorandum and Section 7 of the January 20, 2025 executive order entitled *Unleashing American Energy* (Jan. 20, 2025) (the "*Unleashing* EO"), federal agencies were directed to pause the disbursement or transmission of appropriated federal funds under awarded grants, executed contracts, and other executed financial obligations, including IRA and IIJA funds (hereinafter referred to as the "Federal Funding Freeze"). Op. at 9-10. Plaintiff States "immediately lost access to billions of dollars of funds." States' Br. at 8. Plaintiff States extensively described the scope of the Federal Funding Freeze in their briefing. Doc. 67 at 11-35; States' Br. at 8-9, 62-63.

The district court's March 6, 2025, Order enjoins Defendants "from pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the

disbursement of appropriated federal funds to the States under awarded grants, executed contracts, or other executed financial obligations based on the OMB Directive, . . . or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress. This includes, but is by no means not limited to, Section 7(a) of [*Unleashing EO*]." Op. at 44. This Court consolidated Defendants' appeals of the preliminary injunction and a subsequent Order enforcing it.[2]

USCM's members and their residents are directly affected by the Federal Funding Freeze and receive protection from the existing preliminary injunction. Tens of billions of dollars in  IRA and IIJA funding covered by the preliminary injunction flows from Plaintiff States to local governments and their residents—either via subgrants or state-administered programs—supporting the health and welfare of their local communities. In other words, local governments have "serious reliance interests" on federal funding administered by Plaintiff States. States' Br. at 30. USCM files this brief in support of Plaintiff States to present the unique local government perspective on the serious and irreparable harms that cities, towns, and counties will face if the injunction is lifted.

---

[2] The district court also denied reconsideration of the motion for enforcement on April 14, 2025. Doc. 182.

As the district court held, a blanket freeze of appropriated funds resulted in "unrefuted evidence" of "irreparable and continuing harm" to the Plaintiff States. Op. at 35; States' Br. at 12-13. The scope of that harm extends to the local governments and communities that rely on and benefit from state-administered IRA and IIJA funding the injunction appropriately released. This Court should not disturb the district court's finding.

## ARGUMENT

### I. Local Governments Receive Enormous Benefits From State-Administered IRA and IIJA Funding

In 2021 and 2022, Congress enacted two statutes that appropriate significant funds for energy and infrastructure projects across the United States. Congress passed the IIJA in 2021, authorizing $1.2 trillion for transportation and infrastructure spending.[3] In 2022, it enacted the IRA, which included the largest Congressional appropriation of clean energy spending in American history—allocating $369 billion toward environmental and energy investments. Of that total, $37 billion was earmarked for tribal, State, and local governments.[4] In other words, Congress

---

[3] *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021); *See also Ready to Rebuild*, NAT'L LEAGUE OF CITIES (last accessed May 28, 2025), https://www.nlc.org/initiative/ready-to-rebuild/.

[4] *See* Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022); *See also Climate action and the Inflation Reduction Act: A guide for local government leaders*, C40 CITIES CLIMATE LEADERSHIP (Oct. 2022), https://www.c40knowledgehub.org/s/article/Climate-action-and-the-Inflation-Reduction-Act-A-guide-for-local-government-leaders.

intended for these funds to reach communities nationwide, and provided billions of dollars in critical funding to local governments (either directly or through States) to enable them to plan, invest in, and implement energy, infrastructure, and public health projects.

Even where local governments are not the direct recipients of federal funds, they remain key beneficiaries of IRA and IIJA funding. State investments, enabled by the IRA and IIJA, directly benefit local governments and residents. In some cases, States have provided sub-grants to local governments, enabling them to make their own investments. The specific programs discussed in subsections (A) and (B) exemplify the kinds of legally appropriated federal funding that Plaintiff States have been awarded to deliver widespread benefits to USCM's members—statutorily protected benefits that the Executive now urges this Court to permit them to refreeze in violation of the Administrative Procedure Act ("APA") and the Constitution of the United States. *See, e.g.,* Op. at 20-34 (finding that "the States have shown a likelihood of success on their APA claims").

Judge McConnell explained in the district court's preliminary injunction Order that, "it is so obvious that it almost need not be stated that when money is obligated and therefore expected (particularly money that has been spent and reimbursement is sought) and is not paid as promised, harm follows." Op. at 35. Local governments benefit from IRA and IIJA-funded projects that improve air quality, expand access

to electric vehicle ("EV") charging infrastructure, protect sources of drinking water, and make buildings and the grid more energy-efficient and are thus harmed by the freezing of federal funds. *See* States' Br. at 35. Absent continued injunctive relief, that harm will renew and re-intensify with each passing day, to the detriment of Plaintiff States and to USCM's members and their residents.

## A. IRA Programs

In the IRA, Congress created and appropriated funds for eleven grant programs for which state governments were made expressly eligible.[5] For example, Congress created the Climate Pollution Reduction Grants ("CPRG") Program, and appropriated $5 billion to the U.S. Environmental Protection Agency (EPA) to "competitively award grants to eligible entities to implement" greenhouse gas ("GHG") pollution reduction plans, and "make funds available" to grantees

---

[5] IRA §§ 60103 (Greenhouse Gas Reduction Fund), 60114 (Climate Pollution Reduction Grants), 50131 (Assistance for Latest and Zero Building Energy Code Adoption), 60106 (Clean Heavy-Duty Vehicles), 60107 (Low Emissions Electricity Program), 60501 (Neighborhood Access and Equity Grant Program), 60505 (Environmental Review Implementation Funds), 40001 (Investing in Coastal Communities and Climate Resilience), 23003 (State and Private Forestry Conservation Programs), 50152 (Grants to Facilitate the Siting of Interstate Electricity Transmission) and 40007 (Alternative Fuel and Low-Emission Aviation Technology Program). Local governments are also expressly eligible and have been awarded hundreds of millions of dollars under these programs. However, IRA and IIJA funding directly to local governments is not within the scope of this litigation.

6

including state governments.[6] Under the CPRG's planning phase, Plaintiff States were eligible to receive $69 million in grants to create plans that identify actions—including actions that local governments could take—to reduce GHG emissions in their states.[7]

CPRG's second phase awarded $4.3 billion in competitive funding for implementation strategies identified during the planning phase. Plaintiff States received over $1.7 billion in grants.[8] For example, a coalition of states—Connecticut, Massachusetts, Maine, New Hampshire, and Rhode Island—was awarded $450 million to "fund projects to rapidly accelerate the adoption of cold-climate air-source heat pumps, heat pump water heaters, and ground source heat pumps in more than 500,000 single-family and multifamily residential buildings."[9] Another coalition made up of Plaintiff States—Connecticut, Delaware, Maryland,

---

[6] 42 U.S.C. § 7437(a)(1), (2); (b); (c)(1), (3).

[7] *See, e.g.,* STATE OF COLORADO, COLORADO CLIMATE ACTION PLAN (Mar. 2024), https://www.epa.gov/system/files/documents/2024-03/colorado-pcap.pdf (identifying local government GHG reduction priority measures that "provide significant GHG emissions reduction benefits, advance other state priorities such as improved air quality and equity, are aligned with local government priorities based on stakeholder engagement," and are within the authority and ability of Colorado local governments to implement.).

[8] *General Competition Selection Applications Table*, U.S. ENV'T PROTECTION AGENCY (last accessed May 28, 2025), https://www.epa.gov/inflation-reduction-act/general-competition-selected-applications-table (data filtered to state awards and summed for Plaintiff States).

[9] *Id*.

and New Jersey—was awarded $248,937,720 to advance the "Clean Corridor," an effort to "deploy electric vehicle charging infrastructure for commercial zero-emission medium- and heavy-duty vehicles" along the Interstate-95 freight corridor.[10] Local governments and communities will benefit from these two coalition's actions through, respectively, increased EV charging access and lower grid stress due to the energy efficiency gains of heat pump technology. Communities in these states stand to see air quality improvements by reducing local pollutants produced by fossil fuel appliances and internal-combustion engines.

Also under the IRA, Congress created the Solar for All ("SFA") program, appropriating $7 billion to EPA "to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies," such as solar installations and battery storage for single- and multi-family households and community solar programs.[11] EPA awarded most SFA grants to state and nonprofit applicants.[12] Plaintiff States received over $2.2 billion in SFA grants, and may use their funds to make sub-awards to local governments.[13] Even where states opt not to make sub-grants to local governments, the ultimate benefits from the solar energy deployment – cleaner air and lower utility bills – are felt at the local level. State SFA

---

[10] *Id.*

[11] 42 U.S.C. § 7434(a)(1).

[12] *Solar For All*, U.S. ENV'T. PROTECTION AGENCY (last accessed May 28, 2025), https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all.

[13] *Id.*

grants advance state goals—such as reducing fossil fuel reliance, localizing energy generation to ease grid stress and improve reliability, improving air quality, and expanding access to low-carbon technologies—through measurable changes in local communities. The legal framework may distinguish between state and local entities for administrative purposes, but that distinction has no bearing on the real-world benefits from the program. Those benefits—in the form of improvements in health, safety, and welfare—accrue to local communities within the state where projects are deployed, and it is those same communities that will feel the brunt of the harm from a renewed funding freeze.

Congress also appropriated $4.5 billion to the Department of Energy ("DOE") for Home Electrification and Appliances Rebates Program.[14] Administered by state energy offices, this rebate program "subsidizes low- and moderate-income households' purchase and installation of electric heat pump water heaters, electric heat pump space heating and cooling systems, and other home electrification projects." Doc. 66 at 6. Thousands of homeowners in Plaintiff States have already enrolled. *Id.* The resulting energy efficiency gains from this rebate program will directly benefit USCM's members and their residents by lowering energy costs, increasing grid reliability, and reducing air pollution in urban areas. As a result, air quality in local communities will improve and household energy costs may decline.

---

[14] IRA § 50121.

Again, although the funds are administered by the states, the program's economic, climate, and public health benefits are not confined to state governments. Rather, like SFA, these benefits are realized at the local level—in neighborhoods, households, and municipal systems—demonstrating that the impact of these federal investments is both broad and community-specific.

Further, under Sections 103 to 105 of the Clean Air Act, EPA has administered a national air monitoring program for sixty years. Doc. 66 at 5. Congress appropriated $117.5 million in the IRA to "fund air monitoring grants under this program to increase States' abilities to detect dangerous pollution like particulate matter (soot) and air toxics, including in disadvantaged communities." *Id*. at 5-6. These pollutants are especially concentrated in urban areas—particularly urban disadvantaged communities.[15] These funds improve detection and provide data, which can help local governments make informed decisions to protect human health and the environment. For example, in urban areas recovering from wildfires, early detection of high levels of particulate matter in the air can help local governments protect their residents from the severely negative impacts of sustained

---

[15] *See, e.g.,* Jason G. Su et al., *Examining air pollution exposure dynamics in disadvantaged communities through high-resolution mapping*, 10 SCI. ADVANCES 32 (Aug. 7, 2024), https://www.science.org/doi/10.1126/sciadv.adm9986 (study in California revealing "consistently higher mean annual concentrations of $NO_2$ and $PM_{2.5}$ in disadvantaged communities compared to advantaged communities.").

and acute exposure to air pollution.[16] Lifting the injunction would compromise this public health safeguard, rendering the most vulnerable communities even more vulnerable from unmonitored air pollution, aging pollution monitoring systems, or a lack of air quality data.

USCM's members have structured their climate, clean energy, and public health initiatives around these state-administered programs funded through the IRA. The latter deliver tangible benefits at the local level, and local governments have relied on both funding streams in planning, budgeting, and implementing their work. To preserve funds essential to advancing local climate and environmental justice goals, the injunction must be upheld.

## B. IIJA Programs

As with the IRA, USCM's members have been awarded grants to implement a range of IIJA programs, but also depend on state administered IIJA funding to fully realize the statute's intended benefits.

For example, Congress legislated through the IIJA to originate and appropriate funds for the Charging and Fueling Infrastructure ("CFI") grant

---

[16] *See, e.g., EPA Research Partner Support Story: Wildfire Smoke Air Monitoring Response Technology Pilot*, U.S. ENV'T. PROTECTION AGENCY (last accessed May 12, 2025), https://www.epa.gov/research-states/epa-research-partner-support-story-wildfire-smoke-air-monitoring-response.

program.[17] Administered by the U.S. Department of Transportation ("DOT"), the CFI program allocates $2.5 billion in competitive funding for EV charging and alternative fuel corridor grants.[18] Through CFI's first three rounds of funding, state governments were awarded hundreds of millions of federal dollars to implement the program in their communities.[19]

In the first round of funding alone, state governments were awarded approximately $133 million.[20] For example, Illinois was awarded $14,962,506 to create a state community charging program.[21] New York received $14,786,777 to implement level 2 and direct current fast charging infrastructure for EVs.[22] With its

---

[17] IIJA § 11401.

[18] *Charging and Fueling Infrastructure Discretionary Grant Program*, U.S. DEP'T OF TRANSP. (last accessed May 28, 2025), https://www.fhwa.dot.gov/environment/cfi/.

[19] *See Charging and Fueling Infrastructure Program Grant Recipients*, U.S. DEP'T OF TRANSP. (last accessed May 28, 2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/.

[20] *Charging and Fueling Infrastructure Program Grant Recipients, FY 2022 and 2023 Grant Award Recipients*, U.S. DEP'T OF TRANSP. (last accessed May 28, 2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1a/cfi-awardees-project-description-table.pdf (data filtered for state governments and award amounts summed).

[21] *See CFI Round 1A FY 2022 and 2023 Grant Award Recipients,* U.S. DEP'T OF TRANSP. (last accessed May 28, 2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1a/; Gov. Pritzker Announces $14.9M in Federal Funding for Illinois' Community Charging Program, State of Illinois (Jan. 11, 2024), https://www.illinois.gov/news/press-release.29498.html.

[22] *Id.*

$15 million award, Maine seeks to create an accessible statewide EV charging network by installing charging ports in 63 cities and towns.[23] In the second and third rounds of funding, similar sums were awarded, with 12 state governments winning grants worth nearly $400 million.[24] Local governments serve as critical cooperating partners in planning and implementing the local clean energy transportation networks that the CFI program supports. Many of these projects will be built directly in communities across Plaintiff States, meaning that the benefits of a clean energy transportation sector will be felt in the urban areas that USCM's members represent.

The IIJA appropriated almost $30 billion "for use in constructing and rehabilitating state water, wastewater, and sewage facilities[.]" Doc. 67 at 49. These funds include mandatory capitalization grants for revolving state water funds.[25] Section 50210 of the IIJA appropriated $14.65 billion in grants for States' Clean Water Revolving Funds for 2022 to 2026. Doc. 67 at 7. The IIJA also reauthorized

---

[23] *See Mills Administration Announces $15 Million Federal Grant to Expand Maine's Electric Vehicle Charging Network*, Maine Gov. Off. of Pol'y and the Future (Jan. 11, 2024), https://us5.campaign-archive.com/?u=1996a43d794798c9e8d2e9643&id=c126b6d1e5.

[24] *See CFI Round 1B Grant Award Recipients*, U.S. DEP'T OF TRANSP. (last accessed May 28, 2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_1b/ and *CFI Round 2 Grant Award Recipients*, U.S. DEP'T OF TRANSP. (last accessed May 28, 2025), https://www.fhwa.dot.gov/environment/cfi/grant_recipients/round_2/.

[25] *See* 33 U.S.C. §§ 1381(a), 1384(a), (c)(2) (EPA "*shall* make capitalization grants to each state" for water pollution control using a statutory formula); 42 U.S.C. § 300j-12(a)(1)(A)(C) (drinking water grant).

and appropriated an additional $14.65 billion from 2022 to 2026 for Drinking Water State Revolving Funds. *Id*. at 8. Local governments are among the primary eligible entities to receive state-administered financial assistance for a range of water infrastructure projects.[26] These include the construction of wastewater treatment facilities, development of green infrastructure, stormwater management systems, the protection of water bodies, and water recycling initiatives.[27] States can use their revolving funds to pursue public policy objectives by, for example, directing funding toward certain communities or incentivizing certain types of water-related projects. In turn, local governments—including USCM's members—reap substantial public health and infrastructure benefits from the projects these funds support.

Local governments are not just beneficiaries, but statutorily intended recipients of state-level IIJA funding. Congress appropriated $550 million to the DOE for the IIJA's Energy Efficiency and Conservation Block Grant ("EECBG") Program, which is available to States, Tribes, and local governments to help implement strategies to reduce energy use and fossil fuel emissions, and to improve energy efficiency.[28] EECBG provides crucial investments in communities with

---

[26] *See* About the Clean Water State Revolving Fund (CWSRF), U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/cwsrf/about-clean-water-state-revolving-fund-cwsrf#works.
[27] *Id*.
[28] IIJA § 40552; During the initial Federal Funding Freeze, DOE took down its web pages dedicated to EECBG. EECBG's web address,

historically limited funding for climate action and must allocate 28% of its grants to state governments.[29] State governments are required to sub-grant at least 60% of their formula funding to cities and counties that do not otherwise receive funding under the program.[30] Local governments have used EECBG sub-grants to develop clean energy plans, conduct energy audits, implement energy efficiency and clean energy upgrades and projects, and install EV charging stations—projects that, for many communities with limited capacity, would not occur but for state EECBG support.[31]

Congress also appropriated $10.5 billion of IIJA funds to DOE's Grid Resilience and Innovation Partnerships ("GRIP") program, which aims to ensure the continued reliability of the country's power system in the face of increasing extreme weather events.[32] DOE has already awarded billions of dollars to hundreds of

---

https://www.energy.gov/clean-energy-infrastructure/energy-efficiency-and-conservation-block-grant-program-formula-grant, now reroutes to https://www.energy.gov.

[29] *EECBG Status Update: Many Eligible Midwest Communities Awarded Formula Grants*, MIDWEST ENERGY EFFICIENCY ALLIANCE (June 17, 2024), https://www.mwalliance.org/blog/eecbg-status-update-many-eligible-midwest-communities-awarded-formula-grants.

[30] 42 U.S.C. 17155(c)(1)(A).

[31] *See supra*, n. 29.

[32] IIJA §§ 40101(c), 40103(b), 40107.

projects in all fifty states, including several state-led projects.[33] Hawaiʻi and North Carolina were awarded $17,925,000 and $57,099,386, respectively, to enhance grid resilience and reliability; Maine was selected to receive $65,359,234 to modernize its electric grid.[34] A resilient power system means that local governments and their residents can access basic necessities and essential services throughout the year, during routine weather and extreme events. Modernizing the grid also can increase energy efficiency and reduce energy costs for residents in communities across Plaintiff States.[35]

Under these and other IRA and IIJA programs, Plaintiff States have won funding for projects that local governments rely on and that federal agencies are obligated to fund. These funds provide for a host of actions that advance local climate action, protect and improve public health, and safeguard the well-being of their communities and residents. The district court found that the Federal Funding Freeze was "overly broad" and created "significant disruption[s]" to activities "integral to [the] daily lives" of Plaintiff States' citizens, many of whom are also

---

[33] *Grid Resilience and Innovation Partnerships (GRIP) Program Projects*, U.S. DEP'T OF ENERGY (last accessed May 29, 2025), https://www.energy.gov/gdo/grid-resilience-and-innovation-partnerships-grip-program-projects.
[34] *Id.*
[35] *See* Glen Andersen, Megan Cleveland, and Daniel Shea, MODERNIZING THE ELECTRIC GRID: STATE ROLE AND POLICY OPTIONS, NAT'L CONF. OF STATE LEGS. (Sep. 22, 2021), https://www.ncsl.org/energy/modernizing-the-electric-grid.

residents of USCM's members. Op. at 43. As explained more fully in the following section, lifting the injunction stands to directly undermine USCM's members' ability to protect the health and well-being of their residents, maintain critical infrastructure, and implement the very climate, transportation, clean energy programs, and investments that the IRA and IIJA were duly enacted by Congress to support.

## II.     USCM's Members Have Suffered—and Remain at Risk of Further Suffering—Irreparable Harm if the Preliminary Injunction is not Upheld.

Plaintiff States have described in detail the irreparable harm caused by the Federal Funding Freeze, which "hobbl[ed] programs" advancing their sovereign interests. Doc. 67 at 58-61. The preliminary injunction also averted substantial harm to local governments and their residents—harms not specifically addressed by the district court, yet no less concrete or imminent. If the injunction is lifted, Plaintiff States *and* their local governments will face the same irreparable harm that the district court found to be irrefutable, for "it is their citizens, often our most vulnerable citizens" who suffered much of the harm from the Freeze. Op. at 36.

By their own concession, Defendants cannot present, because they do not have, a clear timeline for how long a renewed freeze would continue. Op. at 35 ("Defendants concede that there is no date written into the EOs or the OMB Directive or instructions when the freeze will end but argues that . . . it will end eventually."). In the absence of a formally communicated, reliable timeline, local

governments would face stalled or withdrawn payments for projects already underway, services already delivered, and goods already purchased. While these harms would still occur during a renewed freeze with a known deadline, they are made all the more acute because the lack of certainty would compromise local governments' ability to plan, leaving them in the dark and forcing them to make under-informed decisions that impact their residents' health and well-being.

These harms are not abstract or speculative. They would worsen each day. IRA- and IIJA-funded projects would be at risk of languishing, costs may rise, and ultimately, local communities will bear the burden of stalled or abandoned projects, to the detriment of local taxpayers. USCM's members are relying on state-administered federal funding to help protect the health and well-being of their residents, business communities, and others who rely on them, supplying crucial services for which they may have foregone other projects or avenues of funding.

### A. Harm Due to Budget Impacts, Projects Paused, Services Interrupted, and Layoffs

Local governments have structured their budgets, secured commitments, and begun project implementation in reliance on Defendants' fulfillment of funding obligations to Plaintiff States. These obligations are not conceptual—they have enabled tangible, shovel-ready projects that local governments would otherwise be

unable to pursue. If the injunction is lifted and a renewed freeze is implemented, these projects may not move forward.

For example, through its Drinking Water State Revolving Fund, Massachusetts awarded $115.2 million in grants for 47 projects in 40 municipalities and water utilities across the state.[36] In Wisconsin, through the IIJA's appropriation for state water revolving funds to address emerging contaminants, the City of Wausau was awarded over $17 million, part of which was earmarked for projects intended to reduce the concentration of PFAs in drinking water.[37] California used funds from its EECBG grant to award subgrants to local governments for projects to plan or implement building decarbonization actions.[38] In Rhode Island, 29 cities and towns are eligible to receive EECBG subgrants "to support the reduction of fossil fuel emissions, reduction of total energy use in communities, improve efficiency of facilities, and contribute to the growth of the clean energy economy."[39] And under

---

[36] *See* Carolyn Berndt and Peyton Siler Jones, *Municipal Water Projects Advance with State Revolving Fund Financing and Funding*, NAT'L LEAGUE OF CITIES (Nov. 14, 2023), https://www.nlc.org/article/2023/11/14/municipal-water-projects-advance-with-state-revolving-fund-financing-and-funding/.

[37] *Id*.

[38] *See e.g., Local Government Building Decarbonization Challenge*, CAL. GRANTS PORTAL (last accessed May 8, 2025), https://www.grants.ca.gov/grants/local-government-building-decarbonization-challenge-2/.

[39] *See* Energy Efficiency and Conservation Block Grant (EECBG), R.I. OFF. OF ENERGY RES. (last accessed May 29, 2025), https://energy.ri.gov/leadbyexample/municipal-programs/energy-efficiency-and-conservation-block-grant-eecbg.

the air monitoring program described *supra* Sec. I(A)(a), state awardees can make subawards to local governments to help monitor air pollution.[40]

Lifting the preliminary injunction would jeopardize these and many other projects, placing them at risk of delay or cancellation. These are projects that local governments may not have otherwise had the funding to pursue. Without assistance from Plaintiff-State-administered federal funding, local governments would be forced to either reallocate funds from other essential services or pause or cancel projects indefinitely. Moving money from other programs and services could result in the loss of services essential to the daily lives of residents. As a corollary, the budgetary trade-offs would risk layoffs to public employees and contractors, exacerbating the harm to local communities.

Indeed, as the district court described, it is "so obvious" that a pause in funding would cause harm because it creates unavoidable opportunity costs. Faced with a renewed Federal Funding Freeze, local governments would have to give up something. Each option would leave USCM's members and their residents worse off.

---

[40] *See Program Guidance for Air Pollution Control Agencies*, U.S. ENV'T. PROTECTION AGENCY, at 6 (last accessed May 29, 2025), https://www.epa.gov/system/files/documents/2024-02/air-monitoring-grants-ira-60105a-b-guidance-02-15-24_0.pdf.

### B. Harm to Local Governments' Climate Efforts and Residents' Health, and Well-Being

Lifting the preliminary injunction would also stand to significantly jeopardize USCM's members' efforts to mitigate and respond to the impacts of climate change, causing further harm to the health and well-being of local residents. The Intergovernmental Panel on Climate Change ("IPCC"), a world-leading panel of scientific experts convened by the United Nations and the World Meteorological Organization, has clearly stated the world must reduce GHG emissions from fossil fuel extraction and consumption as rapidly as possible to avoid the potentially catastrophic consequences of anthropogenic global warming and climate change.[41] Recent data shows that 2024 was the warmest year since 1850, with global average temperatures 1.62°C above pre-industrial levels.[42] The higher temperatures are supercharging extreme weather events which threaten communities across American. The IPCC has warned that, to limit future impacts, GHG emissions must be rapidly and dramatically reduced over the next five years.[43] Local governments are at the forefront of efforts to reduce emissions and prepare for climate impacts and rely on federal funds to do that.

---

[41] IPCC, AR6 SYNTHESIS REPORT: CLIMATE CHANGE 2023 (2023) [hereinafter IPCC AR6 SR].
[42] *See* Robert Rohde, BERKELEY EARTH, GLOBAL TEMPERATURE REPORT FOR 2024 (Jan. 10, 2025), https://berkeleyearth.org/global-temperature-report-for-2024/.
[43] IPCC AR6 SR, *supra* note 41, at 92.

Congress appreciated the need to quickly lower GHG emissions and appropriated IRA and IIJA funds accordingly. The programs and funding reflected herein reflect Congressional policy judgments and priorities that the Executive must respect. Because the Federal Funding Freeze unlawfully violated and jeopardized that careful decision-making, the district court properly enjoined it.

A renewed Federal Funding Freeze on municipal projects made possible through state-administered IRA and IIJA funding would radically inhibit local climate action. Local emissions-reducing projects funded by the IRA and IIJA include solar energy and battery storage installations benefitting disadvantaged communities through the IRA's Solar for All program. If fully implemented, SFA would reduce GHG emissions equivalent to more than 7 million passenger vehicles per year, while reducing local air pollution and lowering energy bills.[44]

Other critical projects now at risk include those funded by CPRG and EECBG sub-grants worth tens of millions of dollars. These are projects that will reduce GHG emissions and local air pollution, and improve public health, through building decarbonization, renewable energy deployment, reductions in methane emissions at landfills, infrastructure improvements to incentivize alternative transportation, EV and associated charging infrastructure, and energy-efficiency improvements. The

---

[44] *Solar for All Fast Facts*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/greenhouse-gas-reduction-fund/solar-all-fast-facts.

collective benefits of these projects are immense: the deployment of tens of thousands of megawatts of solar generation, hundreds of thousands of efficient heat-pumps, clean water supplying millions of people, millions of metric tons of avoided methane emissions, and millions of tons of diverted food waste from landfills, among others.[45]

The cascading effects of a renewed Federal Funding Freeze would further threaten the long-term viability of these projects: permits may lapse, contractors may withdraw, and purchased materials may deteriorate or become unusable. A renewed freeze jeopardizes emissions reductions and introduces damaging uncertainty into municipal planning. These harms would be made particularly acute because local governments reasonably relied on final, binding IRA and IIJA agreements between Plaintiff States and the federal government. Many local governments forewent other sources of capital for their climate work in reliance on state plans to fund and implement projects in their communities or provide subgrants to do so.

Even temporary delays in funding and project execution would result in long-lasting harm. For example, if Colorado's plan to fund 64 local governments to adopt improved minimum energy codes through subgrants from its $128 million CPRG

---

[45] *See, e.g., CPRG Implementation Grants: General Competition Selections*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/inflation-reduction-act/cprg-implementation-grants-general-competition-selections.

implementation grant is frozen, it would hinder local governments' climate commitments, like Denver's goal to achieve net-zero building emissions by 2050.[46] The timing of climate action matters a great deal. Even if Denver could, in theory, reach its 2050 goal in the face of a temporary delay, it will be more difficult and costly to achieve those reductions closer to that date, and as noted, the *temporariness* of the delay is very much not guaranteed. Local governments in Illinois face similar risks, as the state plans to use part of its $430 million grant to provide local governments with subgrants to support transitions to stretch energy codes.[47] Through its U.S. Department of Agriculture ("USDA") Forest Service Urban and Community Forestry Grant, New York awarded $7.1 million in subgrants to 23 urban forestry projects to plant more trees, with a particular focus on disadvantaged communities.[48]

---

[46] *See State of Colorado*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/inflation-reduction-act/state-colorado (explaining that Colorado's Decarbonization Accelerator will "offer[] subawards to local governments for policies and actions in sectors with significant GHG emissions reduction potential, including in the transportation, buildings, land-use, and waste sectors."); *see also* STATE OF COLORADO, COLORADO CLIMATE ACTION PLAN (Mar. 2024), https://www.epa.gov/system/files/documents/2024-03/colorado-pcap.pdf.

[47] *See State of Illinois*, U.S. ENV'T. PROTECTION AGENCY, (last accessed May 29, 2025), https://www.epa.gov/inflation-reduction-act/state-colorado; *see also* STATE OF ILLINOIS, PRIORITY CLIMATE ACTION PLAN (Mar. 1, 2024), https://epa.illinois.gov/content/dam/soi/en/web/epa/topics/climate/documents/Illinois%20Priority%20Climate%20Action%20Plan.pdf.

[48] *New York State Awards 23 Projects $7 Million in Urban and Community Forestry Grants*, NEW YORK STATE URBAN FORESTRY COUNCIL (last accessed May 9, 2025), https://nysufc.org/new-york-state-awards-23-projects-7-million-in-urban-and-community-forestry-grants/2024/08/14/.

If the preliminary injunction is lifted, any delay caused by a renewed Federal Funding Freeze will exacerbate public health harms linked to low tree canopy coverage—such as heightened extreme heat risk, poor storm resiliency, reduced air quality, and the loss of urban green space benefits to quality of life.[49]

Lifting the injunction would thus immediately endanger projects critical to municipal climate action, increase local climate-related risks, and undermine local governments' trust in the federal government. The District Court correctly recognized that Plaintiff States would experience these same harms and rightly granted injunctive relief. Preserving the preliminary injunction protects Plaintiff States and the day-to-day ability of local governments to serve their residents, meet statutory mandates, and deliver on federally funded, state-administered climate and infrastructure goals.

## CONCLUSION

Wheretofore, *Amicus Curiae* USCM respectfully urges this Court to uphold the injunction and allow briefing on the merits to proceed without changing the status quo.

Respectfully Submitted,

/s/ Vince M. Nolette
VINCENT M. NOLETTE
    *Counsel of Record*
AMY E. TURNER
SABIN CENTER FOR CLIMATE

---

[49] *Id.*

CHANGE LAW
435 West 116th Street
New York, NY 10027
(402) 320-4210
vmn2106@columbia.edu

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i) and 29(a)(5) because this brief contains 5,359 words, excluding the parts of the brief exempted by Fed. R. App. P 32(f). The foregoing brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type style requirements of Fed. R. App. P 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

/s/ Vincent M. Nolette
VINCENT M. NOLETTE

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Vincent M. Nolette
VINCENT M. NOLETTE