# United States Court of Appeals
## For the First Circuit

Nos. 25-1236, 25-1413

STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF ILLINOIS; STATE OF RHODE ISLAND; STATE OF NEW JERSEY; COMMONWEALTH OF MASSACHUSETTS; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NORTH CAROLINA; STATE OF NEW MEXICO; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN; and OFFICE OF THE GOVERNOR OF KENTUCKY, ex rel. ANDREW BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky,

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. OFFICE OF MANAGEMENT AND BUDGET; RUSSELL T. VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; U.S. DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; BRANDON L. BEACH, in his official capacity as Treasurer of the United States; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the Department of Health and Human Services; U.S. DEPARTMENT OF EDUCATION; LINDA M. MCMAHON, in her official capacity as Secretary of Education; FEDERAL EMERGENCY MANAGEMENT AGENCY; KAREN S. EVANS, in her official capacity as Senior Official Performing the Duties of the Administrator of the U.S. Federal Emergency Management Agency; U.S. DEPARTMENT OF TRANSPORTATION; SEAN P. DUFFY, in his official capacity as Secretary of Transportation; U.S. DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in her official capacity as Secretary of Labor; U.S. DEPARTMENT OF ENERGY; CHRISTOPHER A. WRIGHT, in his official capacity as Secretary of the U.S. Department of Energy; U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE M. ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; U.S. DEPARTMENT OF THE INTERIOR; DOUGLAS J. BURGUM, in his official capacity as Secretary of the Interior; U.S.

DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in her official capacity as Attorney General; U.S. DEPARTMENT OF AGRICULTURE; BROOKE L. ROLLINS, in her official capacity as Secretary of Agriculture; NATIONAL SCIENCE FOUNDATION; SETHURAMAN PANCHANATHAN, in his official capacity as Director of the National Science Foundation; U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as Secretary of Housing and Urban Development; U.S. DEPARTMENT OF STATE; U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT; MARCO RUBIO, in his official capacities as Secretary of State and Acting Administrator of the U.S. Agency for International Development; U.S. DEPARTMENT OF DEFENSE; PETER HEGSETH, in his official capacity as Secretary of Defense; U.S. DEPARTMENT OF VETERANS AFFAIRS; DOUGLAS A. COLLINS, in his official capacity as Secretary of Veterans Affairs; U.S. DEPARTMENT OF COMMERCE; HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce; NATIONAL AERONAUTICS AND SPACE ADMINISTRATION; JARED ISAACMAN, in his official capacity as Administrator of the National Aeronautics and Space Administration; CORPORATION FOR NATIONAL AND COMMUNTIY SERVICE; JENNIFER BASTRESS TAHMASEBI, in her official capacity as Interim Head of the Corporation for National and Community Service; U.S. SOCIAL SECURITY ADMINISTRATION; FRANK J. BISIGNANO, in his official capacity as Commissioner of the U.S. Social Security Administration; U.S. SMALL BUSINESS ADMINISTRATION; and KELLY L. LOEFFLER, in her official capacity as Administrator of the U.S. Small Business Administration,

Defendants, Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

---

Before

Barron, Chief Judge,
Montecalvo and Rikelman, Circuit Judges.

---

Brian J. Springer, with whom Brett A. Shumate, Assistant Attorney General, Yaakov M. Roth, Acting Assistant Attorney General, Sara Miron Bloom, Acting United States Attorney, Eric D. McArthur, Deputy Assistant Attorney General, Daniel Tenny, and

Sean R. Janda, Attorneys, Appellate Staff, Civil Division, U.S. Department of Justice, were on brief, for appellants.

Judith N. Vale, with whom Letitia James, Attorney General, State of New York, Barbara D. Underwood, Solicitor General, Mark S. Grube, Senior Assistant Solicitor General, Rabia Muqaddam, Special Counsel for Federal Initiatives, Michael J. Myers, Senior Counsel, Molly Thomas-Jensen, Special Counsel, Colleen Faherty, Special Trial Counsel, Zoe Levine, Special Counsel for Immigrant Justice, Kwame Raoul, Attorney General, State of Illinois, Jane Elinor Notz, Solicitor General, Alex Hemmer, Deputy Solicitor General, R. Sam Horan, Assistant Attorney General, Rob Bonta, Attorney General, State of California, Laura L. Faer, Christine Chuang, Supervising Deputy Attorneys General, Nicholas Green, Marie Elizabeth Logan, Theodore McCombs, Deputy Attorneys General, Andrea Joy Campbell, Attorney General, Commonwealth of Massachusetts, Katherine B. Dirks, Chief State Trial Counsel, Turner Smith, Deputy Chief, Energy and Environment Bureau, David C. Kravitz, State Solicitor, Anna Lumelsky, Deputy State Solicitor, Peter F. Neronha, Attorney General, State of Rhode Island, Katheryn M. Sabatini, Civil Division Chief, Special Assistant Attorney General, Sarah W. Rice, Deputy Chief, Public Protection Bureau, Assistant Attorney General, Leonard Giarrano IV, Special Assistant Attorney General, Matthew J. Platkin, Attorney General, State of New Jersey, Angela Cai, Executive Assistant Attorney General, Jeremy M. Feigenbaum, Solicitor General, Shankar Duraiswamy, Deputy Solicitor General, Kristen K. Mayes, Attorney General, State of Arizona, Joshua D. Bendor, Solicitor General, Philip J. Weiser, Attorney General, State of Colorado, Shannon Stevenson, Solicitor General, William Tong, Attorney General, State of Connecticut, Michael K. Skold, Solicitor General, Jill Lacedonia, Kathleen Jennings, Attorney General, State of Delaware, Vanessa L. Kassab, Deputy Attorney General, Delaware Department of Justice, Brian L. Schwalb, Attorney General, District of Columbia, Andrew Mendrala, Assistant Attorney General, Public Advocacy Division, Aaron M. Frey, Attorney General, State of Maine, Jason Anton, Assistant Attorney General, Anne E. Lopez, Attorney General, State of Hawai'i, Kaliko'onālani D. Fernandes, Solicitor General, David D. Day, Special Assistant to the Attorney General, Anthony G. Brown, Attorney General, State of Maryland, Julia Doyle, Solicitor General, Adam D. Kirschner, Senior Assistant Attorney General, Dana Nessel, Attorney General, State of Michigan, Linus Banghart-Linn, Chief Legal Counsel, Neil Giovanatti, Assistant Attorney General, Michigan Department of Attorney General, Keith Ellison, Attorney General, State of Minnesota, Liz Kramer, Solicitor General, Aaron D. Ford, Attorney General, State of

Nevada, Heidi Parry Stern, Solicitor General, Office of the Nevada Attorney General, Raúl Torrez, Attorney General, State of New Mexico, Anjana Samant, Deputy Counsel, N.M. Department of Justice, Jeff Jackson, Attorney General, State of North Carolina, Daniel P. Mosteller, Associate Attorney General, Dan Rayfield, Attorney General, State of Oregon, Benjamin Gutman, Solicitor General, Robert A. Koch, Senior Assistant Attorney General, Charity R. Clark, Attorney General, State of Vermont, Jonathan T. Rose, Solicitor General, Nicholas W. Brown, Attorney General, State of Washington, Andrew Hughes, Assistant Attorney General, Leah Brown, Assistant Attorney General, S. Travis Mayo, General Counsel, Office of the Governor ex rel. Andy Beshear in his official capacity as Governor of the Commonwealth of Kentucky, Taylor Payne, Chief Deputy General Counsel, Laura C. Tipton, Deputy General Counsel, Joshua L. Kaul, Attorney General, State of Wisconsin, and Aaron J. Bibb, Assistant Attorney General, were on brief, for appellees.

Russell Coleman, Attorney General, and Matthew F. Kuhn, Solicitor General, on brief for the Commonwealth of Kentucky as amicus curiae supporting appellants.

Alexander Haberbush and Constitutional Counsel Group on brief for the Claremont Institute's Center for Constitutional Jurisprudence and John C. Eastman as amici curiae supporting appellants.

Christina L. Wentworth, Nikhel S. Sus, and Citizens for Responsibility and Ethics in Washington on brief for Former Office of Management and Budget Officials as amici curiae supporting appellees.

David A. O'Neil, Debevoise & Plimpton LLP, Washington, D.C., Beatrice A. Walton, Raphael M. Vim, William F. Goncher, and Debevoise & Plimpton LLP, New York, NY, on brief for Ilya Somin as amicus curiae in support of appellees.

Joshua B. Shiffrin, J. Alexander Rowell, and Bredhoff & Kaiser, P.L.L.C. on brief for Legal Scholars of Federal Courts and Jurisdiction as amici curiae in support of appellees.

Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, Miriam Becker-Cohen, Nina G. Henry, and Constitutional Accountability Center on brief for Constitutional Accountability Center as amicus curiae supporting appellees.

Samuel R. Bagenstos on brief for Samuel R. Bagenstos as amicus

curiae supporting appellees.

Thomas Zimpleman and Natural Resources Defense Council on brief for National Resources Defense Council, Inc. as amicus curiae supporting appellees.

Vincent Levy, Kevin D. Benish, Charlotte Baigent, Christopher M. Kim, and Holwell Shuster & Goldberg LLP on brief for Former Executive Branch Officials as amici curiae supporting appellees.

Vincent M. Nolette, Amy E. Turner, and Sabin Center for Climate Change Law, Columbia Law School on brief for the U.S. Conference of Mayors as amicus curiae supporting appellees.

Philip S. May, Groombridge, Wu, Baughman and Stone LLP, Washington, D.C., Jennifer H. Wu, Eric Alan Stone, Josephine Young, Jenny C. Wu, Jennifer Rea Deneault, Peter Sandel, Alexander S. Evelson, and Groombridge, Wu, Baughman and Stone LLP, New York, NY, on brief for Dr. Arati Prabhakar as amicus curiae supporting appellees.

Maura Eileen O'Connor, The Brennan Center for Justice, NYU School of Law, Brian A. Sutherland, Melanie C. Gold, and Complex Appellate Litigation Group LLP on brief for 157 Members of Congress as amici curiae supporting appellees.

Susannah Landes Weaver, Envolve Law, Jonas Monast, Patrick R. Jacobi, Alexandra L. St. Romain, and Center for Applied Environmental Law and Policy on brief for Law Scholars as amici curiae supporting appellees.

---

March 16, 2026

---

BARRON, **Chief Judge**.  These consolidated appeals concern events that trace back to the early weeks of the current Trump Administration.  In the first appeal, we confront a challenge to a preliminary injunction that, among other things, blocks a sweeping and unprecedented categorical "freeze" of federal financial assistance that various federal agencies are alleged to have implemented soon after President Trump took office on January 20, 2025.  In the other appeal, we confront a challenge to orders that enforce the preliminary injunction against one of those agencies -- the Federal Emergency Management Agency (FEMA) -- for failing to comply with it.  We affirm the preliminary injunction in part and vacate it in part.  We affirm the orders enforcing the preliminary injunction against FEMA in full.

## I.

### A.

On January 27, 2025, the Acting Director of the Office of Management and Budget (OMB) issued Memorandum M-25-13, entitled "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" (the "OMB Memorandum").  It directed "Federal agencies to identify and review all Federal financial assistance programs and supporting activities consistent with the President's policies and requirements," (footnotes omitted)  including those

set forth in seven executive orders that President Trump issued in "the initial days of his Administration."[1]

"To implement these orders," the OMB Memorandum instructed, "each agency must complete a comprehensive analysis of all of their Federal financial assistance programs to identify programs, projects, and activities that may be implicated by any of the President's executive orders."  It went on to provide that "[i]n the interim, to the extent permissible under applicable law, Federal agencies must temporarily pause all activities related to obligation or disbursement of all Federal financial assistance . . . that may be implicated by the executive orders."

The OMB Memorandum stated that the "temporary pause will become effective" at 5:00 p.m. on January 28, 2025 -- one day after the OMB Memorandum was released.  It concluded by directing that

> [e]ach agency must pause: (i) issuance of new awards; (ii) disbursement of Federal funds under all open awards; and (iii) other relevant agency actions that may be implicated

---

[1] Those executive orders were: Protecting the American People Against Invasion, Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025); Reevaluating and Realigning United States Foreign Aid, Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025); Putting America First in International Environmental Agreements, Exec. Order No. 14162, 90 Fed. Reg. 8455 (Jan. 20, 2025); Unleashing American Energy, Exec. Order No. 14154, 90 Fed. Reg. 8353 (Jan. 20, 2025); Ending Radical and Wasteful Government DEI Programs and Preferencing, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025); Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); and Enforcing the Hyde Amendment, Exec. Order No. 14182, 90 Fed. Reg. 8751 (Jan. 24, 2025).

by the executive orders, to the extent permissible by law, until OMB has reviewed and provided guidance to your agency with respect to the information submitted.

The next day, OMB issued "guidance" concerning the OMB Memorandum. It stated that the "pause" was "limited to programs, projects, and activities implicated" by the executive orders but that the pause did not apply to programs that provide direct benefits, such as the Supplemental Nutrition Assistance Program, Social Security, Medicare, and Medicaid.

OMB also circulated a document, "Instructions for Federal Assistance Program Analysis in Support of [the OMB Memorandum]." It "required" "[a]ll Federal agencies that provide Federal financial assistance" to complete an attached spreadsheet and submit it to OMB by February 7, 2025.

The spreadsheet listed over 2,500 funding lines. It asked administering agencies to report, among other things, whether the funding line "has any anticipated obligations or disbursement[s]" and "any statutory requirements mandating the obligation or disbursement of funds" through March 15, 2025.

**B.**

On January 28, 2025 -- the OMB Memorandum's deadline for instituting the "pause" -- twenty-two states and the District of Columbia (the "States") filed a complaint in the United States District Court for the District of Rhode Island. The plaintiffs

- 8 -

named as defendants President Donald Trump, OMB, the Acting Director of OMB, eleven other agencies, and various agency heads and officials at those agencies.

The complaint alleged that the directive in the OMB Memorandum to "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance" within twenty-four hours -- which the complaint referred to as the "OMB Directive" -- was a final agency action that violated the Administrative Procedure Act (APA). The complaint alleged that the OMB Directive did so because it was "contrary to law" and "arbitrary and capricious." See 5 U.S.C. § 706(2)(A)-(C). The complaint further alleged that the OMB Directive was unconstitutional on several grounds.

In support of these claims, the States alleged that they receive and rely on significant federal financial assistance to provide essential services to their residents, including healthcare, disaster relief, and education. They further alleged that the OMB Directive would impair their abilities to provide such services. Those injuries, the States alleged, were "compounded" because OMB "provided effectively no notice" to them before implementing the OMB Directive and thereby prevented them from "lessen[ing] the blow" by establishing reserves, appropriating funds through their own legislatures, or taking other similar measures.

- 9 -

The States sought declaratory and injunctive relief as well as vacatur of the OMB Directive. They also sought a Temporary Restraining Order (TRO) to "restrain and enjoin the Agency Defendants from implementing or enforcing the OMB Directive."

## c.

The same day that the States filed their complaint, January 28, 2025, the U.S. District Court for the District of Columbia heard a separate case about the OMB Memorandum and its implementation. See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 13 (D.D.C. 2025). The plaintiffs in that case were various nonprofits. Id. at 16. They alleged that they relied on federal financial assistance that the OMB Memorandum and its implementation put in jeopardy. Id. The district court granted those plaintiffs' request for an administrative stay and ordered the defendants in that case -- OMB and its acting director -- to "refrain from implementing [the] OMB Memorandum." Id. at 16-17.

The next day -- January 29, 2025 -- in the case that the States had filed, the District Court scheduled a hearing on their motion for a TRO for 3:00 that afternoon. Later that day, OMB issued a new memorandum that stated: "OMB Memorandum M-25-13 is rescinded. If you have questions about implementing the

- 10 -

President's Executive Orders, please contact your agency General Counsel."

The Government informed the District Court of the rescission of the OMB Memorandum and contended that it mooted the States' case -- and so their request for injunctive relief. The States argued otherwise.

For this argument, the States chiefly relied on a statement that White House Press Secretary Karoline Leavitt posted on social media immediately after the rescission of the OMB Memorandum. In her statement, she asserted: "This is NOT a rescission of the federal funding freeze. It is simply a rescission of the OMB memo. Why? To end any confusion created by the court's injunction. The President's [executive orders] on federal funding remain in full force and effect, and will be rigorously implemented."

The States also relied on declarations from state officials. In those declarations, the state officials averred that they did not receive expected funds or were unable to access grant portals in the wake of the OMB Directive -- and even so after the OMB Memorandum itself had been formally rescinded.

**D.**

On January 31, 2025, the District Court granted the States' motion for the TRO. In the memorandum and order granting

- 11 -

that relief, the District Court explained that "[t]he Executive's action unilaterally suspends the payment of federal funds to the States" without regard to "the authorizing or appropriating statute, the regulatory regime, or the terms of the grant itself." It further concluded that the States were likely to succeed on the merits of "some, if not all" of their claims.

With respect to the issue of mootness, the District Court concluded that "the evidence shows that the alleged rescission of the OMB Directive was in name-only." It pointed to the White House Press Secretary's social media post as well as an email that the States had put in the record from an official at the Environmental Protection Agency (EPA). That email, which the official sent the day after the White House Press Secretary's social media post, asserted that the agency was "work[ing] 'diligently to implement the [OMB] Memorandum.'"

Based on this evidence, the District Court concluded "that the policies in the OMB Directive that the States challenge" were "still in full force and effect" and that "the issues presented in the States' TRO motion" were accordingly "not moot." The TRO prohibited the Agency Defendants from "imped[ing] the States' access" to obligated or awarded federal financial

assistance "except on the basis of the applicable authorizing statutes, regulations, and terms."[2]

## E.

One week later, on February 7, 2025, the States filed a motion for a preliminary injunction. The States submitted declarations from various state officials in support of the motion. The officials stated in their declarations that they had not received expected disbursements or were unable to draw down on their open grants. The officials also described the potential impacts of the sudden freeze of federal financial assistance, including possible layoffs, reductions in service, and closures for childcare programs; probable slowed emergency response times to major disasters; and likely reduced levels of service in processing, approving, and paying out unemployment insurance claims and benefits.

On February 12, 2025, the Government filed its opposition to the States' motion for a preliminary injunction. It argued that the rescission of the OMB Memorandum mooted the States' case and characterized the States' claims as "directed solely" against that document. The Government did not submit any evidence

---

[2] The Government later appealed the TRO and a subsequent order enforcing it, but ultimately asked us to dismiss the appeals, which we did. The TRO and the order enforcing it are not at issue in this appeal.

of its own in opposing the States' motion for the preliminary injunction.

The following day, the States filed an amended complaint. It named one new plaintiff[3] and a dozen additional agencies and agency officials as defendants. It also described the agency actions subject to APA review as "[t]he Federal Funding Freeze, effectuated through [executive orders], the Unleashing Directive,[4] the OMB Directive, and other agency actions implementing them as detailed herein."

The amended complaint included additional factual allegations about the "major funding disruptions" that followed the issuance of the executive orders, some of which predated the OMB Memorandum. It also asserted that "[e]ven after the purported rescission" of the OMB Memorandum, agencies continued to freeze federal grants, "resulting in widespread and significant

---

[3] The additional plaintiff was Andrew Beshear, the Governor of Kentucky.

[4] The "Unleashing Directive" referred to by the States is an OMB memorandum issued on January 21, "Guidance Regarding Section 7 of the Executive Order Unleashing American Energy." That memorandum directed agencies to "immediately pause disbursement of funds appropriated" by the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022), or the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021), "that may be implicated by the policy established" in "Unleashing American Energy," Exec. Order No. 14154, 90 Fed. Reg. 8343 (Jan. 20, 2025). The specifics of that policy are not relevant to this appeal.

disruptions" of the States' ability to "provide essential services to their residents."

In addition, the amended complaint alleged that the challenged agency actions were contrary to law under the APA, see 5 U.S.C. § 706(2)(B)-(C), because they violated the Impoundment Control Act of 1974, 2 U.S.C. §§ 681-92. It also set forth an equitable ultra vires claim based on the defendants having acted beyond the scope of their statutory authority.

The following day, the States filed their reply to the Government's opposition to their preliminary injunction motion. In that reply, the States referenced the amended complaint. They urged the District Court to treat the amended complaint as the operative complaint for purposes of their preliminary injunction motion, notwithstanding that the amended complaint had been filed after that motion.

The District Court held a hearing on the preliminary injunction motion on February 21. On March 6, it granted the States' motion for a preliminary injunction. It also denied the Government's request to stay the order pending appeal.

In its memorandum and order, the District Court rejected the Government's contention that the States' claims likely were moot. It found that "the evidence suggests that the OMB Directive's rescission was in name only" and that the "substantive effect of the" OMB Directive "carries on." It then applied the

voluntary cessation doctrine, concluding that: (1) the "voluntary rescission of the OMB Memorandum was a clear effort to moot legal challenges to the federal funding freeze" and (2) it was not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," as there was "nothing" to "suggest[]" that the OMB Directive had been rescinded either because it was deemed unnecessary to advance the President's policy priorities in light of the executive orders or out of recognition that it was contrary to law or in excess of legal authority. Finally, the District Court concluded that the rescission of the OMB Memorandum did not "provide the States with all the prospective relief they ha[d] requested" because the States were "challenging a pause on federal funding that was implemented under not only the OMB Directive, but also to the [executive orders] incorporated therein and other agency actions such as the OMB's issuance of the Unleashing [Directive]."

The District Court also concluded that the States were likely to succeed in showing both that they had standing under Article III of the U.S Constitution, see U.S. Const. art. III, § 2, cl. 1, and that their APA claims were meritorious. Citing constitutional avoidance principles, the District Court declined to address whether the States were likely to prevail on their non-APA claims. It further concluded that the other preliminary injunction factors weighed in the States' favor. See Winter v.

Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (setting forth factors).

The preliminary injunction that the District Court issued applies to all the agencies and agency officials that the States named as defendants in their amended complaint -- collectively, the Agency Defendants. It does not apply to the President.

The preliminary injunction prohibits the Agency Defendants "from reissuing, adopting, implementing, giving effect to, or reinstating under a different name the [OMB Directive] with respect to" obligated federal funds. It further directs the Agency Defendants to provide a written notice of the preliminary injunction to the "federal departments and agencies to which the OMB Directive was addressed." That notice must instruct the agencies to release to the States any disbursements of "awarded grants, executed contracts, or other executed financial obligations that were paused" because of the OMB Directive, including the executive orders identified in the OMB Memorandum. The District Court also ordered FEMA to submit a status report of its compliance because the States had previously alleged that FEMA was not complying with the TRO.

**F.**

The Government timely appealed and filed an application with our Court to stay the preliminary injunction during the pendency of the appeal. We denied the stay request. New York v. Trump, 133 F.4th 51, 57 (1st Cir. 2025).

During the pendency of the appeal, FEMA filed a status report in the District Court about its compliance with the preliminary injunction. The report asserted that the claimed delays in FEMA's issuance of payments did not reflect a "pause" or "freeze" in funding. It asserted instead that the delays resulted from FEMA's "manual review process," which had been put in place pursuant to FEMA's independent authority to ensure compliance with its regulatory obligations.

On March 24, 2025, the States filed a motion to enforce compliance with the District Court's preliminary injunction based on FEMA's alleged noncompliance. On April 4, 2025, the District Court granted the States' motion to enforce compliance with the preliminary injunction.

As relevant here, the District Court concluded that "FEMA's adoption of a manual review process . . . is essentially an adoption of a funding review scheme that strives to effectuate the funding mandates in section 17 of the Invasion [Executive Order], which [it] enjoined in its preliminary injunction." Accordingly, the District Court "reaffirm[ed] its preliminary

injunction order that the Defendants are enjoined from" freezing federal funds

> based on the OMB Directive, including funding freezes dictated, described, or implied by Executive Orders issued by the President before rescission of the OMB Directive or any other materially similar order, memorandum, directive, policy, or practice under which the federal government imposes or applies a categorical pause or freeze of funding appropriated by Congress.

**G.**

The same day that the District Court granted the States' motion to enforce the preliminary injunction against FEMA based on its alleged noncompliance, the Supreme Court of the United States issued its ruling in Department of Education v. California, 604 U.S. 650 (2025) (per curiam).  In that case, the district court concluded that the states that brought the lawsuit were likely to succeed on their APA claims in which they challenged the termination of various U.S. Department of Education grants.  Id. at 650-51.  The district court in that case then entered a TRO that enjoined the Department of Education from terminating various grants and also ordered that Department to pay out certain grant obligations.  Id. at 650.

The Department of Education sought an administrative stay of the TRO from the Supreme Court, which granted it.  Id. at 651-52.  The Court explained that the Department of Education was "likely to succeed in showing the District Court lacked

jurisdiction to order the payment of money under the APA." Id. at 651. That was so, according to the Court, because the APA's "limited waiver of [sovereign] immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered." Id.

Based on the Supreme Court's stay ruling in Department of Education, the Government in this case filed a motion for reconsideration of the District Court's order granting the States' motion to enforce the preliminary injunction against FEMA based on its noncompliance. The Government argued that, under Department of Education, the District Court "lacks jurisdiction to consider Plaintiffs' enforcement motion" because an "order compelling continued payment of funds under . . . particular FEMA grants" was essentially an "order[] to enforce a contractual obligation to pay money," which was a remedy that the Supreme Court made clear in Department of Education is not available under the APA. (Second alteration in original.) The District Court denied the motion on April 14, 2025.

#### H.

On April 28, 2025, the Government timely appealed both the District Court's order granting the States' motion to enforce and the order denying the Agency Defendants' motion for reconsideration of that order. Upon the Government's unopposed

motion, we consolidated that appeal with the Government's appeal of the preliminary injunction.  We then heard oral arguments in the consolidated appeals.

## II.

To secure a preliminary injunction, the moving party must establish "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20.  We review the grant of a preliminary injunction for abuse of discretion.  N.H. Indon. Cmty. Support v. Trump, 157 F.4th 29, 34 (1st Cir. 2025).  In conducting that review, we "review the legal issues de novo and the factual findings for clear error."  Id.

## III.

The Government's lead challenge to the preliminary injunction rests on the contention that the States cannot satisfy the "likelihood of success" factor because the OMB Memorandum's rescission mooted their case -- and so stripped the District Court of Article III subject matter jurisdiction -- almost as soon as their case began.  See Powell v. McCormack, 395 U.S. 486, 496 (1969) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the

- 21 -

outcome."). The Government acknowledges that under the voluntary cessation doctrine, the recission of the OMB Memorandum moots the case only if "it is absolutely clear [that] the allegedly wrongful behavior" that the States challenged "could not reasonably be expected to recur." Bayley's Campground, Inc. v. Mills, 985 F.3d 153, 158 (1st Cir. 2021) (quoting ACLU of Mass. v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 55 (1st Cir. 2013)); see also FBI v. Fikre, 601 U.S. 234, 241 (2024). But the Government appears to contend that it can meet this "formidable burden," Bayley's Campground, 985 F.3d at 157 (quoting ACLU of Mass., 705 F.3d at 55), because it reasons that there is no realistic chance that OMB would reissue the OMB Memorandum that was rescinded or any document like it.

The voluntary cessation doctrine would come into play in this case, however, only if the OMB Memorandum's rescission caused the governmental action that the States are challenging to cease. We cannot see how we could conclude that the rescission had that consequence.

The States are challenging the OMB Directive, not the piece of paper that contained it. And the District Court expressly found that the rescission of the OMB Memorandum was "in name only" because the "substantive effect of the directive [contained in the OMB Memorandum] carrie[d] on." Notably, the Government does not address (let alone challenge) that finding, despite it being one

- 22 -

of fact that we may review only for clear error.  See Hisp. Affs. Project v. Acosta, 901 F.3d 378, 386 (D.C. Cir. 2018) (treating the existence of a de facto policy as a factual finding).  And, we emphasize, that finding was based on not only the White House Press Secretary's "unequivocal statement" immediately following the OMB Memorandum's rescission that the "federal funding freeze" itself had not been rescinded but also the record evidence of "the continued actions of Executive agencies" following the OMB Memorandum's rescission, which included evidence of their continued freezing of federal financial assistance.  We therefore do not see how the Government's asserted ability to meet the voluntary cessation doctrine's requirements shows that the OMB Memorandum's rescission rendered their case moot, as the Government has not carried its burden of showing that the rescission of that document "has deprived the [States] of a personal stake in the outcome of the lawsuit."  West Virginia v. EPA, 597 U.S. 697, 719 (2022) (citation modified) (explaining that the party claiming mootness "bears the burden to establish that a once-live case has become moot").

The Government's related mootness argument is also unpersuasive.  Here, the Government contends that by rescinding the OMB Memorandum, the Agency Defendants gave the States all the relief that they sought.  But, given the District Court's factual finding that the OMB Directive "carrie[d] on" even after the

- 23 -

rescission of the OMB Memorandum, this mootness argument fails for the simple reason that the rescission did not give the States any relief from the OMB Directive.

In addition, we note that the District Court correctly determined that the amended complaint challenges some agency actions to freeze federal funds that began before the OMB Memorandum issued.   See Hisp. Affs. Project, 901 F.3d at 387 (treating the scope of plaintiffs' challenge to a de facto policy as a question of law).   Thus, the OMB Memorandum's rescission failed to give the States all the relief that they were seeking in this respect, too, see Powell, 395 U.S. at 497 ("Where one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy."), as (for the reasons we have explained) the States' case was not moot at the time that they filed their amended complaint.

## IV.

We now turn to the Government's remaining arguments as to why we must reject the District Court's determination that the States have met their burden as to the "likelihood of success" factor.   We find these arguments unpersuasive as well.

### A.

We start with the Government's argument that the District Court made a procedural error in ruling that the States

were likely to succeed on their APA claims.  This contention rests on the fact that when the States moved for the preliminary injunction they had filed only their initial complaint and the Government's assertion that the initial complaint challenged only the OMB Memorandum.

According to the Government, because the States filed the amended complaint only after they filed their preliminary injunctive motion, the District Court was barred from relying on the allegations that the amended complaint set forth in granting the requested preliminary injunction.  Moreover, the Government contends, the OMB Memorandum did not itself violate the APA.  Thus, the Government reasons that the District Court erred procedurally when it ruled that the States were likely to succeed on their APA claims, as, in doing so, the District Court necessarily -- but impermissibly -- relied on the allegations in the amended complaint.

The record shows, however, that the Government did not preserve the argument that the District Court erred procedurally by relying on the amended complaint in granting the preliminary injunction.  The Government first referred to the timing of the States' filing of their amended complaint at the hearing on the States' motion requesting the preliminary injunction.  The Government did so at that time only through bare observation by its counsel that "shortly before filing their reply brief,

- 25 -

Plaintiffs . . . filed an amended complaint seeking to broaden their claims, no longer just challenging th[e] singular OMB memo but challenging the so-called funding freeze."

Unsurprisingly, the District Court did not treat that mere characterization of what had transpired in the proceedings up until that point as if it were an argument that the amended complaint had no legal bearing on the States' motion for preliminary injunctive relief.  Nor did the District Court have any evident reason to treat that account as if it were such an argument.  The States made it known before the hearing that they were relying on the amended complaint -- which had been filed more than a week earlier -- in seeking the preliminary injunction, and the substance of the allegations in the amended complaint were directly addressed by both parties at the hearing.

We review unpreserved arguments only for plain error. Universitas Educ., LLC v. Granderson, 98 F.4th 357, 373 (1st Cir. 2024).  The Government develops no argument, however, that the District Court made an error of that plain sort in taking account of the allegations in the amended complaint.  Thus, the Government has waived any such argument on appeal.  See id.

### B.

The Government separately argues that, even if the States' APA claims properly target more than just the OMB

Memorandum, the States still are not likely to succeed on the merits as to any of those claims.  The Government argues that, in that event, the States would necessarily be relying on a broader challenge to the "Federal Funding Freeze," which would mean that they would be advancing an impermissible "programmatic attack on federal spending."  That is so, the Government asserts, because the States' APA claims, as set forth in the amended complaint, take aim at "a category of actions" rather than "any particular decision."  Therefore, the Government urges us to conclude that by "amalgamat[ing]" "countless discrete decisions into a single, challengeable 'Federal Funding Freeze,'" the States are necessarily mounting the type of "programmatic attack" under the APA that the Supreme Court "squarely rejected" in Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 66-67 (2004), on the ground that it failed to challenge discrete agency actions.

We rejected this same argument when we denied the Government's application for a stay of the preliminary injunction pending appeal.  New York, 133 F.4th at 66-69.  It fares no better on direct appeal.

"Norton does make clear that the APA permits review of only discrete final agency actions and 'precludes the kind of broad programmatic attack [the Supreme Court] rejected in Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).'"  Id. at 67 (alteration in original) (quoting Norton, 542 U.S. at 64).  But it

also clarified "that the 'broad programmatic attack' at issue in Lujan" was to the Bureau of Land Management's land withdrawal review program, which "was not [itself] an 'agency action.'" Id. (alteration in original) (quoting Norton, 542 U.S. at 64). And Lujan itself recognized that if "some specific order or regulation[] appl[ies] some particular measure across the board to all individual classification terminations and withdrawal revocations, and . . . that order or regulation is final . . . it can of course be challenged under the APA." Lujan, 497 U.S. at 890 n.2.

The Government does not argue that the States' challenge to the OMB Directive is itself an impermissible "programmatic attack." It also fails to explain why an individual agency-wide freeze of the kind that the District Court found that each Agency Defendant likely had implemented is not the kind of across-the-board but still discrete agency action that Lujan explains may be challenged under the APA.

True, the Government argues that the District Court misconstrued the scope of the States' challenge by treating it as if it were a challenge to more than the OMB Memorandum. But, as we explained above, the States' amended complaint makes clear that the States are challenging a broader set of agency actions: the OMB Directive and the agency-wide, categorical funding freezes allegedly implemented by each Agency Defendant. As we also

explained above, the Government has not given us any reason to agree with its unpreserved contention that the States' amended complaint cannot be considered in assessing the merits of their motion requesting the preliminary injunction.

Thus, as the case comes to us, the States are challenging the discrete, agency-wide categorical freeze that each of the Agency Defendants allegedly put in place, as well as the OMB Directive.  And so, because nothing prevents a plaintiff from challenging more than a single discrete final agency action in a single suit, we see no merit to the Government's argument that the States' APA claims are likely to fail for constituting an impermissible "programmatic attack."

### C.

That brings us to the Government's contention that the District Court likely "exceeded the bounds of the APA by ordering agencies to exercise or refrain from exercising their unreviewable discretion in a particular manner."  The Government relies for this contention on § 701(a)(2) of the APA, which makes a final agency action unreviewable when it is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).

Because the APA "embodies a 'basic presumption of judicial review,'" Dep't of Com. v. New York, 588 U.S. 752, 771 (2019) (quoting Abbott Lab'ys v. Gardner, 387 U.S. 136, 140

- 29 -

(1967)), § 701(a)(2)'s exception to reviewability applies only to "those rare administrative decisions traditionally left to agency discretion," Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 17 (2020) (citation modified), "or when the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion,'" Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020)(quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)).  As a result, to succeed on this argument, the Government needs to identify the agency actions that likely are "committed to agency discretion by law" that the District Court either relied on in issuing the preliminary injunction or that the injunction bars. 5 U.S.C. § 701(a)(2).  The Government has failed to do so.

The Government appears to concede that, with respect to at least some of the affected funding streams, the Agency Defendants do not possess unreviewable discretion in allocating and disbursing federal financial assistance.  Nonetheless, the Government likens many of the other agency actions that the States challenge to the agency action that was challenged in Lincoln v. Vigil, which the Supreme Court deemed to be an action "committed to agency discretion by law."  508 U.S. at 193 (quoting 5 U.S.C. § 701(a)(2)).  The Government argues that it follows that the preliminary injunction at issue here impermissibly enjoins

"funding decisions within broad statutory mandates that do not limit an agency's bases for decisionmaking."

As support for this line of argument, the Government identifies a few specific statutes that it contends afford the relevant agencies that are defendants here latitude "over how to achieve the program's purposes."  See, e.g., 16 U.S.C. § 2105 (establishing "urban and community forestry challenge cost-sharing program" for which the Secretary of the Department of Agriculture shall make awards "on a competitive basis"); 42 U.S.C. § 7437 (authorizing the EPA Administrator to "competitively award grants" for "developing a plan for the reduction of greenhouse gas air pollution").  The Government thus appears to be of the view that, notwithstanding the APA's presumption of reviewability, the limited statutory examples that it has put forth suffice to cast doubt on whether virtually any of the States' APA claims target agency actions that can be reviewed under § 701(a)(2).

Even if we were to accept that doubtful premise, however, we still would reject the Government's position, given what Lincoln holds.  There, the Supreme Court held that the Indian Health Service's decision to discontinue a program that provided services "to handicapped Indian children in the Southwest" was "'committed to agency discretion by law.'"  Lincoln, 508 U.S. at 184 (quoting 5 U.S.C. § 701(a)(2)).  But the Supreme Court did so on the limited grounds that "[t]he allocation of funds from a lump-sum

- 31 -

appropriation is [an] administrative decision traditionally regarded as committed to agency discretion," id. at 192, and the relevant statutes spoke "about Indian health only in general terms" and did "not so much as mention" the program at issue, id. at 194.

Thus, contrary to the Government's suggestion, Lincoln did not address an agency's discretion to withhold obligated funds. It thus did not hold that agencies have unreviewable discretion to categorically stop disbursing obligated funds, such that they may indefinitely pause their disbursement of them in a categorical fashion without, for example, having a reasoned explanation for doing so, as the APA ordinarily requires for any final agency action.[5] See Pol'y & Rsch., LLC v. HHS, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (reviewing agency decision to terminate grant funding for arbitrariness and capriciousness); cf. Train v. City of New York, 420 U.S. 35, 41-46 (1975) (holding the Clean Water

---

[5] For similar reasons, the Government's citation to Milk Train, Inc. v. Veneman, 310 F.3d 747 (D.C. Cir. 2002), is equally unpersuasive. At issue in that case was the Secretary of Agriculture's implementation of a subsidy program for milk producers. Id. at 748. The D.C. Circuit held the Secretary's decision to cap the amount of milk production eligible for assistance was unreviewable under the APA because the relevant statute committed that decision to the agency's discretion by directing the funds be provided "in a manner determined appropriate by the Secretary." Id. at 751 (quoting Pub. L. No. 106-78, § 805, 113 Stat. 1135, 1179 (1999)). For the reasons we have explained, the challenged agency actions here are not of the kind Vigil treated as having been similarly committed to agency discretion, and the Government identifies no statutory provisions containing language like that relied on in Milk Train.

Act did not give the EPA Administrator discretion to withhold appropriated funds).

## D.

The Government's remaining argument about the "likelihood of success" factor concerns the District Court's "not in accordance with the law" and "arbitrary and capricious" rulings. See 5 U.S.C. § 706(2)(A). We can bypass the Government's arguments about why the States are unlikely to be able to show that the challenged agency actions were "not in accordance with the law" because we conclude that there is no merit to the Government's arguments that the States are unlikely to be able to show that those actions were arbitrary and capricious.

## 1.

Agency action is arbitrary and capricious "if it is not 'reasonable and reasonably explained.'" Ohio v. EPA, 603 U.S. 279, 292 (2024) (quoting FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021)). A court therefore "must ensure . . . that the agency has offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Id. (citation modified).

In assessing whether an agency action is arbitrary and capricious, a court may consider only "the grounds that the agency invoked when it took the action." Regents, 591 U.S. at 20 (quoting

- 33 -

Michigan v. EPA, 576 U.S. 743, 758 (2015)).  It also must be mindful that an agency's explanation for its action needs only to be "clear enough that its 'path may reasonably be discerned.'" Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221 (2016) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

When an agency fails "to provide even that minimal level of analysis," however, "its action is arbitrary and capricious." Id.  Additionally, when offering an explanation for its action, the agency "must 'be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account,'"" Regents, 591 U.S. at 30 (quoting Encino Motorcars, 579 U.S. at 222), because it acts arbitrarily and capriciously by "ignor[ing] such matters," id. (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009)).

## 2.

The Government relies heavily on the OMB Memorandum to make the case that the District Court's "arbitrary and capricious" rulings are wrong.  It asserts that the OMB Memorandum makes clear that freezing federal financial assistance "was necessary to minimize the expenditure of funds inconsistent with the Administration's policy priorities while the Administration

- 34 -

reviewed funding" "because substantial federal funds are spent every day."

Thus, in the Government's view, the OMB Memorandum's objective was to "safeguard valuable taxpayer resources" and "effectuate the President's Executive Orders." The Government also contends that the OMB Memorandum adequately considered the recipients' reliance interests because it exempted from the pause direct assistance given to individuals and payments required by law, and allowed for exceptions on a case-by-case basis. In that regard, the Government emphasizes, the OMB Memorandum expressly stated that agencies must comply with its directive only "to the extent permissible by law."

As we have explained, however, we cannot accept as a premise -- insofar as the Government's argument requires us to do so -- that the States challenge only the OMB Memorandum. We instead proceed on the understanding that they challenge the "funding freeze" that they allege was directed through the OMB Directive in the OMB Memorandum and implemented through the individual Agency Defendants' categorical, agency-wide freezes, some of which they allege began even before the OMB Memorandum issued.

That is significant because the District Court found that the States were likely to succeed in showing both that the

- 35 -

Agency Defendants took those actions to implement "the freeze" and that

> [t]he breadth and immediacy of the funding freeze and the catastrophic consequences that flowed reflects the Agency Defendants' failure to: (1) meaningfully consider the important aspects of the problems -- namely, the plain implications of withholding trillions of dollars of federal financial assistance; and (2) reflect if the freeze fell within the bounds of their statutory authority.

(Citation modified.) So, to make the case that the OMB Memorandum's text shows that the challenged agency actions are not likely arbitrary and capricious, the Government needs to do one of two things: It needs either to undermine the District Court's finding that the Agency Defendants likely took the agency-wide actions to freeze financial assistance categorically and immediately or it needs to explain why the text of the OMB Memorandum shows that, in taking those actions, the Agency Defendants likely acted based on reasoned assessments.

The Government does not meaningfully dispute, however, the District Court's determination that the Agency Defendants likely did institute the alleged agency-wide categorical freezes. And the Government also does not address whether, in taking those actions, the Agency Defendants failed to make reasoned assessments about the impacts of those actions and the scope of their legal authority.

For example, the Government asserts that "[t]he Memorandum contemplated that funds would continue being disbursed in circumstances where reliance interests would be most acute, including for direct assistance to individuals, payments required by law, and payments that agencies believed appropriate to continue on a case-by-case basis." But the relevant question is whether, in implementing the challenged funding freeze, the Agency Defendants considered whether "payments [were] required by law" and evaluated whether the payments were "appropriate" on "a case-by-case basis."[6] The OMB Memorandum itself obviously does not show that the Agency Defendants did so with respect to any of the freezes that they implemented in advance of that document's issuance. Nor can the OMB Memorandum show as much as to those freezes that were implemented in its wake, except, we suppose, by

---

[6] We recognize that the Government separately asserts that "numerous covered grant programs allow funding pauses." As we have already explained, however, because we affirm the District Court's preliminary injunction on arbitrary-and-capricious grounds, we need not delve into the issue of whether the categorical freezes were contrary to law. To the extent that the Government means to advance this argument to challenge the District Court's determination that the agency actions likely were arbitrary and capricious, it fails to explain how this argument undermines that ruling. Even if the affected funding streams allow for pauses based on policy priorities, the Government does not explain how the categorical agency-wide freezes accounted for the reliance interests at stake that the District Court determined the States were likely to succeed in showing had been ignored. Moreover, the authority to suspend funding based on a determination that the program no longer advances agency priorities does not necessarily include the authority to suspend funding before such a determination has been made.

inference.  Yet the District Court reasonably found, based on the immediate and categorical nature of the agency-wide freezes that it supportably found were implemented, that the States were likely to succeed in showing that the Agency Defendants did not in fact consider such things.  Nothing in the OMB Memorandum itself undermines <u>that</u> finding.

Moreover, the Government does not point to anything other than the text of the OMB Memorandum when it comes to how the Agency Defendants decided to take the challenged actions.  Indeed, although the States introduced over a thousand pages documenting the harms that they faced as a result of the funding freeze, the Government offered no evidence of its own to indicate that the Agency Defendants' decision-making processes considered rather than ignored the States' reliance interests in the already obligated federal financial assistance that they receive but that the challenged agency actions would jeopardize.

As to OMB's action in issuing the challenged OMB Directive itself, it is important to remember that the States' challenge <u>that</u> action rather than the OMB Memorandum.  It is also important to keep in mind that, in assessing whether the OMB Directive was arbitrary and capricious, the District Court relied not only on the text of the OMB Memorandum but also on how the OMB Directive operated after that document had been formally rescinded.

It is in that context that the District Court determined, based on "the undisputed evidence" before it, that the "to the extent permissible by law" caveat in the OMB Memorandum "was nothing more than window dressing." Overall, the District Court concluded, the OMB Directive "amounted to a command, not a suggestion, that Agency Defendants shall execute a categorical, indefinite funding freeze to align funding decisions with the President's priorities."

The District Court supported that conclusion by pointing to the fact that the OMB Memorandum provided that the OMB Directive was "effective on January 28[, 2025]" and stated that "Federal agencies must temporarily pause" all implicated funding activities. It then explained that "the mere twenty-four hours that the OMB gave agencies to discern which of thousands of funding freezes must or must not be paused flouts the [Agency] Defendants' argument[] that" the "to the extent permissible by law" "instruction mitigated the harm that the pause caused." See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 51 (D.D.C. 2025) ("[I]t is unclear whether twenty-four hours is sufficient time for an agency to independently review a single grant, let alone hundreds of thousands of them.").

The Government counters that the District Court misread the OMB Memorandum, chiefly by emphasizing the OMB Memorandum's "to the extent permissible by law" language. But the record

supportably shows that, as the District Court found, the agencies and agency officials to whom the OMB Memorandum was directed consistently acted based on the alleged OMB Directive, which those agencies and agency officials understood to require them to freeze first and ask questions later.[7]

Thus, while we agree that "[t]he mere possibility that some agency might make a legally suspect decision" with regard to a policy "does not justify an injunction against enforcement of a policy" that may properly be implemented in many circumstances, Building & Construction Trades Department, AFL-CIO v. Allbaugh,

---

[7] The Government does point to OMB's follow-on guidance as "making clear that agencies should only pause funding 'to the extent permissible by law.'" But, although the guidance does state that the OMB Memorandum requested agencies to "temporarily pause, to the extent permitted by law, grant, loan or federal financial assistance programs" implicated by the executive orders, it later, in response to the question, "Is the pause of federal financial assistance an impoundment," answered, "No, it is not an impoundment . . . . It is a temporary pause to give agencies time to ensure that financial assistance conforms to the policies set out in the President's Executive Orders, to the extent permitted by law." There, the "to the extent permitted by law" caveat modifies the assurance that financial assistance conforms to the President's executive orders, not the pause itself. Further, the spreadsheet that OMB required agencies to complete "in support" of the OMB Memorandum included over 2,500 funding programs -- including programs that the OMB Memorandum purportedly exempted from the pause, such as individual assistance programs like the Special Supplemental Nutrition Program for Women, Infants, and Children. And the States submitted evidence showing that even after January 29, agencies understood the OMB Directive to mandate a categorical freeze of the funding streams implicated by the executive orders, while the Government offered no evidence to counter that showing. We thus do not agree that the follow-on guidance "ma[de] clear" that the Agency Defendants only were to pause funding "to the extent permissible by law."

295 F.3d 28, 33 (D.C. Cir. 2002), that principle has no relevance here. As we have explained, the District Court made a supportable finding about the content of the OMB Directive that was informed by the record evidence of the consistent way that the intended recipients of the OMB Directive understood it. And, based on that record evidence, the District Court determined that, notwithstanding the "to the extent permitted by law" language in the OMB Memorandum, OMB had ordered, through the OMB Directive, the immediate and categorical freezing of federal financial assistance that the individual Agency Defendants then implemented by imposing their own agency-wide categorical freezes. See City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1239 (9th Cir. 2018) ("Savings clauses are read in their context . . . ."); cf. Dep't of Com., 588 U.S. at 785 ("[W]e are 'not required to exhibit a naiveté from which ordinary citizens are free.'" (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2d Cir. 1977))).[8]

Moreover, we agree with the District Court that the States are likely to succeed in showing that OMB acted arbitrarily and capriciously by directing the Agency Defendants to freeze

---

[8] Because we conclude that the District Court's analysis of the States' claim that the OMB Directive and agency-wide freezes were arbitrary and capricious supports its conclusion that the States were likely to succeed on the merits of their APA claims, we do not reach the other grounds considered by the District Court -- that the funding freeze was contrary to the Impoundment Control Act and appropriation laws.

obligated funds in this immediate and categorical way.  By doing so, the District Court explained, OMB directed the Agency Defendants to freeze such funds without considering an obvious aspect of the problem -- namely, the reliance interests of the recipients of the obligated federal funds that were to be frozen. See Regents, 591 U.S. at 33 (explaining that when an agency changes course, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns").  We thus agree that the States are likely to succeed in showing that it was "arbitrary and capricious to ignore such matters."  Id. at 30 (quoting Fox Television, 556 U.S. at 15).

**V.**

The Government separately challenges the preliminary injunction based on the remaining Winter preliminary injunction factors.  See 555 U.S. at 20.  Specifically, it argues that the States failed to show that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, [or] that an injunction is in the public interest."  Id.  Once again, we disagree.

**A.**

With respect to irreparable harm, the Government argues that the States "have no cognizable interest in receiving federal

- 42 -

funds to which they are not legally entitled or on a timeline that is not legally compelled."  The argument presupposes, however, that the States are not likely to succeed on the merits of their APA claims.  But, as we have explained, the Government has failed to show that the District Court erred in ruling that the States are likely to succeed in doing just that.

The Government also argues as to "irreparable harm" that the States "can bring an action in an appropriate forum" and ultimately "will receive any funds that agencies are legally obligated to disburse."  The Government points to Department of Education, 604 U.S. at 652, which ruled that the plaintiffs there "would not suffer irreparable harm" in part because "they can recover any wrongfully withheld funds through suit in an appropriate forum."  This argument fails to account, however, for the nonpecuniary harms that the District Court found would follow from the categorical freeze of federal funds.  These harms include, among others, "catastrophic[] disrupt[ion]" to "student instruction"; possible "layoffs, reductions in service, and . . . closures" of childcare programs; and "significant[] impediments to "the delivery of basic health care services" to vulnerable populations, and "upend[ing]" state budgets and leading states to incur debts due to the unanticipated loss of obligated funds.  See Rhode Island v. Trump, 155 F.4th 35, 49 (1st Cir. 2025) (concluding that follow-on effects from loss of funding may

constitute irreparable harm and collecting cases to similar effect); cf. Dep't of Educ., 604 U.S. at 652 (basing irreparable harm conclusion in part on the plaintiffs' representation "that they have the financial wherewithal to keep their programs running").

**B.**

As for the public interest and the balance of the equities, the Government identifies three harms on their side of the scale. First, it points to "interfere[nce] with agencies' ability to exercise their lawful authorities to implement the President's policy directives," which it contends undermines the separation of powers.[9] Second, it points to the absence of any "guarantee" that funds paid to the States pursuant to the preliminary injunction "would be retrievable . . . after the fact." And, third, it points to a chilling effect on decisions by the Agency Defendants to take "legally permitted actions to review and realign funding," particularly in light of "the risk of contempt proceedings" and the preliminary injunction's assertedly "vague instructions." The Government then asserts that, collectively, these three harms are so substantial that the

---

[9] The Agency Defendants similarly suggest that harm also arises from the District Court "micromanaging the administration of federal funds."

equities weigh in its favor, seemingly even if the States are likely to show irreparable harm.

The Government would suffer the first two of these asserted harms, however, only if the preliminary injunction barred "lawful conduct."  But, as we have explained, the Government fails to show that the States are not likely to succeed on the merits of their APA claims.

That brings us to the third asserted harm -- the chilling effect -- which the Government traces to the preliminary injunction's assertedly "vague instructions."  As the Government sees it, those "instructions" give the Agency Defendants too little "guidance" as to what the preliminary injunction prohibits.

As we explained in our opinion denying a stay pending appeal, however, the injunction meets the requirements of Federal Rule of Civil Procedure 65 by describing its restraints in "reasonable detail."  New York, 133 F.4th at 72 (quoting Fed. R. Civ. P. 65(d)(1)(C)).  Contrary to the Government's supposition, the preliminary injunction does not "allow[] plaintiffs to bring all manner of funding disputes to a single district judge."  By its very terms, the preliminary injunction permits the States to bring to the District Court only those disputes in which they allege that funds are withheld "based on the OMB Directive, including funding freezes dictated, described, or implied by" the

executive orders issued by President Trump before the rescission of the OMB Memorandum.

The Government separately tries to support its claim of a chilling effect by directing our attention to the District Court's order enforcing the preliminary injunction.  It suggests that this order illustrates the broad reach of the preliminary injunction, characterizing the District Court as exercising its authority over funding decisions "when any connection can be traced back to" an executive order identified in the OMB Memorandum.  On that basis, it argues that the Agency Defendants would be chilled in their exercise of lawful authority when faced with "the risk of contempt proceedings."

In its order granting the motion to enforce, however, the District Court expressly found that FEMA's funding review process was <u>not</u> undertaken pursuant to FEMA's "independent regulatory authority."  Instead, based on the temporal proximity of FEMA's funding policy to the OMB Directive and the language of various memoranda by FEMA leadership, the District Court found that FEMA's "manual review process" was "essentially an adoption of a funding review scheme that strives to effectuate the funding mandates" in one of the executive orders identified by the OMB

Directive.[10]  Given those findings, we fail to see how that order reveals that the preliminary injunction chills the Agency Defendants' exercise of lawful conduct.

Even if we were to assume, however, that the injunction might in theory chill some lawful agency action, the Government does not meaningfully explain why that mere possibility constitutes a harm substantial enough to outweigh the harm that States allege that they will suffer from the agency actions that they challenge.  Nor does the Government explain why that mere possibility suffices to overwhelm the public interest in blocking the challenged agency actions insofar as the States are likely to succeed in showing that those actions violate the APA.  We therefore conclude that the Government has not shown that District Court abused its discretion in concluding that the remaining Winter factors support the preliminary injunction.

**VI.**

We still must address the Government's argument that the preliminary injunction is overly broad because it impermissibly orders the payment of money to remedy what are essentially contract

---

[10] The executive order was "Protecting the American People Against Invasion," Exec. Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025).  In relevant part, it directed the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement, do not receive access to Federal funds." Id. at 8446, § 17.

claims.[11]   Here, we agree that the preliminary injunction is too broad in some respects.

## A.

After the District Court entered this preliminary injunction, the Supreme Court decided Department of Education v. California, 604 U.S. 650 (2025) (per curiam), and National Institutes of Health v. American Public Health Association, 145 S. Ct. 2658 (2025).   In both cases, the federal government asked the Supreme Court to stay preliminary injunctions that vacated the termination of grants awarded by executive branch departments or agencies.   Dep't of Educ., 604 U.S. at 650; Nat'l Insts. of Health, 145 S. Ct. at 2659.   The Supreme Court granted stays with respect to the grant terminations, explaining that "[t]he [APA]'s 'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' . . . grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants."   Nat'l Insts. of Health, 145 S. Ct. at 2659 (third alteration in original) (quoting Dep't of Educ., 604 U.S. at 651); accord Dep't of Educ., 604 U.S. at 651-52.

---

[11] In its briefing, the Government framed this argument as a reason why the District Court erred in its merits analysis.  We understand the point, however, to relate to the relief ordered. See 5 U.S.C. § 702 (sovereign immunity waiver does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought").

Drawing on Department of Education and National Institutes of Health, the Government argues that the District Court "lacks the power to order direct monetary payments" to resolve "contractual disputes." That is so, the Government contends, because those decisions show that the Tucker Act, 28 U.S.C. § 1491(a)(1), requires that contract claims for payment of moneys be brought in the Court of Federal Claims. Thus, the Government argues, the District Court exceeded its authority "to the extent that contractual disputes fall within the scope of the preliminary injunction." For that reason, the Government contends, "the injunction cannot stand in its current form."

**B.**

The Tucker Act poses no bar to the first paragraph of the preliminary injunction. Nothing in that paragraph orders the payment of money. It simply prohibits the Agency Defendants "from reissuing, adopting, implementing, giving effect to, or reinstating under a different name" the OMB Directive. Cf. Nat'l Insts. of Health, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring) ("If a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward.").

The Tucker Act also does not cast doubt on the second paragraph of the preliminary injunction. That paragraph enjoins

the Agency Defendants from "pausing, freezing, blocking, canceling, suspending, terminating, or otherwise impeding the disbursement of appropriated federal funds to the States . . . based on the OMB Directive."  Read in context, that paragraph merely further specifies the portion of the preliminary injunction that bars the Agency Defendants from "implementing" or "giving effect to" the OMB Memorandum.  See Fed. R. Civ. P. 65(d)(1)(C) (requiring orders granting injunctions to "describe in reasonable detail" the restrained acts); cf. Axia Netmedia Corp. v. Mass. Tech. Park Corp., 889 F.3d 1, 12 (1st Cir. 2018) ("The specificity requirements are not merely technical but are designed to prevent uncertainty and confusion and to avoid basing a contempt citation on a decree too vague to be understood." (citation modified)).  So, we do not understand that paragraph of the preliminary injunction to order direct money payments either.

There also is no Tucker Act-based problem with the paragraph of the preliminary injunction that requires the Agency Defendants to "provide written notice" of the preliminary injunction "to all federal departments and agencies to which the OMB Directive was addressed" and to "instruct those departments and agencies that they may not take any steps to implement, give effect to, or reinstate under a different name . . . the OMB Directive."  It, too, does not order the payment of money.

The fourth paragraph of the preliminary injunction, however, is a different story.  There, the District Court ordered the Agency Defendants "to release and transmit any disbursements to the States on awarded grants, executed contracts, or other executed financial obligations that were paused on the grounds of the OMB Directive and Executive Orders included by reference therein or issued before the rescission of the OMB Directive."  In this paragraph, the District Court ordered specific performance with respect to payment to remedy the States' contractual injuries as to "awarded grants" and "executed contracts."  But, under the Supreme Court's recent pronouncements regarding the interaction between the APA and the Tucker Act, it is likely the District Court cannot do so.  See Nat'l Insts. of Health, 145 S. Ct. at 2659.

The States disagree with this conclusion.  In their view, Department of Education is distinguishable because it concerned claims challenging grant terminations as such, whereas the States' claims here do not turn on "the terms of any particular award."  Instead, the States contend, their claims only the Agency Defendants' "broad, categorical freezes on obligated funds" without review of applicable statutory, regulatory, or grant terms.

The plaintiffs' claims in National Institutes of Health, however, similarly did not turn on the terms of any particular grant awards.  Am. Pub. Health Ass'n v. Nat'l Insts. of Health,

- 51 -

145 F.4th 39, 50 (1st Cir. 2025) ("[N]either the plaintiffs' claims nor the court's orders depend on the terms or conditions of any contract."). Instead, the plaintiffs in that case, like the plaintiffs here, argued that the challenged grant terminations violated the APA and other various constitutional guarantees. Id. at 43. That the States' claims do not focus on specific, individual grants thus does not cure the likely problem with the District Court's remedy for those claims. See Nat'l Insts. of Health, 145 S. Ct. at 2658 (explaining that the APA does not grant district courts "jurisdiction to adjudicate claims based on . . . grants or to order relief designed to enforce any obligation to pay money pursuant to those grants" (emphasis added) (citation modified)). We therefore vacate the preliminary injunction to the extent that it requires the Agency Defendants to make "disbursements to the States on awarded grants" and "executed contracts."[12]

---

[12] The same portion of the preliminary injunction also uses the phrase "other executed financial obligations." It is not clear whether that phrase encompasses only payments that the Government must make to the States for their claims that concern "grants" as National Institutes of Health v. American Public Health Association, 145 S. Ct. 2658, 2659 (2025), used the term "grant" in identifying the Tucker Act problem there. It is possible that the phrase also encompasses the States' claims that seek payment for "executed financial obligations" that are materially distinguishable from the claims that concern "grants" that gave rise to the Tucker Act problem in National Institutes of Health. Indeed, the Government itself appears to be of the view that the preliminary injunction orders some payments that do not implicate

**VII.**

We now turn to FEMA's appeal of the District Court's order granting the States' motion to enforce the preliminary injunction and its denial of the Agency Defendants' motion for reconsideration. After addressing the parties' threshold dispute about whether we have jurisdiction over the appeal, we explain why we affirm the orders.

**A.**

As support for there being appellate jurisdiction, FEMA relies on 28 U.S.C. § 1292(a)(1). That provision gives federal courts of appeals subject matter jurisdiction over district court orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." FEMA asserts that we have appellate jurisdiction under § 1292(a)(1) because the District Court's orders are "better conceived" of as modifying its injunction. It appears to concede that we lack jurisdiction over those orders, however, if they "merely enforced

---

the jurisdiction of the Court of Federal Claims under the Tucker Act for claims "based on 'any express or implied contract with the United States.'" Dep't of Educ. v. California, 604 U.S. 650, 651 (2025) (quoting 28 U.S. § 1491(a)(2)). To the extent that the phrase "executed financial obligations" refers to obligations pursuant to instruments akin to the "grants" at issue in National Institutes of Health, however, we agree with the Government that it must be vacated for the reasons above. We leave any questions about the scope of this portion of the preliminary injunction to the District Court in the first instance.

[the] Preliminary Injunction."  (Alteration in original.)  For their part, the States assert that we lack jurisdiction over these orders because they "merely enforced the preliminary injunction." See Hatten-Gonzales v. Hyde, 579 F.3d 1159, 1170 (10th Cir. 2009) (explaining that appellate courts lack § 1292(a)(1) jurisdiction over an order that "enforce[s]" or "clarifie[s]," but does not "modify," a preliminary injunction); Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 759 F.3d 1333, 1340 (Fed. Cir. 2014) ("A contempt order interpreting or enforcing an injunction is generally not appealable until final judgment." (citation modified)).

Whether these orders are properly understood as "modifying" (rather than simply enforcing) the District Court's preliminary injunction is not perfectly clear.  But we can bypass the question because, even assuming that we do have appellate jurisdiction over them, FEMA's challenge to them is meritless. See Federated Mut. Ins. Co. v. Peterson's Oil Serv., Inc., 155 F.4th 1, 6 (1st Cir. 2025) ("When a case poses a question of statutory, not Article III, jurisdiction and when the decision on the merits will favor the party challenging the court's jurisdiction, we may sidestep the jurisdictional determination altogether and resolve the case by asserting hypothetical jurisdiction." (citation modified)); Akebia Therapeutics, Inc. v.

Azar, 976 F.3d 86, 91-92 (1st Cir. 2020) (relying on hypothetical statutory jurisdiction in challenge to preliminary injunction).

**B.**

FEMA argues that, under Department of Education, 604 U.S. at 651, the District Court "lacked jurisdiction" to enter one portion of the order granting the States' motion to enforce the preliminary injunction. Contrary to FEMA's theory, however, the District Court, by granting the States' motion to enforce the preliminary injunction, did not in that portion of the order impermissibly "order the payment of money under the APA." Id. In fact, that portion of the order did not require FEMA to pay any money at all.

After concluding that FEMA's "manual review process" was "essentially an adoption of a funding review scheme" enjoined by the preliminary injunction, the District Court ordered FEMA to "immediately cease" that manual review process. It also ordered FEMA to "comply with the plain text of the preliminary injunction order not to pause or otherwise impede the disbursement of appropriated federal funds to the States based on funding freezes dictated, described, or implied by Executive Orders issued by the President before the recission of the OMB [Memorandum]." The District Court then went on to order FEMA to give notice of the preliminary injunction and motion-to-enforce order "to FEMA's

leadership and all FEMA staff who administer the[] FEMA grants and other federal financial assistance" and to "file notice . . . within 10 days, evidencing its payment to the States of each of the challenged payments this Order effected."

The sole portion of the motion-to-enforce order that the Government identifies as creating a problem based on the Tucker Act is the portion that orders FEMA to "comply with the plain text of the preliminary injunction order not to pause or otherwise impede the disbursement of appropriated federal funds to the States based on funding freezes dictated, described, or implied by Executive Orders issued by the President before the recission of the OMB [Memorandum]."  As we explained in connection with our discussion of the Government's Tucker Act-based challenge to the preliminary injunction, however, "[i]f a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward."  Nat'l Insts. of Health, 145 S. Ct. at 2662 n.1 (Barrett, J., concurring).  Thus, an order prohibiting implementation of agency guidance does not create a problem based on the Tucker Act simply because the guidance "discusses internal policies related to grants."  Id. at 2661; see also Dep't of Educ., 604 U.S. at 651 ("A district court's jurisdiction is not barred by the possibility that [its] order setting aside an agency's action may result in the disbursement of funds." (citation modified)).

When read in context, the portion of the order that the Government challenges is best understood merely to restate the portion of the preliminary injunction that, as we explained above, bars the Agency Defendants from "implementing" or "giving effect to" the proscribed funding freezes.  As we also explained above, that portion of the preliminary injunction is not itself an order "to enforce a contractual obligation to pay money."  Dep't of Educ., 604 U.S. at 651 (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002)); see also Nat'l Insts. of Health, 145 S. Ct. at 2661 (Barrett, J., concurring) ("Even if the guidance and grant terminations are linked, vacating the guidance does not necessarily void decisions made under it . . . .").  It therefore follows that this portion of the motion-to-enforce order also is not an order "to enforce a contractual obligation to pay money."  Dep't of Educ., 604 U.S. at 651 (quoting Great-West Life & Annuity Ins. Co., 534 U.S. at 212).

We therefore conclude that the Government has not shown that the District Court abused its discretion in issuing the order granting the motion to enforce the preliminary injunction against FEMA.[13]  Nor do we see any abuse of discretion in the order denying FEMA's motion for reconsideration of that order.

---

[13]  To be sure, the order does require FEMA to "file notice . . . evidencing its payment to the States of each of the challenged payments this Order effected."  But, consistent with

- 57 -

**VIII.**

The March 6, 2025 preliminary injunction is **affirmed in part** and **vacated in part**, and the April 4, 2025 and April 14, 2025 orders are **affirmed**.

---

our understanding that the only portion of the order that the Government identifies as giving rise to a Tucker Act problem does not itself direct FEMA to make any payments, FEMA does not identify this portion of the order as independently giving rise to such a problem.